No. 21-1832

# In The United States Court of Appeals
# For the Third Circuit

MADISON M. LARA, SOPHIA KNEPLEY, LOGAN D. MILLER, SECOND AMENDMENT FOUNDATION, INC., AND FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

v.

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA (20-cv-1582)
(Hon. William S. Stickman, IV, Presiding)

## BRIEF OF PLAINTIFFS-APPELLANTS

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@CivilRightsDefenseFirm.com
(888) 202-9297
(610) 400-8439 (fax)

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

**United States Court of Appeals for the Third Circuit**

**<u>Corporate Disclosure Statement and
Statement of Financial Interest</u>**

No. <u>21-1832</u>

Madison M. Lara, Sophia Knepley, Logan D. Miller, Second
Amendment Foundation, Inc., and Firearms Policy Coalition, Inc.

v.

Commissioner Pennsylvania State Police

<u>Instructions</u>

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Second Amendment Foundation, Inc.
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations:
      None.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:
None.

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:
None.

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.
N/A

s/ David H. Thompson
_____
(Signature of Counsel or Party)

Dated: 06/23/21
_____

**rev: 09/2014**                (Page 2 of 2)

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

No. <u>21-1832</u>

Madison M. Lara, Sophia Knepley, Logan D. Miller, Second
Amendment Foundation, Inc., and Firearms Policy Coalition, Inc.

v.

Commissioner Pennsylvania State Police

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

## Firearms Policy Coalition, Inc.
(Name of Party)

    1) For non-governmental corporate parties please list all parent corporations:

None.

    2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None.

    3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

    4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

N/A

## s/ David H. Thompson
(Signature of Counsel or Party)

Dated: 06/23/21

**rev: 09/2014**                 (Page 2 of 2)

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT ..................................................................3

ISSUES PRESENTED.......................................................................................4

STATEMENT OF RELATED CASES ..............................................................4

STATEMENT OF THE CASE...........................................................................5

I.      Pennsylvania's restrictions on the carrying of firearms by
        18-to-20-year-olds. ................................................................................5

II.     The effect on Plaintiffs. .........................................................................7

III.    Proceedings below. .................................................................................8

SUMMARY OF THE ARGUMENT .................................................................9

ARGUMENT ...................................................................................................10

I.      Standard of review. ...............................................................................10

II.     The Second Amendment protects the right of 18-to-20-year-old
        law-abiding adults to carry firearms outside the home. ..............11

        A.      The right to keep and bear arms extends outside the home. ...............12

        B.      The Second Amendment extends to 18-to-20-year-old adults. ..........21

III.    The Pennsylvania laws barring 18-to-20-year-old citizens from carrying
        firearms are categorically unconstitutional. ..................................37

IV.     Pennsylvania's age-ban fails any level of heightened constitutional
        scrutiny.................................................................................................42

i

A.     Strict scrutiny applies. ...................................................43

B.     The challenged laws fail even intermediate scrutiny. ........................44

V.     In the alternative, the Court at a minimum should reverse the district court's refusal to grant preliminary injunctive relief....................................50

CONCLUSION .................................................................................51

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen.*
*New Jersey*, 910 F.3d 106 (3d Cir. 2018) ...................................................44

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) ...................................15

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) .....................................18

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016) .............................49

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) .....................................13

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ..........44

*Commonwealth v. Goosby*, 380 A.2d 802 (1977).....................................39, 40

*Commonwealth v. Hopkins*, 747 A.2d 910 (Pa. Super. Ct. 2000) ............40

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)............51

*Craig v. Boren*, 429 U.S. 190 (1976)........................................................46

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................*passim*

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .....................................13, 37

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) .........................20

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...........................50

*Folajtar v. Attorney Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020) .........30

*Gamble v. United States*, 139 S. Ct. 1960 (2019)....................................36

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016).......44

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............11

*Hernandez-Morales v. Attorney Gen.*, 977 F.3d 247 (3d Cir. 2020)........10, 11

*Hodgson v. Minnesota*, 497 U.S. 417 (1990).........................................46

*Issa v. School Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017) .......50, 51

*Jones v. Becerra*, 498 F. Supp. 3d 1317 (S.D. Cal. 2020)......................28

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
710 F.3d 99 (3d Cir. 2013) ...............................................................50, 51

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)..........14

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)...................................31, 32

iii

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) ........................................................50

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ..................................................48, 49

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............... 15, 21, 30, 38, 43, 46

*Mitchell v. Atkins*, 483 F. Supp. 3d 985 (W.D. Wash. 2020) .................................28

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..........................12, 14, 15, 42, 43

*National Rifle Ass'n of America, Inc., v. BATFE*,
    700 F.3d 185 (5th Cir. 2012) ........................................ 28, 29, 30, 31, 32, 33, 34

*National Rifle Ass'n of America, Inc. v. BATFE*,
    714 F.3d 334 (5th Cir. 2013) ..........................................................................33, 34

*National Rifle Ass'n of America, Inc. v. McCraw*,
    719 F.3d 338 (5th Cir. 2013) ...............................................................................28

*Nunn v. State*, 1 Ga. 243 (1846)...............................................................13, 14, 18

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).............................24

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) .............................18

*Planned Parenthood v. Danforth*, 428 U.S. 52 (1976)...........................................22

*Powell v. Tompkins*, 926 F. Supp. 2d 367 (D. Mass. 2013) ...................................28

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ................................10, 11

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686)........................................................16

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .............................43

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) .................................................49

*Simpson v. State*, 13 Tenn. 356 (1833) ..................................................................19

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ............................................19

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975)............................46

*State v. Huntly*, 25 N.C. 418 (1843)........................................................................19

*State v. Reid*, 1 Ala. 612 (1840) .............................................................................18

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)................................11, 12

*United States v. Miller*, 307 U.S. 174 (1939) ........................................................26

*United States v. Virginia*, 518 U.S. 515 (1996).....................................................44

*Watters v. Board of Sch. Dir. of City of Scranton*,
    975 F.3d 406 (3d Cir. 2020) ................................................................................10

*Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013) ...............................................14

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ......13, 14, 42, 44, 51

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) ......................................................14

**Constitutional Provisions, Statutes and Legislative Materials, and Rules**

U.S. CONST. amend. II ..............................................................................1, 9, 12, 21

U.S. CONST. art. I, § 8, cl. 16 ....................................................................................23

10 U.S.C. § 246(a) .....................................................................................................2

50 U.S.C. § 3802(a) ...................................................................................................2

18 PA. C.S.

    § 6106 ...............................................................................................................4
    § 6106(a)(1) .......................................................................................................5
    § 6106(b)(8) .....................................................................................................40
    § 6107 ........................................................................................................4, 5, 6
    § 6107(a) ............................................................................................................3
    § 6107(a)(1) ......................................................................................................40
    § 6109 ...................................................................................................4, 5, 6, 7
    § 6109(b) ......................................................................................................7, 37
    § 6109(e) ............................................................................................................7

51 PA. C.S. § 301(a)(1) .............................................................................................26

1 Stat. 271 (1792) .........................................................................................1, 23, 24

2021 Pa. Laws 1753, *available at* https://bit.ly/3gnAZxi .......................................6

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) ................................................20

An Act To Punish Certain Offences Therein Named, and for Other Purposes,
    ch. 23, § 1, 1865 Miss. Laws 165 ...............................................................20, 21

2 Edw. 3, 258, c. 3 (1328) ........................................................................................18

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy) ....21

2 ANNALS OF CONGRESS (Joseph Gales ed., 1834) ...........................................24, 25

FED. R. CIV. P. 12(b)(6) ..............................................................................................8

FED. R. EVID. 201, Advisory Committee Note (1972) .............................................42

**Other Authorities**

John Adams, *Argument for the Defense: 3-4 December 1770,*
    NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh ...........................17

3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS (L.H. Butterfield ed., 1961)........17

1 WILLIAM BLACKSTONE, COMMENTARIES ...............................................32

4 WILLIAM BLACKSTONE, COMMENTARIES ...............................................15

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803).............16

Bureau of Justice Statistics, *Percent of violent victimizations by location of incident, 1993-2019*, (Nov. 11, 2020), www.bjs.gov ..........................................15

THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA (1880).......................................................21

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991)..................20, 21

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893)......................17

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906).....21

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) ............................................................................15, 16, 19

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822) ..............................................................................19

WALTER ISAACSON, BENJAMIN FRANKLIN (2004)...............................17, 18

1 THE WRITINGS OF THOMAS JEFFERSON (letter of Aug. 19, 1785) (H. A. Washington ed., 1884)...................................................................17

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012)..............................................................16

Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204 (1983) ...........................25, 26

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)..................................................................................47

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998)..................................................................................47

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119 (2018) .......................................................36

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 49 (2019) ........................25, 26, 27, 31

WILLIAM LAMBARD, EIRENARCHA (1588) ................................................19

1 THE PAPERS OF JAMES MADISON
(William T. Hutchinson & William M.E. Rachal eds, 1962)............................17

TIM MCGRATH, JAMES MONROE (2020) ................................................18

*Firearms*, Monticello, https://goo.gl/W6FSpM........................................17

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE:
A CRITICAL REVIEW (2005) ...............................................................47

*A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* LES ADAMS, THE SECOND AMENDMENT PRIMER 121 (1996) ........23

HARLOW GILES UNGER, LION OF LIBERTY (2010)........................................18

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gpBXYw...............................................................45

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2018, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3vuWX5z ...............................................................45

Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2017, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gwxkx0 ...............................................................45

*Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).........25

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) ........19

Gov. Tom Wolf, *Amendment to Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE GOVERNOR (May 7, 2021), https://bit.ly/3iG9AYY ...............................................................6

Gov. Tom Wolf, *Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE GOVERNOR (Jan. 10, 2018), https://bit.ly/3ljNBoX ...............................................................6

11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2021)...............................................................50

**INTRODUCTION**

The Second Amendment right "to keep and bear Arms," U.S. CONST. amend. II, guarantees "the individual right to possess and carry weapons in case of confrontation," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). The text and history of that provision, as well as binding precedent, demonstrate that it applies outside the home. Yet, the Pennsylvania provisions challenged here, taken together, *categorically forbid* an entire class of law-abiding adults—those who are 18-to-20 years old—from carrying loaded, operable firearms outside their homes (or places of business), for no other or better reason than the ongoing "state of emergency" due to the now-three-year-old opioid crisis. The problem of opioid addiction obviously does not justify special, draconian limits on the Second Amendment right of 18-to-20-year-olds to bear arms, and this Court should strike down the challenged restrictions.

The Second Amendment right to keep and bear arms belongs to "the people" as a whole, U.S. CONST. amend. II, not the subset of the people who have attained the age of 21. And the history and tradition of the right leaves no doubt that it fully vests by age 18. Indeed, just months after ratification of the Second Amendment, Congress enacted the Militia Act of 1792, which required all able-bodied men to enroll in the militia and to arm themselves upon turning 18. 1 Stat. 271 (1792). This Act reflected the widespread understanding that citizens reached the age for militia

1

membership by 18—an understanding that simply cannot be squared with the notion these able-bodied 18-year-olds were outside the Second Amendment's protective scope. After all, "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms" was the *very* "*reason that right [to keep and bear arms] was codified in a written Constitution.*" *Heller*, 554 U.S. at 599 (emphasis added).

