IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

―――――――

**No. 21-1832**

―――――――

**MADISON M. LARA, SOPHIA KNEPLEY, LOGAN D. MILLER
SECOND AMENDMENT FOUNDATION, INC., and
FIREARMS POLICY COALITION,**

**Appellants**

**v.**

**COMMISSIONER PENNSYLVANIA STATE POLICE,**

**Appellee**

―――――――

**BRIEF FOR APPELLEE
COMMISSIONER PENNSYLVANIA STATE POLICE**

―――――――

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ENTERED APRIL 16, 2021

JOSH SHAPIRO
*Attorney General*

| | | |
|---|---|---|
| Office of Attorney General | | |
| 1251 Waterfront Place | BY: | DANIEL B. MULLEN |
| Pittsburgh, PA 15222 | | *Deputy Attorney General* |
| Phone: (412) 235-9067 | | |
| FAX:   (412) 565-3028 | | J. BART DELONE |
| | | *Chief Deputy Attorney General* |
| DATE: September 22, 2021 | | *Chief, Appellate Litigation Section* |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF JURISDICTION ...................................................................1

STATEMENT OF THE ISSUES .......................................................................2

STATEMENT OF THE CASE ..........................................................................3

      A.    Statutory Background: .......................................................4

      B.    Proceedings Below: ...........................................................7

      C.    Post-Judgment Developments: ..........................................8

STATEMENT OF RELATED CASES ..............................................................10

SUMMARY OF THE ARGUMENT .................................................................11

ARGUMENT ..................................................................................................14

I.      The Coalition's suit against Commissioner Evanchick is actually a suit against the Commonwealth of Pennsylvania, and it seeks redress that Commissioner Evanchick cannot provide. It is thus barred by the Eleventh Amendment and Article III of the Constitution. ...........................14

II.     The challenged laws do not implicate the Second Amendment. ...................20

      A.    In *District of Columbia v. Heller* and *McDonald v. City of Chicago*, the Supreme Court made it clear that the Second Amendment is not unlimited. ..........................................21

      B.    This Court's post-*Heller* jurisprudence establishes a two-step framework for analyzing Second Amendment claims. ......................23

      C.    The challenged provisions are longstanding, presumptively lawful regulations that the public has accepted as being consistent with the Second Amendment. ..........................................27

D.    The Coalition's arguments present no basis for questioning the District Court's judgment.................................................36

   1.The Coalition's contention that the UFA effectuates a "categorical ban" and is *per se* unconstitutional under *Heller* reveals its fundamental misapprehension of both the UFA and *Heller*.................................................36

   2.The Coalition's heavy reliance on militia laws from the 1700s underscores its misunderstanding of *Heller* and its indifference toward this Court's precedent. .........................................41

   3.The Coalition's criticisms of the District Court's opinion are nothing more than recycled critiques from other cases.................................44

III.    The Coalition has waived its request for a preliminary injunction, which, in any event, does not comport with the specificity requirements of Fed.R.Civ.P. 65(d).................................................47

IV.    Alternatively, if this case is not barred by the Eleventh Amendment and Article III of the Constitution, and the challenged provisions are not longstanding, the District Court should determine, in the first instance, whether the UFA satisfies intermediate scrutiny. .........................50

CONCLUSION .................................................53

CERTIFICATE OF COUNSEL.................................................54

CERTIFICATE OF SERVICE.................................................55

# TABLE OF AUTHORITIES

**Page**

**Cases**

*1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108 (3d Cir. 1993) .................16, 17

*Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*,
   910 F.3d 106 (3d Cir. 2018) .........................................................................51, 52

*Aymette v. State*, 21 Tenn. 154 (1840)........................................................................33

*Barron v. Mayor and City Council of Baltimore*, 32 U.S. 243 (1833) ....................32

*Bassett v. Slatery*, Case No. 3:21-cv-152 (E.D. Tenn.)......................................4, 10

*Baughcum v. Jackson*, 3:21-cv-36 (S.D. Ga.).......................................................4, 10

*Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016)................................24, 37, 38

*Caba v. Weaknecht*, 64 A.3d 39 (Pa. Cmwlth. 2013) ..........................................15

*Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226 (3d Cir. 2021)..............................9

*Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128 (9th Cir. 2012)............16

*Commonwealth v. McKnown*, 79 A.3d 678 (Pa. Super. 2013)..............................28

*Cowey v. Mullen*, 2:20-cv-01845 (W.D. Pa.)......................................................7, 19

*Dig. Recognition Network v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015) ..............18

*District of Columbia v. Heller*, 554 U.S. 570 (2008)......................................passim

*Doe v. Holcomb*, 883 F.3d 971 (7th Cir. 2018) ...................................................18

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*,
  336 F.3d 211 (3d Cir. 2003) ...............................................................4

*Doyle v. Hogan*, 1 F.4th 249, 224 (4th Cir. 2021) .................................16

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...................................passim

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021)...............passim

*Ellis v. Horn*, 37 Fed. Appx. 38 (3d Cir. 2002) ......................................8

*Ex parte Young*, 209 U.S. 123 (1908)..............................................16, 17

*Fetsurka. v. Outlaw*, 2:20-cv-05857 (E.D. Pa.) ................................7, 19

*Finberg v. Sullivan*, 634 F.2d 50 (3d Cir. 1980).....................................17

*Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020)...............24

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015)................................26

*Granny Goose Foods v. Bhd. of Teamsters, Local No. 70*,
  415 U.S. 423 (1974)...........................................................................49

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011).......... 25, 26, 38, 42

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021)................................35

*Holloway v. Att'y Gen. United States*, 948 F.3d 164 (3d Cir. 2020) ......................38

*In re Hetchinger Inv. Co. of Del., Inc.*, 335 F.3d 244 (3d Cir. 2003) ....................20

*In re Surrick*, 338 F.3d 224 (3d Cir. 2004)...........................................50

*Jones v. Becerra*, 498 F.Supp.3d 1317 (S.D. Cal.) .........................10, 35

*Jones v. Bonta*, 20-56174 (9th Cir.) ........................................10, 44, 46

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)......................................46

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cr. 2017) ........................................................38

*Kost v. Kozakiewicz*, 1 F.3d 176 (3d Cir. 1993)......................................................47

*Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762 (3d Cir. 1994)........49

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)......................................................17

*McCauley v. Univ. of the Virgin Islands*,
   618 F.3d 232 (3d Cir. 2010) ................................................................................16

*McDonald v. City of Chicago*, 561 U.S. 742 (2010)..................................21, 22, 24

*Meyer v. Raoul*, 3:21-cv-518 (S.D. Ill.).......................................................4, 10, 19

*Mitchell v. Atkins*, 483 F.Supp.3d 985 (W.D. Wash. 2020) ...................................35

*NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012) ...................................................passim

*NRA v. McCraw*, 719 F.3d 338 (5th Cir. 2013) ......................................................34

*NRA v. Swearingen*, ___F.Supp.3d___,
   2021 WL 2592545 (N.D. Fla. June 24, 2021)................................. 26, 34, 35, 43

*People v. Mosley*, 33 N.E.3d 137 (Ill. 2015)...........................................................35

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) ...........................................26

*Powell v. Tompkins*, 926 F.Supp.2d 367 (D. Mass. 2013) ......................................35

*PSP v. McPherson*, 831 A.2d 800 (Pa. Cmwlth. 2003) ..............................5, 15, 18

quoting *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676 (Pa. 2003) ...............39

*Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988) ............................................17

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ............................52

*Simpson v. State*, 13 Tenn. 356 (1833)...................................................................33

*State v. Callicut*, 69 Tenn. 714 (1878).................................................................33

*TD Bank N.A. v. Hill*, 928 F.3d 259 (3d Cir. 2019) ..............................................20

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2021)...........................................24

*United States v. Cruikshank*, 92 U.S. 542 U.S. 542 (1875)....................................32

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) .........................23, 24, 25

*United States v. One (1) Palmetto Sate Armory PA-15 Machinegun*,
    822 F.3d 136 (3d Cir. 2016) ...............................................................37

*Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*,
    535 U.S. 635 (2002)............................................................................17

*Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989) ..................8, 14, 15, 16

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ...................................................38

*Worth v. Harrington*, 0:21-cv-1348 (D. Minn.)..................................................4, 10

*Wright v. Commonwealth*, 77 Pa. 470 (Pa. 1875)..................................................29

*Young v. Hawaii*, 922 F.3d 765 (9th Cir. 2021)......................................................7

**Constitutional Provisions**

PA CONST. ART. IV, § 20.........................................................................................9

PA CONST. ART. IX, § 21 (1790) ...........................................................................29

U.S. CONST., amend. II .........................................................................................20

**Statutes**

1 Stat. 271 (1792) .............................................................................................43, 47

16 Del. Laws 716 (1881)........................................................................................30

18 Pa.C.S. § 1606 ..................................................................... 3, 5, 38, 43

18 Pa.C.S. § 6110.1................................................................................5

18 Pa.C.S. § 6111 ...........................................................................5, 18

18 Pa.C.S. § 6111.1.............................................................................19

18 Pa.C.S. § 6124 ..................................................................................5

18 Pa.C.S. 6107 .........................................................................3, 6, 38

18 Pa.C.S. 6109 ....................................................................3, 5, 15, 18

1856 Ala. Acts 17 (1856).....................................................................30

1856 Tenn. Pub. Acts 92 (1856)...........................................................31

1859 Ohio Laws 56 (1859) ...................................................................39

1873 Ky. Stat. art. 29, at 359 (1873) ....................................................31

1875 Ind. Acts 86 (1875) ......................................................................30

1876 Ga. Laws 112 (1876).....................................................................30

1878 Miss. Laws 175 (1878)..................................................................31

1881 Ill. Laws 73 (1881)........................................................................30

1882 Md. Laws 656 (1882).....................................................................31

1882 W.Va. Acts 421-22 (1882) ......................................................31, 39

1883 Kan. Sess. Laws 159 (1883).........................................................31

1883 Mo. Laws 76 (1883)......................................................................31

1883 Wis. Sess. Laws 290 (1883).........................................................31

1884 Iowa Acts 86 (1884)................................................................30

1885 Nev. Stat. 51 (1885) ...............................................................31

1890 La. Acts 39 (1890) ..................................................................31

1890 Wyo. Sess. Laws 1253 (1890)..................................................31

1893 N.C. Sess. 468-69 (1893) ........................................................31

1897 Tex. Gen. Laws 221-22 (1897)................................................31

21 Ok. Stat. § 1290.9 ......................................................................34

27 Stat. 116 (1892)..........................................................................30

28 U.S.C. § 1291...............................................................................1

28 U.S.C. § 1331...............................................................................1

28 U.S.C. § 1343...............................................................................1

42 U.S.C. § 1983...............................................................................1

Act No. 246 of Aug. 26, 1721, (3 St. L. 254, Ch. 246)........................28

Alaska Stat. § 18.65.705 ..................................................................34

