**21-1832**

IN THE

# United States Court of Appeals

## FOR THE THIRD CIRCUIT

◆◆

MADISON M. LARA; SOPHIA KNEPLEY; LOGAN D. MILLER;
SECOND AMENDMENT FOUNDATION, INC.; FIREARMS POLICY COALITION,

*Plaintiffs-Appellants,*

—v.—

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

## BRIEF OF EVERYTOWN FOR GUN SAFETY
## AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE

Janet Carter
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, New York 10017
(646) 324-8215

Lisa M. Ebersole
EVERYTOWN LAW
P.O. Box 14780
Washington, DC 20044
(646) 324-8215
lebersole@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund) has no parent corporations. It has no stock; hence, no publicly held company owns 10% or more of its stock.

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................. iii

STATEMENT OF INTEREST ............................................................ 1

STATEMENT OF ADDENDUM......................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT...................................... 2

ARGUMENT ...................................................................................... 5

    THE PENNSYLVANIA UFA PROVISIONS ARE
    CONSTITUTIONAL ...........................................................................5

    A.    Restrictions on the Transfer of Firearms to Persons Under 21
        Comport with Historical Understandings of the Second
        Amendment.........................................................................7

        1.    The most relevant time period for historical analysis purposes
            begins with the Fourteenth Amendment's ratification................. 7

        2.    Individuals under 21 were historically considered minors. ........ 10

        3.    Laws restricting minors' access to and use of firearms have
            existed for more than 150 years. ................................................ 12

    B.    Appellants' Historical Arguments Are Mistaken. .............................16

        1.    Appellants' militia-based argument is unsound and irrelevant... 17

        2.    Appellants' attempt to distinguish the robust historical record is
            flawed. ................................................................................. 21

CONCLUSION ..................................................................................... 25

CERTIFICATE OF SERVICE............................................................. 26

CERTIFICATE OF COUNSEL ........................................................... 27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ............................................................... 2, 6

*Binderup v. Att'y Gen.*,
836 F.3d 336 (3d Cir. 2016) (en banc) .................................................. 5

*Coleman v. State*,
32 Ala. 581 (1858) ............................................................................. 14

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .................................................................. *passim*

*Drake v. Filko*,
724 F.3d 426 (3d Cir. 2013) ......................................................... 6, 7, 8

*Drummond v. Robinson Twp.*,
9 F.4th 217 (3d Cir. 2021) ............................................................ 5, 8, 9

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ................................................................ 8

*Gamble v. United States*,
139 S. Ct. 1960 (2019) ......................................................................... 8

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018), *cert. denied*, 141 S. Ct. 108 (2020) ....................... 7

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........................................................... 9

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
---- F.4th ----, 2021 WL 4301564 (4th Cir. Sept. 22, 2021) ............................ 16

*Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
5 F.4th 407 (4th Cir. 2021),
*vacated as moot*, --- F.4th ----, 2021 WL 4301564 (4th Cir. Sept. 22, 2021) .... 16

# TABLE OF AUTHORITIES

**Page(s)**

*Horsley v. Trame*,
808 F.3d 1126 (7th Cir. 2015) ...................................................................... 10, 11

*Jones v. Becerra*,
498 F. Supp. 3d 1317 (S.D. Cal. 2020),
*appeal docketed*, No. 20-56174 (9th Cir. Nov. 9, 2020) ............................. 15, 19

*Lindenau v. Alexander*,
663 F.2d 68 (10th Cir. 1981) ............................................................................ 20

*Mitchell v. Atkins*,
483 F. Supp. 3d 985 (W.D. Wash. 2020),
*appeal docketed*, No. 20-35827 (9th Cir. Sept. 22, 2020)................................. 15

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,
Firearms & Explosives*,
700 F.3d 185 (5th Cir. 2012) ...................................................................... *passim*

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
719 F.3d 338 (5th Cir. 2013) ............................................................................ 15

*Nat'l Rifle Ass'n of Am., Inc. v. Swearingen*,
--- F. Supp. 3d ----, 2021 WL 2592545 (N.D. Fla. June 24, 2021),
*appeal docketed*, No. 21-12314 (11th Cir. July 8, 2021) ............................. 15, 17

*People v. Mosley*,
33 N.E.3d 137 (Ill. 2015).................................................................................. 15

*Powell v. Tompkins*,
926 F. Supp. 2d 367 (D. Mass. 2013),
*aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015) ....................................... 15

*Presser v. Illinois*,
116 U.S. 252 (1886) ......................................................................................... 20

*Rehaif v. United States*,
139 S. Ct. 2191 (2019) ....................................................................................... 2

# TABLE OF AUTHORITIES

**Page(s)**

*Rupp v. Becerra*,
   401 F. Supp. 3d 978 (C.D. Cal. 2019),
   *appeal docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019) ................................... 2

*State v. Allen*,
   94 Ind. 441 (1884) ............................................................................. 14

*State v. Callicutt*,
   69 Tenn. 714 (1878) ...................................................................... 13, 14

*United States v. Greeno*,
   679 F.3d 510 (6th Cir. 2012) ................................................................ 8

