No. 21-1832

# In The United States Court of Appeals
## For the Third Circuit

MADISON M. LARA, SOPHIA KNEPLEY, LOGAN D. MILLER, SECOND AMENDMENT FOUNDATION, INC., AND FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

v.

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA (20-cv-1582)
(Hon. William S. Stickman, IV, Presiding)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@CivilRightsDefenseFirm.com
(888) 202-9297
(610) 400-8439 (fax)

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ............................................................................................1

ARGUMENT ...................................................................................................3

   I.    Plaintiffs Have Standing and the Commissioner Is a Proper Defendant.........3

  II.   Pennsylvania's Ban Violates the Second Amendment...................................7

     A. A Ban on Carrying Handguns in Public Falls Within the Second
        Amendment's Scope..........................................................................7

     B. The Challenged Laws Amount to an Outright Ban on Plaintiffs'
        Exercise of Their Second Amendment Rights That Is *Per Se* Invalid.....18

     C. If the Court Finds the Ban Implicates the Second Amendment But
        Is Not Categorically Unconstitutional, It Should Assess Whether
        the Ban Satisfies Heightened Scrutiny. ...................................................21

 III.   Plaintiffs Have Not Waived Their Request for a Preliminary Injunction
     and Their Request Is Sufficiently Specific.................................................24

CONCLUSION ...............................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                                              **Page**

*1st Westco Corp. v. Sch. Dist. of Phila.*, 6 F.3d 108 (3d Cir. 1993)......................5, 6

*Alexis Bailly Vineyard, Inc. v. Harrington*, 931 F.3d 774 (8th Cir. 2019)............6, 7

*Bateman v. Perdue*, 881 F. Supp. 2d 709 (E.D.N.C. 2012)....................................22

*Binderup v. Att'y Gen. U.S.*, 836 F.3d 336 (3d Cir. 2016) ....................................19

*Craig v. Boren*, 429 U.S. 190 (1976)....................................................................22

*Del. River Joint Toll Bridge Comm'n v. Sec'y Penn. Dep't of Lab. and Indus.*,
    985 F.3d 189 (3d Cir. 2021) .......................................................................... 5

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................*passim*

*Doyle v. Hogan*, 1 F.4th 249 (4th Cir. 2021)..........................................................6

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) .........................................................9

*Drummond v. Robinson Twp.*, 9 F.4th 217 (3d Cir. 2021) ............................. *passim*

*Ex parte Young*, 209 U.S. 123 (1908)...............................................................3, 5, 6

*Gamble v. United States*, 139 S. Ct. 1960 (2019).....................................................12

*Green Valley Special Util. Dist. v. City of Schertz, Tex.*,
    969 F.3d 460 (5th Cir. 2020) ........................................................................7

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)............................12

*Hirschfeld v. BATFE*, 5 F.4th 407 (4th Cir. 2021) ..........................................14 , 16

*Hirschfeld v. BATFE*, 2021 WL 4301564 (4th Cir. Sept. 22, 2021) .................14, 24

*Hope v. Warden York Cnty. Prison*, 972 F.3d 310 (3d Cir. 2020) ......................... 25

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)........................... 3

*John Wyeth & Bro., Ltd. v. CIGNA Int'l Corp.*,
    119 F.3d 1070 (3d Cir. 1997) ....................................................................... 24

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .....................................................3

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ..............................................12

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...............................................8, 23

*Nat'l Rifle Ass'n, Inc. v. BATFE*, 700 F.3d 185 (5th Cir. 2012)............................13

*Nat'l Rifle Ass'n, Inc. v. BATFE*, 714 F.3d 334 (5th Cir. 2013)............11, 14, 16, 17

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ....................................................... 10

*Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127 (3d Cir. 2000)..............6

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) ........................................ 12

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ....................21

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ............................21

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) .......................10

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)....................................7, 8

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number LW001804*, 822 F.3d 136 (3d Cir. 2016) ................................................................19

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ...................................10

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) .............17, 18, 19, 20

## Constitutional Provisions, Statutes, Legislative Materials, and Rules

U.S. CONST. amend. II................................................................................8

18 PA. C.S. § 6106......................................................................... 3

18 PA. C.S. § 6107......................................................................... 4,

18 PA. C.S. § 6109.........................................................................5

71 PA. C.S.
    § 251................................................................................ 4
    § 252...............................................................................4, 7

Militia Act of 1792, 1 Stat. 271 (1792).................................................. 16

Act. No. 246 of Aug. 26, 1721, (3 St. L. 254, Ch. 246) ................................... 9, 10

An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within this Province § 2 (1775), in 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 (1898)......15

1883 Mo. Laws 76, § 1 ...............................................................11

1897 Tex. Gen. Laws 221-122, ch. 155, § 1 .............................................11

FED. R. CIV. P. 65(d) ................................................................24

FED. R. CIV. P. 65(d)(1)(B) ...........................................................25

FED. R. CIV. P. 65(d)(1)(C) ...........................................................25

FED. R. EVID. 201, Advisory Comm. Note (1972) ...................................... 23

## Executive Materials

40 PA. B.
    511 (Jan. 7, 2010) ........................................................................................1
    967 (Feb. 6, 2010)........................................................................................1
    5898 (Sept. 30, 2010)..................................................................................1