At age 18, Plaintiffs were deemed adults for almost all purposes and certainly for the purpose of exercising constitutional rights. They became eligible to serve in the military—to fight and die by arms for the country. Indeed, upon reaching 17, Plaintiff Miller was designated a member of the militia by federal statute, 10 U.S.C. § 246(a), and at 18 he was required to register for potential conscription to bear arms on behalf of his country, 50 U.S.C. § 3802(a). But under the provisions challenged here, he and other 18-to-20-year-old Pennsylvanians are presently forbidden to carry operable firearms outside their homes for "the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

There is no reasoned public-safety justification for this ban. Current FBI statistics indicate that 18-to-20-year-olds are arrested for violent crimes no more frequently than, say, 21-year-olds—and the percentage of wrongdoers in this age bracket who *do* commit violent crimes is an infinitesimal fraction of the age group as a whole. Indeed, Pennsylvania *recognizes as much*, since it ordinarily *freely*

*allows* 18-to-20-year-olds to carry firearms in public openly (with the exception of in Philadelphia), *without even requiring them to obtain a license*. It is only because of the currently active "state of emergency" arising from the opioid epidemic—which triggers a statutory provision that effectively bans 18-to-20-year-olds from carrying firearms, 18 PA. C.S. § 6107(a)—that Plaintiffs and others in their age group are prohibited from exercising their Second Amendment right to bear arms. Under the Supreme Court's reasoning in *Heller*, this flat ban prohibiting virtually all 18-to-20-year-old law-abiding citizens from bearing arms should be struck down categorically. And even setting *Heller*'s categorical test aside, and without diminishing the urgency of combatting opioid addiction, the notion that this public health crises justifies banning an entire class of law-abiding citizens from "carry[ing] weapons in case of confrontation," *Heller*, 554 U.S. 592, does not pass even rational basis review, much less the heightened scrutiny that must, at a minimum, apply where fundamental constitutional rights are at stake.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this case involves a constitutional challenge to 18 PA. C.S. §§ 6106, 6107, and 6109. On April 16, 2021, the District Court entered an opinion, order, and judgment denying Appellants' motion for a preliminary injunction and granting Appellee's motion to dismiss all claims as to all parties. JA3–25, 26, 27. Appellants

3

filed a timely notice of appeal on April 23, 2021. JA1. This Court has jurisdiction over the district court's denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1), and over the district court's final order of dismissal under 28 U.S.D. § 1291.

## ISSUES PRESENTED

Whether Pennsylvania's regulatory scheme restricting 18-to-20-year-old adults from carrying and transporting firearms in public for the purpose of self-defense—in particular, 18 PA. C.S. §§ 6106, 6107, and 6109, together with the Governor's Proclamation of Disaster Emergency initially issued on January 10, 2018—violates the Second Amendment, as applicable against the State under the Fourteenth Amendment of the United States Constitution. Issue raised: JA60–70 (Complaint). Issue ruled upon: JA8–24 (Opinion).

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. Appellants are aware of no other pending cases or proceedings challenging the constitutionality of 18 PA. C.S. §§ 6106, 6107, or 6109. The United States District Court for the Southern District of California is currently considering a Second Amendment challenge to California's restrictions on the ability of 18-to-20-year-olds to acquire firearms, *Jones v. Becerra*, 19-cv-1226 (S.D. Cal.), and the Ninth Circuit is currently

considering an interlocutory appeal arising out of the district court's refusal to grant a preliminary injunction in that proceeding, *Jones v. Becerra*, 20-56174 (9th Cir.).

**STATEMENT OF THE CASE**

**I.     Pennsylvania's restrictions on the carrying of firearms by 18-to-20-year-olds.**

Pennsylvania generally requires a license to carry a concealed firearm in public. Under 18 PA. C.S. § 6106(a)(1), "any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under [18 PA. C.S. § 6109] commits a felony of the third degree." Section 6106(b) provides a number of exceptions to this requirement—for law-enforcement officers, members of the military, and the like—but these exceptions do not provide the typical, law-abiding Pennsylvanian with the ability to carry a concealed, loaded, and operable firearm for most lawful purposes, including self-defense.

Section 6106's licensing requirement does not apply to carrying firearms *openly*, so it ordinarily does not deprive those citizens unable to obtain a concealed-carry license of the ability to carry a firearm in at least *some* manner. Section 6107, however, provides that "[n]o person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive unless that person is" either "[a]ctively engaged" in self-defense or possesses a concealed carry license issued under Section 6109. 18 PA.

C.S. § 6107. Pennsylvania is currently under a proclaimed "state of emergency" relating to the opioid epidemic, which was first proclaimed over three years ago on January 10, 2018[1] and has since been renewed over a dozen times, most recently in an amendment on May 7 that extended the state of emergency until August 5, 2021.[2] Since Section 6107 limits *all* forms of carrying firearms in public—whether open or concealed—its effect, in conjunction with this declaration of emergency, is to require all ordinary citizens to obtain a license before carrying a firearm for most lawful purposes, including the purpose "of being armed and ready . . . in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)).

The availability of the license required by Sections 6106 and 6107 is governed by 18 PA. C.S. § 6109. Section 6109 provides that an individual seeking a concealed carry license must submit an application to his local sheriff, who is then required to investigate the applicant's criminal history, character, and reputation, to ensure that

---

[1] Gov. Tom Wolf, *Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE GOVERNOR (Jan. 10, 2018), https://bit.ly/3ljNBoX.

[2] Gov. Tom Wolf, *Amendment to Proclamation of Disaster Emergency*, COMMONWEALTH OF PENNSYLVANIA OFFICE OF THE GOVERNOR (May 7, 2021), https://bit.ly/3iG9AYY. At the time of the district court's decision, Pennsylvania was also under a proclaimed state of emergency related to the COVID-19 pandemic, JA4 (Opinion), but the Pennsylvania legislature voted to terminate that emergency declaration on June 10, 2021. 2021 Pa. Laws 1753, *available at* https://bit.ly/3gnAZxi.

he meets a number of statutory requirements, including the absence of any mental illness or conviction for certain controlled-substance violations or any crime carrying a sentence exceeding one year. *See id.* § 6109 (e)(1). Importantly for present purposes, Section 6109 limits the availability of a concealed carry license to "[a]n individual who is 21 years of age or older." *Id.* § 6109(b).

Taken together, Sections 6106, 6107, and 6109—in conjunction with the Governor's ongoing, statewide emergency declaration—thus operate to bar virtually all 18-to-20-year-old adult Pennsylvanians from carrying loaded, operable firearms for most lawful purposes, including the purpose of being prepared to defend themselves and their families from violent assault.

## II.    The effect on Plaintiffs.

Plaintiffs Lara and Knepley are United States Citizens and residents of Pennsylvania. JA39–41 (Complaint), 102, 108, 114 (Declarations). They are over the age of 18 but under the age of 21. JA102, 108, 114 (Declarations). But for their ages, Plaintiffs Lara and Knepley meet the requirements for the issuance of a concealed carry license set forth in 18 PA. C.S. § 6109(e), and would thus be eligible to obtain a license under Section 6109. JA102–03, 104–05, 108–09, 110–11, 114–15, 116–17 (Declarations). Each of the Plaintiffs wishes to carry loaded, operable firearms outside their homes and places of business for lawful purposes, including the purpose of being armed and ready for self-defense, JA103, 109, 115

7

(Declarations), and if it were not for the challenged provisions of Sections 6106, 6107, and 6109, they would do so—either openly or by obtaining a concealed-carry license, JA106–07, 112–13, 118–19 (Declarations).[3]

## III. Proceedings below.

Plaintiffs brought suit on October 16, 2020, challenging as unconstitutional under the Second Amendment the combined force of Sections 6106, 6107, and 6109, which—in conjunction with the ongoing declared state of emergency—have the effect of completely foreclosing them from carrying firearms in most public places for lawful purposes like self-defense. JA32–75 (Complaint). They moved for a preliminary injunction on December 1. The State responded by moving to dismiss Plaintiffs' claims under FED. R. CIV. P. 12(b)(6). JA133.

On April 16, the district court denied Plaintiffs' motion for a preliminary injunction and granted the State's motion to dismiss. JA26 (Order). Citing the "broad consensus" of non-binding decisions from other federal courts "that restrictions on firearm ownership, possession and use for people younger than 21 fall within the types of 'longstanding' and 'presumptively lawful' regulations envisioned by *Heller*," as well as this Court's past decisions from other contexts "giv[ing] broad

---

[3] Associational Plaintiffs Second Amendment Foundation and Firearms Policy Coalition likewise have members in Pennsylvania who are 18 to 20 years old, wish to carry loaded firearms in public for lawful purposes including self-defense, and would do so but for the challenged provisions. JA122, 127 (Declarations). An additional Plaintiff, Miller, recently turned 21.

construction to *Heller*'s recognition of 'longstanding' and 'presumptively valid regulatory measures' in the context of licensing requirements," the court concluded that Pennsylvania's restrictions "fall outside the scope of the Second Amendment." JA5, 20 (Opinion). The court accordingly declined to inquire whether the challenged restrictions satisfy the applicable level of constitutional scrutiny. JA24 n.8 (Opinion).

## SUMMARY OF THE ARGUMENT

The text and history of the Second Amendment make clear that it protects the right of law-abiding 18-to-20-year-olds to carry operable firearms. The right "to keep *and bear* Arms" necessarily protects a right to carry arms in public for lawful purposes, not just keep them in the home. U.S. CONST. amend. II. And by the Second Amendment's plain text and history, these protections extend to "the people" *as a whole*, *id.*—including 18-to-20-year-olds.

Pennsylvania effectively bans virtually all 18-to-20-year-olds from carrying firearms outside the home for most lawful purposes, and under *Heller* that ban should be invalidated categorically. Even if not struck down categorically, the challenged provisions should at a minimum be subjected to strict scrutiny. Nevertheless, those provisions cannot withstand even intermediate scrutiny. There is no evidence in the record (or elsewhere) that Pennsylvania's age ban will advance the State's public-safety objectives of reducing gun violence. There is, however,

substantial evidence that it will hinder public safety by depriving individuals who are disproportionately at risk of facing violence of their preferred means of self-defense. In any event, the ban burdens substantially more conduct than is necessary to advance the stated goal of ensuring public safety during the opioid epidemic, and for that reason alone, it is unconstitutional.

## ARGUMENT

### I.    Standard of review.

When reviewing a district court's order dismissing a case pursuant to Rule 12(b)(6), this Court must "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it contain enough facts to state a claim to relief that is plausible on its face." *Watters v. Board of Sch. Dir. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020) (cleaned up). Whether the Second Amendment protects the conduct that 18 PA. C.S. §§ 6106, 6107, and 6109 prohibit Plaintiffs from engaging in is a question of law that this Court reviews *de novo*. *Hernandez-Morales v. Attorney General*, 977 F.3d 247, 249 (3d Cir. 2020).