Ariz. Rev. Stat. § 13-3112................................................................34

Ark. Code § 5-73-309 ......................................................................34

Colo. Rev. Stat. § 18-12-203............................................................34

Conn. Gen. Stat. § 29-28..................................................................34

Fla. Stat. § 790.06...........................................................................34

Ga. Code § 16-11-129.......................................................................34

Haw. Rev. Stat. § 134-2 ...................................................................34

Idaho Code § 18-3302 ......................................................................34

Iowa Code § 724.8 ...........................................................................34

Kan Stat § 75-7c04 ..........................................................................34

Ky. Rev. Stat. § 237.110 ..................................................................34

La. Rev. Stat. § 40:1379.3 ...............................................................34

Mass. Gen. Laws ch. 140 § 131 ......................................................34

Mich. Comp. Laws § 28.425b ..........................................................34

Minn. Stat. § 624.714 .......................................................................34

Miss. Code § 45-9-101 .....................................................................34

N.C. Gen. Stat § 14-415.12 ..............................................................34

N.J. Admin Code 13:54-2.4 ..............................................................40

N.M. Stat. Ann. § 29-19-4 ................................................................34

N.Y. Penal Law § 400.00 ..................................................................34

Neb. Rev. Stat. § 69-2433 ................................................................34

Nev. Rev. Stat. § 202.3657 ..............................................................34

Ohio Rev. Code § 2923.125 .............................................................34

Or. Rev. Stat. § 166.291 ...................................................................34

R.I. Gen. Laws § 11-47-11 ...............................................................34

S.C. Code § 23-31-215 .....................................................................34

Tenn. Code. § 39-17-1351 ......................................................................34

Tx. Gov't Code § 411.172.......................................................................34

Utah Code § 53-5-74................................................................................34

Va. Code § 18.2-308.02 ...........................................................................34

W. Va. Code § 61-7-4 ..............................................................................34

Wash. Rev. Code § 9.41.070....................................................................34

Wyo. Stat. § 6-8-104................................................................................34

**Rules**

Fed.R.Civ.P. 12(b)(6)................................................................................8

Fed.R.Civ.P. 65(d) ..............................................................................2, 49

**Other Authorities**

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America*
(2011) ................................................................................................29, 47

*Black's Law Dictionary* (11th ed. 2019)..............................................30

Clayton Cramer, *Concealed Weapon Laws of the Early Republic: Dueling,
Southern Violence, and Moral Reform* (1999)...................................47

*Debates and Proceedings in the Congress of the United States*, Vol. II., March 3,
1789 to March 3, 1791 .......................................................................43

Eric Monkkonen, *Murder in New York City* (2001) .............................33

Gov. Tom Wolf, Press Release, "Opioid Disaster Declaration to End Aug. 25,"
(Aug. 25, 2021), https://www.governor.pa.gov/newsroom/opioid-disaster-
declaration-to-end-aug-25/...................................................................9

Gov. Tom Wolf, Proclamation of Disaster Emergency (Aug. 31, 2021),
https://www.pema.pa.gov/Governor-Proclamations/Documents/Hurricane-Ida-
Proclamation-Of-Disaster-Emergency-08312021.pdf.............................................9

John Indermaur, Principles of the Common Law,
195 (Edmund H. Bennett ed., 1st Am. Ed. 1878) .............................................30

Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613
(2007) .....................................................................................30, 31

Repository of Historical Gun Laws, Duke University School of Law,
https://firearmslaw.duke.edu/repository/search-the-repository/ .........................31

Saul Cornell & Emma Cornell, *The Second Amendment and Firearms Regulation:
A venerable Tradition Regulating Liberty While Securing Public Safety*, Am. J.
Public Health, Vol. 180, No. 7 (July 2018),
https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2018.304501.............11

Saul Cornell & Nathan DeDino, *A Well Regulated Right*: *The Early American
Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004).....................29, 32, 42

William Blackstone, *Commentaries on the Laws of England*,
Vol I at 463 (1st ed. 1765)..............................................................30

Wright & Miller, 11A Federal Practice and Procedure, Civ. § 2955 (3d ed.).........49

## STATEMENT OF JURISDICTION

This is a civil rights action arising under 42 U.S.C. § 1983. The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. This appeal is from final orders denying Appellants' (plaintiffs below) motion for a preliminary injunction and granting Appellee's (defendant below) motion to dismiss. JA26-27. The District Court's judgment was entered on April 16, 2021, and the notice of appeal was filed on April 23, 2021.

Ordinarily, this Court would have jurisdiction under 28 U.S.C. § 1291. For the reasons explained *infra*, however, this case is barred by the Eleventh Amendment, and Appellants have failed to satisfy the Article III standing requirements of causation and redressability. Therefore, this case it not justiciable.

## STATEMENT OF THE ISSUES

I.      Is this action barred by the Eleventh Amendment and do Appellants lack Article III standing where the only named defendant has no authority to provide Appellants with the relief they seek, and was merely sued as a representative of the Commonwealth based on his generalized duty to enforce Pennsylvania law?

I.      Assuming there is a justiciable case, did the District Court correctly determine that the challenged public-carry restrictions are longstanding, presumptively valid regulations under *District of Columbia v. Heller*, and therefore do not implicate the Second Amendment?

III.    Did Appellants waive their request for injunctive relief by failing to adequately develop that request in their opening appellate brief, and, even if were not waived, does their vague injunction request violate the specificity requirement of Fed.R.Civ.P. 65(d)?

IV.     Alternatively, if the challenged restrictions do implicate the Second Amendment, should the District Court address, in the first instance, whether the laws satisfy intermediate scrutiny?

**STATEMENT OF THE CASE**

This is a Section 1983 action challenging the public-carry licensing provisions of Pennsylvania's Uniform Firearms Act (UFA) that regulate the ability of individuals younger than 21 to carry firearms in public: (1) Section 6106, which makes it unlawful to carry a concealed firearm in public without a license, *see* 18 Pa.C.S. § 1606(a); (2) Section 6109, which establishes a minimum age of 21 for concealed-carry licenses, *see* 18 Pa.C.S. 6109(b); and (3) Section 6107, which regulates the public carrying of firearms during a proclaimed statewide emergency, *see* 18 Pa.C.S. 6107(a).

Appellee, defendant below, is Robert Evanchick, Commissioner of the Pennsylvania State Police, who was sued in his official capacity only. JA43 (complaint ¶ 25). Appellants, plaintiffs below, consist of two groups: institutional plaintiffs and individual plaintiffs. Both groups are represented by the same counsel.

The institutional plaintiffs are the Second Amendment Foundation and the Firearms Policy Coalition. JA41-43 (complaint ¶¶ 23-24). The Firearms Policy Coalition is a 501(c)(4) organization with its principal place of business in Sacramento, California. JA42 (complaint ¶ 24). The Firearms Policy Coalition purports to represent persons who "have been adversely and directly harmed by" Commissioner Evanchick's enforcement of Pennsylvania law. JA41 (complaint ¶ 24). It is presently litigating multiple challenges to similar age-based carry laws in

other states. *See Bassett v. Slatery*, Case No. 3:21-cv-152 (E.D. Tenn.); *Worth v. Harrington*, 0:21-cv-1348 (D. Minn.); *Meyer v. Raoul*, 3:21-cv-518 (S.D. Ill.); *Baughcum v. Jackson*, 3:21-cv-36 (S.D. Ga.). The complaints in those cases are remarkably similar to the complaint filed here, save for the individual plaintiffs named. *Ibid.*[1]

The individual plaintiffs enlisted in this case are Madison M. Lara and Sophia Knepley, both of whom are Pennsylvania residents older than 18, but younger than 21. JA39-41 (complaint ¶¶ 20-22).[2]

For ease of reference, Appellants will be referred to collectively as the Firearms Policy Coalition, or, more simply, "the Coalition." The Coalition appeals from the District Court's orders denying its preliminary injunction motion and granting Commissioner Evanchick's motion to dismiss. JA1 (notice of appeal).

**A. Statutory Background:**

Under the UFA, Pennsylvanians 18 years-of-age and older can possess handguns and other firearms in their homes or places of business. 18 Pa.C.S. §

---

[1]   *See also* Firearms Policy Coalition, Legal Action, https://www.firearmspolicy.org/legal.

[2] Logan D. Miller was also an individual plaintiff below, but according to Appellants, he recently turned 21. Opening Br. at 8 n.3. Because he is now eligible for a concealed-carry license, his claims are moot. *See*, *e.g.*, *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 217 (3d Cir. 2003) (student's claim for declaratory relief was rendered moot by his graduation).

6110.1; 18 Pa.C.S. § 1606(a). Outside the home, Section 6106 of the Act makes it a crime to carry a firearm "in any vehicle," or to carry a concealed firearm "on or about his person" without a valid license. 18 Pa.C.S. § 1606(a). Subsection 6106(b) of the Act enumerates 15 exceptions to the licensing requirement, which have no age limitations, and provide that individuals can carry and use firearms outside their homes or places of business without a license if they are, *inter alia*: law enforcement officers, members of the military, or members of the national guard, *see* 18 Pa.C.S. § 6106(b)(1)-(2); engaged in target shooting, *see* 18 Pa.C.S. § 6106(b)(4); carrying an unloaded firearm to or from a place of purchase or repair, *see* 18 Pa.C.S. § 6106(b)(8); or hunting and are going to and from the places where they desire to hunt, *see* 18 Pa.C.S. § 6106(b)(9).

The licensing process is governed by Section 6109, which provides that an individual must be at least 21 years old to obtain a concealed-carry license. 18 Pa.C.S. § 1609(b). Although the Pennsylvania State Police has the limited ability to prescribe forms for license applications, *see* 18 Pa.C.S. §§ 6109(c) and 6124, and helps process criminal background checks for license applications, *see* 18 Pa.C.S. §§ 6109(d)(5) and 6111, the State Police has no authority to issue or revoke licenses. Instead, county sheriffs and local law enforcement agencies are tasked with issuing, refusing to issue, and revoking licenses under Section 6109. 18 Pa.C.S. § 6109(b), (d), (g), (i); *see also PSP v. McPherson*, 831 A.2d 800, 801-05 (Pa. Cmwlth. 2003)

(discussing the respective roles of county sheriffs and the State Police and stating "[t]he decision to issue a license is solely for the sheriff"). The State Police lacks any authority to manage or control the local law enforcement agencies that issue licenses.