*United States v. Marzzarella*,
   614 F.3d 85 (3d Cir. 2010) ............................................................... 5, 6

*United States v. Skoien*,
   614 F.3d 638 (7th Cir. 2010) (en banc) ................................................. 9

*Whitt v. Whitt*,
   490 S.W.2d 159 (Tenn. 1973) ............................................................. 13

*Young v. Hawaii*,
   992 F.3d 765 (9th Cir. 2021) (en banc),
   *petition for cert. filed*, No. 20-1639 (May 11, 2021) ......................................... 20

## STATUTES

18 Pa.C.S. § 6106 ............................................................................................. 2

18 Pa.C.S. § 6107 ............................................................................................. 2

18 Pa.C.S. § 6109 ............................................................................................. 2

1883 Kan. Sess. Laws 159 ............................................................................... 13

1883 Wis. Sess. Laws 290 ............................................................................... 12

1885 Nev. Stat. 51 ........................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

1895 Neb. Laws 237-38 .................................................................... 13

1925 W.Va. Acts 25-30 ................................................................... 12

## OTHER AUTHORITIES

2 *Annals of Cong., The Debates and Proceedings in the Cong.
of the U.S.* (1834) ......................................................................... 19

*Black's Law Dictionary* (1st ed. 1891) ......................................... 11

1 William Blackstone, *Commentaries On the Laws of England* 451
(1st ed. 1765) ................................................................................ 10

Br. in Opp. to Pet. for a Writ of Cert., *McGinnis v. United States*,
No. 20-6046 (Jan. 15, 2021) ......................................................... 10

Br. of J. Michael Luttig et al., *New York State Rifle & Pistol Ass'n v.
Bruen*, No. 20-843 (filed Sept. 21, 2021) .................................... 21

2 James Kent, *Commentaries on American Law* (1827) ................... 11

Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender, Soc.
Pol'y & L. 613 (2007) ................................................................... 11

Pet'n for Rehearing or Rehearing En Banc, *Hirschfeld I*,
No. 19-2250, ECF No. 85 (4th Cir., filed Aug. 27, 2021) ............... 16

Saul Cornell, *"Infants" and Arms Bearing in the Era of the
Second Amendment: Making Sense of the Historical Record*,
30 Yale L. Pol'y Rev. (forthcoming 2021),
*to be available at* https://ylpr.yale.edu/inter-alia ............. 16, 20, 22, 23

T. E. James, *The Age of Majority*, 4 Am. J. Legal Hist. 22 (1960) ......... 11

Thomas M. Cooley, *A Treatise on the Constitutional Limitations*
(5th ed. 1883) ................................................................................ 14

**TABLE OF AUTHORITIES**

**Page(s)**

United States Selective Service System, *Military Obligation:*
*The American Tradition*, v. 2, pt. 11 (1947)........................................................ 19

Vivian E. Hamilton, *Adulthood in Law and Culture*,
91 Tul. L. Rev. 55 (2016) ............................................................................. 11

**STATEMENT OF INTEREST**

Amicus curiae Everytown for Gun Safety ("Everytown") is the nation's largest gun-violence-prevention organization, with nearly six million supporters across the country, including over 400,000 in Pennsylvania. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a 20-year-old gunman murdered twenty children and six adults at an elementary school in Newtown, Connecticut. The mayors of over 100 cities, towns, and other localities in Pennsylvania are members of Mayors Against Illegal Guns. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high-school and college students working to end gun violence.

Everytown's mission includes defending common-sense gun safety laws through the filing of amicus briefs that provide historical context and doctrinal analysis that might otherwise be overlooked. Everytown has filed such briefs in numerous Second Amendment cases, including in this Circuit, *see Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, No. 19-3142 (3d Cir.), and in other challenges to firearms minimum-age restrictions. *See, e.g.*, *Mitchell v. Atkins*, No. 20-35827 (9th Cir.); *Jones v. Becerra*, No. 20-56174 (9th Cir.); *Hirschfeld v.*

1

*Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 19-2250 (4th Cir.).

Several courts have cited and expressly relied on Everytown's amicus briefs in

deciding Second Amendment and other gun cases, including this Court. *See, e.g.*,

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 112 n.8

(3d Cir. 2018) (*ANJRPC*); *Rupp v. Becerra*, 401 F. Supp. 3d 978, 991-92, 992 n.11

(C.D. Cal. 2019), *appeal docketed*, No. 19-56004 (9th Cir. Aug. 28, 2019); *see*

*also Rehaif v. United States*, 139 S. Ct. 2191, 2210 n.4, 2211 n.7 (2019) (Alito, J.,

dissenting).[1]

## STATEMENT OF ADDENDUM

Pursuant to Fed. R. App. P. 28(f), an addendum containing pertinent statutes,

constitutional provisions, treatises, and other authorities has been filed

concurrently with this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case is about Pennsylvania's ability to protect its populace from the

harms of guns in public places. Appellants challenge the "combined force" of

Sections 6106, 6107 and 6109 of the Pennsylvania Uniform Firearms Act of 1995

("Pennsylvania UFA") under the Second Amendment. Appellants' Br. 8. The

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission.

challenged provisions, in combination with a declared state of emergency, mean that individuals under the age of 21 are not permitted to carry firearms in public, either openly or concealed, unless they fall into one of a substantial list of exceptions. This restriction is comparable to (and, indeed, more limited than) numerous minimum-age laws on the purchase, sale, and carrying of firearms that federal and state courts have upheld throughout the country. It does not infringe on the Second Amendment.