41 PA. B.
    330 (Dec. 29, 2010) ....................................................................................1
    723 (Jan. 21, 2011) .....................................................................................1
    1753 (Mar. 10, 2011) ..................................................................................1
    4942 (Aug. 26, 2011) ..................................................................................1

42 PA. B.
    2368 (Apr. 23, 2012)...................................................................................1
    6861 (Oct. 26, 2012) ...................................................................................1

45 PA. B.
    658 (Jan. 26, 2015) .....................................................................................1
    5382 (Aug. 24, 2015) ..................................................................................1

46 PA. B.
    550 (Jan 21, 2016) ......................................................................................1
    7517 (Nov. 16, 2016)..................................................................................1

47 PA. B. 1728 (Mar. 13, 2017) .................................................................................1

48 PA. B. 458 (Jan. 10, 2018)....................................................................................1

49 PA. B. 377 (Jan. 18, 2019) ....................................................................................1

50 PA. B.
    1644 (Mar. 6, 2020) ...................................................................................1
    2834 (May 30, 2020) ..................................................................................1
    6195 (Oct. 28, 2020) ...................................................................................1

51 PA. B.
    8 (Dec. 15, 2020).........................................................................................1
    2377 (Apr. 15, 2021)...................................................................................1
    5820 (Aug. 31, 2021) ..................................................................................1

## Other Authorities

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019)................................................................ 16

THOMAS MCINTYRE COOLEY, THE GENERAL PRINCIPLES OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880).........................................14, 15

## INTRODUCTION

In *District of Columbia v. Heller*, the Supreme Court held that the "right to possess and carry weapons in case of confrontation" presumptively "belongs to all Americans," not "an unspecified subset." 554 U.S. 570, 580, 581, 592 (2008). Plaintiffs are adult citizens between 18-and-20-years-old and organizations that count those individuals as members.

The laws at issue in this case categorically bar Plaintiffs from exercising their right to carry firearms in case of confrontation whenever Pennsylvania has declared a state of emergency. States of emergency are declared frequently in Pennsylvania. In addition to the COVID-19 and opioid emergencies that were in place when this lawsuit was filed, 50 PA. B. 1644 (Mar. 6, 2020); 48 PA. B. 458 (Jan. 10, 2018), and the currently applicable Hurricane Ida emergency, 51 PA. B. 5820 (Aug. 31, 2021), there have been 19 state-wide emergencies declared since 2010.[1] As a result,

---

[1] 40 PA. B. 511 (Jan. 7, 2010) (weather); 40 PA. B. 967 (Feb. 6, 2010) (weather); 40 PA. B. 5898 (Sept. 30, 2010) (weather); 41 PA. B. 330 (Dec. 29, 2010) (weather); 41 PA. B. 723 (Jan. 21, 2011) (weather); 41 PA. B. 1753 (Mar. 10, 2011) (weather); 41 PA. B. 4942 (Aug. 26, 2011) (Hurricane Irene); 42 PA. B. 2368 (Apr. 23, 2012) (weather); 42 PA. B. 6861 (Oct. 26, 2012) (Hurricane Sandy); 45 PA. B. 658 (Jan. 26, 2015) (weather); 45 PA. B. 5382 (Aug. 24, 2015) (weather); 46 PA. B. 550 (Jan 21, 2016) (weather); 46 PA. B. 7517 (Nov. 16, 2016) (weather); 47 PA. B. 1728 (Mar. 13, 2017) (weather); 49 PA. B. 377 (Jan. 18, 2019) (weather); 50 PA. B. 2834 (May 30, 2020) (protests); 50 PA. B. 6195 (Oct. 28, 2020) (protests); 51 PA. B. 8 (Dec. 15, 2020) (weather); 51 PA. B. 2377 (Apr. 15, 2021) (protests).

Plaintiffs and those like them frequently have their Second Amendment right to carry stripped away by Pennsylvania law.

The Commissioner makes several arguments to support these laws, but first disputes that he is a proper state official to defend them. But as Commissioner he is charged with enforcing Pennsylvania's laws and the state police officers who work under him are empowered to enforce violations of the ban at issue. As such, he is an appropriate defendant for both Eleventh Amendment and Article III purposes.

On the merits, the Commissioner devotes much of his brief to arguing Pennsylvania's law is part of a longstanding tradition of firearm regulation that falls outside the scope of the Second Amendment, but in doing so he cites no similar regulations from any time period. And even those laws he cites that are loosely related to Pennsylvania's ban are almost all closer to the present day than they are to the Founding era, which is the crucial period for determining the content of the Second Amendment.

The Commissioner ignores or handwaves away more relevant evidence from the Founding, but when that history is considered, not only is the challenged ban clearly within the scope of the Second Amendment, it is the sort of categorical legislation that *Heller* identified as *per se* invalid.