When reviewing a district court's refusal to grant a preliminary injunction, the Court inquires whether the movant has shown "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

In addition, the Court, "in considering whether to grant a[n] . . . injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. The movant need only meet the first two factors, after which a court balances all the factors, and the first factor is met where the prospect of success on merits is "significantly better than negligible." *Id.* at 179 & n.3. Again, this Court reviews questions of law—including whether the Second Amendment protects the conduct at issue—*de novo*. *Hernandez-Morales*, 977 F.3d at 249.

This Court has established "a two-pronged approach to Second Amendment challenges." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). "First, [courts] ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee . . . . [Second,] [i]f it does, [they] evaluate the law under some form of means-end scrutiny."[4] *Id.*

## II.    The Second Amendment protects the right of 18-to-20-year-old law-abiding adults to carry firearms outside the home.

Because the challenged statutory provisions ban virtually all 18-to-20-year-olds from carrying firearms outside the home (or their places of business) for self-defense, whether it burdens "conduct falling within the scope of the Second

---

[4] Plaintiffs reserve the right to argue in subsequent proceedings that a tiers-of-scrutiny approach is not appropriate in Second Amendment cases like this one. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1271–85 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Amendment's guarantee," *id.*, depends on the questions whether that guarantee (1) protects the right to carry firearms in public, and (2) applies to law-abiding 18-to-20-year-old citizens. The answer to both questions is yes.

**A. The right to keep and bear arms extends outside the home.**

1.      The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home.

2.      Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Moore*, 702 F.3d at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case

12

of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello*, 524 U.S. at 143 (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, 1 Ga. 243 (1846), a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

In *Drake v. Filko*, this Court "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," choosing instead to assume for the sake of analysis that the Amendment has "some application beyond the home." 724 F.3d 426, 431 (3d Cir. 2013). That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-

defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And several others have assumed that the Second Amendment applies outside the home. *See Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013); *Kachalsky v. County of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *but compare Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (en banc) (holding that the Second Amendment does not protect a right to carry firearms in public), *with id.* at 830 (O'Scannlain, J., dissenting) ("[T]he majority has declared that a state may constitutionally *forbid* all public carry of firearms, based on the utterly inconsequential fact that the lawful *manner* of open public carry has historically been subject to modest regulation (but never to outright prohibition).").

3.     The Second Amendment's purposes show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, and discussed at greater length below, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn*, 1 Ga. at 251), for citizens prohibited from carrying arms in public could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and

hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms within their homes. And the same reasoning applies with even more force to the right to self-defense—"the *central component*" of the Second Amendment, *id.* at 599—which "is as important outside the home as inside," *Moore*, 702 F.3d at 942. Indeed, according to 2019 nationwide data from the Bureau of Justice Statistics, less than a third of violent crimes occur in or near the victim's home.[5]

4.      Finally, the historical understanding of the right to keep and bear arms confirms that it extends outside the home. As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him,"

---

[5] Bureau of Justice Statistics, *Percent of violent victimizations by location of incident, 1993-2019*, (Nov. 11, 2020), generated using the NCVS Victimization Analysis Tool at www.bjs.gov.

15

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716). And because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it necessarily conferred a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

16

The practices of the Founding generation confirm that the right to carry arms was well-established:

- George Washington carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893).

- Thomas Jefferson advised his nephew to "[l]et your gun … be the *constant* companion of your walks," 1 THE WRITINGS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884) (emphasis added), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://goo.gl/W6FSpM.

- James Madison used arms sufficiently frequently to develop a good enough aim that he "should not often miss . . . on a fair trial at [100 yards'] distance." 1 THE PAPERS OF JAMES MADISON 151–54 (William T. Hutchinson & William M.E. Rachal eds, 1962).

- In defending the British soldiers charged in the Boston Massacre, rather than arguing that the colonists who clashed with his clients had no right to bear arms in public, John Adams conceded that, in this country, "every private person is authorized to arm himself and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence," John Adams, *Argument for the Defense: 3-4 December 1770*, NAT'L ARCHIVES FOUNDERS ONLINE, https://bit.ly/35FCuRh.

- Adams spoke from experience: as a schoolboy he was so fond of shooting for sport that he used to take his gun "to school and leave it in the entry and the moment it was over went into the field to kill crows and squirrels." 3 DIARY AND AUTOBIOGRAPHY OF JOHN ADAMS 257–61 (L.H. Butterfield ed., 1961). When the schoolteacher "found this out and gave [him] a most dreadful scolding" he instead took to leaving his gun "at an old woman's in the neighborhood." *Id.*

- In 1765, an angry mob besieged Benjamin Franklin's home while he was away in London, forcing his wife Deborah to call upon local

17

friends and relatives "to fetch a gun or two" and rally to defend the home. WALTER ISAACSON, BENJAMIN FRANKLIN 224–25 (2004).

- As an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30, 53 (2010).

- James Monroe, likewise, was accustomed to carrying his "musket slung across his back" on his way to school in the 1760s. TIM MCGRATH, JAMES MONROE 9 (2020).

This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-history of the Second Amendment, the medieval Statute of Northampton provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But by the seventeenth century the courts and commentators had conclusively interpreted the

18

provision as limited to "prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this rule was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136.

Early American courts and commentators shared this understanding. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

This reading of the Second Amendment persisted throughout the nineteenth century. Reconstruction Era views are "instructive" evidence of the Second

19

Amendment's scope because they reflect "*the public understanding* of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. Those who wrote and ratified the Fourteenth Amendment understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed at every turn to prevent their enslaved and free black populations from bearing arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 160 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857). After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An

Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Similar restrictions were enacted in Louisiana and Alabama, Cottrol & Diamond, *supra*, at 344–45, and throughout the South, 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

**B. The Second Amendment extends to 18-to-20-year-old adults.**

The text and history of the Second Amendment make equally clear that the rights it protects—including the right to bear arms outside the home for self-defense—are fully vested by age 18.

1.    The Second Amendment protects "the right *of the people* to keep and bear Arms," U.S. CONST. amend. II (emphasis added), and the "people" referred to in the Bill of Rights have always been understood to be "the whole people," THOMAS MCINTYRE COOLEY, GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 267–68 (1880); *see also Heller*, 554 U.S. at 580. *Heller*

21

accordingly held that "the Second Amendment right is exercised individually and belongs to all Americans" and cannot be limited to "an unspecified subset." *Id.* at 580, 581. " 'The right of the whole people, *old and young, men, women and boys, and not militia only*, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree.' " *Id.* at 612–13 (quoting with approval *Nunn*, 1 Ga. at 250 (emphasis added)).

2.      Founding-Era history and tradition confirm that 18-to-20-year-old adult citizens fall squarely within the Second Amendment's protective sphere. To be sure, the rights of actual *children* may be restricted in ways that adults' may not. *See Planned Parenthood v. Danforth*, 428 U.S. 52, 72–75 (1976). But Founding-Era history demonstrates that 18-to-20-year-olds are not to be treated as children for purposes of the Second Amendment.

The strongest evidence on this point comes from the Founding-Era understanding of militia service. Although the Second Amendment's prefatory clause cannot be read to "limit or expand the scope of the operative clause," "[l]ogic demands that there be a link between the stated purpose and the command." *Heller*, 554 U.S. at 577, 578. The prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 595,

22

599. Therefore, the Framers' understanding of the militia is highly probative in determining whether 18-to-20-year-olds enjoy Second Amendment rights. After all, if this class of adult citizens were originally understood to be *capable* of keeping and bearing arms—and were in fact *required by law to do so* as part of their militia service—it necessarily follows that these 18-to-20-year-old citizens also *enjoyed a Second Amendment right* to engage in this conduct. *See A Pennsylvanian*, THE PENNSYLVANIA GAZETTE (Philadelphia, Feb. 20, 1788), *reprinted in* LES ADAMS, THE SECOND AMENDMENT PRIMER 121 (1996) ("The militia of these free commonwealths, entitled and accustomed to their arms, when compared to any possible army, must be tremendous and irresistible. . . . Congress ha[s] no power to disarm the militia."). For it would simply make no sense to enumerate a constitutional right to arms for the purpose of ensuring an armed militia if that right did not protect *the militia's own members*.

There is no doubt that 18-to-20-year-olds were understood to be part of the militia at the time the Second Amendment was adopted. This is apparent from Congress's initial exercise of its power to "provide for organizing, arming, and disciplining, the militia." U.S. CONST. art. I, § 8, cl. 16. On May 8, 1792, mere months after ratification of the Second Amendment, Congress passed an Act providing that "every free able-bodied white male citizen . . . *who is or shall be of the age of eighteen years*, and under the age of forty-five years (except as is herein

after excepted) shall severally and respectively be enrolled in the militia." 1 Stat. 271 ("Militia Act") (emphasis added). Because the term " 'militia' means the same thing in Article I and the Second Amendment," Congress's authority over the militia under Article I, Section 8 extends *only* to the same "body" or "pool" of Americans who constitute the militia for purposes of the Second Amendment—and who hence are among those entitled to keep and bear arms: namely, "all able-bodied men." *Heller*, 554 U.S. at 596.

As a contemporaneous act of Congress, the Militia Act provides extraordinarily powerful evidence that Second Amendment rights vest at age 18. "[M]any of the members of the Second Congress were also members of the First, which had drafted the Bill of Rights. But more importantly, they were conversant with the common understanding of both the First Congress and the ratifying state legislatures as to what was meant by 'Militia' in the Second Amendment." *Parker v. District of Columbia*, 478 F.3d 370, 387 (D.C. Cir. 2007), *aff'd by Heller*, 554 U.S. 570.

The legislative history of the Militia Act lends further support. In 1790, Secretary of War Henry Knox submitted a militia plan to Congress providing that "all men of the legal military age should be armed," and that "[t]he period of life in which military service shall be required of the citizens of the United States [was] to commence at eighteen." 2 ANNALS OF CONGRESS 2146 (Joseph Gales ed., 1834).

24

Acknowledging that "military age has generally commenced at sixteen," Secretary Knox instead drew the line at 18 because "the youth of sixteen do not commonly attain such a degree of robust strength as to enable them to sustain without injury the hardships incident to the field." *Id*. at 2153. Representative Jackson explained "that from eighteen to twenty-one was found to be the *best* age to make soldiers of." *Id*. at 1860 (emphasis added).

Eighteen is also the age that George Washington recommended for beginning militia enrollment. In an enclosure to a 1783 letter to Alexander Hamilton, General Washington—who as President signed the 1792 Militia Act into law—wrote that "the Citizens of America . . . from 18 to 50 Years of Age should be borne on the Militia Rolls" and "so far accustomed to the use of [Arms] that the Total strength of the Country might be called forth at a Short Notice on any very interesting Emergency." *Sentiments on a Peace Establishment* (May 2, 1783), *reprinted in* 26 THE WRITINGS OF GEORGE WASHINGTON 389 (John C. Fitzpatrick, ed. 1938).

State militia laws enacted around the time of the Second Amendment provide additional evidence. Minimum enrollment ages ranged from 16 to 18. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 533–89 (2019).