Finally, Section 6107 provides that "[n]o person shall carry a firearm upon public streets or upon any public property during an emergency proclaimed by a State or municipal governmental executive[.]" 18 Pa.C.S. § 6107(a). Section 6107 contains three exceptions, and allows Pennsylvanians to publicly carry firearms during a proclaimed emergency if they: (1) are actively engaged in defending themselves or their property "from peril or threat"; (2) have a concealed-carry license under Sections 6106 and 6109; or (3) qualify for one of the 15 exceptions to the concealed-carry license requirement enumerated in Subsection 6106(b). 18 Pa.C.S. § 6107(a)(1)-(2).

In short, Pennsylvanians between the ages of 18 and 21 can possess and carry firearms: (a) in their homes and places of business; (b) concealed in public if they qualify for one of the 15 enumerated exceptions to the concealed-carry license requirement; (c) openly in public, so long as the Commonwealth is not in a declared state of emergency; and (d) openly in public during a declared state of emergency when engaged in defense of themselves or their property from "peril or threat."

6

**B. Proceedings Below:**

On October 16, 2020, the Coalition sued Commissioner Evanchick in his official capacity only, *see* JA43 (complaint ¶ 25), claiming that the public-carry provisions of the UFA violated the Second Amendment. JA32-75 (complaint).[3] The Coalition did not sue any county sheriff—or indeed any other official at all—as it has in other similar suits. *See, e.g.*, *Cowey v. Mullen*, 2:20-cv-01845 (W.D. Pa.) (Coalition suit against Commissioner Evanchick and Allegheny County sheriff); *Fetsurka. v. Outlaw*, 2:20-cv-05857 (E.D. Pa.) (Coalition suit against Commissioner Evanchick and Philadelphia Police Commissioner). The Coalition raised facial challenges to Sections 6106, 6107, and 6109,[4] and sought declaratory and permanent

---

[3] The Coalition's complaint specifically referenced Pennsylvania Governor Tom Wolf's Opioid and COVID-19 emergency proclamations. *See* JA38 (complaint ¶ 16). As explained *infra*, both of those emergency proclamations have lapsed.

[4] The complaint also raised, in the alternative, as-applied challenges to the UFA. But the Coalition's complaint did not allege facts that would support an as-applied challenge, and neither its brief in this Court nor its briefs in the District Court distinguished its facial challenge from its as-applied challenge. Indeed, the District Court construed the Coalition's claim as a facial challenge only. *See* JA 10 (dist. ct. op.) ("Plaintiffs assert a facial challenge to Sections 6106, 6107, and 6109."). The Coalition has not questioned that characterization, and it has abandoned any as-applied challenge by failing to address it in its opening appellate brief. *See Young v. Hawaii*, 922 F.3d 765, 780 (9th Cir. 2021) (appellant forfeited as-applied challenge by failing to adequately plead it or raise it in initial appellate brief).

injunctive relief with respect to those provisions. JA60-73 (complaint ¶¶ 88-113); JA71-74 (complaint, prayer for relief, ¶¶ a-n).[5]

The Coalition then filed a motion for a preliminary injunction, *see* JA 88, which Commissioner Evanchick opposed, s*ee* Dist. Ct. Docket ECF No. 25. (response to preliminary injunction). Separately, Commissioner Evanchick moved to dismiss the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim under the Second Amendment. *See* JA 133-135; *see also* Dist. Ct. Docket ECF No. 24 (motion to dismiss brief). On April 16, 2021, the District Court denied the Coalition's preliminary injunction motion and granted Commissioner Evanchick's motion to dismiss. JA3-27 (dist. ct. op.). This appeal followed. JA1 (notice of appeal).

### C. Post-Judgment Developments:

On May 18, 2021, after the Coalition filed its notice of appeal, Pennsylvania amended its constitution to limit the Governor's authority to issue an emergency proclamation to 21 days, unless the General Assembly votes to extend it. *See* PA

---

[5] Although the complaint also sought nominal damages, damages are not recoverable from Commissioner Evanchick because he was sued in his official capacity only. *See e.g.*, *Ellis v. Horn*, 37 Fed. Appx. 38, 39 (3d Cir. 2002) (per curiam) ("an individual state official, sued for damages in his official capacity, is not a person within the meaning of 42 U.S.C. 1983") (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

CONST. ART. IV, § 20; *see also Cnty. of Butler v. Governor of Pa.*, 8 F.4th 226, 229

(3d Cir. 2021). Because of this change in Pennsylvania law, the Opioid[6] and COVID-

19[7] emergency proclamations referenced in the Coalition's complaint have expired.

*See* JA38 (complaint ¶ 16).[8]

---

[6] *See* Gov. Tom Wolf, Press Release, "Opioid Disaster Declaration to End Aug. 25," (Aug. 25, 2021), https://www.governor.pa.gov/newsroom/opioid-disaster-declaration-to-end-aug-25/.

[7] *See Cnty. of Butler*, 8 F.4th at 229 (acknowledging the expiration of Pennsylvania's COVID-19 emergency proclamation).

[8] Pennsylvania is currently in a declared emergency due to hurricane Ida, however. *See* Gov. Tom Wolf, Proclamation of Disaster Emergency (Aug. 31, 2021), https://www.pema.pa.gov/Governor-Proclamations/Documents/Hurricane-Ida-Proclamation-Of-Disaster-Emergency-08312021.pdf.

## STATEMENT OF RELATED CASES

This case has not previously been before this Court. The Coalition identifies *Jones v. Bonta*, 20-56174, which is currently pending in the Ninth Circuit, as a related case. That case involves the Coalition's challenge to California laws that restrict the ability of 18-to-20-year-olds to purchase certain firearms. *Jones v. Becerra*, 498 F.Supp.3d 1317 (S.D. Cal.).

This case is also related to parallel lawsuits brought by the Coalition in at least four other states, challenging public-carry limitations on 18-to-20-year-olds. *See Bassett v. Slatery*, Case No. 3:21-cv-152 (E.D. Tenn.); *Worth v. Harrington*, 0:21-cv-1348 (D. Minn.); *Meyer v. Raoul*, 3:21-cv-518 (S.D. Ill.); *Baughcum v. Jackson*, 3:21-cv-36 (S.D. Ga.).

## SUMMARY OF THE ARGUMENT

The Coalition's official-capacity suit against Commissioner Evanchick is barred by the Eleventh Amendment and Article III of the Constitution. As the District Court recognized, Section 6109 of the UFA is the only provision of the Act that mentions age, and the real essence of the Coalition's claim turns on the fact that 18-to-20-year-olds cannot obtain concealed-carry licenses under Section 6109. But the Section 6109 licensing provisions are administered by local law enforcement agencies, and Commissioner Evanchick lacks any authority to issue concealed-carry licenses. The Coalition's official-capacity suit against the Commissioner based on his generalized duty to enforce the law is thus a suit against the Commonwealth of Pennsylvania. It is therefore barred by the Eleventh Amendment. And because Commissioner Evanchick is not responsible for the purported Second Amendment violation and cannot provide the redress the Coalition seeks, the Coalition has failed to satisfy each element of standing.

But even if this action were justiciable, the Coalition's Second Amendment claim fails on the merits. "As long as there have been guns in America, there has been regulation of firearms."[9] In *District of Columbia v. Heller* the Supreme Court

---

[9] Saul Cornell & Emma Cornell, *The Second Amendment and Firearms Regulation: A venerable Tradition Regulating Liberty While Securing Public Safety*, Am. J. Public Health, Vol. 180, No. 7 (July 2018), https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2018.304501.

11

recognized that firearms regulations and the Second Amendment have always co-existed, and it took pains to emphasize that its decision was not casting doubt on longstanding laws regulating the purchase, possession, and public carrying of firearms. 554 U.S. 570, 626-27 (2008). Under this Court's post-*Heller* jurisprudence, these longstanding firearms regulations fall outside the scope of the Second Amendment altogether. *See Drake v. Filko*, 724 F.3d 426, 429-33 (3d Cir. 2013).

Public-carry laws in Pennsylvania predate the Declaration of Independence, and firearms laws regulating those under 21 trace their origins to the Reconstruction era—just after the Fourteenth Amendment was ratified and just as the Nation experienced a sharp rise in gun-related homicide due to the mass-production of handguns. Just like 34 other States, Pennsylvania has elected to place modest limitations on 18-to-20-year-olds' ability to carry firearms in public. In the judgment of these 35 legislatures, recent high school graduates are not mature or responsible enough to have an unrestrained right to carry deadly weapons in public. No court has ever invalidated one of those State laws.

But the Coalition invites this Court to become the first. It takes an absolutist position on gun laws generally, and believes that all 18-to-20-year-olds should be able to possess any type of deadly weapon at any time, in whatever manner, and for whatever purpose. And its justification for doing so rests on a contrived and selective reading of inapposite militia laws from the 1700s. That justification is belied by

12

*Heller* itself, which clarified that the rights afforded by the Second Amendment are "unconnected with militia service." 554 U.S. at 605.

The Coalition's arguments reflect its disregard for this Court's recent Second Amendment jurisprudence, its misapprehension of Pennsylvania's UFA, and its crabbed reading of *Heller*. Indeed, it asks this Court to apply *Heller* in the precise manner that the Supreme Court said it ought not be applied, that is, as a basis "to cast doubt on longstanding" firearms regulations. 554 U.S. at 626. This Court should reject the Coalition's radical and ahistorical vision of the Second Amendment, and decline its invitation to become the first court in the country to invalidate a State's public-carry restriction on 18-to-20-year-olds.

## ARGUMENT

**I.　The Coalition's suit against Commissioner Evanchick is actually a suit against the Commonwealth of Pennsylvania, and it seeks redress that Commissioner Evanchick cannot provide. It is thus barred by the Eleventh Amendment and Article III of the Constitution.**

The Coalition's official-capacity suit against Commissioner Evanchick is barred by the Eleventh Amendment, and fails to satisfy the standing requirements of causation and redressability. The Coalition seeks declaratory and injunctive relief as to the UFA's public-carry licensing scheme.[10] As the District Court recognized, "[t]he real essence of Plaintiffs' claims centers upon the fact that they cannot obtain [] concealed-carry license[s] . . .. If they were able to obtain [] license[s], the basis of their claims would fall away." JA21-22 (dist. ct. op).

That characterization stemmed from the Coalition's filings below, including its complaint, which teemed with allegations that Commissioner Evanchick had prevented the individual plaintiffs (and other 18-to-20-year-olds) from obtaining licenses under Section 6109. *See* JA36 (complaint ¶ 10) (alleging that Commissioner Evanchick has prohibited individual plaintiffs "from obtaining a license to carry firearms"); JA34, 51, 55 (complaint ¶¶ 34, 47, 60) (alleging that Commissioner Evanchick is actively enforcing Section 6109(b)); JA69-70 (complaint ¶¶124-25)

---

[10] As noted *supra*, any claim for damages against Commissioner Evanchick is not viable, as he was sued in his official capacity only. *See Will*, 491 U.S. at 71.