Under the framework developed in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008), this Court must first determine whether Appellants' claim implicates the Second Amendment right at all—or whether it involves conduct that falls outside the scope of the Second Amendment as historically understood. Regulating access to firearms for those under age 21 has a clear historical pedigree extending back over a hundred and fifty years, from at least the mid-nineteenth century. The state's ability to limit those under 21 from having firearms even for use in the home, through restrictions on purchase or possession, confirms the state's ability to impose the lesser restriction of prohibiting those individuals from carrying firearms in public. Moreover, other historical laws with an equally long pedigree specifically restricted carry by those under 21. Accordingly, the district court correctly held that the challenged provisions here "fall outside the scope of the Second Amendment." JA5 (observing, further, that

"[t]he restrictions at issue in this case are … significantly less restrictive than measures upheld by other federal courts"). Appellants' effort to dismiss this body of history because it is more recent than the founding era fundamentally misunderstands the Second Amendment analysis.

Indeed, throughout their brief, Appellants show open disdain for binding Third Circuit precedent. *See, e.g.*, Appellants' Br. 44 (asserting that binding decision in *ANJRPC* was "wrong" and "Plaintiffs intend to so argue before a court competent to reverse that flawed decision"); *id.* at 41-42 (advocating a "categorical approach" to strike down laws on Second Amendment grounds despite binding Third Circuit authority requiring application of tiered scrutiny); *id.* at 35-36 (asserting that 19th-century firearms regulations "can prove nothing" despite binding Third Circuit authority concluding that even 20th-century laws can establish a longstanding regulatory tradition). If Appellants believed that their arguments stood any chance under controlling Third Circuit caselaw, it is unlikely they would have treated it with such disrespect.

Everytown files this amicus brief in support of the Commissioner to provide additional background on how firearms restrictions applicable to persons under age 21 are consistent with historical understandings of the Second Amendment—and thus regulate conduct outside its scope.

## ARGUMENT

## THE PENNSYLVANIA UFA PROVISIONS ARE CONSTITUTIONAL

The Supreme Court held in *Heller* that the Second Amendment protects an individual right to bear arms. It emphasized, however, that this right "is not unlimited," and that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or … laws imposing conditions and qualifications on the commercial sale of arms," which it identified as "presumptively lawful regulatory measures." 554 U.S. at 626-27, 627 n.26. In the years since *Heller*, federal courts have confirmed that "exclusions" from the Second Amendment right "need not mirror limits that were on the books in 1791." *Binderup v. Att'y Gen.,* 836 F.3d 336, 351 (3d Cir. 2016) (en banc) (opinion of Ambro, J.) (quoting *United States v. Skoien,* 614 F.3d 638, 641 (7th Cir. 2010) (en banc)); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 226-27 (3d Cir. 2021).

Under Third Circuit precedent, courts apply a two-step framework to assess whether a law violates the Second Amendment. *First*, they ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), including by determining whether the law "qualifies as a 'presumptively lawful,' 'longstanding' regulation and therefore does not burden" the Second

5

Amendment right, *Drake v. Filko*, 724 F.3d 426, 429 (3d Cir. 2013). If the law does not impose such a burden, it is constitutional, and the court's "inquiry is complete." *Marzzarella*, 614 F.3d at 89. *Second*, if the law does impose a burden on the right, courts apply a "means-end" test, to evaluate whether the law satisfies the appropriate level of scrutiny. *Id.* Strict scrutiny applies only if the "core Second Amendment right" is burdened; if not, intermediate scrutiny applies. *ANJRPC*, 910 F.3d at 117. The core of the Second Amendment right is "the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home." *Marzzarella*, 614 F.3d at 92.[2]

The Pennsylvania UFA provisions do not implicate the Second Amendment as traditionally understood. Restricting the ability of individuals under 21 to acquire or carry firearms is a "longstanding" form of regulation that "regulate[s] conduct outside the scope of the Second Amendment." *Marzarella*, 614 F.3d at 91. The district court thus correctly concluded that Appellants' claim fails on the merits at step one of the constitutional analysis. *See* JA5.[3] Therefore, this Court

---

[2] As the Commissioner correctly observes, neither *Heller* nor Third Circuit precedent supports Appellants' "*per se* invalidation" theory, and in any event the UFA provisions are not a "categorical ban." *See* Commissioner's Br. 36-41.