2

## ARGUMENT

### I.    Plaintiffs Have Standing and the Commissioner Is a Proper Defendant.

The Commissioner argues, for the first time, that he is not an appropriate defendant given the Eleventh Amendment's requirement that an official sued in a challenge to unconstitutional legislation must have "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. 123, 157 (1908). This requirement, the Commissioner argues, "dovetail[s]" with the requirements of standing, namely that a plaintiff must suffer (1) an injury in fact that is (2) fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); Br. for Appellee Comm'r Pa. State Police, Doc. 23, at 17 (Sept. 22, 2021) ("Comm'r Br."). In fact, "Article III standing and the proper defendant under *Ex parte Young* are separate issues." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1256 (11th Cir. 2020) (cleaned up).

> To be a proper defendant under *Ex parte Young* ... a state official need only have some connection with the enforcement of the challenged law. In contrast, Article III standing requires that the plaintiff's injury be fairly traceable to the defendant's actions and redressable by relief against *that* defendant.

*Id.* (cleaned up). Plaintiffs meet both standards here.

Plaintiffs challenge the constitutionality of three interrelated provisions of Pennsylvania law. 18 PA. C.S. § 6106 generally outlaws the concealed carriage of a

firearm without a license, but it allows *open* carry even by the unlicensed (although with strict limits on where firearms can be transported in vehicles). Under Section 6107, open carriage itself depends on an individual being licensed (unless "[a]ctively engaged in [self-]defense") if there is a declared state of emergency. Pennsylvania is currently under such a declaration, and as discussed above, that is frequently the case. Section 6109, for its part, provides a route for an individual to receive a license to conceal carry, but not if the ordinary, law-abiding applicant is 18-to-20-years old. Together, these statutes ban ordinary 18-to-20-year-olds from carrying firearms in the ordinary course for the lawful purpose of self-defense when there is a declared state of emergency.

The Commissioner argues that he cannot be sued to challenge these laws because county sheriffs are responsible for granting concealed-carry licenses, not him. Comm'r Br. at 18. Plaintiffs only seek to carry; they are agnostic as to whether they do so concealed or openly, so granting Plaintiffs concealed-carry licenses is just one way to remedy their injury. If the Commissioner and his department were enjoined from arresting 18-to-20-year-olds for openly carrying firearms during an emergency in violation of Sections 6106 and 6107, that would also relieve Plaintiffs' injuries. *See* 71 PA. C.S. § 251 ("The Commissioner of Pennsylvania State Police shall be the head and executive officer of the Pennsylvania State Police."); *id.* § 252 ("The various members of the Pennsylvania State Police are hereby authorized ...

4

[t]o make arrests, without warrant, for all violations of the law ... which they may witness."). To the extent that the Commissioner's argument focuses on licensing—and it almost entirely does—it is irrelevant to the questions of whether Plaintiffs' injuries are "fairly traceable" to him and whether he has "some connection" to the challenged laws because it ignores his enforcement of Sections 6106 and 6107. *See Del. River Joint Toll Bridge Comm'n v. Sec'y Penn. Dep't of Lab. and Indus.*, 985 F.3d 189, 194 (3d Cir. 2021). And the Commissioner has "some connection" to the licensing process in any event. *See* 18 PA. C.S. § 6109(c).

The Commissioner's only Eleventh Amendment and standing arguments that have some relevance to his enforcement of Sections 6106 and 6107 are the assertions that a "general obligation to uphold the law" is insufficient to give Plaintiffs standing to challenge that law and that the Commissioner must "threaten and [be] about to commence proceedings" against Plaintiffs. Comm'r Br. at 16–17 (quoting *Young*, 209 U.S. at 155). These arguments are unpersuasive.

The Commissioner relies on *1st Westco Corp. v. School District of Philadelphia*, 6 F.3d 108 (3d Cir. 1993), to argue a general obligation to enforce the law is insufficient, but in that case neither of the Pennsylvania officials sued had *any* duty, generalized or otherwise, to enforce the challenged statutes. 6 F.3d at 113. The Commissioner gets the law right later when he notes "the officer sued must be able to enforce, if he so chooses, the specific law the plaintiff challenges." Comm'r Br.

at 16 (quoting *Doyle v. Hogan*, 1 F.4th 249, 255 (4th Cir. 2021)). In fact, *Ex parte Young* itself acknowledges enforcement authority may be found in "the general duties of the officer," 209 U.S. at 158, which is only insufficient "if the officer cannot enforce the [specific] law at issue," *Doyle*, 1 F.4th at 255. Here, there is no question that the Commissioner and his department can enforce—and actively do—violations of Sections 6106 and 6107. The Commissioner does not argue otherwise, nor could he.

Furthermore, his enforcement of those provisions is sufficiently threatened and immediate. Again, the Commissioner relies on *1st Westco Corp.*, but there, enforcement by the defendants was, "theoretically possible" only if the officials initiated suit against Westco and there was "no evidence in the record to demonstrate that two of the state's highest policy officials would have filed suit to rectify a statutory residency infraction by seven construction workers in connection with a contract with a local school district." 6 F.3d at 114–15. The path to enforcement by the Commissioner is nowhere near so long or unlikely. When a Plaintiffs' actions fall within the plain text of a statute, there is a "'credible threat of prosecution'" (to use language from the more demanding Article III test) by officials with power to enforce the statute unless those officials have provided "assurances [the law] would not be enforced against [the plaintiffs]." *See Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 148 (3d Cir. 2000); *see also Alexis Bailly Vineyard, Inc. v.*

6

*Harrington*, 931 F.3d 774, 778 (8th Cir. 2019). If Plaintiffs violated Sections 6106 and 6107 by carrying firearms during a state of emergency and they were seen to do so by a member of the state police, they would be arrested and prosecuted for that violation. *See* 71 PA. C.S. § 252. That is enough for both Article III and the Eleventh Amendment.[2]

If the panel disagrees with Plaintiffs on this point, it should vacate and remand for dismissal without prejudice so that Plaintiffs may replead their case against the appropriate defendants. *See, e.g.*, *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, 969 F.3d 460, 469 (5th Cir. 2020).