There was thus a consensus in the States that, by age 18, individuals were able to, and hence entitled to, bear arms. This followed colonial practice: "From the

25

earliest times the duty to possess arms was imposed on the entire colonial populace, with actual militia service contemplated for every male of 15, 16, or 18 through 45, 50, or 60 (depending on the colony)." Don B. Kates Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 215 n.46 (1983). Plaintiffs are unaware of even a single State that exempted 18-to-20-year-olds from militia service at the time the Second Amendment was ratified. Indeed, a comprehensive survey of over 250 separate state and colonial provisions enacted from the seventeenth through the end of the eighteenth century found that the minimum "age for militia duty" was most commonly either 16 or 18, "and never higher (except for one 19-year period in Virginia [between 1738 and 1757])." Kopel & Greenlee, *Second Amendment Rights*, *supra*, at 533. *cf.* 51 PA. C.S. § 301(a)(1) (declaring the Militia of the Commonwealth to consist of able-bodied persons "17 years six months of age and . . . not more than 55 years of age . . .").

The Supreme Court has recognized that *militia membership presupposed firearm possession,* because "when called for service these men were expected to appear bearing arms supplied by *themselves*." *United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added). This is illustrated by the Militia Act, which required each enrollee, regardless of age, to "provide himself with a good musket or firelock." 1 Stat. 271. Several state laws contained similar provisions. Kopel & Greenlee, *Second Amendment Rights*, *supra*, at 507–08. These requirements confirm the

Founders' shared understanding that Second Amendment rights vest at 18, because they demonstrate that, by that age, individuals not only (i) were entrusted with using firearms in connection with organized militia activities, but also (ii) were expected to *keep and maintain those arms as private citizens*.

Numerous other laws in place at or near the adoption of the Second Amendment also required able-bodied 18-to-20-year-olds to keep and carry firearms for certain non-militia purposes. At common law, for example, by the age of 18 men "were obliged to join in the 'hue and cry' (*hutesium et clamor*) to pursue fleeing criminals." *Id.* at 534. They were likewise obligated to serve in the *posse comitatus* to "assist in keeping the peace" or "suppress[ing] a riot." *See id.* Again, if 18-to-20-year-olds were *legally required* to keep and bear arms for these purposes, they plainly were understood to *have a right to do so*.

By contrast to this bulk of historical evidence that law-abiding 18-to-20-year-old citizens were understood at the Founding to be part of "the people" for purposes of the Second Amendment's protections, the district court did not identify, and we are not aware of, *any evidence whatsoever* of colonial or Founding-era laws prohibiting the carrying of firearms by adults aged 18 or over because of their age.

3.      The district court nonetheless concluded that "age-related restrictions" are "within the class of 'presumptively lawful regulatory measures' that are,

27

therefore, outside the scope of the Second Amendment." JA15 (Opinion). That was error.

The court below *simply ignored* the great bulk of the historical evidence discussed above. Instead of analyzing this evidence or conducting any meaningful historical analysis of its own, it principally supported its conclusion by simply parroting the Fifth Circuit's reasoning that federal limits on the sale of handguns to 18-to-20-year-olds purportedly were "consistent with a longstanding tradition of age and safety-based restrictions on the ability to access arms." JA17 (Opinion) (quoting *National Rifle Ass'n of America, Inc., v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012) ("*NRA*")). The court attempted to bolster its reliance on *NRA* by invoking a "consensus of federal appellate and district courts from around the country," JA20 (Opinion), but the other cases that form this supposed "consensus" also do little more than parrot the Fifth Circuit's reasoning in *NRA*—leaving that decision as the sole pillar holding up the district court's analysis. *See National Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1325–27 (S.D. Cal. 2020); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 992–94 (W.D. Wash. 2020); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013), *aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015). And the opinion in *NRA* cannot bear the weight for multiple independent reasons.

As an initial matter, the Fifth Circuit's reasoning was dicta and therefore not binding even in the Fifth Circuit. The court ultimately stopped short of finding that 18-to-20-year-olds were outside the scope of the Second Amendment and decided the case on the basis of a scrutiny analysis. *See NRA*, 700 F.3d at 204.

The Fifth Circuit's dicta is not persuasive. It was based on four types of historical evidence: (1) Founding-era "gun safety regulations," (2) a handful of laws "that targeted particular groups for public safety reasons," (3) the fact that at the time of the Founding the "age of majority . . . was 21," and (4) the appearance, starting in the second half of the 19th century, of State laws "restricting the ability of persons under 21 to purchase or use particular firearms." *NRA*, 700 F.3d at 200, 201, 202, 203. None of these meager scraps of evidence comes close to supporting the Fifth Circuit's suggestion that modern age-based restrictions—much less Pennsylvania's expansive ban—are outside the scope of the Second Amendment.

The first two categories of evidence—the only restrictions cited by the Fifth Circuit that date to the time of the Second Amendment's ratification, and thus the only pieces of evidence that provide significant "insight into its original meaning," *Heller*, 554 U.S. at 614—are woefully insufficient. While "laws regulating the storage of gun powder," "administering gun use in the context of militia service," and "prohibiting the use of firearms on certain occasions and in certain places," *NRA*, 700 F.3d at 200, may provide historical support for similarly marginal "time, place,

and manner" regulations on the books today, they plainly cannot support blanket restrictions preventing large numbers of law-abiding adults from carrying firearms. Indeed, *precisely the same* set of safety regulations were cited in *Heller* in support of the District of Columbia's ban, and the Supreme Court made short work of them, explaining that they "provide no support for the severe restriction" imposed by D.C., since "they do not remotely burden the right of self-defense as much as an absolute ban on handguns." 554 U.S. at 632. The fact that the Fifth Circuit, without any apparent sense of irony, staked its historical analysis on *the very pieces of evidence rejected as irrelevant in Heller* calls the entirety of its historical conclusions into question.

Similarly, the Founding-era laws "disarming certain groups" for "public safety reasons"—such as "law-abiding slaves, free blacks, and Loyalists"— obviously come up short. *NRA*, 700 F.3d at 200; *see* JA17 (Opinion) (invoking "longstanding tradition of targeting select groups' ability to access and use arms for the sake of public safety"). Racist laws targeting enslaved and free African Americans hardly constitute the type of historical evidence we should look to in determining the Second Amendment's scope. *See McDonald v. City of Chicago*, 561 U.S. 742, 771–78 (2010) (discussing the Fourteenth Amendment's repudiation of racist gun-control restrictions). And laws disarming loyalists who maintained allegiance to a hostile foreign power that at the time *was literally invading the*

*American homeland* hardly provide support for draconian restrictions on law-abiding 18-to-20-year-olds. *See Folajtar v. Attorney Gen. of the United States*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting).

Moreover, these anti-loyalist laws only confiscated weapons owned by loyalists on an *individual basis* after a showing that they "refused to swear an oath of allegiance to the state or to the nation" during wartime. Kopel & Greenlee, *Second Amendment Rights*, *supra*, at 602. Sections 6106, 6107, and 6109, on the other hand, strip all 18-to-20-year-olds of their Second Amendment rights with a broad brush without any individual showing that the person in question is a threat to public safety.

Nor do more-recent laws restricting "criminals" or "the mentally imbalanced" from accessing firearms fill the gap. *NRA*, 700 F.3d at 201. Those laws are arguably supported by the Founding-era understanding "that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). But the notion that *all 18-to-20-year-olds* fall into that category—*solely by virtue of their age*—is completely insupportable. And again, felons and the mentally ill are prohibited from possessing firearms only after they have *individually* been adjudicated—through procedures complying with due process—as belonging in the relevant group. Pennsylvania law affords no such individualized determination to its 18-to-20-year-old citizens before stripping their

Second Amendment rights. *See id.* at 465 ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

The Fifth Circuit's third piece of evidence—that "[t]he age of majority at common law was 21," *NRA*, 700 F.3d at 201—likewise does not advance the ball. *See also* JA16 (Opinion) (relying on the proposition that "in the early republic, the term 'minor' or 'infant . . . applied to persons under the age of 21" (cleaned up)). To be sure, at the Founding the common-law "age of majority" for some legal purposes was 21, rather than the modern standard of 18. But it is important to understand that in the Founding Era (as is still true today), age requirements were "different for different purposes." 1 WILLIAM BLACKSTONE, COMMENTARIES *463. At age 14, for example, individuals were deemed capable of discerning right from wrong and could be "capitally punished for any offense." *Id*. at *463–64. Likewise, even though 18-to-20-year-olds would have been considered "minors" for *some* purposes at the Founding, the historical evidence surveyed above leaves no doubt that the purpose of keeping and bearing arms *was not one of them*. To the contrary, adults aged 18 and up would contemporaneously have been *affirmatively required*, by statutes enacted by colonial, state, and federal legislatures, to keep and bear arms so that they could fulfill their obligatory militia duties. *See supra*, Part II.B.2. In other words, at the Founding, 18-to-20-year-olds, even when considered to be *under the age of*

32

*majority* under common law, *still had the right to keep and bear arms*. The fact that 18 years old is now considered the legal age of adulthood only bolsters the Second Amendment right of such citizens. Indeed, the only plausible justification for limiting the self-defense rights to minors as a class is that such individuals are under the care and protection of parents or guardians—a justification that has zero application to 18-to-20-year-old legal adults.

The Fifth Circuit's discussion of Founding-era evidence all suffers from the same fallacy: it is conducted at the wrong level of generality. The Fifth Circuit proceeded as follows: (1) it carefully tweezed from the historical record a few isolated examples of particular gun-control measures—none of which are remotely analogous to modern age-based restrictions (and certainly not analogous to Pennsylvania's ban); (2) it then abstracted from these individual restrictions a general "Founding-Era Attitude[ ]" of accepting "sensible gun safety regulation"; and (3) it then concluded that because the law before it appeared sufficiently "sensible," it was, ergo, potentially "outside the Second Amendment's protection." *NRA*, 700 F.3d at 200, 203.

That palpably superficial historical analysis borders on parody of the careful historical inquiry mandated by *Heller*. *See National Rifle Ass'n of America, Inc. v. BATFE*, 714 F.3d 334, 337 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing en banc) (explaining that *Heller* requires "a meticulous textual and

33

historical review" "[r]ather than generalizing about 'founding era attitudes,' as the panel did"). The Fifth Circuit itself acknowledged that the history of the Second Amendment supported age-based restrictions only "[a]t a high level of generality." *NRA*, 700 F.3d at 203. But under that approach, *any* gun-control measure that strikes a court as sufficiently "sensible" is automatically *exempt from constitutional scrutiny* under the purported Second Amendment exception for "sensible gun safety regulation." *NRA*, 700 F.3d at 200. *Heller* expressly disclaimed such an approach. *See* 554 U.S. at 634–35 ("Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.").