14

(alleging that Commissioner Evanchick's enforcement of Section 6109 violates the Second Amendment). The Coalition's filing in this Court also makes clear that the enforcement of the Section 6109 licensing provision is fundamental to the prospective relief it seeks. Opening Br. at 8, 43.

But Commissioner Evanchick—the only defendant named in this case—lacks any authority to issue licenses under Section 6109. Rather, county sheriffs and local law enforcement agencies have that authority. *See generally* 18 Pa.C.S. § 6109; *McPherson*, 831 A.2d at 803 ("[t]he decision to issue a license is solely for the sheriff"); *see also Caba v. Weaknecht*, 64 A.3d 39, 42 (Pa. Cmwlth. 2013) (stating, in suit against a county sheriff, that "[e]ach county of the Commonwealth has its own licensing authority" and that "the county sheriff is the licensing authority under the Act"). Because Commissioner Evanchick cannot issue concealed carry-licenses under Section 6109, he lacks any authority to provide the Coalition with the relief it seeks. The Coalition thus sues Commissioner Evanchick based on his generalized duty to enforce Pennsylvania law. Such a suit is barred by the Eleventh Amendment and Article III of the Constitution.

The Eleventh Amendment generally bars suits against States in federal court without their consent. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from

15

a suit against the State itself." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010) (citing *Will*, 491 U.S. at 71) (cleaned up). A plaintiff can avoid that bar by naming a state official in a suit for prospective declaratory or injunctive relief to prevent a continuing violation of federal law. *Ex parte Young*, 209 U.S. 123, 157 (1908). But the action cannot simply seek to make the state official a "representative of the state," thereby making the state a party. *Ibid.* Instead, the official sued must have sufficient connection with the enforcement of the challenged provision. *Ibid*.

But that connection cannot be based merely on the official's generalized duty to uphold the law. *1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108, 114-15 (3d Cir. 1993) (stating that "Commonwealth Officials' general duty to enforce the laws of the Commonwealth of Pennsylvania," standing alone, "is not a proper predicate for liability"). Rather, the official must play some fairly direct role in enforcing the challenged statute. *See Ex parte Young*, 209 U.S. at 157; *see also Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (the connection "must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit"); *Doyle v. Hogan*, 1 F.4th 249, 224 (4th Cir. 2021) (". . . the officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges").

16

While "ministerial" duties can sometimes be sufficient to satisfy *Ex parte Young*, the official's duties—whether discretionary or ministerial—must actually affect the plaintiff. *Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980). "[T]he inquiry is not into the nature of an official's duties but into the effect of the official's performance of his duties on the plaintiff's rights[.]" *Ibid.*[11]

Further, the State official sued must "threaten and [be] about to commence proceedings" against the plaintiffs. *Ex parte Young*, 209 U.S. at 155. So when an official is sued "based solely on his or her general obligation to uphold the law, it is appropriate only in cases where there is a 'real, not ephemeral, likelihood or realistic potential that the connection will be employed against the plaintiff's interests.'" *1st Westco Corp.*, 6 F.3d at 114 (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988)).

These requirements dovetail with the test for Article III standing, which requires a plaintiff to establish: (1) an injury in fact; (2) that is caused by challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). When a plaintiff sues state officials to enjoin the enforcement of a state statute, the dictates of *Ex parte Young* overlap significantly with the last two requirements of standing—

---

[11] This inquiry "does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).

17

causation and redressability. *See Doe v. Holcomb*, 883 F.3d 971, 975-76 (7th Cir. 2018); *see also Dig. Recognition Network v. Hutchinson*, 803 F.3d 952, 956-57 (8th Cir. 2015) ("questions of Article III jurisdiction and Eleventh Amendment immunity are related"). Accordingly, "a plaintiff must show that the named state official plays some role in enforcing the statute in order to avoid the Eleventh Amendment. But, in order to satisfy the requirements of causation and redressability, he must also establish that his injury is causally connected to that enforcement and that enjoining the enforcement is likely to redress his injury." *Holcomb*, 883 F.3d at 975-76.

The Coalition's suit against Commissioner Evanchick challenging Pennsylvania's public-carry licensing scheme is barred by the Eleventh Amendment, and the Coalition has failed to satisfy the requirements of causation and redressability. Under Section 6109, county sheriffs, not Commissioner Evanchick, are tasked with issuing concealed-carry licenses. 18 Pa.C.S. § 6109(b), (d), (g), (i); *see also McPherson*, 831 A.2d at 803. Although Commissioner Evanchick has the limited authority to establish license application forms, *see* 18 Pa.C.S. §§ 6109(c) and 6124, and the State Police and helps process criminal background checks for license applications, *see* 18 Pa.C.S. §§ 6109(d)(5) and 6111, Commissioner Evanchick has no statutory authority to issue licenses. Because Commissioner Evanchick does not issue licenses under Section 6109, he is not responsible for the

18

purported ongoing violation of Federal law, and he cannot provide the redress that the Coalition seeks through this suit.[12]

Other Pennsylvania cases brought by the Coalition establish that it understands the need to name county sheriffs in suits challenging the licensing provisions of the UFA. *See, e.g., Cowey v. Mullen*, 2:20-cv-01845 (W.D. Pa.) (Coalition suit against both Commissioner Evanchick and the Sheriff of Allegheny County); *Fetsurka v. Outlaw,* 2:20-cv-05857 (E.D. Pa.) (Coalition suit against Commissioner Evanchick and the Philadelphia Police Commissioner). And in similar age-based carry suits brought by the Coalition in other jurisdictions, it has sued the appropriate local officials who administer and enforce those laws. *See, e.g., Meyer v. Raoul*, 3:21-cv-518 (S.D. Ill.) (Coalition suit against state AG and Police, and six county officials). But the Coalition failed to do so here. That failure dooms its challenge to the UFA's public-carry provisions.

The Coalition sues Commissioner Evanchick as a mere "representative of the state," thereby making its suit against the Commonwealth of Pennsylvania. *Ex parte Young*, 209 U.S. at 157. Indeed, its appellate brief makes clear that its true desire is

---

[12] If the Coalition reiterates the argument it raised below regarding Commissioner Evanchick's authority under 18 Pa.C.S. § 6111.1, that section plainly establishes the Commissioner's role with respect to firearms *sales and transfers*. That authority is entirely separate from the provisions governing the issuance carry licenses under Section 6109, which, again, are administered by county sheriffs.

to sue the Commonwealth, stating that this Court should "remand with instructions to enter an injunction forbidding *Pennsylvania* from continuing to ban 18-to-20-year-olds from carrying firearms in public for lawful purposes." Opening Br. at 51 (emphasis added).

The Coalition's official-capacity suit against Commissioner Evanchick is barred by the Eleventh Amendment and Article III of the Constitution.[13]

## II.    The challenged laws do not implicate the Second Amendment.

Even if this case were justiciable—which it is not—the Coalition's Second Amendment claim would still fail on the merits. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II. Under this Court's post-*Heller* framework, longstanding regulatory measures fall outside the scope of the Second Amendment altogether and are presumptively valid. Because the public-carry provisions of the UFA mirror firearms laws that date back to the Reconstruction era, just after the Fourteenth Amendment was ratified, the District Court correctly concluded that those provisions were "of the sort that have

---

[13] This Court may consider Eleventh Amendment issues for the first time on appeal, *In re Hetchinger Inv. Co. of Del., Inc.*, 335 F.3d 244, 251 (3d Cir. 2003), and may affirm the District Court's judgment on any ground supported by the record. *TD Bank N.A. v. Hill*, 928 F.3d 259, 276 n.9 (3d Cir. 2019).

long been accepted as being consistent with the right to keep and bear arms." JA23 (dist. ct. op.). That determination should be affirmed.

### A. In *District of Columbia v. Heller* and *McDonald v. City of Chicago*, the Supreme Court made it clear that the Second Amendment is not unlimited.

Because the Coalition woefully misapprehends the Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago*, a brief overview of those decisions is necessary.

In *District of Columbia v. Heller*, the Supreme Court invalidated D.C. laws that banned handgun possession, including in the home, and required all firearms in the home to be kept in an inoperable state, even when necessary for self-defense. 554 U.S. at 635. In doing so, it held that the Second Amendment, at its core, conferred an individual right to keep and bear arms in the home for self-defense. 554 U.S. at 630-35 (the Second Amendment "elevates above all other interests the right of law abiding, responsible citizens to use arms in defense of hearth and home"); *see also McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010) ("In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for self-defense."). The Court observed that "[f]ew laws in the history of our nation" had matched D.C.'s outright ban on handgun possession, concluding that the law "would fail constitutional muster" "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Heller*, 554 U.S. at 628-29.

21

Following *Heller*, the Supreme Court held that the core Second Amendment right to possess a handgun in the home for self-defense applied to the States via the Fourteenth Amendment. *McDonald*, 561 U.S. at 791. Two aspects of the Supreme Court's opinions in *Heller* and *McDonald* are particularly important for present purposes.

*First*, the Supreme Court emphasized that the right secured by the Second Amendment, "[l]ike most rights, . . . is not unlimited," and does not encompass "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786. The Court acknowledged, as one example of a limitation on the Second Amendment, that "the majority of 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *Heller*, 554 U.S. at 626. The Court also made it clear that its holding "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *McDonald*, 561 U.S. at 786 (cleaned up) (quoting *Heller*, 554 U.S. at 626-27). The Court described these longstanding restrictions as "presumptively lawful," and emphasized that the list was not exhaustive. *Heller*, 561 U.S. at 627 n.26.

22

*Second*, the Supreme Court did not attempt to "clarify the entire field" of Second Amendment law or establish a framework for analyzing Second Amendment claims, stating that there "will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." *Heller*, 554 U.S. at 635; *see also United States v. Marzzarella*, 614 F.3d 85, 92 (3d Cir. 2010) (" . . . *Heller* did not purport to define all the contours of the Second Amendment"). But the High Court did recognize that "a variety of legal and other sources" can be used "to determine *the public understanding*" of the Second Amendment, including sources from the period after its ratification. *Heller*, 554 U.S. at 605 (emphasis in original). In finding a core right to keep a handgun in the home for self-defense, the High Court relied on, *inter alia*: analogous arms-bearing rights adopted by the States between 1789 and 1820, *see id.* at 600-02; interpretations of those provisions by 19th century courts and commentators, *see id.* at 603; and post-Civil War legislation, *see id.* at 614. *See also NRA v. BATFE*, 700 F.3d 185, 194 n.8 (5th Cir. 2012) (summarizing the historical sources the Court relied on in *Heller*).