[3] Historical concealed-carry laws also provide support for the conclusion that the UFA falls outside the Second Amendment's scope. *See* Commissioner's Br. 27-29.

need not reach the second step of the inquiry. *See* Appellees' Br. 50; *see also, e.g.,*

*Drake*, 724 F.3d at 434 (recognizing that the court "need not move to the second

step of *Marzzarella* to apply means-end scrutiny" because the handgun permit law

was a "longstanding" regulation and therefore outside the scope of the Second

Amendment).[4]

### A.    Restrictions on the Transfer of Firearms to Persons Under 21 Comport with Historical Understandings of the Second Amendment.

#### 1.    The most relevant time period for historical analysis purposes begins with the Fourteenth Amendment's ratification.

Because Appellants are challenging a state law, the most relevant time

period for purposes of historical analysis begins around 1868, when the Fourteenth

Amendment was ratified and made the Second Amendment fully applicable to the

states. *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the

challenge here is directed at a state law, the pertinent point in time would be 1868

(when the Fourteenth Amendment was ratified)."), *cert. denied*, 141 S. Ct. 108

(2020); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald*

---

[4] For the reasons set out in the Commissioner's brief, if this Court does not conclude that the Pennsylvania UFA provisions are constitutional at step one, it should hold that the applicable standard of scrutiny is intermediate scrutiny and remand to the district court for fact development and analysis under that standard. *See* Commissioner's Br. 50-52; *see also* JA24.

confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond*, 9 F.4th at 227 ("[T]he question is if the Second and *Fourteenth Amendments'* ratifiers approved [the challenged] regulations …." (emphasis added)).[5]

The historical inquiry continues after 1868. *Heller* instructs that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605 (second emphasis added). And this Court has previously concluded that a 1924 law permitting concealed carry only for those who can show a "justifiable need" is "a longstanding regulation that enjoys presumptive constitutionality." *Drake*, 724 F.3d at 433-34; *see also, e.g.*, *id.* at 434 n.11 (noting that "[o]ur sister courts have likewise recognized that a firearms regulation may be 'longstanding' and 'presumptively valid' even if it was only first enacted in the 20th century"); *Heller*

---

[5] Appellants' citation (Appellants' Br. 35-36) to *Gamble v. United States*, 139 S. Ct. 1960 (2019), is inapposite. *Gamble* involved a challenge to a *federal* prosecution, and thus it did not implicate the time of ratification of the Fourteenth Amendment.

*v. District of Columbia*, 670 F.3d 1244, 1253-54 (D.C. Cir. 2011) (*Heller II*) (relying on early twentieth-century statutes to show that a D.C. handgun registration requirement was "longstanding"); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc) (noting that prohibitions on possession of firearms by felons and the mentally ill have been found to be sufficiently longstanding, despite the fact that these prohibitions originated in 1938 and 1969, respectively); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) (*NRA v. BATFE*) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."); Commissioner's Br. 26.

In addition, a regulatory tradition does not have to match exactly the modern, challenged law for that law to fall outside the Second Amendment's protection. *See Drummond*, 9 F.4th at 227 ("The question … is not whether the challenged rules replicate precise historical models."). Instead, "courts focus on 'whether a particular *type* of regulation has been a longstanding exception to the right.'" *Id.* at 226-27 (quoting *United States v. Class*, 930 F.3d 460, 465 (D.C. Cir. 2019)). And, as the U.S. Solicitor General recently explained in a case challenging a federal law (and thus implicating only the Second Amendment, not its incorporation), the Supreme Court "has never held … that modern firearms regulations can be constitutional only if they mirror colonial regulations. … It is enough if the modern law is 'fairly

9

supported' by tradition." Br. in Opp. to Pet. for a Writ of Cert. 9-10, *McGinnis v. United States*, No. 20-6046 (Jan. 15, 2021) (citations omitted), *cert. denied* (Feb. 22, 2021).

A survey of laws from before 1868 through modern day reveals a longstanding history of state regulation of the acquisition, possession, and/or carrying of firearms by 18- to 20-year-olds. These laws establish a clear historical understanding that the Constitution allows a state government to prevent people under age 21 not only from carrying firearms, as Pennsylvania does here, but even from acquiring or possessing them.

### 2.    Individuals under 21 were historically considered minors.

For most of U.S. history, including when the Second and Fourteenth Amendments were ratified, persons younger than 21 were considered minors. At the time of founding, the age of majority was 21, and the term "minor" applied to persons under 21. *See NRA v. BATFE*, 700 F. 3d at 201; *Horsley v. Trame*, 808 F.3d 1126, 1130 (7th Cir. 2015) ("During the founding era, persons under 21 were considered minors or 'infants.'"); ADD0006, 1 Blackstone, *Commentaries On the Laws of England* 451 (1st ed. 1765) ("So that full age in male or female is twenty one years, … who till that time is an infant, and so styled in law."); ADD0010, Infant, *Black's Law Dictionary* (1st ed. 1891) (defining "infant" as "[a] person within age,

not of age, or not of full age; a person under the age of twenty-one years; a minor");

Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016)

("The immediate historical origins of the U.S. age of majority lie in the English

common law tradition. The American colonies, then the United States, adopted age

twenty-one as the near universal age of majority. The U.S. age of majority remained

unchanged from the country's founding well into the twentieth century.");

ADD0012, T. E. James, *The Age of Majority*, 4 Am. J. Legal Hist. 22, 30 (1960) ("In

the eyes of the common law, all persons were esteemed infants until they attained

[21 years of age]"); *id.* at 26, ADD0016 (noting that at the time of the Magna Carta,

the age of majority was 21 years); ADD0029, 2 James Kent, *Commentaries on*

*American Law* 191 (1827), Lecture XXXI Of Infants ("T[he] necessity of guardians

results from the inability of infants to take care of themselves; and this inability

continues, in contemplation of law, until the infant has attained the age of twenty-

one years."); *see also* Commissioner's Br. 30. And until 1969—more than a century

after the Fourteenth Amendment's ratification—the age of majority for unmarried

men was 21 in every state. *See* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J.