## II.   Pennsylvania's Ban Violates the Second Amendment.

### A. A Ban on Carrying Handguns in Public Falls Within the Second Amendment's Scope.

This Court has applied a two-step analysis to Second Amendment challenges, first asking "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee" and, if the law does impose such a burden, then "evaluat[ing] the law under some form of means-end scrutiny."

---

[2] Later in his brief, the Commissioner discusses possible injunctions and argues that if he were enjoined from arresting 18-to-20-year-olds who carry without a license (slightly misstating the relief sought—if enjoined from enforcing Section 6107 during a state of emergency, he just could not arrest an 18-to-20-year-old who carried openly), that would be a "perverse result" because it would leave an 18-year-old able to carry in a way "her unlicensed parents [could not.]" Comm'r Br. at 50. This is tantamount to an admission that effective relief could run against him.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). Pennsylvania's ban falls within the scope of the Amendment because it prevents 18-to-20-year-olds from carrying arms "for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person" during a declared state of emergency. *See Heller*, 554 U.S. at 584.

The Commissioner argues that this ban on public carry qualifies as a "longstanding regulatory measure" that is excepted from the Amendment's coverage, Comm'r Br. at 20, but the text of the Amendment alone refutes that argument. It protects the right of "the *people*," without qualification, "to keep and bear Arms." U.S. CONST. amend. II (emphasis added). "To speak of 'bearing' arms within one's home would at all times have been an awkward usage," so the inclusion of "[the] right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). The Commissioner offers *no response* to this textual argument. Instead, he goes right to history, but in doing so, he fails to offer a single historical analogue from the Founding that indicates Pennsylvania's carry ban is anything but an "outlier[ regulation] that our ancestors never would never have accepted." *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021). And even his much later evidence demonstrates that restrictions this severe on 18-to-20-year-olds' rights have only rarely been enacted and are of recent vintage.

1. The Commissioner claims that "this Court has already held that public-carry regulations are longstanding," Comm'r Br. at 27, but that reading is only accurate at the highest level of generality and *Heller* requires a more specific approach. For support, the commissioner cites *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013), but *Drake* left open "whether the individual right to bear arms for the purpose of self-defense extends beyond the home." *Id.* at 430–31. And rather than finding that any-and-all public-carry regulations qualify as longstanding, its holding was limited to a "justifiable need" standard for carry permits, a standard that is not implicated by the *flat ban* at issue in this case. *Id.* at 434. Nothing in *Drake* suggests such a ban is "longstanding" or outside the scope of the Amendment.

The Commissioner's discussion of historical statutes suffers from the same problem—they only relate to the present dispute at the highest level of generality. For example, the Commissioner states that more than half a century before the Declaration of Independence was signed, Pennsylvania was "limiting the ability to carry firearms beyond one's own property," Comm'r Br. at 28, but the law he relies on for this assertion merely banned "carry[ing] any gun or hunt[ing] on any inclosed or improved lands of any inhabitants of this province," Act. No. 246 of Aug. 26, 1721, (3 St. L. 254, Ch. 246). In other words, it was focused on preventing Pennsylvanians from hunting on their neighbor's land, not restricting public carry. In fact, the law went on to outlaw "fir[ing] a gun on or near any of the King's

9

highways," strongly suggesting that carriage of guns in public places was *not*, in fact, restricted. *Id*. The other historical laws and cases cited by the Commissioner all involve restrictions on *concealed* carry of firearms, but again, Plaintiffs do not object to limits placed on *how* they might carry. Comm'r Br. at 29. Even if the Commissioner's evidence amounted to a longstanding tradition on regulating the *how* of carrying under the Second Amendment, it says nothing about the State's ability to regulate *whether* ordinary law-abiding adults can carry. "Were [this Court] to conflate these distinct types of regulations, [it] would read the historical record more loosely than *Heller* allows." *Drummond*, 9 F.4th at 228.

2. The Commissioner's evidence with respect to restrictions placed on 18-to-20-year-olds fares no better. First, he relies on the fact that at the founding (and up until the 1970s) individuals under 21 were considered minors whose rights could be restricted. Comm'r Br. at 30. But when discussing the scope of the Second Amendment, the age of majority at any given time in our nation's history is a red herring. What matters is whether the Second Amendment protected people 18 years old or older, even though they were minors. After all, the First and Fourth Amendments—the other two amendments in the Bill of Rights that explicitly cover "the people"—apply to minors. *See Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (free speech); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (free exercise); *New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985)

10

(Fourth Amendment). As in the context of each of these rights, under the Second Amendment it is "inconceivable" that, though they were minors, "18- to 20-year olds were not considered, at the time of the founding, to have full rights regarding firearms." *Nat'l Rifle Ass'n, Inc. v. BATFE* ("*NRA II*"), 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissental).