The Fifth Circuit also erred, like the court below in this case, by failing to meaningfully engage with the evidence, discussed above, affirmatively establishing that 18-year-olds were uniformly understood to fall within the Second Amendment's scope at the Founding. The court "relegate[d] militia service to a footnote," *National Rifle Ass'n, Inc.*, 714 F.3d at 339 (Jones, J., dissenting from denial of rehearing en banc), and even that footnote got the historical record *wrong. Compare NRA*, 700 F.3d at 204 n.17 (citing a single 1779 New Jersey statute as "setting [the militia-service] minimum age at 21"), *with National Rifle Ass'n, Inc*, 714 F.3d at 342 (Jones, J., dissenting from the denial of rehearing en banc) (explaining that the 1779 law merely supplemented New Jersey's general militia act, and expressly preserved the

34

ability of militia officers to enlist males "between the Age of sixteen and twenty-one years").

Unable to provide any Founding-era support for age-based firearm restrictions, the Fifth Circuit turned to a fourth category of evidence: the age-based limits that some States began to enact in the late nineteenth century. This final type of evidence is no more persuasive than the preceding ones. As an initial matter, the earliest law cited by the court dated to 1856—over a half-century after the Second Amendment's enactment. Because of the late date of these restrictions, they necessarily "do not provide as much insight into its original meaning as earlier sources." *Heller*, 554 U.S. at 614.

The district court doubled down on the Fifth Circuit's reliance on these pieces of evidence post-dating the Founding Era and insisted that whether restrictions on the Second Amendment rights of 18-to-20-year-olds "date to the founding period" is "not the standard." JA22 (Opinion). Instead, the court insisted, "a long history in this Country"—a phrase the Court apparently meant to include a history that is "only decades old"—suffices to show that a type of restriction is "outside the scope" of the Second Amendment. JA22–23 (Opinion). That conclusion is flatly inconsistent with *Heller*. After all, that case made clear that "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them"—not the scope they came to bear five decades later. *Heller*, 554 U.S. at 634–35. And the

35

Supreme Court confirmed in *Gamble v. United States*, 139 S. Ct. 1960 (2019), that the relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment," and 19th-century sources cited by *Heller* "were treated as mere *confirmation* of what the Court thought had already been established." *Id*. at 1975–76 (emphasis added). Because there is no *Founding*-era tradition of age-based restrictions on carrying firearms, a handful of laws that began to pop up two generations later can prove nothing.

Moreover, even if the late-nineteenth-century laws cited by the Fifth Circuit are taken at face value, they provide no persuasive grounding for modern age-based restrictions. By the turn of the 20th century, less than half of the States had adopted such laws, which typically applied only to certain types of weapons—and several, moreover, contained "exceptions for self-defense, hunting, or home possession." David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. ILL. U. L.J. 119, 142 (2018). These limited laws—adopted by less than half of the country beginning more than five decades after the Founding—do not come close to showing that blanket restrictions banning 18-to-21-year-olds from carrying arms outside the home "fall outside the scope of the rights protected by the Second Amendment." JA23 (Opinion).

36

Finally, the court below sought to reinforce its heavy reliance upon the non-binding decision in *NRA* by asserting that this Court has "generally given broad construction to *Heller's* recognition of 'longstanding' and 'presumptively valid regulatory measures' in the context of licensing requirements," an approach it thought made it "likely" that this Court would find *NRA*'s approach "consistent with *Heller*." JA5, 20 (Opinion). That significantly overreads the decision in *Drake*—which "refrain[ed] from answering th[e] question" whether and to what extend the Second Amendment "extends beyond the home." 724 F.3d at 431. And the district court's reliance on *Drake* fails even on its own terms. For unlike the "licensing requirements" in *Drake*, JA20 (Opinion)—which this Court repeatedly emphasized "left room for public carrying by those citizens who can demonstrate a 'justifiable need' to do so" and thus did not "ban[ ] public handgun carrying," 724 F.3d at 440—the provisions of Pennsylvania law challenged here, in conjunction with the ongoing declared emergency, *foreclose all* 18-to-20-year-olds from carrying firearms in most public places, by making them *categorically ineligible for a license in the first place*. 18 PA. C.S. § 6109(b).

III.   **The Pennsylvania laws barring 18-to-20-year-old citizens from carrying firearms are categorically unconstitutional.**

Given that the Second Amendment protects the right of law-abiding 18-to-20-year-old citizens to carry firearms for self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes

out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements upon rights safeguarded by the Amendment must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Pennsylvania's prohibition on the right of an entire category of law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," *id.* at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And *McDonald* reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

38

The ban on carry effected by Sections 6106, 6107, and 6109 is just as extensive and categorical as the one on home possession struck down in *Heller*. The district court resisted this conclusion, asserting that "the prohibitions effectuated are not as broad as have been characterized by Plaintiffs" because they include exemptions for "a broad range of persons," including law-enforcement officers, military personnel, and armed guards, as well as "for recreational purposes, such as target shooting, hunting, furbearing or fishing." JA11–12, 15 (Opinion). But the occupation-based exemptions for a favored few professions plainly do not allow *the typical* 18-to-20-year-old—who *does not* wish to pursue a career in law enforcement or enlist in the military—to carry firearms in public. *Compare Heller*, 554 U.S. at 575 n.1 (noting that D.C.'s ban contained "minor exceptions"), *with id.* at 636 (categorically invalidating the ban anyway). Similarly, the exceptions for hunting and target shooting *do nothing* to mitigate the ban's draconian prohibition on carrying arms "for the core lawful purpose of self-defense." *Id.* at 630.

The district court next sought to minimize the breadth of Pennsylvania's age-ban by asserting that the State's limits on carrying arms openly during a declared emergency "are location-specific and apply only to public streets and property." JA12 (Opinion) (citing 18 PA. C.S. § 6107(a)(1)–(2)). This argument fails too. The "public streets [and] public property" include not only government buildings and spaces but also all roads and sidewalks "used by members of the public,"

39

*Commonwealth v. Goosby*, 380 A.2d 802, 806 (1977) (interpreting identically worded provision in 18 PA. C.S. § 6108), and "circumstantial evidence" that an individual without a license "travelled at [least] some distance on a public street" with a firearm before reaching his destination is sufficient to place him outside the scope of this supposed "location-specific" limitation, *Commonwealth v. Hopkins*, 747 A.2d 910, 918 (Pa. Super. Ct. 2000) (same). When it is triggered by a declared emergency, Section 6107 is thus nothing short of a general ban on carrying operable firearms without a license in any place that one can only access via a public street or sidewalk—which is to say, virtually any place outside one's own home.

Finally, the district court sought support in Section 6107's exception for those who are "actively engaged in a defense of that person's life or property from peril or threat." 18 PA. C.S. § 6107(a)(1). This attempt is just as unpersuasive as the previous ones. The Second Amendment protects the right to " 'be[ ] *armed and ready*' " "*in case* of confrontation," *Heller*, 554 U.S. at 584, 592 (quoting *Muscarello*, 524 U.S. at 143) (emphases added). Under the challenged provisions, Plaintiffs must *leave their firearms at home* except in narrow circumstances such as when they are transporting them from their place of business, between homes, or from the gun or repair shop—and even then their firearms must be "not loaded" and "in a secure wrapper." 18 PA. C.S. § 6106(b)(8). These limits utterly vitiate the "actively engaged in self-defense" proviso. Criminal assailants are not in the habit of confining their

40

attacks to those individuals traveling to or from the gun shop, or of giving their intended victims sufficient advance notice of the attack to allow them to retrieve their firearm from the gun case and load it. *See Heller*, 554 U.S. at 630 (striking down D.C.'s requirement "that firearms in the home be rendered and kept inoperable at all times" because it "makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional"). The Second Amendment right to armed self-defense is not a right to race your attacker back home so you can retrieve your firearm.[6]

In short, the Second Amendment takes Pennsylvania's flat ban on 18-to-20-year-olds' right to carry firearms for self-defense "off the table." *Id.* at 636. While this Court has directed the use of one of the "tiers of scrutiny" for most restrictions on the right to keep and bear arms, the challenged provisions here *completely ban* protected Second Amendment conduct so *Heller*'s categorical approach should

---

[6] The district court sought to brush aside these obvious problems with the "active self-defense" exception by insisting that it would not adopt an interpretation of Section 6107(a)(1) that yields "a result that is absurd, impossible of execution, or unreasonable." JA23 n.7 (Opinion). But the court then proceeded directly to hold that it would nonetheless "defer to Pennsylvania's courts to interpret that extent of the self-defense exception," and that it would "take the language of Section 6107 as written." *Id.* And the language as written is confined to those "*[a]ctively engaged*" in self-defense (emphasis added). Perhaps this would relieve an 18-to-20-year-old of an obligation to drop his firearm at the doorstep if attempting to escape an armed robber pursuing him in his home, but as a general matter the exception is utterly vacuous for the reasons just discussed.

apply. *See Wrenn*, 864 F.3d at 665 (striking down ban on carrying arms categorically despite circuit precedent applying levels-of-scrutiny analysis in other Second Amendment cases); *Moore*, 702 F.3d at 942 (same).

## IV.   Pennsylvania's age-ban fails any level of heightened constitutional scrutiny.

Even if Pennsylvania's restrictions were not *categorically* unconstitutional, they would still fail any level of heightened constitutional scrutiny.[7] While the district court elected not "to proceed to an examination of the restrictions" under a scrutiny analysis, JA22 n.8 (Opinion), this Court can and should conduct that analysis (if it concludes that the ban is not *per se* unconstitutional under *Heller*). All of the disputed questions bearing on the application of heightened scrutiny are either issues of law or of legislative fact. *See* FED. R. EVID. 201, Advisory Committee Note (1972) ("Adjudicative facts are simply the facts of the particular case. Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body."). Moreover, both parties agreed below that the motions to dismiss and for a preliminary injunction "could be decided on the papers without a hearing or any other record development." JA6

---

[7] Because "rational basis" review is unavailable in the Second Amendment context, *see Heller*, 554 U.S. at 628 n.27, at a minimum intermediate scrutiny applies.

(Opinion). There is thus no need "to remand the case for evidentiary proceedings," since "only legislative facts are relevant to the constitutionality of [Pennsylvania's restrictions]." *Moore*, 702 F.3d at 942. Indeed, because the legislative facts clearly show that the challenged provisions of Pennsylvania law do not pass constitutional muster this Court can and should order entry of judgment for Plaintiffs. *See id.* (ordering entry of judgment for plaintiffs in appeal of dismissal of challenge to Illinois's carry ban).

### A. Strict scrutiny applies.

Because Sections 6106, 6107, and 6109—together with the now-three-year-long (and counting) declared opioid emergency—impose a broad ban on the ability of an entire class of law-abiding adults to carry firearms for self-defense, the challenged restrictions should at the very least be subjected to the strictest judicial scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms not only is enumerated in the constitutional text but also was counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

43

**B. The challenged laws fail even intermediate scrutiny.**

Ultimately determining the correct standard of scrutiny is immaterial, however, because Pennsylvania's ban also flunks intermediate scrutiny.

1.    That is so, first, as a matter of law. By design, Defendant's restrictions will reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650; *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 449 (2002) (Kennedy, J., concurring) (government may not justify a speech restriction on the basis "that it will reduce secondary effects by reducing speech in the same proportion"). While the panel in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, rejected the applicability of these principles in the Second Amendment context, 910 F.3d 106, 124 n.28 (3d Cir. 2018), it was wrong to do so, and Plaintiffs intend to so argue before a court competent to reverse that flawed decision.