**B. This Court's post-*Heller* jurisprudence establishes a two-step framework for analyzing Second Amendment claims.**

In the wake of *Heller* and *McDonald*, this Court created a framework for analyzing Second Amendment challenges structured around the Supreme Court's

holding that it was not upending longstanding firearms restrictions.[14] That framework—which has since been adopted by nearly every Court of Appeals in the country, *see Binderup v. Att'y Gen.*, 836 F.3d 336, 346 (3d Cir. 2016) (*en banc*) (collecting cases)—established a two-pronged approach to such challenges.

Under the first prong, this Court looks to whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. *Marzzarella*, 614 F.3d at 89. If it does not, the law is constitutional and the inquiry is complete. *Ibid.* If the law does burden conduct that falls within the scope of the Second Amendment, however, the Court moves to the second prong and evaluates that law under some form of means-end scrutiny. *Ibid.* If the law passes muster under that standard it is constitutional. *Ibid.* If it fails, it is invalid. *Ibid.*

As to the first prong, "certain longstanding regulations are exceptions, such that the conduct they regulate is not within the scope of the Second Amendment." *Drake*, 724 F.3d at 431-32. Put another way, these measures are "exceptions to the

---

[14] This Court has determined that the critical passage from *Heller* was not mere *dicta*. Rather, that passage was integral to the Supreme Court's holding. *See, e.g.*, *United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2021) ("We agree with the Second and Ninth Circuits that *Heller*'s list of 'presumptively lawful' regulations is not dicta."); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 903 (3d Cir. 2020) (*Heller's* instruction on longstanding prohibitions "constrain[s] the scope of the right"). Indeed, the High Court reiterated that critical passage in *McDonald*. *See* 561 U.S. at 786.

Second Amendment guarantee." *Marzzarella*, 614 F.3d at 91.[15] The D.C. Circuit, after adopting this Court's *Marzzarella* framework, stated that "[t]his is a reasonable presumption because a regulation that is longstanding, which necessarily has long been accepted by the public, is not likely to burden a constitutional right; concomitantly the activities covered by a longstanding regulation are presumptively not protected from regulation by the Second Amendment." *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*"); *see also Heller*, 554 U.S. at 605 (relying, in part, on "the public understanding" of the Second Amendment).

In determining whether a regulation is sufficiently longstanding, most courts, including this one, have held that the regulation need not date back to the Founding era. This Court recently explained the inherent risks in approving "only those rules that mirror 'precise founding-era analogues,'" concluding that such a "rigid approach" would unduly constrain governments in addressing modern problems. *Drummond v. Robinson Twp.*, 9 F.4th 217, 226-27 (3d Cir. 2021) (quoting *NRA v. BATFE*, 700 F.3d at 196).

---

[15] In a similar vein, certain categories of speech, such as obscenity or defamation, fall outside the scope of the First Amendment. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 225-26 (3d Cir. 2021).

In *Drake*, this Court relied on 19th and 20th century authorities to conclude that New Jersey's "justifiable need" public-carry restriction was "longstanding" under *Heller* where it "existed in New Jersey in some form for nearly 90 years." 724 F.3d at 431-34. This Court noted that "[o]ur sister courts have likewise recognized that a firearms regulation may be 'longstanding' and 'presumptively valid' even if it was only first enacted in the 20th century." *Id.* at 434 n.11; *see also NRA v. BATFE*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be 'longstanding' even if it cannot boast a precise founding-era analogue"); *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) (early twentieth century regulations can establish a history of longstanding regulation); *Peterson v. Martinez*, 707 F.3d 1197, 1210 (10th Cir. 2013) (relying on 19th century sources to conclude that "[t]here can be little doubt that bans on the concealed carrying of firearms are longstanding."); *Heller II*, 670 F.3d at 1254 (handgun registration requirement from 1911was longstanding).

Indeed, of the three categories of longstanding, presumptively valid regulations identified in *Heller* and *McDonald*—*i.e.*, (1) prohibitions on the possession of firearms by felons and the mentally ill, (2) laws forbidding the carrying of firearms in sensitive places, and (3) laws imposing conditions and qualifications on the commercial sale of firearms—only laws forbidding the carrying of firearms in sensitive places existed at the time of the Founding. *See NRA v. Swearingen*, ___F.Supp.3d___, 2021 WL 2592545, *13 (N.D. Fla. June 24, 2021). Prohibitions

26

on the possession of firearms by felons and the mentally-ill and laws regulating the commercial sale of firearms first arose in the 20th century. *Ibid.*; *see also NRA v. BATFE*, 700 F.3d at 196 (". . . *Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage").

**C. The challenged provisions are longstanding, presumptively lawful regulations that the public has accepted as being consistent with the Second Amendment.**

Under step-one of *Marzzarella*, the District Court concluded that the challenged laws do not implicate the Second Amendment's guarantee. It did not proceed to means-ends scrutiny under step-two given that determination. That determination should be affirmed.

As noted, *Heller* itself acknowledged the validity of 19th century concealed-carry laws, *see* 554 U.S. at 626, and this Court has already held that public-carry regulations are longstanding under step-one of *Marzzarella*, *see Drake*, 724 F.3d at 431-34. In *Drake*, this Court upheld New Jersey's law requiring an individual to demonstrate justifiable need to obtain a permit to publicly carry a handgun. *Id.* at 428-29. New Jersey's law did not distinguish between concealed and open carrying. *Ibid.*; *id.* at 433 (New Jersey's justifiable need requirement "must be met to carry openly or concealed").

27

This Court observed that while *Heller* and *McDonald* made clear that the individual right afforded by the Second Amendment is at its "zenith within the home, beyond the home we encounter a 'vast terra incognita.'" *Drake*, 724 F.3d at 430 (citations omitted). This Court rejected the notion that any historical analysis "leads *inevitably* to the conclusion that the Second Amendment confers upon individuals a right to carry handguns in public for self-defense." *Id.* at 431 (emphasis in original). And although this Court assumed that the Second Amendment "*may* have some application beyond the home," it ultimately determined that a definitive ruling on that question was unnecessary where New Jersey's public-carry regulation "fit comfortably within the longstanding tradition of regulating the public carrying of weapons for self-defense." *Id.* at 431-33. That conclusion was firmly grounded in the historical record.

Pennsylvania's practice of limiting the ability to carry firearms beyond one's own property predates the Declaration of Independence. *See* Act No. 246 of Aug. 26, 1721, (3 St. L. 254, Ch. 246) (prohibiting one to "carry any gun or hunt" on lands other than one's own land without license or permission); *see also Commonwealth v. McKnown*, 79 A.3d 678, 700 (Pa. Super. 2013) (Fitzgerald, J. concurring) ("Laws regulating the carrying of firearms predate the earliest incarnation of the Pennsylvania Constitution."). That practice continued well into the 19th century. Between 1851 and 1897, Pennsylvania enacted a series of laws that restricted the

concealed carrying of firearms and other deadly weapons in public. *See*, *e.g.*, *Wright v. Commonwealth*, 77 Pa. 470 (Pa. 1875) ("[T]he Act of May 3, 1864, Pamph. L. 823, 1 Br. Purd. 323, PL 40, prohibiting the carrying of concealed deadly weapons . . . in Schuylkill county[.]"). Those regulations existed alongside Pennsylvania's independent constitutional provision on the right to bear arms. PA CONST. ART. IX, § 21 (1790).

Other states went further than Pennsylvania in regulating the public carrying of concealable firearms in the decades after the ratification of the Constitution. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right*: *The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 513-15 (2004) (detailing concealed-carrying laws in Ohio, Tennessee, Virginia, and Georgia enacted during the antebellum period). For example, Tennessee criminalized the carrying of concealable and other dangerous weapons statewide, and Georgia criminalized the sale of concealable weapons altogether. *Ibid.* Concealed-carry laws were thus "among the earliest types of gun control laws adopted in the years after the American Revolution" and "[n]o gun control law was more common in the late 1800s." Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America*, p. 166 (2011).

As to the specific age-based provision in Section 6109 of the UFA, that also "fit[s] comfortably within the longstanding tradition" of firearms regulations. For

29

most of the Nation's history, those who were under the age of 21 were considered "minors." *See*, *e.g.*, William Blackstone, *Commentaries on the Laws of England*, Vol I at 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Infant, *Black's Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years") (quoting John Indermaur, Principles of the Common Law, 195 (Edmund H. Bennett ed., 1st Am. Ed. 1878)). Indeed, 21 was the statutory age of majority in most states until 1971, when the 26th Amendment lowered the minimum voting age to 18. *See* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681-86 (2007). It is thus unsurprising that laws restricting the ability of those under 21 to purchase, possess, and carry firearms are of considerable vintage.

By the end of the 19th century, 19 states and the District of Columbia enacted laws that limited the ability of those under 21 to purchase and use firearms. *See NRA v. BATFE*, 700 F.3d at 202 n.14 (collecting statutes).[16] Of those 19 States, 12 had

---

[16] 1856 Ala. Acts 17 (1856) (banning gun sales to minors under 21); 16 Del. Laws 716 (1881) (banning concealed-carry, and banning the sale of deadly weapons to minors under 21); 27 Stat. 116 (1892) (criminalizing concealed-carry for all persons, and banning the sale of guns and dangerous weapons to minors under 21); 1876 Ga. Laws 112 (1876) (banning gun sales to minors under 21); 1881 Ill. Laws 73 (1881) (banning the sale of guns and other dangerous weapons to minors under 21); 1875 Ind. Acts 86 (1875) (banning the sale of pistols, cartridges, and other concealable deadly weapons to anyone under 21); 1884 Iowa Acts 86 (1884)

Second Amendment analogues in their respective State constitutions. *Ibid*. And just

like the challenged provisions of the UFA, those 19th century age-based restrictions

typically appeared in the exact same statutes that also banned concealed-carry. *Ibid.*

---

(banning the sale of pistols to minors under 21); 1883 Kan. Sess. Laws 159 (1883); (banning the purchase and possession of guns and other dangerous weapons by minors under 21); 1873 Ky. Stat. art. 29, at 359 (1873) (criminalizing concealed-carry for all persons, and banning the sale of all deadly weapons to minors under 21); 1890 La. Acts 39 (1890) (banning the sale of concealable deadly weapons to anyone under 21); 1882 Md. Laws 656 (1882) (banning the sale of firearms and deadly weapons other than rifles and shotguns to minors under 21); 1878 Miss. Laws 175 (1878) (criminalizing concealed-carry for all persons, and prohibiting the sale of firearms and deadly weapons to intoxicated persons or to minors under 21); 1883 Mo. Laws 76 (1883) (criminalizing concealed carry for all persons, and prohibiting the sale of such weapons to minors under 21 without parental consent);  1885 Nev. Stat. 51 (1885) (prohibiting minors under 21 from carrying concealed pistols and other dangerous weapons); 1893 N.C. Sess. 468-69 (1893) (banning the sale of pistols and other dangerous weapons to minors under 21); 1856 Tenn. Pub. Acts 92 (1856) (prohibiting the sale of pistols and other dangerous weapons to minors under 21); 1897 Tex. Gen. Laws 221-22 (1897) (banning the sale of pistols and other dangerous weapons to minors under 21); 1882 W.Va. Acts 421-22 (1882) (criminalizing carrying guns and other dangerous weapons about one's person and prohibiting the sale of such weapons to minors under 21); 1883 Wis. Sess. Laws 290 (1883) (making it unlawful for "any minor . . . to go armed with any pistol or revolver" and for any person to sell firearms to minors under 21); 1890 Wyo. Sess. Laws 1253 (1890) (banning the sale of pistols and other dangerous weapons to anyone under 21). *See also* Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L, at 681-86 (age of majority by state).