Gender, Soc. Pol'y & L. 613, 681-86 (2007); *NRA v. BATFE*, 700 F.3d at 201 ("[I]t

was not until the 1970s that States enacted legislation to lower the age of majority

to 18."); *Horsley*, 808 F.3d at 1130 ("The age of majority was 21 until the 1970s.");

11

JA16-18. Thus, historically, laws restricting the rights of minors applied to persons under the age of 21.

### 3. Laws restricting minors' access to and use of firearms have existed for more than 150 years.

Statutes restricting individuals under the age of 21 from acquiring, possessing and/or carrying firearms have existed for over 150 years. In the nineteenth century, at least 19 states and the District of Columbia restricted the purchase of firearms by, and transfer of firearms to, minors—including Alabama, Delaware, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, North Carolina, Tennessee, Texas, West Virginia, Wisconsin, and Wyoming. *See, e.g.*, ADD0039-99, Chart compiling the earliest known nineteenth-century state laws restricting the purchase of firearms by, and transfer of firearms to, minors; *see also NRA v. BATFE*, 700 F.3d at 202 n.14; Commissioner's Br. 30 & n.16. Several of these states also specifically restricted minors' ability to carry firearms. An 1883 Wisconsin law prohibited minors from "go[ing] armed with any pistol or revolver," ADD0096-97, 1883 Wis. Sess. Laws 290, while in 1885 Nevada prohibited those under 21 from carrying concealed weapons, *see* ADD0081-82, 1885 Nev. Stat. 51, ch. 51, § 1. In the early twentieth century, West Virginia did not allow anyone under 21 to obtain a license to carry firearms. ADD0100-109, 1925 W.Va. Acts 25-30, ch. 3, § 7(a). Other laws went further, prohibiting minors from

12

possessing firearms altogether. *See, e.g.*, ADD0064, 1883 Kan. Sess. Laws 159, ch. CV, 1-2; ADD0111, 1895 Neb. Laws 237-38, Laws of Nebraska Relating to the City of Lincoln, Art. XXVI, §§ 2, 5.[6]

Not only did the people's elected representatives demonstrate, by enacting these laws, that they considered them to be within the government's constitutional power, but judges and leading scholars of the era also considered them to be constitutional. For example, in 1878, the Supreme Court of Tennessee rejected a challenge to a law prohibiting the sale of pistols to minors (individuals under age 21)[7] and held that "we regard the acts to prevent the sale, gift, or loan of a pistol or other like dangerous weapon to a minor, not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878).[8] The court rejected the defendant's argument that "every citizen who

---

[6] At the time these restrictions on minors were enacted, constitutional provisions analogous to the Second Amendment existed in twelve of these states. *See* ADD0113-170, Chart compiling nineteenth century state analogues to the Second Amendment.

[7] *See Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn. 1973) (noting that Chapter 162 of the Public Acts of 1971 reduced the age of majority from 21 to 18 years of age).

[8] That the Tennessee Supreme Court decided *Callicutt* under a more militia-based construction of Tennessee's analogous constitutional provision does not undermine the evidentiary value of the decision. Amicus highlights *Calicutt* not for its precedential value on that point, but as historical evidence of the public meaning of the right to keep and bear arms shortly following the ratification of the Fourteenth Amendment.

13

is subject to military duty has the right 'to keep and bear arms,' and that this right necessarily implies the right to buy or otherwise acquire, and the right in others to give, sell, or loan to him." *Id.* at 716.[9]

The work of a leading scholar supports the same conclusion. Thomas Cooley, the "most famous" nineteenth century constitutional law scholar and author of "a massively popular" constitutional law treatise, *Heller*, 554 U.S. at 616, acknowledged that "the State may prohibit the sale of arms to minors." ADD0186, Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 740 n.4 (5th ed. 1883). In the same volume, Cooley noted that the "federal and State constitutions … provide that the right of the people to bear arms shall not be infringed." ADD0185, *id.* at 429. Nothing indicates that he perceived any conflict between these principles.