The Commissioner next cites a series of laws that, between 1856 and 1923, placed some sort of restriction on the gun rights (writ large) of those under 21. Comm'r Br. at 30–31 n.30, 33–34. Again, these laws are more probative the less closely one looks at them. The most common type of restriction cited limited the sale of guns to those under 21 and relatively few of them address public carry. *See, e.g.*, 1897 Tex. Gen. Laws 221-122, ch. 155, § 1 (preventing the sale of pistols and a range of other items like sword-canes and bowie knives to anyone under 21); 1883 Mo. Laws 76, § 1 (criminalizing sale of "any deadly or dangerous weapon" to anyone under 21 "without the consent of [a] parent or guardian").

Even assuming, *arguendo*, restrictions on the sale of firearms to individuals under 21 could tell us *something* about the constitutionality of Pennsylvania's carry ban, the sources the Commissioner cites are far too late-in-time to bear the weight he places on them. The Commissioner asserts that a regulation may be "longstanding" even if it lacks "precise founding-era analogues," Comm'r Br. 25 (quoting *Drummond*, 9 F.4th at 226–27), but as this Court has held, not "every

11

modern law that remotely resembles a historical analogue" can be squared with the protections of the Second Amendment, *Drummond*, 9 F.4th at 226. And in *Heller*, post-ratification sources of this vintage served as "mere confirmation of what the Court thought had already been established" by sources from (and predating) ratification, *Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019). To the extent evidence from the Founding contradicts later evidence (and as discussed below, it does here), the Founding controls. *See id.*; *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

The Commissioner tries to overcome the deficiency of his evidence from the Founding by emphasizing the importance of the ratification of the 14th Amendment, which made the Second Amendment binding on the states. But this argument is contrary to binding Supreme Court precedent. "Incorporated provisions of the Bill of Rights bear the same content when asserted against [the] States as they do when asserted against the federal government." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020). In this context, "the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version" of the Second Amendment must be rejected. *McDonald v. City of Chicago*, 561 U.S. 742, 785–86, 788 (2010) (plurality); *id.* at 805 (Thomas, J., concurring). The ratification of the Fourteenth Amendment did not change the content of the Second Amendment, so even sources from that later period (and it is quite a stretch to claim, as the Commissioner does,

12

that restrictions *from 1923* qualify) must give way to contradictory evidence from the Founding.[3]

Finally, the Commissioner turns, as the district court did, to the Fifth Circuit's decision in *National Rifle Association of America, Inc. v. BATFE* ("*NRA I*"), 700 F.3d 185 (5th Cir. 2012), and the several other cases from federal courts that have followed that case's reasoning. Comm'r Br. at 35. These cases were thoroughly addressed in Plaintiffs' opening brief. Br. of Pls.'-Appellants, Doc. 14, at 28–37 (June 23, 2021) ("Pls.' Br."). The Commissioner mostly ignores Plaintiffs' arguments, except for the peculiar objection that other plaintiffs have made similar arguments in other cases. *See* Comm'r Br. 44, 46 n.23.

3. The evidence from the Founding era uniformly refutes the Commissioner's argument that 18-to-20-year-olds are entitled to some lesser degree of Second Amendment protection. *Heller* requires that, whatever else might be true, at the very least the Second Amendment *must* protect members of the "militia" that was, at the Founding, the pool of "all able-bodied men" from whom the government had the authority to "organize the units that will make up an effective fighting force." *Heller*,

---

[3] And of course, technological progress and mass production of firearms were also powerless to change the content of the Second Amendment. *See Heller*, 554 U.S. at 582 ("Just as the First Amendment protects modern forms of communications and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). Mass production made firearms more affordable. It did not make them less protected.

554 U.S. at 596; Pls.' Br. 23–24. That means it must protect adults 18-years-old or older because, when the Second Amendment was adopted, *every state* considered 18-year-olds to be part of the "militia" and therefore entitled to bear arms. *See NRA II*, 714 F.3d at 340 (Jones, J., dissental); *Hirschfeld v. BATFE*, 5 F.4th 407, 453–57 (4th Cir. 2021) (collecting Founding-era militia laws), *vacating as moot*, 2021 WL 4301564 (4th Cir. Sept. 22, 2021). The Commissioner rejects this sound approach as a "simplistic historical syllogism [that] fails for a plethora of reasons." Comm'r Br. at 41. No argument in his plethora is convincing.

*First*, the Commissioner argues *Heller* itself rejected this approach when it stated that the Second Amendment protects "an individual right unconnected with militia service." 554 U.S. at 605; Comm'r Br. at 41. But this takes *Heller* utterly out of context. *Heller* divided the Second Amendment into a "prefatory clause" ("A well regulated Militia, being necessary to the security of a free state") and an "operative clause" ("the right of the people to keep and bear Arms, shall not be infringed"). 554 U.S. at 576–77. And while the prefatory clause "does not limit the [operative clause] grammatically" it does "announce[] a purpose" and "[l]ogic demands that there be a link between the stated purpose and the command." *Id.* at 577. It would be, in *Heller*'s words, "nonsensical" for the Second Amendment to begin with a reference to the militia, and then not protect the rights of *at least* those Americans who made up the militia. *Id.*; *see also* THOMAS MCINTYRE COOLEY, THE GENERAL PRINCIPLES

14

OF CONSTITUTIONAL LAW IN THE UNITED STATES OF AMERICA 271 (1880) ("The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for that purpose.").