2.    Even setting aside this threshold problem, the challenged limits still fail constitutional scrutiny. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* To be sure, the Government's

44

interest in protecting public safety from violent crime is important—indeed, compelling. But there is simply no persuasive evidence showing that specific the conduct at issue here—carrying firearms outside the home by 18-to-20-year-olds during an opioid epidemic—poses any special risk to public safety.

As an initial matter, there is no justification for singling out 18-to-20-year-olds, as a group, because of their age. Government statistics indicate that in 2019, 18-to-20-year-olds were *less* likely to be arrested for a violent crime than 21-to-24-year-olds.[8] And even if 18-to-20-year-olds disproportionately contributed to gun violence when compared to their neighboring age groups (they do not), that alone could not be sufficient legal reason to block *the entire population* of 18-to-20-year-olds from exercising their Second Amendment rights. As the data just cited shows, only a minuscule fraction of 18-to-20-year-olds—about 1/3 of 1%—were arrested for violent crimes in 2019.[9] Pennsylvania thus strips *all* 18-to-20-year-olds of their Second Amendment rights because of the sins of a very, very few. Such a result

---

[8] In 2019, 18-to-20-year-olds were arrested for violent crimes at a rate of 320.8 per 100,000, and 21-to-24-year-olds at a rate of 338.9 per 100,000. *See* Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2019, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gpBXYw.

[9] *See supra.* n.9. The year 2019 was not an outlier in this respect. *See, e.g.*, Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2018, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3vuWX5z (.36%); Off. of Juvenile Justice & Delinquency Programs, *Arrest rates by offense and age group, 2017, Gender: All*, U.S. DEP'T OF JUST., https://bit.ly/3gwxkx0 (.38%).

would be unthinkable in the context of any other constitutional right. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("deeply etched in our law [is the theory that] a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand") (emphasis added); *Hodgson v. Minnesota*, 497 U.S. 417, 446–47 (1990) (" 'The statist notion that governmental power should supersede parental authority in *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.' "). It can be no more permissible under the Second Amendment. *McDonald*, 561 U.S. at 780.

Indeed, if that reasoning were sound, then the government could disarm other demographic groups simply because some number of that cohort commits crimes with handguns at a higher rate than the general population. The most obvious examples might be differentially higher gun-violence rates by males or by the poor. Could these entire groups therefore be disarmed? Supreme Court precedent indicates that the answer is no. *See, e.g.*, *Craig v. Boren*, 429 U.S. 190, 191, 201–02 (1976) (statistics showing that 18-to-20-year-old men were over ten times more likely than their female counterparts to be arrested for "alcohol-related driving offenses" "hardly can form the basis for employment of a gender line as a classifying device").

3.      Even if the challenged limits on 18-to-20-year-old citizens' right to bear arms *could* be shown likely to marginally increase public safety (and they cannot),

46

that would still not end the matter, because any such public-safety *benefits* would need to be weighed against the public-safety *costs* of preventing these law-abiding adults from engaging in effective self-defense in public. And those costs are substantial. Although the number of defensive gun uses is difficult to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 103 (2005). Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the challenged ban cannot be shown to benefit the public safety—but it may well harm it.

47

4.      Even if Pennsylvania's limits did advance public safety on balance, they still fail heightened scrutiny because they are not properly tailored. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between the challenged limits and their purported objective of public safety.

The effect of the challenged provisions, taken together, is that while law-abiding 18-to-20-year-olds may lawfully carry firearms openly in *ordinary* times, they cannot do so at present because of the existence of the opioid epidemic. That is a complete non-sequitur. There is no conceivable explanation why the need to address the outbreak of addiction to opioids in recent years somehow calls for limiting the rights of law-abiding 18-to-20-year-olds to carry arms for self-defense outside the home. The phenomena are completely unrelated. Indeed, the contention that a public-health emergency of this kind justifies a limit on the Second Amendment rights of law-abiding adults is so absurd that it would not pass *even rational basis review*.

Even if the specific nature of the present emergency is set aside, the challenged limits still fail. Far from becoming somehow *less* important during a time of disaster or upheaval, these periods of crises are when the rights secured by the

48

Second Amendment *are needed most.* "The Second Amendment is a doomsday provision," *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kozinksi, J., dissenting from denial of rehearing en banc), designed to enable ordinary citizens to protect themselves and their families when all else fails. It is thus precisely during an emergency—when the social fabric is strained, and law-enforcement resources are stretched thin by the urgent need to address the crisis immediately at hand—that law-abiding citizens, including those aged 18 to 20, must be able to act *as their own* first responders until the crisis has passed.

At a bare minimum, if Pennsylvania genuinely believes that the presence of an emergency—of any kind—justifies limiting the Second Amendment rights of 18-to-20-year-olds, it had a constitutional obligation to do so in the least-constitutionally-intrusive way possible. *See McCullen*, 134 S. Ct. at 2540. Here, a less-intrusive limit is readily available: requiring 18-to-20-year-olds who wish to carry firearms openly in times of emergency to go through the same permitting requirements, set forth in 18 PA. C.S. Section 6109, that Pennsylvania believes are sufficient to protect against violent crime in other adults. Yet there is no evidence that the Commonwealth *even considered* these alternatives—which is alone fatal, under intermediate scrutiny. *See McCullen*, 134 S. Ct. at 494; *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 371 (3d Cir. 2016).

**V.  In the alternative, the Court at a minimum should reverse the district court's refusal to grant preliminary injunctive relief.**

As explained above, the challenged provisions of Pennsylvania law unconstitutionally infringe conduct protected by the Second Amendment, and this Court should order the entry of final judgment making that clear and permanently enjoining their continued enforcement. In the alternative, however, the Court should at a minimum reverse the district court's order of dismissal and remand with instructions to preliminarily enjoin the enforcement of the challenged restrictions during the pendency of any further proceedings.

For all the reasons discussed above, Plaintiffs are likely to succeed on the merits of their Second Amendment claims. And the conclusion that their constitutional claims are likely meritorious also compels the conclusion that they face irreparable injury in the absence of injunctive relief, given the well-accepted rule that the deprivation of a constitutional right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2021); *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (applying the rule in the context of the Second Amendment).

The public interest and balance of equities likewise favor Plaintiffs. "If a plaintiff proves both a likelihood of success on the merits and irreparable injury, it

almost always will be the case that the public interest favors preliminary relief." *Issa v. School Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017) (quotation marks omitted). That is because "it is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), and "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn*, 864 F.3d at 667. On the other side of the scale, Pennsylvania would suffer little harm from a preliminary injunction, as it has no valid interest in enforcing its unconstitutional ban and, as explained above, there is no reason to believe the ban will advance public safety.

## CONCLUSION

This Court should reverse the decision of the district court and remand with instructions to enter an injunction forbidding Pennsylvania from continuing to ban 18-to-20-year-olds from carrying firearms in public for lawful purposes.

Dated: June 23, 2021                         Respectfully submitted,


                                             s/ David H. Thompson
Joshua Prince, Esq.                          David H. Thompson
CIVIL RIGHTS DEFENSE FIRM, P.C.              Peter A. Patterson
646 Lenape Road                              John D. Ohlendorf
Bechtelsville, PA 19505                      COOPER & KIRK, PLLC
Joshua@CivilRightsDefenseFirm.com            1523 New Hampshire Ave., NW
(888) 202-9297                               Washington, D.C. 20036
(610) 400-8439 (fax)                         (202) 220-9600
                                             (202) 220-9601 (fax)
                                             dthompson@cooperkirk.com

*Attorneys for Plaintiffs-Appellants*

52

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

Dated: June 23, 2021                        s/ David H. Thompson
                                            David H. Thompson
                                            *Counsel for Plaintiffs-Appellants*


## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,605 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: June 23, 2021                        s/ David H. Thompson
                                            David H. Thompson
                                            *Counsel for Plaintiffs-Appellants*

# STATUTORY ADDENDUM –

# PERTINENT CONSTITUTIONAL

# PROVISIONS AND STATUTES

# TABLE OF CONTENTS

**Page**

U.S. CONST. art. I, § 8 .................................................................................Add1

U.S. CONST. amend. II..................................................................................Add1

18 PA. C.S.

    § 6106.............................................................................................Add1
    § 6107.............................................................................................Add4
    § 6109.............................................................................................Add5

**U.S. CONST. art. I, § 8.**

The Congress shall have Power . . . To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;
. . . .

**U.S. CONST. amend. II.**

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

**18 PA. C.S. § 6106. Firearms not to be carried without a license.**

**(a) Offense defined.**

(1) Except as provided in paragraph (2), any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.

(2) A person who is otherwise eligible to possess a valid license under this chapter but carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license and has not committed any other criminal violation commits a misdemeanor of the first degree.

**(b) Exceptions.** The provisions of subsection (a) shall not apply to:

(1) Constables, sheriffs, prison or jail wardens, or their deputies, policemen of this Commonwealth or its political subdivisions, or other law-enforcement officers.

(2) Members of the army, navy, marine corps, air force or coast guard of the United States or of the National Guard or organized reserves when on duty.

Add1

(3) The regularly enrolled members of any organization duly organized to purchase or receive such firearms from the United States or from this Commonwealth.

(4) Any persons engaged in target shooting with a firearm, if such persons are at or are going to or from their places of assembly or target practice and if, while going to or from their places of assembly or target practice, the firearm is not loaded.

(5) Officers or employees of the United States duly authorized to carry a concealed firearm.

(6) Agents, messengers and other employees of common carriers, banks, or business firms, whose duties require them to protect moneys, valuables and other property in the discharge of such duties.

(7) Any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person, having in his possession, using or carrying a firearm in the usual or ordinary course of such business.

(8) Any person while carrying a firearm which is not loaded and is in a secure wrapper from the place of purchase to his home or place of business, or to a place of repair, sale or appraisal or back to his home or place of business, or in moving from one place of abode or business to another or from his home to a vacation or recreational home or dwelling or back, or to recover stolen property under section 6111.1(b)(4) (relating to Pennsylvania State Police), or to a place of instruction intended to teach the safe handling, use or maintenance of firearms or back or to a location to which the person has been directed to relinquish firearms under 23 Pa.C.S. § 6108 (relating to relief) or back upon return of the relinquished firearm or to a licensed dealer's place of business for relinquishment pursuant to 23 Pa.C.S. § 6108.2 (relating to relinquishment for consignment sale, lawful transfer or safekeeping) or back upon return of the relinquished firearm or to a location for safekeeping pursuant to 23 Pa.C.S. § 6108.3 (relating to relinquishment to third party for safekeeping) or back upon return of the relinquished firearm.

(9) Persons licensed to hunt, take furbearers or fish in this Commonwealth, if such persons are actually hunting, taking furbearers or fishing as permitted by such license, or are going to the places where they desire to hunt, take furbearers or fish or returning from such places.

Add2

(10) Persons training dogs, if such persons are actually training dogs during the regular training season.

(11) Any person while carrying a firearm in any vehicle, which person possesses a valid and lawfully issued license for that firearm which has been issued under the laws of the United States or any other state.