Full texts of these laws are available at the Repository of Historical Gun Laws, Duke University School of Law, https://firearmslaw.duke.edu/repository/search-the-repository/.

31

Although the earliest of these age-based provisions was enacted in 1856, the overwhelming majority were enacted during the Reconstruction era, after the Fourteenth Amendment was ratified in 1868. That timing is significant.

Until the Fourteenth Amendment was ratified, the States were not constrained by the Bill of Rights. *See Barron v. Mayor and City Council of Baltimore*, 32 U.S. 243 (1833); *see also United States v. Cruikshank*, 92 U.S. 542 U.S. 542, 553 (1875) ("The second amendment . . . means no more than that it shall not be infringed by Congress . . . [it] has no other effect than to restrict the powers of the national government, leaving the people to look for their protection [to state law]."). *Heller* itself underscored the importance of the post-Civil War era. 554 U.S. at 615; *see also Drummond*, 9 F.4th at 227 (". . . the question is if the Second and *Fourteenth Amendments' ratifiers* approved [the challenged] regulations . . ..") (emphasis added). And even the Coalition acknowledges the importance of this period: "Reconstruction Era views are 'instructive' evidence of the Second Amendment's scope because they reflect 'the public understanding of the Second Amendment in the period after its enactment.'" Opening Br. at 19-20 (cleaned up) (quoting *Heller*).

Additionally, the timing of those concealed-carry/age-based statutes coincided with the mass-production of handguns, and a corresponding rise in firearms related violence that was largely unknown to the Founding era. *See*, *e.g.*, Cornell & DeDino, 73 Fordham L. Rev. at 500 ("firearms only accounted for a small

32

percentage of homicides in the period before the Civil War"); *see also* Eric

Monkkonen, *Murder in New York City*, at 35-48 (2001) (describing the mass-

production of concealable handguns and the corresponding rise in gun-related

homicides, and noting that after 1857 the proportion of gun murders doubled).

Significantly, age-based provisions withstood legal challenges in 19th century

courts following the Fourteenth Amendment's ratification. *See*, *e.g.*, *State v.*

*Callicut*, 69 Tenn. 714, 716-17 (1878). In upholding Tennessee's law banning the

sale of pistols to minors under the age of 21, the Tennessee Supreme Court stated

that the law was "not only constitutional as tending to prevent crime but wise and

salutary in all its provisions." *Id.* at 717.[17]

The long tradition of regulating 18-to-20-year-olds, specifically in the context

of public-carry statutes, has continued into the 20th and 21st centuries. By 1923,

three more states—New Hampshire, Oklahoma, and South Carolina—enacted laws

restricting the ability of 18-to-20-year-olds to purchase firearms, bringing the total

---

[17] Although the Tennessee Supreme Court cited to *Aymette v. State*, 21 Tenn. 154 (1840), and the Court in *Heller* adopted a different construction of the Second Amendment from *Amyette*'s militia-based construction of Tennessee's analogous constitutional provision, *see Heller*, 554 U.S. at 613, that does not undercut *Callicut*'s usefulness from a historical perspective. The Court in *Heller* went on to observe that in 1833—before *Callicut*—the Tennessee Supreme Court acknowledged a right to bear arms for personal self-defense. *Ibid.* (citing *Simpson v. State*, 13 Tenn. 356 (1833)). The Tennessee Supreme Court saw no contradiction between that principle and the age-based restriction it considered in *Callicut* in 1878.

to 21 States plus the District of Columbia. *See NRA v. BATFE*, 700 F.3d at 202 n.16.

Currently, at least 19 States prohibit those under 21 from purchasing certain types

of firearms. *See NRA v. Swearingen*, 2021 WL 2592545, *13 n.27 (collecting

statutes). And like Pennsylvania, 34 other States currently restrict the ability of those

under 21 to carry firearms in public.[18]

The District Court correctly determined that the UFA is the type of law that

fits comfortably with the long history of regulating both public-carry and those under

21, and has been accepted by the public as falling outside the scope of the Second

Amendment. That determination coheres with the view of most courts to consider

the question. *See*, *e.g.*, *NRA v. BATFE*, 700 F.3d at 204  (federal law prohibiting

federally licensed firearms dealers from selling handguns to persons under 21 was

longstanding); *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (Texas's public-

---

[18] Alaska Stat. § 18.65.705(1); Ariz. Rev. Stat. § 13-3112(E)(2); Ark. Code § 5-73-309(3)(A); Colo. Rev. Stat. § 18-12-203(1)(b); Conn. Gen. Stat. § 29-28(b); Fla. Stat. § 790.06(2)(b); Ga. Code § 16-11-129(b)(2)(A); Haw. Rev. Stat. § 134-2(d); Idaho Code § 18-3302(11); Iowa Code § 724.8(1); Kan Stat § 75-7c04(a)(3)(B); Ky. Rev. Stat. § 237.110(4)(c); La. Rev. Stat. § 40:1379.3(C)(4); Mass. Gen. Laws ch. 140 § 131(d)(iv); Mich. Comp. Laws § 28.425b(7)(a); Minn. Stat. § 624.714(2)(b)(2); Miss. Code § 45-9-101(2)(b)(i); Neb. Rev. Stat. § 69-2433(1); Nev. Rev. Stat. § 202.3657(3)(a); N.M. Stat. Ann. § 29-19-4(A)(3); N.Y. Penal Law § 400.00(1)(a); N.C. Gen. Stat § 14-415.12(a)(2); Ohio Rev. Code § 2923.125(D); 21 Ok. Stat. § 1290.9(3)(a); Or. Rev. Stat. § 166.291(1)(b); R.I. Gen. Laws § 11-47-11(a); S.C. Code § 23-31-215(A); Tenn. Code. § 39-17-1351(b)(1); Tx. Gov't Code § 411.172(a)(2); Utah Code § 53-5-74(1)(b)(1); Va. Code § 18.2-308.02(A); Wash. Rev. Code § 9.41.070(1)(c); W. Va. Code § 61-7-4(b)(3); Wyo. Stat. § 6-8-104(b)(ii).

carry restriction on 18-to-20-year-olds was longstanding); *Powell v. Tompkins*, 926 F.Supp.2d 367 (D. Mass. 2013) (state law prohibiting 18-to-20-year-olds from obtaining concealed-carry licenses was longstanding); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (public-carry restrictions on 18-to-20-year-olds was "historically rooted" and did not regulate "core conduct subject to second amendment protection"); *Mitchell v. Atkins*, 483 F.Supp.3d 985, 993 (W.D. Wash. 2020) (prohibition on selling semiautomatic assault rifles to 18-to-20-year-olds was longstanding); *Jones v. Becerra*, 498 F.Supp.3d at 1327 (California laws restricting the ability of 18-to-20-year-olds to purchase certain firearms was longstanding); *NRA v. Swearingen*, 2021 WL 2592545, at *17 (Florida law banning 18-to-20-year-olds from purchasing firearms was longstanding).[19]

---

[19] Only one Court—a divided three-judge panel of the Fourth Circuit—has reached a contrary conclusion. *See Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021); *see also id.* at 457-484 (Wynn, J. dissenting). But the reasoning of the two judges in the *Hirschfeld* majority cannot be squared with this Court's precedent establishing that firearms regulations need not "mirror precise founding era analogues" to be considered longstanding and presumptively valid under step-one of *Marzzarella*. *Compare Hirschfeld*, 5 F.4th at 439 ("we focus the historical inquiry in step one on the time of ratification in 1791), *with Drummond*, 9 F.4th at 227 (criticizing the requirement of a precise Founding-era analogue as a "rigid approach"), *and Drake*, 724 F.3d at 341-34 (relying on 19th and 20th century authorities).

**D. The Coalition's arguments present no basis for questioning the District Court's judgment.**

The essence of the Coalition's response to the above historical analysis is as follows: (1) the public-carry provisions of the UFA effectuate a "categorical ban" that is "unconstitutional *per se*" under *Heller*; (2) militia laws from the 1700s required 18-to-20-year-olds to join the militia, which necessarily confers a corresponding right to carry firearms in public in 2021; and (3) the District Court erred in relying on the Fifth Circuit's reasoning in *NRA v. BATFE*. Each of these erroneous arguments will be discussed in turn.

**1. The Coalition's contention that the UFA effectuates a "categorical ban" and is *per se* unconstitutional under *Heller* reveals its fundamental misapprehension of both the UFA and *Heller*.**

Rather than couch its analysis in this Court's framework, the Coalition attempts to create, and then apply, its own. Although it pays momentary lip service to this Court's Second Amendment precedents, *see* Opening Br. at 11, it largely ignores those precedents in favor of a *per se* invalidation rule that is purportedly grounded in *Heller*. Opening Br. at 38 ("*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment."). The Coalition then proceeds to apply its *per se* invalidation rule improperly, wrongly asserting that the UFA effectuates a "flat ban on 18-to-20-year-olds' ability to carry firearms for self-defense." Opening Br. at 41. These arguments are emblematic of the Coalition's

36

fundamental misapprehension of *Heller* and the UFA, and of its disregard for this Court's precedent.

The Coalition asserts that "wholesale infringements upon rights safeguarded by the [Second] Amendment must be held unconstitutional categorically." Opening Br. at 38. Although the Coalition sandwiches those words between two quotes from *Heller*, that verbiage appears nowhere in the *Heller* opinion. The Coalition continues that "*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment." Opening Br. at 38. That language also appears nowhere in *Heller*, but the supposed support for that proposition comes from the majority opinion's rejection of the dissent's proposed "freestanding interest balancing inquiry." *See* 554 U.S. 634. How that translates into a "categorical" or "*per se*" rule is far from obvious, and the Coalition does not explain it.