This robust historical record supports the district court's conclusion that the Pennsylvania UFA provisions are part of a longstanding regulatory tradition and, therefore, constitutional. In so holding, the district court joined a clear consensus among state and federal courts that restricting individuals under 21 from carrying does not impinge upon the Second Amendment. For example, in *People v. Mosley*,

---

[9] There are numerous examples of prosecutions under similar laws. *See, e.g.*, *Coleman v. State*, 32 Ala. 581, 582 (1858) (upholding conviction under law forbidding "sell[ing], or giv[ing], or lend[ing]" a pistol "to any male minor"); *State v. Allen*, 94 Ind. 441, 442 (1884) (defendant was charged with "'unlawfully barter[ing] and trad[ing] to … a minor under the age of twenty-one years, a certain deadly and dangerous weapon, to wit: a pistol'").

33 N.E.3d 137, 155 (Ill. 2015), the Illinois Supreme Court found that the "restriction on [carrying for] persons under the age of 21" is "historically rooted" and "not a core conduct subject to second amendment protection." Similarly, *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013), *aff'd on other grounds*, 783 F.3d 332 (1st Cir. 2015), held that Massachusetts's limiting public carry licenses to those 21 and older "comports with the Second Amendment and imposes no burden on the rights of eighteen- to twenty-year-olds to keep and bear arms." And in *National Rifle Association of America, Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013), the Fifth Circuit upheld a Texas requirement that applicants for concealed-carry permits be at least 21, noting that "the conduct burdened by the Texas scheme likely 'falls outside the Second Amendment's protection.'"

Indeed, there is a consensus among federal courts that restricting those under 21 even from *acquiring* firearms does not impinge upon the Second Amendment.[10]

---

[10] *See, e.g.*, *National Rifle Ass'n of Am., Inc. v. Swearingen*, --- F. Supp. 3d ----, 2021 WL 2592545, at *16 (N.D. Fla. June 24, 2021) (*NRA v. Swearingen*) (holding, "as many other[] [courts] have, that age-based restrictions on the purchase of firearms are longstanding"), *appeal docketed*, No. 21-12314 (11th Cir. July 8, 2021); *Jones v. Becerra*, 498 F. Supp. 3d 1317, 1327 (S.D. Cal. 2020) (denying preliminary injunction in challenge to California minimum-age law because such restrictions "are longstanding, do not burden the Second Amendment, and are therefore presumptively Constitutional"), *appeal docketed*, No. 20-56174 (9th Cir. Nov. 9, 2020); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 994 (W.D. Wash. 2020) (finding Washington law restricting purchases of semiautomatic rifles by those under 21 "does not burden Second Amendment rights"), *appeal docketed*, No. 20-35827 (9th Cir. Sept. 22, 2020).

15

As the district court recognized, "federal caselaw following *Heller* shows a broad consensus that restrictions on firearm ownership, possession and use for people younger than 21 fall within the types of 'longstanding' and 'presumptively lawful' regulations envisioned by *Heller* and, thus, fall outside the scope of the Second Amendment." JA5; *see id.* at 15-18 (citing cases).[11]

### B. Appellants' Historical Arguments Are Mistaken.

Despite purporting to base their case on history, Appellants barely engage with this robust record. Instead, they assert that the existence of colonial-era militia laws, which applied to certain males under 21, entails a right for people under 21 to acquire firearms. *See* Appellants' Br. 22-27. They then attempt to dismiss the 150-year history of firearms restrictions on individuals under 21—restrictions from

---

[11] In *Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 5 F.4th 407 (4th Cir. 2021) (*Hirschfeld I*), a divided panel of the Fourth Circuit openly split with the Fifth Circuit's *NRA v. BATFE* decision. Because the plaintiff had turned 21 during the pendency of a rehearing en banc petition, however, the panel recently vacated that judgment and opinion on mootness grounds. *See Hirschfeld v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, ---- F.4th ----, 2021 WL 4301564 (4th Cir. Sept. 22, 2021). As one member of the panel explained, the value of the *Hirschfeld I* majority opinion is now "no more than the value of newspaper editorials." *Id.* at *3 (Wynn, J., concurring in the result). Even as a newspaper editorial, the opinion is not persuasive for the reasons the United States set out in its petition for rehearing en banc, *see* Pet'n for Rehearing or Rehearing En Banc 1-2, *Hirschfeld I*, No. 19-2250, ECF No. 85 (4th Cir., filed Aug. 27, 2021), and for additional reasons set out in a forthcoming article by one of the leading historians of gun use and gun policy, *see* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 30 Yale L. Pol'y Rev. (forthcoming 2021), *to be available at* https://ylpr.yale.edu/inter-alia.

across the country that would have been unconstitutional for their entire existence, if Appellants had their way—on the grounds that they are not from the founding era and did not exist in every state. None of these arguments has merit.

### 1.    Appellants' militia-based argument is unsound and irrelevant.

Appellants' militia-based argument rests on a series of unwarranted inferences from colonial and founding-era militia laws. They observe that the Militia Act of 1792 and state laws generally required males in an age range encompassing 18- to 20-year-olds to enroll in the militia and argue that therefore "Second Amendment rights vest at age 18." Appellants' Br. 24. As the Fifth Circuit has held, *see NRA v. BATFE*, 700 F.3d at 204 n.17, this argument fails on multiple grounds.