*Second*, the Commissioner reiterates his argument that he need not find a "precise founding era analogue" to support his claim that the challenged laws are "longstanding." Comm'r Br. 41, 45. But a regulation cannot be "longstanding" if there are examples of practices at the Founding that *directly contradict* the claim that the asserted regulation can be squared with the Second Amendment. At a minimum, any presumption of validity that arises is rebutted by the contrary Founding-era evidence. That is the case here and the militia laws prove it.

*Third*, the Commissioner suggests Founding-era militia laws support *his* position, an argument for which he cites just two laws. The first, a Pennsylvania law from 1755 (during the French and Indian War), required enrollment of all men over 21 in the militia but permitted those under 21 to be enrolled with the consent of his parents or guardians. An Act for the Better Ordering and Regulating Such as Are Willing and Desirous to Be United for Military Purposes Within this Province § 2 (1775), in 5 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 197, 200 (1898). The Commissioner fails to mention, however, that given the pressures of war, shortly thereafter, Pennsylvania encouraged any men between 16 and 50

15

years old who "are not conscientiously scrupulous of bearing arms, to join the [militia] association immediately" and five months after that the Commonwealth stopped encouraging and began taxing anyone in that age range who still had not joined. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495, 561 n.511 (2019) (quoting 8 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 492 (1902)). And even more importantly, in 1777, Pennsylvania changed its law to enroll "every male white person usually inhabiting or residing within his township, borough, ward or district *between the ages of eighteen and fifty-three years* capable of bearing arms." *Id.* at 562 n.521 (quoting 9 THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, at 77 (1903)) (emphasis added). And the relevant age remained 18 through the time of ratification. *See Hirschfeld*, 5 F.4th at 433 n.42 (collecting statutes).

The other statute the Commissioner cites, the Militia Act of 1792, also does not support his argument. As he admits, the Act required "every free able-bodied white male citizen ... who is or shall be the age of eighteen years" to serve. 1 Stat. 271 (1792). This unambiguously favors Plaintiffs' position. That during the debate over the law it was noted that 18-year-olds would likely use arms provided by their parents, Comm'r Br. at 43, does not diminish the fact that the law required 18-year-olds to keep and to bear arms. "[T]he point remains that those minors were in the

militia and, as such, they were required to own their own weapons," regardless of who bought them. *NRA II*, 714 F.3d at 342 (Jones, J., dissental).

*Fourth*, the Commissioner argues "the minimum age for militia service during the Founding era varied from state-to-state and fluctuated," occasionally going as low as 16, so "[t]he logical extension of [Plaintiffs'] position would lead to all restrictions on those age 16 and older being invalidated." Comm'r Br. at 43. That is only the logical extension of Plaintiffs' position if one misconstrues the historical record as the Commissioner has. Although 16 was the minimum age for militia participation in many states before ratification, "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in *every state* became eighteen." *NRA II*, 714 F.3d at 340 (Jones, J., dissental) (emphasis added).

*Finally*, the Commissioner argues, to the extent the Founding-era militia does inform the scope of the Second Amendment, the carry ban is consistent with that history because "members of the military and national guard (the modern-day militia) are exempt." Comm'r Br. at 43. But this is just wordplay. The "militia" referenced in the Second Amendment's prefatory clause was *not* an organized army but the collection of "all able-bodied men." *Heller*, 554 U.S. at 596, 600. It does not advance the Commissioner's cause that Pennsylvania exempts members of the military. The Second Amendment "is for law-abiding citizens as a rule," and a law

17

that does not provide for exercise of that right "at least [by] each typical member of that class," cannot pass muster. *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017).

### B. The Challenged Laws Amount to an Outright Ban on Plaintiffs' Exercise of Their Second Amendment Rights That Is *Per Se* Invalid.

As discussed above, this Court has applied a two-step analysis to Second Amendment challenges and in a typical case the next step would be to determine whether it survives some form of means-end scrutiny. But *Heller* provides another method for laws that entirely remove the right from a class of law-abiding citizens: categorical invalidation. *See Heller*, 554 U.S. at 634–35. Because the Pennsylvania ban *destroys* the right for typical 18-to-20-year-old citizens, it should be categorically invalidated.