(12) A person who has a lawfully issued license to carry a firearm pursuant to section 6109 (relating to licenses) and that said license expired within six months prior to the date of arrest and that the individual is otherwise eligible for renewal of the license.

(13) Any person who is otherwise eligible to possess a firearm under this chapter and who is operating a motor vehicle which is registered in the person's name or the name of a spouse or parent and which contains a firearm for which a valid license has been issued pursuant to section 6109 to the spouse or parent owning the firearm.

(14) A person lawfully engaged in the interstate transportation of a firearm as defined under 18 U.S.C. § 921(a)(3) (relating to definitions) in compliance with 18 U.S.C. § 926A (relating to interstate transportation of firearms).

(15) Any person who possesses a valid and lawfully issued license or permit to carry a firearm which has been issued under the laws of another state, regardless of whether a reciprocity agreement exists between the Commonwealth and the state under section 6109(k), provided:

> (i) The state provides a reciprocal privilege for individuals licensed to carry firearms under section 6109.

> (ii) The Attorney General has determined that the firearm laws of the state are similar to the firearm laws of this Commonwealth.

(16) Any person holding a license in accordance with section 6109(f)(3).

**(c) Sportsman's firearm permit.**

(1) Before any exception shall be granted under paragraph (b)(9) or (10) of this section to any person 18 years of age or older licensed to hunt, trap or fish or who has been issued a permit relating to hunting dogs, such person shall, at the time of securing his hunting, furtaking or fishing license or any time after such license has been issued, secure a sportsman's firearm permit from

the county treasurer. The sportsman's firearm permit shall be issued immediately and be valid throughout this Commonwealth for a period of five years from the date of issue for any legal firearm, when carried in conjunction with a valid hunting, furtaking or fishing license or permit relating to hunting dogs. The sportsman's firearm permit shall be in triplicate on a form to be furnished by the Pennsylvania State Police. The original permit shall be delivered to the person, and the first copy thereof, within seven days, shall be forwarded to the Commissioner of the Pennsylvania State Police by the county treasurer. The second copy shall be retained by the county treasurer for a period of two years from the date of expiration. The county treasurer shall be entitled to collect a fee of not more than $6 for each such permit issued, which shall include the cost of any official form. The Pennsylvania State Police may recover from the county treasurer the cost of any such form, but may not charge more than $1 for each official permit form furnished to the county treasurer.

(2) Any person who sells or attempts to sell a sportsman's firearm permit for a fee in excess of that amount fixed under this subsection commits a summary offense.

**(d) Revocation of registration.** Any registration of a firearm under subsection (c) of this section may be revoked by the county treasurer who issued it, upon written notice to the holder thereof.

**(e) Definitions.**

(1) For purposes of subsection (b)(3), (4), (5), (7) and (8), the term **"firearm"** shall include any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of the weapon.

(2) As used in this section, the phrase **"place of instruction"** shall include any hunting club, rifle club, rifle range, pistol range, shooting range, the premises of a licensed firearms dealer or a lawful gun show or meet.


**18 PA. C.S. § 6107. Prohibited conduct during emergency.**

**(a) General rule.** No person shall carry a firearm upon the public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive unless that person is:

Add4

(1) Actively engaged in a defense of that person's life or property from peril or threat.

(2) Licensed to carry firearms under section 6109 (relating to licenses) or is exempt from licensing under section 6106(b) (relating to firearms not to be carried without a license).

**(b) Seizure, taking and confiscation.** Except as otherwise provided under subsection (a) and notwithstanding the provisions of 35 Pa.C.S. Ch. 73 (relating to Commonwealth services) or any other provision of law to the contrary, no firearm, accessory or ammunition may be seized, taken or confiscated during an emergency unless the seizure, taking or confiscation would be authorized absent the emergency.

**(c) Definitions.** As used in this section, the following words and phrases shall have the meanings given to them in this subsection:

> **"Accessory."** Any scope, sight, bipod, sling, light, magazine, clip or other related item that is attached to or necessary for the operation of a firearm.

> **"Firearm."** The term includes any weapon that is designed to or may readily be converted to expel any projectile by the action of an explosive or the frame or receiver of any weapon.

## 18 PA. C.S. § 6109. Licenses.

**(a) Purpose of license.** A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle throughout this Commonwealth.

**(b) Place of application.** An individual who is 21 years of age or older may apply to a sheriff for a license to carry a firearm concealed on or about his person or in a vehicle within this Commonwealth. If the applicant is a resident of this Commonwealth, he shall make application with the sheriff of the county in which he resides or, if a resident of a city of the first class, with the chief of police of that city.

**(c) Form of application and content.** The application for a license to carry a firearm shall be uniform throughout this Commonwealth and shall be on a form prescribed by the Pennsylvania State Police. The form may contain provisions, not exceeding one page, to assure compliance with this section. Issuing authorities shall

use only the application form prescribed by the Pennsylvania State Police. One of the following reasons for obtaining a firearm license shall be set forth in the application: self-defense, employment, hunting and fishing, target shooting, gun collecting or another proper reason. The application form shall be dated and signed by the applicant and shall contain the following statement:

> I have never been convicted of a crime that prohibits me from possessing or acquiring a firearm under Federal or State law. I am of sound mind and have never been committed to a mental institution. I hereby certify that the statements contained herein are true and correct to the best of my knowledge and belief. I understand that, if I knowingly make any false statements herein, I am subject to penalties prescribed by law. I authorize the sheriff, or his designee, or, in the case of first class cities, the chief or head of the police department, or his designee, to inspect only those records or documents relevant to information required for this application. If I am issued a license and knowingly become ineligible to legally possess or acquire firearms, I will promptly notify the sheriff of the county in which I reside or, if I reside in a city of the first class, the chief of police of that city.

> **(d) Sheriff to conduct investigation.** The sheriff to whom the application is made shall:

> (1) investigate the applicant's record of criminal conviction;

> (2) investigate whether or not the applicant is under indictment for or has ever been convicted of a crime punishable by imprisonment exceeding one year;

> (3) investigate whether the applicant's character and reputation are such that the applicant will not be likely to act in a manner dangerous to public safety;

> (4) investigate whether the applicant would be precluded from receiving a license under subsection (e)(1) or section 6105(h) (relating to persons not to possess, use, manufacture, control, sell or transfer firearms); and

> (5) conduct a criminal background, juvenile delinquency and mental health check following the procedures set forth in section 6111 (relating to sale or transfer of firearms), receive a unique approval number for that inquiry and record the date and number on the application.

Add6

**(e) Issuance of license.**

(1) A license to carry a firearm shall be for the purpose of carrying a firearm concealed on or about one's person or in a vehicle and shall be issued if, after an investigation not to exceed 45 days, it appears that the applicant is an individual concerning whom no good cause exists to deny the license. A license shall not be issued to any of the following:

(i) An individual whose character and reputation is such that the individual would be likely to act in a manner dangerous to public safety.

(ii) An individual who has been convicted of an offense under the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act.[1]

(iii) An individual convicted of a crime enumerated in section 6105.

(iv) An individual who, within the past ten years, has been adjudicated delinquent for a crime enumerated in section 6105 or for an offense under The Controlled Substance, Drug, Device and Cosmetic Act.

(v) An individual who is not of sound mind or who has ever been committed to a mental institution.

(vi) An individual who is addicted to or is an unlawful user of marijuana or a stimulant, depressant or narcotic drug.

(vii) An individual who is a habitual drunkard.

(viii) An individual who is charged with or has been convicted of a crime punishable by imprisonment for a term exceeding one year except as provided for in section 6123 (relating to waiver of disability or pardons).

(ix) A resident of another state who does not possess a current license or permit or similar document to carry a firearm issued by that state if a license is provided for by the laws of that state, as published annually in the Federal Register by the Bureau of Alcohol, Tobacco and Firearms of the Department of the Treasury under 18 U.S.C. § 921(a)(19) (relating to definitions).

---

[1] 35 P.S. § 780-101 et seq.

(x) An alien who is illegally in the United States.

(xi) An individual who has been discharged from the armed forces of the United States under dishonorable conditions.

(xii) An individual who is a fugitive from justice. This subparagraph does not apply to an individual whose fugitive status is based upon nonmoving or moving summary offense under Title 75 (relating to vehicles).

(xiii) An individual who is otherwise prohibited from possessing, using, manufacturing, controlling, purchasing, selling or transferring a firearm as provided by section 6105.

(xiv) An individual who is prohibited from possessing or acquiring a firearm under the statutes of the United States.

(2) Deleted by 1995, June 13, No. 17 (Spec. Sess. No. 1), § 2, effective in 120 days.

(3) The license to carry a firearm shall be designed to be uniform throughout this Commonwealth and shall be in a form prescribed by the Pennsylvania State Police. The license shall bear the following:

(i) The name, address, date of birth, race, sex, citizenship, height, weight, color of hair, color of eyes and signature of the licensee.

(ii) The signature of the sheriff issuing the license.

(iii) A license number of which the first two numbers shall be a county location code followed by numbers issued in numerical sequence.

(iv) The point-of-contact telephone number designated by the Pennsylvania State Police under subsection (*l*).

(v) The reason for issuance.

(vi) The period of validation.

(4) The sheriff shall require a photograph of the licensee on the license. The photograph shall be in a form compatible with the Commonwealth Photo Imaging Network.

Add8

(5) The original license shall be issued to the applicant. The first copy of the license shall be forwarded to the Pennsylvania State Police within seven days of the date of issue. The second copy shall be retained by the issuing authority for a period of seven years. Except pursuant to court order, both copies and the application shall, at the end of the seven-year period, be destroyed unless the license has been renewed within the seven-year period.

**(f) Term of license.**

(1) A license to carry a firearm issued under subsection (e) shall be valid throughout this Commonwealth for a period of five years unless extended under paragraph (3) or sooner revoked.

(2) At least 60 days prior to the expiration of each license, the issuing sheriff shall send to the licensee an application for renewal of license. Failure to receive a renewal application shall not relieve a licensee from the responsibility to renew the license.

(3) Notwithstanding paragraph (1) or any other provision of law to the contrary, a license to carry a firearm that is held by a member of the United States Armed Forces or the Pennsylvania National Guard on Federal active duty and deployed overseas that is scheduled to expire during the period of deployment shall be extended until 90 days after the end of the deployment.

(4) Possession of a license, together with a copy of the person's military orders showing the dates of overseas deployment, including the date that the overseas deployment ends, shall constitute, during the extension period specified in paragraph (3), a defense to any charge filed pursuant to section 6106 (relating to firearms not to be carried without a license) or 6108 (relating to carrying firearms on public streets or public property in Philadelphia).

**(g) Grant or denial of license.** Upon the receipt of an application for a license to carry a firearm, the sheriff shall, within 45 days, issue or refuse to issue a license on the basis of the investigation under subsection (d) and the accuracy of the information contained in the application. If the sheriff refuses to issue a license, the sheriff shall notify the applicant in writing of the refusal and the specific reasons. The notice shall be sent by certified mail to the applicant at the address set forth in the application.