That this Court has already rejected that reading of *Heller* is apparently of no moment to the Coalition. *See*, *e.g.*, *United States v. One (1) Palmetto Sate Armory PA-15 Machinegun*, 822 F.3d 136, 144 (3d Cir. 2016) (stating that *Heller* "does not mean that a categorical ban on any particular type of bearable arm is unconstitutional. . . . *Heller* contains clear statements to the contrary."); *Binderup*, 836 F.3d at 344 (rejecting *per se* invalidation rule); *see also id.* at 399 (Fuentes, J., concurring in part, dissenting in part) (stating that a *per se* rule is "inconsistent with the development of the Second Amendment Doctrine in this and other circuits" and

37

"seems out of step with *Heller* itself").[20] And, as this Court observed in *Binderup*, that reading has also been rejected by other Courts of Appeals. *Binderup*, 836 F.3d at 344 ("Neither the Supreme Court nor any court of appeals has held that laws burdening Second Amendment rights evade constitutional scrutiny."); *see also Heller II*, 670 F.3d at 1268; *Worman v. Healey*, 922 F.3d 26, 38 n.6 (1st Cir. 2019); *Kolbe v. Hogan*, 849 F.3d 114, 138-39 (4th Cr. 2017).

But even if *Heller* could be interpreted as establishing a *per se* rule, that rule would have no application here. The Coalition maintains that "Pennsylvania *effectively* bans *virtually* all 18-to-20-year-olds from carrying firearms outside the home for *most* lawful purposes[.]" Opening Br. at 9 (emphasis added). The number of qualifiers in that statement undermines the Coalition's categorical ban theory, as does a cursory review of the UFA.

Section 6106 of the Act enumerates 15 exceptions to the licensing requirement, *see* 18 Pa.C.S. § 6106(b), Section 6107 contains a self-defense exception, *see* 18 Pa.C.S. § 6107(a)(1), and all law-abiding 18-to-20-year-olds can

---

[20] A clear majority of ten judges in *Binderup* rejected the Coalition's reading of *Heller*. *Accord Holloway v. Att'y Gen. United States*, 948 F.3d 164, 171 n.5 (3d Cir. 2020) (setting forth the holdings from *Binderup* and stating that the goal in analyzing a fractured judicial opinion "is to find a single standard that when properly applied, produces results with which a majority" would agree) (cleaned up).

possess firearms in their homes—which is the core right that the Second Amendment protects. *See Heller*, 554 U.S. at 634-35.

Because the exemptions in the UFA are inconvenient for the Coalition's narrative, it attempts to write them out of existence. Opening Br. at 39-41. In particular, it dismisses the self-defense exception in Section 6107 as "utterly vacuous." Opening Br. at 41 n.6. But the self-defense exception in Pennsylvania's statute mirrors provisions in analogous public-carry laws from the 19th century. *See, e.g.*, 1882 W.Va. Acts 421-22 (1882) (prohibiting carrying guns and other dangerous weapons about one's person and the sale of such weapons to minors under 21, but including an exception for self-defense); 1859 Ohio Laws 56 (1859) (prohibiting concealed-carry, but including an exception for defense of self, property, or family). Like the 19th century legislatures that crafted those laws, the Pennsylvania General Assembly included the self-defense exception in Section 6107 because it intended it be meaningful.

Indeed, as the District Court correctly observed, "bedrock" principles of statutory construction in Pennsylvania establish that the General Assembly does not "intend a result that is absurd, impossible of execution or unreasonable," and require that a statute "be construed, if possible, to give effect to all its provisions, so that no provision is mere surplusage." JA23 n.7 (dist. ct. op.) (quoting *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003)) (cleaned up). While it does not

appear that the phrase "[a]ctively engaged in a defense of that person's life or property from peril or threat" as used in Subsection 6107(a)(1) has been interpreted by Pennsylvania courts, that is not a basis to render it meaningless.

The New Jersey public-carry licensing scheme this Court upheld in *Drake* required an individual to articulate an "urgent necessity for self-protection as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant's life that cannot be avoided by other means than by issuance of a permit to carry a handgun." 724 F.3d at 428 (quoting N.J. Admin Code 13:54-2.4(d)(1). This Court rejected the argument that the law amounted to a "complete prohibition on public carry." *Id.* at 433 n.9. That same logic applies here.

The Coalition's "categorical ban" argument is completely unmoored from the actual substance of the UFA. It goes so far as to make the remarkable claim that Sections 6106, 6107, and 6109 are "just as extensive and categorical" as the absolute ban on handgun possession that the Supreme Court struck down in *Heller*, *see* Opening Br. at 39—a law that the Supreme Court said had few analogues in our Nation's history. *Heller*, 554 U.S. at 628-29 ("[f]ew laws in the history of our nation" have come close the District of Columbia's outright ban on handgun possession); *see also Drake*, 724 F.3d at 431 (stating that the High Court in *Heller* "struck down a single law that 'ran roughshod' over D.C. residents' individual right to possess usable handguns *in the home*") (emphasis in original, citations omitted). The

40

Coalition's inability to recognize the obvious differences in these laws shows that it does not understand how the UFA actually functions.

The Coalition's assertion that the UFA is a categorical ban that is unconstitutional *per se* under *Heller* is neither grounded in precedent nor tethered to reality.

### 2. The Coalition's heavy reliance on militia laws from the 1700s underscores its misunderstanding of *Heller* and its indifference toward this Court's precedent.

Consistent with its misapprehension of *Heller*, this Court's precedents, and the UFA, the Coalition also misreads the historical record by narrowly focusing on militia laws from the 1700s. In its view, because certain State and Federal militia laws at the time of the Founding required 18-to-20-year-olds to serve in the militia, then recent high school graduates must have a corresponding right to publicly carry firearms in 2021. Opening Br. at 22-23. The Coalition's simplistic historical syllogism fails for a plethora of reasons.

*First*, the Coalition's myopic focus on militia laws from the 1700s is belied by *Heller* itself, which specifically stated that the Second Amendment protects "an individual right unconnected with militia service." 554 U.S. at 605.

*Second*, this Court has already rejected the Coalition's "rigid" view of the step-one historical analysis. As this Court explained, "[i]f we approve only those laws that mirror 'precise founding era analogues,' we risk compelling governments

41

to confront 'new weapons or modern circumstances' with old playbooks." *Drummond*, 9 F.4th at 226 (quoting *NRA v. BATFE* and *Heller II*) (cleaned up). That concern is particularly acute here, given that concealable handguns were not common during the Founding era. As noted, handguns were first mass produced in the mid-1800s, leading to guns becoming the primary weapon used in murders by the end of the that century. "American constitutional law did not end at the founding and it is important to recognize the profound changes that swept over American law in the decades after the ratification of the Constitution." Cornell & DeDino, 73 Fordham L. Rev. at 503. The Coalition's Founding-era-or-bust approach flouts that principle, and is at war with this Court's precedent.

*Third*, if militia laws from the 1700s are relevant at all, those laws are not as favorable to the Coalition's position as it suggests. Far from establishing an unqualified right to bear arms, militia service for those under 21 presupposed parental oversight. For example, Pennsylvania's 1755 Militia Act provided that "no Youth, under the age of Twenty-one Years, . . . shall be admitted to enroll himself . . . without the Consent of his or their Parents or Guardians[.]"[21] And when Congress enacted the Federal Militia Act of 1792, which required "every free able-bodied white male citizen . . . who is or shall be of the age of eighteen years, and under the

---

[21] Full text available at https://founders.archives.gov/documents/Franklin/01-06-02-0116#BNFN-01-06-02-0116-fn-0001.

age of forty-five years" to serve, *see* 1 Stat. 271 (1792), it assumed that minors' parents would provide them with the necessary arms. *See Debates and Proceedings in the Congress of the United States*, Vol. II., March 3, 1789 to March 3, 1791, at 1856 (". . . as to minors, their parents or guardians would prefer furnishing them with arms themselves . . .").

Moreover, the minimum age for militia service during the Founding era varied from state-to-state and fluctuated during periods of conflict. *NRA v. Swearingen*, 2021 WL 2592545, at *8 ("In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one."). When the Second Amendment was ratified, a majority of states established 16 as the minimum age for militia service. *Id.* *8. The logical extension of the Coalition's position would lead to all restrictions on those age 16 and older being invalidated. That result is untenable.

*Finally*, insofar as 18th century militia laws are relevant, members of the military and national guard (the modern-day militia) are exempt from the UFA's licensing requirement altogether and may carry firearms in public even when Pennsylvania is in a declared state of emergency. *See* 18 Pa.C.S. §§ 6106(b)(2) and 6107(a)(2). Pennsylvania law is thus consistent with the Coalition's assertion that militia service confers a right to carry in public.

In short, the Coalition wrongly conflates a duty to serve in the militia in 1790 with an unfettered right to carry firearms in public in 2021. Militia laws from the 1700s simply lend no support to the Coalition's radical interpretation of the Second Amendment, and they certainly do not undermine the District Court's conclusion that the challenged provisions are "of the sort that have long been accepted as being consistent with the right to keep and bear arms." JA23 (dist. ct. op.).

### 3. The Coalition's criticisms of the District Court's opinion are nothing more than recycled critiques from other cases.

The Coalition asserts that the District Court "simply ignored the great bulk of the historical evidence" it presented and "principally supported its conclusion by simply parroting the Fifth Circuit's reasoning" in *NRA v. BATFE*, 700 F.3d 185, 196 (5th Cir. 2012). *See* Opening Br. at 28. The Coalition seems to reflexively level this verbatim critique whenever a court references the Fifth Circuit's decision in *NRA v. BATFE*. *See Jones v. Bonta*, 20-56174 (9th Cir.), Docket No. 17, Coalition's Br. at 26 (stating that the district court in that case "simply ignored the great bulk of the historical evidence" and that it "principally supported its conclusion by simply parroting the Fifth Circuit's conclusion" in *NRA v. BATFE*).[22] But in the context of *this case*, the critique misses the mark by a wide margin.

---

[22] The Coalition's brief in *Jones* is available at https://www.firearmspolicy.org/jones.

Contrary to the Coalition's derisive description of the District Court's opinion, it did much more than simply "parrot the Fifth Circuit's reasoning." Opening Br. at 28. The District Court carefully analyzed the specific statutory provisions at issue, surveyed all of the relevant case-law—including this Court's decision in *Drake*—and determined that the challenged regulations were longstanding under this Court's *Marzzarella* framework. Nor did the District Court "ignore" the Coalition's arguments about Founding-era militia laws; it simply found those arguments unavailing. *See*, *e.g.*, JA16 (dist. ct. op.) (" . . . under *Heller* . . . a challenged restriction does not have to date from the time of the framing of the Second Amendment").

While the District Court certainly considered the Fifth Circuit's analysis in *NRA v. BATFE* persuasive, that was entirely appropriate given that the Coalition presented the exact historical narrative presented by the NRA in that case, which also narrowly focused on Founding-era militia laws. *See NRA v. BATFE*, 700 F.3d at 204 n.17 (rejecting the NRA's argument that militia duty for 18-year-olds in the 1700s "necessarily implies the right to purchase firearms."). There was nothing improper about the District Court considering the Fifth Circuit's analysis of identical arguments.