*First*, Appellants' argument is undercut by *Heller*, which decoupled the right to bear arms from the duty to serve in the militia. *See Heller*, 554 U.S. at 589-94. As the Fifth Circuit observed in *NRA v. BATFE*, *Heller* held that "the right to arms is not co-extensive with the duty to serve in the militia." 700 F.3d at 204 n.17. Thus, "whether a select group was considered part of the militia has limited value in determining the scope of the Second Amendment right." *NRA v. Swearingen*, 2021 WL 2592545, at *8; *see also* Commissioner's Br. 41.

*Second*, Appellants' argument largely ignores the fact that the lower age for militia service differed between states and frequently changed over time. In the Fifth

17

Circuit's words, these differing ages and fluctuations "undermine[] Appellants' militia-based claim that the right to purchase arms must fully vest precisely at age 18—not earlier or later." *NRA v. BATFE*, 700 F.3d at 204 n.17. Indeed, it is unclear whether even Appellants would accept the imprudent consequences of their argument—that those as young as 16 should have unrestricted Second Amendment rights. *See* Appellants' Br. 25 (noting that "[m]inimum enrollment ages" under state militia laws "ranged from 16 to 18"); *NRA v. BATFE*, 700 F.3d at 204 n.17 (argument "proves too much" by implying rights for 16-year-olds). Appellants accept that "the rights of actual *children* may be restricted in ways that adults' may not," Appellants' Br. 22, but make no effort to address the fact that the very historical arguments on which they rely would, to the contrary, support Second Amendment rights for "actual *children*" of 16. *See also* Commissioner's Br. 43.

*Third*, Appellants' argument relies not on a legal or analytical inference, but on a baseless practical inference: if 18- to 20-year-olds had to serve in the militia, and had to have a firearm to do so, there must have been firearms available to them, and (in Appellants' view) the only way for that to occur is if 18- to 20-year-olds had a constitutional right to acquire firearms. *See* Appellants' Br. 23. But that final step simply does not follow. Historical sources establish all manner of means by which 18- to 20-year-olds in the militia were supplied with firearms. In the debate regarding the Militia Act, Representative Jeremiah Wadsworth of Connecticut noted that "as

18

to minors, their parents or guardians would prefer furnishing them with arms themselves to depending on the United States." ADD0188, 2 *Annals of Cong., The Debates and Proceedings in the Cong. Of the U.S.* 1856 (1834). Several states even *required* the parents of militia members who were minors to provide firearms to their children. *See, e.g.*, ADD0189-228, Chart compiling examples of state laws requiring parents to furnish or provide arms to minors in the militia; *see also* Commissioner's Br. 42-43. And some militia laws required states to equip certain militia members with public arms (*i.e.*, arms that were the property of the state or town); ADD0229-255, Chart compiling examples of state laws providing for distribution of public arms to militia members. Thus, even laws that did mandate militia enrollment by minors frequently provided other means by which they would receive arms, negating the purported implication that minors had *a right* to arm themselves.

*Fourth*, the founding-era contexts where minors had a duty to carry firearms were strictly supervised, and so cannot justify the right Appellants seek to carry firearms independently and unsupervised. Militia service was military-like in its command structure and supervision. *See, e.g.*, ADD0263-265, United States Selective Service System, *Military Obligation: The American Tradition*, v. 2, pt. 11, pp. 37-39 (1947) (republishing *An Act to Regulate the Militia of the Common-Wealth of Pennsylvania*, Mar. 17, 1777); *see also Jones*, 498 F. Supp. 3d at 1327 (observing that minors' enrollment in the militia, which was itself clearly regulated, remains

consistent with regulations on firearm possession); Cornell, *supra* note 11 ("minors serving in the militia" were "supervised by adults"). Similarly, when minors were required to assist in the "hue and cry" (in which civilians rallied to pursue a criminal), "adults supervised [those] minors." *Id.*

*Fifth*, Appellants' argument fails to recognize that a government mandate to engage in certain conduct does not create an individual right to do so.[12] The Supreme Court made that clear in the militia context almost 150 years ago. *See Presser v. Illinois*, 116 U.S. 252, 267 (1886) (holding that participation in a non-government-organized militia "cannot be claimed as a right independent of law"). And it reaffirmed that principle in *Heller*, explaining that "weapons … most useful in military service," which are not typically possessed by law-abiding citizens for lawful purposes, fall outside of the Second Amendment's scope, *see* 554 U.S. at 627-28, even though the government may mandate their use in the military or militia.

*Sixth*, and finally, the creation of the duty itself indicates that the government "assumes that it has the power to regulate the public carrying of weapons; whether it forbids them or commands them, the government is regulating the practice of public carrying." *Young v. Hawaii*, 992 F.3d 765, 819 (9th Cir. 2021) (en banc),

---

[12] For example, even though there is a duty to serve in the military if drafted, "[i]t is well established that there is no right to enlist in this country's armed services." *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981).