The Commissioner makes several arguments against categorical invalidation. First, he suggests Plaintiffs have invented the very idea of a *per se* rule under the Second Amendment, Comm'r Br. at 36, but in fact "Plaintiffs' framework" is just what *Heller* did. *Heller* engaged in a lengthy textual and historical analysis to determine whether the Second Amendment protected the right to possess a firearm in the home for self defense and, when it concluded it did, it did not conduct any interest balancing but held that D.C.'s ban on handgun possession in the home violated the Second Amendment, full stop. 554 U.S. at 635. And the Commissioner is wrong to claim that the Third Circuit has rejected (or even could reject) this

18

approach. He points to the statement in *United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial Number LW001804*, 822 F.3d 136 (3d Cir. 2016) that *Heller* did not hold "a categorical ban on any particular type of bearable arm is unconstitutional. As explained above, *Heller* contains clear statements to the contrary." Comm'r Br. at 37 (quoting *One (1) Palmetto State Armory*, 822 F.3d at 144). But that has nothing to do with the issue Plaintiffs are raising. Of course there are some firearms—*Heller* singled out "dangerous and unusual" ones—that are not covered by the Second Amendment and so categorical bans on them are not unconstitutional. 554 U.S. at 627. But a categorical ban on the exercise of the Second Amendment right by a category of *people* is a different story. *See Wrenn*, 864 F.3d at 665. And with respect to *Binderup v. Attorney General United States of America*, 836 F.3d 336 (3d Cir. 2016) (en banc), Judge Fuentes, on whose opinion the Commissioner relies for his claim that "[a] clear majority of ten judges ... rejected [Plaintiffs'] reading of *Heller*," Comm'r Br. at 38 n.20, did not write a law may never be *per se* invalid under the Second Amendment; he simply found "the rejection of heightened scrutiny *in this context* ... out-of-step with *Heller*" because the law at issue targeted a group of people who were, by definition, not law-abiding and therefore presumptively outside the Second Amendment's protection. *Binderup*, 836 F.3d at 399 (Fuentes, J., concurring in part,

19

dissenting in part, and dissenting from judgments) (emphasis added). In short, no precedent from this Court rules out categorical treatment in an appropriate case.

The Commissioner next argues the laws at issue here do not operate as an outright ban on 18-to-20-year-olds' exercise of their Second Amendment rights. Comm'r Br. at 38. But that is simply not true. Whenever an emergency declaration is in place, it is illegal for an ordinary 18-year-old Pennsylvanian to carry a firearm in public. That there are minor exceptions for individuals with special status (like members of the military) does not turn Pennsylvania's ban into a minor regulation. "[I]f the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class." *Wrenn*, 864 F.3d at 664–65. The exceptions cited by the Commissioner do not meaningfully limit the effect of the challenged laws to conform them to this rule.

The Commissioner places particular reliance on Section 6107's exception for an individual "[a]ctively engaged in a defense of that person's life or property from peril or threat," and he claims that our contention that this exception does little to negate the ban's force violates the principle that no provision of a statute should be read to be meaningless or without any effect. Comm'r Br. at 39. But that is not what Plaintiffs have argued. Plainly, the self-defense provision has some effect, but that effect is felt only in rare cases where an individual, *actively engaged* in self-defense, must move into the street or other public area (where he would normally be

20

forbidden from carrying a firearm during an emergency) while armed. The exception

does little to secure the right to armed self-defense because it does not allow an 18-

to-20-year-old to carry a firearm so that she *has one on hand* when she finds herself

"actively engaged in self-defense." The Commissioner notes that no court has

interpreted the self-defense provision of Section 6107, but he does not offer any

interpretation more expansive than this one and could not without running afoul of

the principle that an exception should not be read so broadly as to swallow the rule.

*See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 487, 504 n.2

(1999).

### C. If the Court Finds the Ban Implicates the Second Amendment But Is Not Categorically Unconstitutional, It Should Assess Whether the Ban Satisfies Heightened Scrutiny.

Although the district court dismissed the case without deciding whether the

challenged laws satisfy any heightened level of constitutional scrutiny, this Court

should undertake that analysis in the first instance if it finds the laws implicate the

Second Amendment's protections but are not categorically unconstitutional. Even

if, *arguendo*, only intermediate scrutiny applies,[4] Pennsylvania's ban must be

---

[4] Plaintiffs recognize that the Third Circuit has held that any use of firearms other than "defense at home" triggers only intermediate scrutiny. *Drummond*, 9 F.4th at 229. That decision conflicts with the text of the Amendment, which places equal weight on the right to keep and the right to carry firearms, and with the rule that strict scrutiny applies to any law that "impinges upon a fundamental right." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Plaintiffs raise this argument to preserve it for review by a court competent to overrule that decision.

invalidated because it aims to reduce firearm violence only in proportion to the number of firearms it removes from public. That is impermissible. Pls.' Br. at 45. And moreover, the Government bears the burden of justifying its decision to single out 18-to-20-year-olds for special treatment under intermediate scrutiny, an impossible task here. There is no rational, let alone "substantial," connection between hurricanes or opioid epidemics and the safety implications of carriage of firearms by 18-year-olds. *Id.* at 46; *see Bateman v. Perdue*, 881 F. Supp. 2d 709, 716 (E.D.N.C. 2012) (finding that statute restricting gun carriage during emergencies "effectively bann[ed plaintiffs] (and the public at large) from engaging in conduct that is at the very core of the Second Amendment at a time when the need for self-defense may be at its very greatest"). And in fact, all available statistics demonstrate that, under any circumstances, emergency or otherwise, there is no constitutionally permissible basis for singling out 18-to-20-year-olds. That group poses a *lower* risk of crime than 21-to-24-year-olds do, and only a minuscule proportion of the overall 18-to-20-year-old population commits any violent crime at all—far less than the 2% connection that the Supreme Court found "unduly tenuous" in *Craig v. Boren*, 429 U.S. 190, 201–02 (1976). *See* Pls.' Br. at 46. As a matter of law, if the Pennsylvania ban implicates the Second Amendment, it is impossible for it to pass scrutiny and this Court should declare it invalid.