**(h) Fee.**

(1) In addition to fees described in paragraphs (2)(ii) and (3), the fee for a license to carry a firearm is $19. This includes all of the following:

(i) A renewal notice processing fee of $1.50.

(ii) An administrative fee of $5 under section 14(2) of the act of July 6, 1984 (P.L. 614, No. 127),[2] known as the Sheriff Fee Act.

(2) Expired May 9, 2011, pursuant to 2005, Nov. 10, P.L. 335, No. 66, § 3.

(3) An additional fee of $1 shall be paid by the applicant for a license to carry a firearm and shall be remitted by the sheriff to the Firearms License Validation System Account, which is hereby established as a special restricted receipt account within the General Fund of the State Treasury. The account shall be used for purposes under subsection (*l*). Moneys credited to the account and any investment income accrued are hereby appropriated on a continuing basis to the Pennsylvania State Police.

(4) No fee other than that provided by this subsection or the Sheriff Fee Act may be assessed by the sheriff for the performance of any background check made pursuant to this act.

(5) The fee is payable to the sheriff to whom the application is submitted and is payable at the time of application for the license.

(6) Except for the administrative fee of $5 under section 14(2) of the Sheriff Fee Act, all other fees shall be refunded if the application is denied but shall not be refunded if a license is issued and subsequently revoked.

(7) A person who sells or attempts to sell a license to carry a firearm for a fee in excess of the amounts fixed under this subsection commits a summary offense.

**(i) Revocation.** A license to carry firearms may be revoked by the issuing authority for good cause. A license to carry firearms shall be revoked by the issuing authority for any reason stated in subsection (e)(1) which occurs during the term of the permit. Notice of revocation shall be in writing and shall state the specific reason for revocation. Notice shall be sent by certified mail to the individual whose license

---

[2] 42 P.S. § 21114(2).

is revoked, and, at that time, notice shall also be provided to the Pennsylvania State Police by electronic means, including e-mail or facsimile transmission, that the license is no longer valid. An individual whose license is revoked shall surrender the license to the issuing authority within five days of receipt of the notice. An individual whose license is revoked may appeal to the court of common pleas for the judicial district in which the individual resides. An individual who violates this section commits a summary offense.

**(i.1) Notice to sheriff.** Notwithstanding any statute to the contrary:

(1) Upon conviction of a person for a crime specified in section 6105(a) or (b) or upon conviction of a person for a crime punishable by imprisonment exceeding one year or upon a determination that the conduct of a person meets the criteria specified in section 6105(c)(1), (2), (3), (5), (6) or (9), the court shall determine if the defendant has a license to carry firearms issued pursuant to this section. If the defendant has such a license, the court shall notify the sheriff of the county in which that person resides, on a form developed by the Pennsylvania State Police, of the identity of the person and the nature of the crime or conduct which resulted in the notification. The notification shall be transmitted by the judge within seven days of the conviction or determination.

(2) Upon adjudication that a person is incompetent or upon the involuntary commitment of a person to a mental institution for inpatient care and treatment under the act of July 9, 1976 (P.L. 817, No. 143), known as the Mental Health Procedures Act, or upon involuntary treatment of a person as described under section 6105(c)(4), the judge of the court of common pleas, mental health review officer or county mental health and mental retardation administrator shall notify the sheriff of the county in which that person resides, on a form developed by the Pennsylvania State Police, of the identity of the person who has been adjudicated, committed or treated and the nature of the adjudication, commitment or treatment. The notification shall be transmitted by the judge, mental health review officer or county mental health and mental retardation administrator within seven days of the adjudication, commitment or treatment.

**(j) Immunity.** A sheriff who complies in good faith with this section shall be immune from liability resulting or arising from the action or misconduct with a firearm committed by any individual to whom a license to carry a firearm has been issued.

Add11

**(k) Reciprocity.**

(1) The Attorney General shall have the power and duty to enter into reciprocity agreements with other states providing for the mutual recognition of a license to carry a firearm issued by the Commonwealth and a license or permit to carry a firearm issued by the other state. To carry out this duty, the Attorney General is authorized to negotiate reciprocity agreements and grant recognition of a license or permit to carry a firearm issued by another state.

(2) The Attorney General shall report to the General Assembly within 180 days of the effective date of this paragraph and annually thereafter concerning the agreements which have been consummated under this subsection.

**(l) Firearms License Validation System.**

(1) The Pennsylvania State Police shall establish a nationwide toll- free telephone number, known as the Firearms License Validation System, which shall be operational seven days a week, 24 hours per day, for the purpose of responding to law enforcement inquiries regarding the validity of any Pennsylvania license to carry a firearm.

(2) Notwithstanding any other law regarding the confidentiality of information, inquiries to the Firearms License Validation System regarding the validity of any Pennsylvania license to carry a firearm may only be made by law enforcement personnel acting within the scope of their official duties.

(3) Law enforcement personnel outside this Commonwealth shall provide their originating agency identifier number and the license number of the license to carry a firearm which is the subject of the inquiry.

(4) Responses to inquiries by law enforcement personnel outside this Commonwealth shall be limited to the name of the licensee, the validity of the license and any information which may be provided to a criminal justice agency pursuant to Chapter 91 (relating to criminal history record information).

**(m) Inquiries.**

(1) The Attorney General shall, not later than one year after the effective date of this subsection and not less than once annually, contact in writing the appropriate authorities in any other state which does not have a current reciprocity agreement with the Commonwealth to determine if:

Add12

(i) the state will negotiate a reciprocity agreement;

(ii) a licensee may carry a concealed firearm in the state; or

(iii) a licensee may apply for a license or permit to carry a firearm issued by the state.

(2) The Attorney General shall maintain a current list of those states which have a reciprocity agreement with the Commonwealth, those states which allow licensees to carry a concealed firearm and those states which allow licensees to apply for a license or permit to carry a firearm. This list shall be posted on the Internet, provided to the Pennsylvania State Police and made available to the public upon request.

**(m.1) Temporary emergency licenses.**

(1) A person seeking a temporary emergency license to carry a concealed firearm shall submit to the sheriff of the county in which the person resides all of the following:

(i) Evidence of imminent danger to the person or the person's minor child. For purposes of this subparagraph, the term "minor" shall have the same meaning as provided in 1 Pa.C.S. § 1991 (relating to definitions).

(ii) A sworn affidavit that contains the information required on an application for a license to carry a firearm and attesting that the person is 21 years of age or older, is not prohibited from owning firearms under section 6105 (relating to persons not to possess, use, manufacture, control, sell or transfer firearms) or any other Federal or State law and is not currently subject to a protection from abuse order or a protection order issued by a court of another state.

(iii) In addition to the provisions of subsection (h), a temporary emergency license fee established by the Commissioner of the Pennsylvania State Police for an amount that does not exceed the actual cost of conducting the criminal background check or $10, whichever is less.

(iv) An application for a license to carry a firearm on the form prescribed pursuant to subsection (c).

Add13

(2) Upon receipt of the items required under paragraph (1), the sheriff immediately shall conduct a criminal history, juvenile delinquency and mental health record check of the applicant pursuant to section 6105. Immediately upon receipt of the results of the records check, the sheriff shall review the information and shall determine whether the applicant meets the criteria set forth in this subsection. If the sheriff determines that the applicant has met all of the criteria, the sheriff shall immediately issue the applicant a temporary emergency license to carry a concealed firearm.

(3) If the sheriff refuses to issue a temporary emergency license, the sheriff shall specify the grounds for the denial in a written notice to the applicant. The applicant may appeal the denial or challenge criminal records check results that were the basis of the denial, if applicable, in the same manner as a denial of a license to carry a firearm under this section.

(4) A temporary emergency license issued under this subsection shall be valid for 45 days and may not be renewed. A person who has been issued a temporary emergency license under this subsection shall not be issued another temporary emergency license unless at least five years have expired since the issuance of the prior temporary emergency license. During the 45 days the temporary emergency license is valid, the sheriff shall conduct an additional investigation of the person for the purposes of determining whether the person may be issued a license pursuant to this section. If, during the course of this investigation, the sheriff discovers any information that would have prohibited the issuance of a license pursuant to this section, the sheriff shall be authorized to revoke the temporary emergency license as provided in subsection (i).

(5) The temporary emergency license issued pursuant to this section shall be consistent with the form prescribed in subsection (e)(3), (4) and (5). In addition to the information provided in those paragraphs, the temporary emergency license shall be clearly marked "Temporary."

(6) A person who holds a temporary emergency license to carry a firearm shall have the same rights to carry a firearm as a person issued a license to carry a firearm under this section. A licensee under this subsection shall be subject to all other duties, restrictions and penalties under this section, including revocation pursuant to subsection (i).

(7) A sheriff who issues a temporary emergency license to carry a firearm shall retain, for the entire period during which the temporary emergency

Add14

license is in effect, the evidence of imminent danger that the applicant submitted to the sheriff that was the basis for the license, or a copy of the evidence, as appropriate.

(8) A person applying for a temporary emergency license shall complete the application required pursuant to subsection (c) and shall provide at the time of application the information required in paragraph (1).

(9) Prior to the expiration of a temporary emergency license, if the sheriff has determined pursuant to investigation that the person issued a temporary emergency license is not disqualified and if the temporary emergency license has not been revoked pursuant to subsection (i), the sheriff shall issue a license pursuant to this section that is effective for the balance of the five-year period from the date of the issuance of the temporary emergency license. Records and all other information, duties and obligations regarding such licenses shall be applicable as otherwise provided in this section.

(10) As used in this subsection, the term **"evidence of imminent danger"** means:

> (i) a written document prepared by the Attorney General, a district attorney, a chief law enforcement officer, judicial officer or their designees describing the facts that give a person reasonable cause to fear a criminal attack upon the person or the person's minor child. For the purposes of this subparagraph, the term "chief law enforcement officer" shall have the same meaning as provided in 42 Pa.C.S. § 8951 (relating to definitions) and "judicial officer" shall have the same meaning as provided in 42 Pa.C.S. § 102 (relating to definitions).

> (ii) a police report.

**(m.2) Inconsistent provisions.** Notwithstanding the provisions of section 7506 (relating to violation of rules regarding conduct on Commonwealth property), 75 Pa.C.S. § 7727 (relating to additional limitations on operation) or the act of June 28, 1995 (P.L. 89, No. 18),[3] known as the Conservation and Natural Resources Act, and regulations promulgated under that act, a firearm may be carried as provided in subsection (a) by:

---

[3] 71 P.S. § 1340.101 et seq.

Add15

(1) a law enforcement officer whose current identification as a law enforcement officer shall be construed as a valid license to carry a firearm; or

(2) any licensee.

**(m.3) Construction.** Nothing in this section shall be construed to:

(1) Permit the hunting or harvesting of any wildlife with a firearm or ammunition not otherwise permitted by 34 Pa.C.S. (relating to game).

(2) Authorize any Commonwealth agency to regulate the possession of firearms in any manner inconsistent with the provisions of this title.

**(n) Definition.** As used in this section, the term **"licensee"** means an individual who is licensed to carry a firearm under this section.

Add16

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 23, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: June 23, 2021

s/ David H. Thompson
David H. Thompson
*Attorney for Plaintiffs-Appellants*