Further, the Coalition's contention that the Fifth Circuit engaged in a "palpably superficial historical analysis that borders on parody of the careful

45

historical inquiry mandated by *Heller*," is wildly off base. Opening Br. at 33.[23] The Fifth Circuit extensively reviewed the historical record and relied on analogous arms-bearing rights adopted by the States between 1789 and 1820, interpretations of those provisions by 19th century courts and commentators, and post-Civil War legislation. *See NRA v. BATFE*, 700 F.3d at 194 n.8 (citing *Heller*). This Court looks to similar sources when analyzing Second Amendment claims, and has cited favorably to the Fifth Circuit's opinion in *NRA v. BATFE. See Drummond*, 9 F.4th at 226-27. There is little, if any, daylight between the Fifth Circuit's approach and the approach in this Circuit. And there is nothing superficial about that approach, which is rooted in *Heller*.[24]

---

[23] This is also a copy-and-paste critique that the Coalition has used in other filings. *See Jones*, 20-56174 (9th Cir.), Docket No. 17, Coalition's Br. at 32 (stating that the Fifth Circuit's "palpably superficial historical analysis borders on parody of the careful historical inquiry mandated by *Heller*").

[24] The Coalition also condemns the Fifth Circuit for acknowledging that certain Colonial and Reconstruction Era governments banned the sale of firearms to enslaved and formerly-enslaved African-Americans, *see* Opening Br. at 30-31, a fact this Court has also acknowledged, *see Drummond*, 9 F.4th at 228. The Coalition emphasizes the history of racially discriminatory firearms laws throughout its brief, apparently in an effort to link any effort at firearms control to racism. *See* Opening Br. at 20-21. To be clear, African-Americans were stripped of basic liberties for much of this Nation's history, including in the Second Amendment context. As this Court recently emphasized, however, "it should go without saying that such race-based exclusions would be unconstitutional today." *Drummond*, 9 F.4th at 228 n.8 (quoting *Kanter v. Barr*, 919 F.3d 437, 458 n.7 (7th Cir. 2019) (Barrett, J., dissenting)) (cleaned up).

**III.    The Coalition has waived its request for a preliminary injunction, which, in any event, does not comport with the specificity requirements of Fed.R.Civ.P. 65(d).**

In three terse paragraphs in the back of its brief, the Coalition asserts that, at bottom, the District Court should have granted its request for preliminary injunctive relief. Opening Br. at 50-51. For the reasons already discussed, the Coalition is unlikely to succeed on the merits of its Second Amendment claim. It makes no effort to demonstrate the other criteria for issuance of a preliminary injunction, other than baldly stating that it will suffer irreparable injury and that Pennsylvania somehow lacks any interest in enforcing its laws. Opening Br. at 50-51. It has thus failed to preserve any argument that the District Court should have granted a preliminary injunction. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("cursory treatment" of an issue is "insufficient to preserve the issue on appeal").

---

Moreover, unlike the militia laws the Coalition cites, *see* 1 Stat. 271 (1792), the historical concealed-carry and age-based restrictions relevant here contained racially neutral language. *See supra* n.16. And scholars—including those generally favorable to the Coalition's policy agenda—have disputed any racist motive behind 19th century concealed-carry laws. *See* Winkler, *Gun Fight*, p. 166-67 (citing, *inter alia*, Clayton Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999)). The clear aim of those laws was to stem the rise in firearms-related violence occasioned by the mass-production of handguns. *Id.* at 166-69.

47

Waiver aside, the Coalition's injunction request suffers from a more fundamental defect: it is unclear how an injunction (preliminary or permanent) against Commissioner Evanchick would function.

The Coalition's request for injunctive relief in the District Court asked that court to "enjoin Defendants from enforcing those provisions of [Sections] 6106, 6107, and 6109 that prohibit Plaintiffs and other similarly situated law-abiding adults from exercising the Second Amendment right to carry operable firearms in public for all lawful purposes, including self-defense." Dist. Ct. Docket ECF No. 11-8 at 38 (preliminary injunction br.). Commissioner Evanchick raised the overbreadth of that request, stating that "Plaintiffs should not be awarded the broad relief they seek by the instant motion—a court order enjoining enforcement of the age-based restrictions of 6106, 6107 and 6109 in all applications." *See* Dist. Ct. Docket ECF No. 25 at 21 (preliminary injunction response). But in reply, the Coalition continued to describe the relief it sought in broad, non-specific terms, stating that it merely wanted 18-to-20-year-olds to have the ability "to carry firearms *in at least some manner.*" Dist. Ct. Docket No. 33 at 10 (preliminary injunction reply) (emphasis in original). The Coalition has been no more specific in this Court, simply asserting that the case should be remanded with "instructions to enter an injunction forbidding *Pennsylvania* from continuing to ban 18-to-20-year-olds from carrying firearms in public for lawful purposes." Opening Br. at 51 (emphasis added).

48

But an injunction, whether it is preliminary or permanent, is a scalpel, not a sword. For this reason, Rule of Civil Procedure 65(d) provides that every order granting an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed.R.Civ.P. 65(d). That basic requirement reflects an acknowledgment that "[t]he party constrained is entitled to 'fair and precisely drawn notice of what the injunction actually prohibits' because serious consequences may befall those who do not comply with court orders." *Louis W. Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994) (quoting *Granny Goose Foods v. Bhd. of Teamsters, Local No. 70*, 415 U.S. 423, 444 (1974)). "Broad, non-specific language that merely enjoins a party to obey the law or comply with an agreement, however, does not give the restrained party fair notice of what conduct will risk contempt." *Louis W. Epstein Family P'ship*, 13 F.3d at 771. A decree is vague where "the delineation of the proscribed activity lacks particularity." Wright & Miller, 11A Federal Practice and Procedure, Civ. § 2955 (3d ed.).

Far from seeking a clear, specific mandate, the Coalition seeks a broad, non-specific decree that the UFA's public-carry provisions violate the Second Amendment in some unspecified manner and thus cannot be enforced. Would that mean that 18-to-20-year-olds must have the ability to obtain licenses under Sections 6106 and 6109? As already discussed, Commissioner Evanchick lacks any authority

49

to issue licenses under Section 6109. Alternatively, does the Coalition want to enjoin Commissioner Evanchick from arresting any 18-to-20-year-old who publicly carries a firearm without a license? That would lead to a perverse result, which would give an unlicensed 18-year-old high school senior the ability to carry concealed firearms in public at any time, but would leave her unlicensed parents vulnerable to criminal sanction for the same conduct. That result cannot be consistent with the intent of the General Assembly when it enacted the UFA.

The vague decree the Coalition seeks would make it impossible for Commissioner Evanchick to understand precisely what conduct would be prohibited. The Coalition's persistent failure to clearly articulate what it believes is an appropriate form of injunctive relief is fatal to its request. And an appellate reply brief is far too late in the game for clarification on this point. *See In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2004). The Coalition has failed to demonstrate any of the basic criteria for issuance of an injunction.

**IV. Alternatively, if this case is not barred by the Eleventh Amendment and Article III of the Constitution, and the challenged provisions are not longstanding, the District Court should determine, in the first instance, whether the UFA satisfies intermediate scrutiny.**

Because the challenged provisions of the Act do not implicate the Second Amendment under step-one of *Marzzarella*, this Court need not consider whether the law satisfies some form of means-end scrutiny under step-two. But assuming *arguendo* this Court determines that the challenged provisions do implicate the

Second Amendment, this Court should remand to the District Court to consider, in the first instance, whether the UFA is nonetheless constitutional under step two of *Marzzarella*. Indeed, the District Court suggested that, if this Court disagreed with its step-one analysis, it should be given the opportunity to address step-two on remand, and, if necessary, with the benefit of a more developed record. JA24 (dist. ct. op.). And this Court's recent decision in *Drummond* emphasized the difficulty of performing a step-two analysis at the pleading phase. *See* 9 F.4th at 234. That task is further complicated where, as here, the District Court never reached step-two. Accordingly, if a step-two analysis is necessary, Commissioner Evanchick respectfully suggests that the District Court perform that analysis in the first instance.

In this hypothetical scenario, however, this Court's remand opinion should make clear that, in accordance with established case law, intermediate scrutiny applies. In arguing for strict scrutiny, the Coalition, once again, reveals its disregard for this Court's binding precedents.

Whether a law warrants strict or intermediate scrutiny "depends on whether it invades the Second Amendment's 'core.'" *Drummond*, 9 F.4th at 229 (quoting *Marzzarella*); *see also Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018). As this Court has stated many times, the "core" of the Second Amendment "protects the right of law-abiding citizens to possess non-

51

dangerous weapons for self-defense in the home." *Drummond*, 9 F.4th at 229 (quoting *Marzzarella*, 614 F.3d at 92); *see also Ass'n of N.J. Rifle & Pistol Clubs*, *supra*. Only those laws that infringe upon that core right warrant strict scrutiny. *Ibid.*

"But when a law limits other uses of firearms, *or defense that takes place in public*, intermediate scrutiny prevails." *Drummond*, 9 F.4th at 229 (citing *Drake*) (emphasis added). This Court has already determined that public-carry laws do not impinge upon the core of the Second Amendment, and thus draw intermediate scrutiny. *Drake*, 724 F.3d at 436. It would make little sense for intermediate scrutiny to apply in *Drake*, but strict-scrutiny to apply to Pennsylvania's less restrictive public-carry law.

Because it apparently dislikes the long-line of precedents from this Court establishing intermediate scrutiny for laws like the public-carry provisions at issue here, the Coalition pretends that those precedents do not exist. *See* Opening Br. at 43-49. The only case it cites in support of its position that strict scrutiny applies is a 1973 Supreme Court case arising under the Equal Protection clause, which has no Second Amendment implications. Opening Br. at 43 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973)). Its contention that strict scrutiny applies is wholly unrelated to this Court's precedents.

## CONCLUSION

This Court should affirm the District Court's judgment.

Respectfully submitted,

JOSH SHAPIRO
Attorney General

By:    /s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General
Bar No. 321525 (Pa.)

J. BART DeLONE
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA 15222
Phone: (412) 235-9067
FAX:   (412) 565-3028

DATE: September 22, 2021

# CERTIFICATE OF COUNSEL

I, Daniel B. Mullen, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 12,261 words within the meaning of Fed. R. App. Proc. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Daniel B. Mullen, Deputy Attorney General, do hereby certify that I have this day served the foregoing Brief for Appellee Commissioner, Pennsylvania State Police, via electronic service, on the following:

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036

Joshua Prince
Civil Rights Defense Firm, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505

Seven copies were also sent by first class mail to the Clerk of the United States Court of Appeals for the Third Circuit in Philadelphia, Pennsylvania.

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General

DATE: September 22, 2021