*petition for cert. filed*, No. 20-1639 (May 11, 2021). As former Fourth Circuit Judge J. Michael Luttig recently explained in an amicus brief in the U.S. Supreme Court, "government compulsion is antithetical to a right that is exercised individually." Br. of J. Michael Luttig et al. 16, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (Sept. 21, 2021). Thus, the fact that some states compelled the carrying of guns in some public places "is not evidence that the Founders believed the Second Amendment created an individual right to carry guns in public. Rather, it is affirmative evidence from the founding period that the carrying of guns in public places was not an individual right, but rather was a matter left for debate and decision in the legislative arena." *Id.* Equally, here, the fact that several states compelled minors under 21 to carry firearms as part of militia service is not evidence that those minors had an individual right to do so, but rather affirmative evidence that it was "*not* an individual right." *Id.* (emphasis added).

### 2. Appellants' attempt to distinguish the robust historical record is flawed.

Appellants make two efforts to dismiss the 150-year history of firearms restrictions applicable to individuals under 21. First, they assert that *only* founding-era laws are relevant, and laws that "began to pop up two generations later can prove nothing." Appellants' Br. 36. Second, they dismiss the laws that existed in at least 19 states and the District of Columbia starting in the second half of the 19th century

as a mere "handful of laws" and insist that, because they were adopted "by less than half of the country," they cannot establish a regulatory tradition sufficient to satisfy *Heller*'s "longstanding" exception. *Id.* Both arguments are mistaken.

First, as to the timing of the historical laws, the period beginning around the time of the Fourteenth Amendment's ratification, and thus, the Second Amendment's applicability to the states, is in fact the *most* relevant time to determine the scope of such application. *See supra* Part A.1. Even if the time of ratification of the Second Amendment were the most pertinent period, though, the historical record still establishes that firearms restrictions on those under 21 fall outside the Amendment's scope. To begin with, according to *Heller*, 19th century laws remain highly relevant—indeed, a "critical tool of constitutional interpretation"—as evidence of the public understanding of the Second Amendment even when the Fourteenth Amendment is not implicated. *See Heller*, 554 U.S. at 605-19 (examining "post-Civil War legislation" and "post-Civil War commentators," alongside "postratification commentary" and "pre-Civil War case law," to discern the original public understanding of the Second Amendment (capitalization altered)). In addition, as Professor Cornell explains, historical evidence establishes that members of the founding generation did not consider "minors"—those under 21—to be vested with the same legal rights as adults. *See* Cornell, *supra* note 11 ("Until the minor reached the age of majority, he would have been a legal cipher, with few legal

22

rights.") "Given the irrefutable fact that minors were legally 'disabled' in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is just false." *Id*.[13]

As for Appellants' second argument, regarding the breadth of adoption of under-21 firearms restrictions, it is absurd to suggest that regulations must have existed in more than half of the country before they can demonstrate that such restrictions fall outside the Second Amendment's scope. There is no question that many state and local governments, at some points in our history, have chosen to allow individuals under 21 to acquire, and even to carry, firearms. But it is equally true that these policy choices tell us little about whether the United States Constitution *requires* that result, and many other states and cities (and even the federal government, as to handgun purchases from licensed dealers) have gone the other way. Our federalist system permits—indeed, celebrates—a diversity of local solutions to local problems, particularly when it comes to public safety. The Bill of Rights sets a floor, not a ceiling. And precisely *because* it sets a floor, when the people of at least 19 states and the District of Columbia enacted restrictions on the

---

[13] Appellants say that their "strongest evidence" that 18- to 20-year-olds must have been considered adults for purposes of the Second Amendment in the founding era—in fact, their only argument—is that individuals in that age range were subject to militia service. *See* Appellants' Br. 22-27. But for the reasons already discussed, minors' obligation to serve in the highly-regulated, highly-supervised militia does not establish a Second Amendment right. *See supra* Part B.1.

ability of those under 21 to acquire or use firearms in the second half of the 19th century, they demonstrated that they understood that those restrictions were fully within the government's constitutional powers. It is hard to imagine better evidence of the "*public understanding*" of the Second Amendment's scope, *see Heller*, 554 U.S. at 605, than what tens of millions of people, through their elected representatives, enacted.

## CONCLUSION

For the foregoing reasons, and those set forth by the Commissioner, the Court should affirm the district court's judgment.

Respectfully submitted,

Dated:  September 29, 2021                    By:  *s/ Lisa M. Ebersole*

Janet Carter
EVERYTOWN LAW
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8215

Lisa M. Ebersole
EVERYTOWN LAW
P.O. Box 14780
Washington, D.C. 20044
(646) 324-8215
lebersole@everytown.org

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

## CERTIFICATE OF SERVICE

I hereby certify, under penalty of perjury, that I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*s/ Lisa M. Ebersole*

## CERTIFICATE OF COUNSEL

I, Lisa M. Ebersole, hereby certify as follows:

1.  That I am a member of the bar of this Court.

2.  That the text of the electronic version of this brief is identical to the text of the paper copies.

3.  That a virus detection program, SentinelOne, was run on the file and no virus was detected.

4.  That this brief complies with the type-volume limitations of Fed. R. App. 29(a)(5) because this brief contains 5,870 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Fourteen point, Times New Roman.

*s/ Lisa M. Ebersole*