The Commissioner urges the Court not to resolve the issue and to give him more time in the district court to build a "more developed record." Comm'r Br. at 51. No more development is necessary. The Seventh Circuit's decision in *Moore* illustrates why. In that case, the Seventh Circuit reversed a pair of district court decisions dismissing challenges to Illinois's law generally banning law-abiding citizens from carrying firearms outside the home. Rather than remanding for discovery, summary judgment motions, and (if necessary) trial, the court ordered judgment entered for plaintiffs. 702 F.3d at 942. It reasoned that "there are no evidentiary issues in these two cases" because "the constitutionality of the challenged statutory provisions does not present factual questions for determination [at] trial." *Id.* Instead, the case turned on "legislative facts," *i.e.*, "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case." *Id.*; *see also* FED. R. EVID. 201, Advisory Comm. Note (1972) (distinguishing legislative and adjudicative facts).

The same reasoning applies here, perhaps even more strongly. This Court has the benefit of dozens of Second Amendment decisions that postdate *Moore* and deal with closely analogous issues. These cases have thoroughly explored the proposed justifications for these laws and the statistics that support or undercut those justifications. And unlike *Moore*, the ban here applies only for three years, so for the individual Plaintiffs in this case to be afforded meaningful relief, resolution must

23

come before that three-year period has run its course (as the recent decision by the Fourth Circuit to vacate its decision in *Hirschfeld* demonstrates, *see* 2021 WL 4301564, at *2). For these Plaintiffs, justice delayed can too easily become justice denied. This court should, if it reaches the question, decide whether the Pennsylvania ban can survive the second step of its Second Amendment review.

### III.    Plaintiffs Have Not Waived Their Request for a Preliminary Injunction and Their Request Is Sufficiently Specific.

If the Court does not fully resolve the issues in this case and remands for further consideration, it should grant a preliminary injunction to prevent the Pennsylvania ban from being enforced against the individual Plaintiffs and organizational Plaintiffs' members. Pls.' Br. 50–51. The Commissioner strangely claims Plaintiffs waived this argument, but in their opening brief, Plaintiffs discussed each of the elements of the preliminary injunction test and cited cases for support. Just because an argument is made briefly does not mean it is waived, and Plaintiffs' briefing of the issue is nowhere near the sort of inadequate treatment that this Court has held results in waiver. *See John Wyeth & Bro., Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997).

The Commissioner argues that an injunction should be denied because "it is unclear how an injunction ... against Commissioner Evanchick would function" and that Plaintiffs have not "'state[d] its terms specifically.'" Comm'r Br. at 48, 49 (quoting FED. R. CIV. P. 65(d)). As explained above, the Commissioner enforces

24

Sections 6106 and 6107, provisions of the Pennsylvania ban that prohibit Plaintiffs from carrying during a declared emergency. An injunction that prevented him from enforcing those provisions would relieve the ongoing denial of Plaintiffs' Second Amendment rights.[5] Contrary to the Commissioner's claim of vagueness, Plaintiffs requested exactly that in their complaint. *See* App.70–71 ("Plaintiffs respectfully request[] that this Honorable Court ... [p]reliminarily, and thereafter permanently, enjoin Defendant, his officers, agents, [and] servants, employees, and all persons in active concert or participation with him from enforcing against Plaintiffs and those similarly situated, 18 PA. C.S. § 6107.").[6] Rule 65(d) requires a party to "describe in reasonable detail ... the act or acts restrained or required." FED. R. CIV. P. 65(d)(1)(B) & (C). It requires that the enjoined party "receive fair and precisely drawn notice of what the injunction actually prohibits," *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 322 (3d Cir. 2020) (quotation omitted), and that an injunction be "phrased in terms of objective actions, not legal conclusions," *id.* (quotation omitted). These requirements are easily met here. Plaintiffs' request for an injunction was adequately

---

[5] In particular, an injunction prohibiting the enforcement of Sections 6106 and 6107 would permit individual Plaintiffs and the organizational Plaintiffs' members to open carry a firearm for purposes of self-defense within the Commonwealth (and to transport firearms in vehicles to locations where they could then open carry).

[6] Plaintiffs requested identical relief in relation to Section 6106.

and appropriately made and, if this Court reaches the issue, it should grant the injunction.

## CONCLUSION

For the foregoing reasons and those contained in Plaintiffs' opening brief, this Court should reverse the decision of the district court and remand with instructions to enter an injunction forbidding the Commissioner from continuing to enforce the challenged ban.

Dated: October 13, 2021

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
joshua@civilrightsdefensefirm.com
(888) 202-9297
(610) 400-8439 (fax)

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

26

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

Dated: October 13, 2021                    s/ David H. Thompson
                                           David H. Thompson
                                           *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,497 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: October 13, 2021                    s/ David H. Thompson
                                           David H. Thompson
                                           *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on October 13, 2021. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 13, 2021

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*