

COMMONWEALTH OF PENNSYLVANIA

## OFFICE OF ATTORNEY GENERAL

JOSH SHAPIRO
ATTORNEY GENERAL

July 25, 2022

Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA 15222

RE: *Lara, et al. v. Comm'r Pa. State Police*, No. 21-1832
Appellee's Letter Brief

Dear Ms. Dodszuweit,

Appellee, the Commissioner of the Pennsylvania State Police, respectfully submits this letter brief in response to the Court's order directing the parties to address the impact of *New York State Rifle & Pistol Assoc. v. Bruen*, 142 S.Ct. 2111 (2022). Appellants have taken the position that *Bruen* requires this Court to vacate the District Court's judgment and remand with instructions to enjoin enforcement of the "challenged provisions." 3d Cir. Dkt. No. 53 (28(j) letter). Even if this case were not moot (and it is), *see* 3d Cir. Dkt. No. 34 (Commissioner's supp. br.), *Bruen* would not compel that extraordinary result.

Although *Bruen* clarified the framework for analyzing Second Amendment claims in general, the District Court's ruling—that Pennsylvania's modest public-carry restrictions on 18-to-20-year-olds are analogous to longstanding, historical age-based restrictions—is entirely consistent with that framework. Just as *Bruen* requires, the District Court ended its analysis after concluding 18-to-20-year-olds "fall outside the scope of the Second Amendment." J.A.24 (dist. ct. op.) *Bruen* thus reinforces that this Court should affirm the District Court's judgment.

But this Court need not reach the issue of whether the District Court's analysis coheres with the *Bruen* framework. That is because the Supreme Court also confirmed that concealed-carry prohibitions are constitutional so long as they do not prohibit open carry. *Bruen*, 142 S.Ct. at 2146-47. Pennsylvanians between the ages of 18 and 21 currently have the ability to carry firearms openly on public streets, and to transport firearms to-and-from various places, including shooting ranges, places of purchase and repair, and places where they desire to hunt. 18 Pa.C.S. § 6106(b); 18 Pa.C.S. § 6107. In other words, Pennsylvania law affords Appellants the ability to do everything that they requested in their complaint and all that the Constitution requires. *Bruen* thus confirms that this case is moot.

I.      **In *Bruen*, the High Court clarified the appropriate test for Second Amendment claims and struck down an unusually restrictive public-carry law. It did not address, let alone resolve, the issue presented here.**

The Court's opinion in *Bruen* did three broad things: *First*, it clarified the framework for analyzing Second Amendment claims in general, holding that courts must assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. *Second*, the Court confirmed that the Second Amendment confers a general right to carry a handgun for self-defense in public. *Third*, the Court struck down an unusually restrictive type of public-carry law that required individuals to articulate proper cause for exercising their right to carry in public in any manner. The Commissioner will discuss each aspect of the decision before explaining why these rulings to not change the outcome of this appeal.

Before *Bruen*, virtually every Court of Appeals in the country (including this one) followed a two-step approach to analyzing Second Amendment claims. *Bruen*, 142 S.Ct.

at 2125-26. Under step one, courts looked to whether the challenged law burdened conduct falling within the scope of the Second Amendment and upheld regulations that were consistent with "longstanding" firearms regulations throughout history. *Id.* at 2126. If that analysis revealed that the regulated conduct fell outside the scope of the Second Amendment, the conduct was considered categorically unprotected and the inquiry was complete. *Ibid.* If the law did burden conduct falling within the scope of the Second Amendment, however, courts would then proceed to step two, and evaluate the law under some form of means-end scrutiny. *Ibid.* Because the District Court here determined that firearms restrictions on 18-to-20-year-olds are historically rooted, it ended its analysis at step-one, concluding it was unnecessary to proceed to step-two. J.A.24 (dist. ct. op.).

In *Bruen*, the High Court clarified that the Second Amendment does not support applying means-end scrutiny (*i.e.*, step two). 142 S.Ct. 2127. The Court held that the standard moving forward, which centers on the Second Amendment's text and history, is as follows: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The Court then applied its test to the question presented.

Beginning with the text, the Court stated that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. Critically, the Court noted that the parties there agreed that the plain text of the Second Amendment confers a general right to public carry, and that there was no

3

dispute that the individual petitioners were "law-abiding, *adult citizens*" and thus part of "'the people' whom the Second Amendment protects." *Bruen*, 142 S.Ct. at 2134-35 (emphasis added). The Court nonetheless briefly focused on whether the definition of the word "bear" naturally encompasses public carry. *Ibid*. The Court determined that it did. *Ibid.*

Because the petitioners' satisfied their initial burden of demonstrating that the plain text of the Second Amendment presumptively covered the conduct in question, the Court then shifted its attention to history. *Cf. Bruen*, 142 S.Ct. at 2126, 2135, 2141 n.11.Unlike the textual prong, under which the burden falls on plaintiffs, the Court emphasized that the burden under the historical prong falls on the State, which must show that a firearms regulation is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2135; *see also id.* at 2126 (noting that the Government bears the burden of demonstrating the historical prong).

The Court stressed that modern firearms regulations need not be a "dead ringer for historical precursors" and that a law will pass constitutional muster so long as it is "analogous enough" to historical firearms restrictions. *Id.* 2133. Put differently, "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Ibid.* (emphasis added). Thus, in determining whether a regulation is consistent with the Second Amendment, courts only need to find that modern and historical regulations impose a "comparable burden" that is "comparably justified." *Ibid.* After surveying a variety of historical sources, the Court concluded that there was no tradition of "broadly prohibiting public carry" or of any "historical tradition

limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* at 2138-56. [1]

Based on the above, the Court determined that New York's requirement that individuals exercise their right to public carry "only after demonstrating to government officers some special need" was incongruous with both the text and history of the Second Amendment. *Id.* at 2156. So it rendered that statute invalid. The Court cabined that ruling in several important respects.

The Court made it clear that it was only invalidating New York's unusually restrictive "proper cause" statute (and those like it), which gave government officials an extraordinary amount of discretion to deny licenses to carry in any manner. 142 S.Ct. at 2123-347; *see also id*. at 2159 (Alito, J., concurring) ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside for home and that [New York's] Law, which makes that virtually impossible for most New

---

[1] The Court in *Bruen* did not resolve a debate among legal and historical scholars about whether courts should primarily rely on the prevailing understanding of the right to keep and bear arms when the Fourteenth Amendment was ratified in 1868, or in 1791 when the Second Amendment was ratified.142 S.Ct. at 2138 (citing A.Amar, *The Bill of Rights: Creation and Reconstruction*, xix, 223, 243 (1998) and K.Lash, *Re-Speaking the Bill of Rights: A new Doctrine of Incorporation* (Jan. 15, 2021), (manuscript, at 2)). Notably, however, both of the scholars the Court cited agree that the "[a]n originalist interpretation of the Fourteenth Amendment not only calls for an 1868 understanding of provisions in the Bill of Rights incorporated against the states . . ., it also requires an updated understanding of the Bill of Rights itself." Lash, *supra*, manuscript at 1-2 (citing, *inter alia*, Amar, *supra*). And just as it did in *Heller*, *see* 554 U.S. at 615, the Court in *Bruen* relied on Reconstruction era laws to confirm its interpretation of the Second Amendment, *see* 142 S.Ct. at 1250-53. *See also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) (". . . the question is if the Second and *Fourteenth Amendments' ratifiers* approved [the challenged] regulations . . ..") (emphasis added). Indeed, even Appellants acknowledge that "Reconstruction Era views are 'instructive' evidence of the Second Amendment's scope because they reflect 'the public understanding of the Second Amendment in the period after its enactment.'" 3d Cir. Dkt. No. 14 (br. at 19-20 (cleaned up) (quoting *Heller*).

The Court ultimately determined that it was unnecessary to resolve that issue in *Bruen*, however, because the "public understanding" of the right to keep and bear arms with respect to public carry was "for all relevant purposes" the same in 1791 and 1868. 142 S.Ct. at 2138. It is also unnecessary to definitively resolve here because, as will be explained *infra*, both in 1791 and 1868 those younger than 21 were considered infants not covered by the right.

Yorkers, is unconstitutional."). Indeed, two Justices described New York's law as an "outlier." *Id.* at 2161-62 (Kavanaugh J., concurring).

The Court contrasted "proper cause" statutes, employed by seven jurisdictions only, with the "shall issue" statutes employed in 43 jurisdictions. The Court endorsed "shall issue" statutes and emphasized that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 'shall issue' licensing regimes[.]" *Bruen*, 142 S.Ct. at 2138 n.9; *see also id.* at 2161-62 (Kavanaugh J., concurring). The Court specifically identified Pennsylvania as a jurisdiction with a valid "shall issue" licensing regime. *Id.* at 2124 n.1.

The Court also emphasized that New York's law failed to make any distinction between concealed-carry and open-carry. That failure was significant because, as the Court recognized both in *Bruen* and *Heller*, "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008); *see also Bruen*, 142 S.Ct. at 2146 (quoting *Heller*, 554 U.S. at 626). In *Bruen*, the Court stressed that those "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry" and that "States could not ban public carry altogether" like New York's statute functionally did. 142 S.Ct. at 2146-47.

Finally, several Justices took pains to emphasize that the Court's ruling had no impact on laws regulating *who* may lawfully possess firearms and said nothing about laws that categorically excluded certain classes of individuals from owning guns. *Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully

possess a firearm . . .. Nor have we disturbed anything we said in *Heller* . . . about restrictions that may be imposed on the possession or carrying of guns."); *see also id.* at 2162 (Kavanaugh, J.,) ("nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms" by certain groups) (quoting *Heller*). Indeed, Justice Alito highlighted that federal law "bars the sale of a handgun to anyone under the age of 21" and that the Court's decision did not "expand the categories of people who may lawfully possess a gun." *Id.* at 2157-58.

## II.    *Bruen's* text and history framework confirms that the Second Amendment does not cover individuals under 21 years of age.

### A.  Appellants cannot establish that the plain text of the Second Amendment confers the right of 18-to-20-year-olds to keep and bear arms.

Appellants cannot satisfy their initial burden of demonstrating that the plain text of the Second Amendment covers 18-to-20-year-olds. *Cf. Bruen*, 142 S.Ct. at 2126, 2135, 2141 n.11.[2] The "operative" clause of the Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend II; *see also Bruen*, 142 S.Ct. at 2128 (citing *Heller*).

In both *Bruen* and *Heller*, the Court's interpretation of the "keep and bear" component was outcome determinative as there was no dispute that the parties in those cases were "ordinary, law-abiding, *adult* citizens." *Bruen*, 142 S.Ct. at 2134 (citing *Heller*) (emphasis added); *see also Heller*, 554 U.S. at 575-76. By contrast, the load-bearing term

---

[2] *See also Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) ("Under this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to show that its actions were nonetheless justified[.]").

in this case is "the people," and the issue presented—which neither *Bruen* nor *Heller* resolved—is whether those younger than 21 are considered part of "the people" whom the Second Amendment protects. As the Commissioner detailed in his response brief, *see* 3d Cir. Dkt. No. 23 (br. at 29-30), and as recent scholarship by one of the leading Second Amendment historians has confirmed, *see* Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, Yale L. & Pol'y Rev., Inter Alia (Oct. 26, 2021), they are not.[3]

In considering whether 18-to-20-year-olds are among "the people" whom the plain text of the Second Amendment covers, the term must be given the "normal and ordinary" meaning known to citizens who ratified the Second and Fourteenth Amendments. *Heller*, 554 U.S. at 577; *see also id.* at 604 (relying on a "a variety of legal and other sources to determine *the public understanding*" of the Second Amendment) (emphasis in original). At the time of the Founding—and, indeed, for most of the Nation's history—those who were under the age of 21 were considered "infants" or "minors" in the eyes of the law. *See*, *e.g.*, William Blackstone, *Commentaries on the Laws of England*, Vol I at 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Zephaniah Swift, 1 *A System of the Laws of the State Of Connecticut* 213 (1795) ("Persons within the age of 21, are, in the language of the law denominated infants, but in common speech—minors.").

---

[3] Professor Cornell's Second Amendment scholarship has been cited favorably by the Justices many times in *Bruen*. *See*, *e.g.*, *Bruen*, 142 S.Ct. at 1249; *see also id.* at 2188 (Breyer, J., dissenting).The full text of Professor Cornell's article is available online: https://ylpr.yale.edu/inter_alia/infants-and-arms-bearing-era-second-amendment-making-sense-historical-record.

That was also the prevailing view when the Fourteenth Amendment was adopted. *See*, *e.g.*, "Infant," *Black's Law Dictionary* (11th ed. 2019) ("An infant in the eyes of the law is a person under the age of twenty-one years") (quoting John Indermaur, *Principles of the Common Law*, 195 (Edmund H. Bennett ed., 1st Am. Ed. 1878)). And that view persisted until well into the 20th century. *See* Larry D. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. 613, 681-86 (2007).

The infancy status of those younger than 21 meant that they had few independent legal rights. As Zephaniah Swift, "an esteemed Connecticut jurist and author of one of the first legal treatises published after the adoption of the Second Amendment," put it, minors had few legal rights at common law and could bind themselves "'by contract for necessaries, for diet, apparel, education and lodging,' but little else." Cornell, *Infants*, *supra* (quoting Swift, 1 *A System of the Laws of the State Of Connecticut* 213 (1795)). Thomas M. Cooley—who wrote a "massively popular" treatise in 1868 and was described by the Court in *Heller* as "the most famous" 19th century legal scholar to interpret the Second Amendment, *see* 554 U.S. at 616—explained that the under a State's inherent police powers "the State may prohibit the sale of arms to minors." Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883). The Court in *Heller* relied on Cooley's treatise as evidence of the Second Amendment's meaning. 554 U.S. at 616.

Even a minor's religious choices during the Founding era was subject to parental control. *See, e.g.*, Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Household in Connecticut, 1750-1820*, 47 Wm. & Mary Q. 235, 236 (1990). And when minors went to college, which was "one of the very few circumstances" in which they lived

outside of their parents' direct authority, they "traded strict parental authority for an equally restrictive rule of *in loco parentis*." Cornell, *Infants*, *supra* (citations omitted). James Kent, an influential 19th century legal scholar and jurist, explained the rationale undergirding the diminished legal status of minors: "The necessity of guardians results from the inability of infants to take care of themselves; and this inability continues, in contemplation of the law, until the infant has attained the age of twenty-one years." Cornell, *Infants*, *supra* (quoting Kent, *Commentaries on American Law* (1836)).

In short, the view that those under the age of 21 "were not recognized as independent legal actors who enjoyed the full range of legal rights under American law" was an "indisputable fact about American law" from the time of the Founding through the Reconstruction Era and the latter-half of the 20th century. *See* Cornell, *Infants*, *supra*. And "[g]iven the status of minors in American law at the time of the Second Amendment's enactment, there is no credible legal argument that an infant might have made regarding a Second Amendment right to purchase or use a gun without the permission of a legal guardian." *Ibid.* Thus, the plain text of the Second Amendment—as understood by those who ratified the Second and Fourteenth Amendments—does not cover individuals younger than 21.

### B. Pennsylvania's public-carry restrictions on 18-to-20-year-olds are analogous to longstanding firearms restrictions throughout history.

Because the plain text of the Second Amendment does not cover those younger than 21, a historical analysis is unnecessary. *Bruen*, 142 S.Ct. at 2129-30. Nonetheless, as the Commissioner demonstrated both below and in his appellate response brief, State and

Federal laws restricting the ability of those under 21 to purchase, possess, and carry firearms have existed for the past 231 years. And the modest age-based public carry restrictions in Pennsylvania's statute are analogous to those historical precursors.

Appellants' argument that 18-to-20-year-olds have the unfettered right to keep and bear arms under the Second Amendment focuses almost entirely on certain Founding era militia laws, which, in some instances, required 18-to-20-year-olds to serve during times of conflict (and thus carry arms). But those laws undermine, rather than support, their claim that 18-to-20-year-olds had independent Second Amendment rights.

Initially, Appellants' arguments conflate a duty to carry arms in the highly supervised militia setting[4] with an unfettered right to do so outside of that narrow setting. "[D]uties do not automatically confer individual rights on those who are required by law to participate in the militia." *See* Cornell, *Infant*s, *supra*. The mere fact that some States had established "*policy preferences* regarding whom to include within the militia" does not mean that those preferences enshrined a "*fixed constitutional principle* hardwired into constitutional text." *Ibid.* (emphasis in original). For example, as this Court's amici Everytown for Gun Safety notes, while there may be a duty to serve in the military if drafted "it is well established that there is no right to enlist in this country's armed services." 3d Cir. Dkt. No. 31-1 (Amicus br. at 20 n.12) (quoting *Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981)) (internal brackets omitted).

---

[4] *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right*: *The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 (2004) (noting that Founding era militia regulations "were the most common form of laws pertaining to firearms" and that "[s]uch laws could be quite intrusive").

More fundamentally, Founding era militia laws actually reinforced the diminished legal status of 18-to-20-year-olds. Pennsylvania's 1755 Militia Act, for example, provided that "no Youth, under the age of Twenty-one Years, . . . shall be admitted to enroll himself . . . without the Consent of his or their Parents or Guardians[.]"[5] And many State militia laws expressly *required* the parents of infant militiamen to purchase arms rather than the minors themselves. *Cornell*, *supra*, at Table 1 (collecting statutes of early American militia laws requiring parents to furnish their infants with arms).[6] Such laws would have obviously been unnecessary if 18-to-20-year-olds were fully protected by the Second Amendment and had the independent right to purchase, possess, and carry firearms, as Appellants suggest.

As detailed in the Commissioner's response brief, the Founding era view that those under the age of 21 were not responsible enough to have an unfettered right to keep and bear arms has persisted for the last 231 years. *See* 3d Cir. Dkt. No. 23 (response br. at 29-35). Between 1856 and 1892, twenty jurisdictions throughout the Nation enacted laws that restricted minors' ability to purchase and/or carry firearms. *Ibid.*; *see also* 3d Cir. Dkt. No. 32-2 (Everytown Amicus br. addendum at 39-45) (chart of 19th century firearms restrictions on minors younger than 21). Many laws during this period prohibited those younger than 21 from purchasing or possessing firearms altogether. *Ibid.* And firearms

---

[5] Full text available at https://founders.archives.gov/documents/Franklin/01-06-02-0116#BNFN-01-06-02-0116-fn-0001.

[6] It is thus unsurprising that when Congress enacted the Federal Militia Act of 1792, *see* 1 Stat. 271 (1792), certain members assumed that minors' parents would provide them with the necessary arms. *See Debates and Proceedings in the Congress of the United States*, Vol. II., March 3, 1789 to March 3, 1791, at 1856 (". . . as to minors, their parents or guardians would prefer furnishing them with arms themselves . . .").

laws restricting those younger than 21 continued into the 20th century, even after 1971 when the 26th Amendment lowered the minimum voting age to 18. Barnett, *The Roots of Law*, 15 Am. U. J. Gender Soc. Pol'y & L. at 681-86. Today, at least 34 States (including Pennsylvania) place some restrictions on the ability of those under 21 to purchase, possess, and carry firearms. 3d Cir. Dkt. No. 30 (Illinois, et al. Amicus Br., at 11-12) (collecting statutes).

In light of the above, the District Court correctly determined that modern firearms restrictions on 18-to-20-year-olds are consistent with longstanding restrictions on those under 21: "there is no question that age-based restrictions on the ownership, use and, especially, carrying of firearms have a long history in this Country." JA23 (dist. ct. op.). That determination is entirely consistent with the framework established by *Bruen*. It also coheres with the overwhelming view among courts to consider the question.[7] Appellants' tortured, self-serving reading of the historical record does nothing to undermine that consensus view.

III.    **Because 18-to-20-year-old Pennsylvanians can carry and transport firearms in the precise manner Appellants requested, this case is moot.**

This Court need not reach the issue of whether 18-to-20-year-olds are covered by the Second Amendment. Pennsylvania's public carry statute affords 18-to-20-year-olds the

---

[7] *See*, e.g., *NRA v. Swearingen*, 545 F.Supp.3d 1247, 1264 (N.D. Fla. 2021) (Florida law banning 18-to-20-year-olds from purchasing firearms was longstanding); *NRA v. BATFE*, 700 F.3d 185, 204 (5th Cir. 2012) (federal law prohibiting federally licensed firearms dealers from selling handguns to persons under 21 was longstanding); *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (Texas's public-carry restriction on 18-to-20-year-olds was longstanding); *Powell v. Tompkins*, 926 F.Supp.2d 367 (D. Mass. 2013) (state law prohibiting 18-to-20-year-olds from obtaining concealed-carry licenses was longstanding); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (public-carry restrictions on 18-to-20-year-olds was "historically rooted" and did not regulate "core conduct subject to second amendment protection"); *Mitchell v. Atkins*, 483 F.Supp.3d 985, 993 (W.D. Wash. 2020) (prohibition on selling semiautomatic assault rifles to 18-to-20-year-olds was longstanding).

ability to carry firearms in public openly without a license and to transport firearms in the precise manners that Appellants' have requested. And *Bruen* confirmed the validity of concealed-carry prohibitions that do not also prohibit open carry. *See* 142 S.Ct. at 2146-47. Appellants' case is therefore moot.

In their complaint, Appellants stated that they wanted the ability to transport unloaded firearms on public streets and public property, to transport unloaded firearms to and from shooting ranges, places of purchase and repair, and places where they desire to hunt, and to carry loaded firearms on public streets throughout the Commonwealth. JA 45-46, 50-51, 54-55 (complaint, ¶¶ 33, 46, 59). Pennsylvania law allows them to do exactly that. 18 Pa.C.S. § 6106(b); 18 Pa.C.S. § 6107.

Although Appellants' complaint also sought the ability to procure concealed-carry licenses, *see* JA 45, 49, 54 (complaint, ¶¶ 32, 45, 58), *Bruen* clarified that one avenue for public carry is sufficient under the Constitution. In any event, Appellants tacitly acknowledged in their reply brief that the Eleventh Amendment bars their ability to challenge the restriction on 18-to-20-year-olds from obtaining concealed-carry licenses in the context of this case. 3d Cir. Dkt. No. 38 (reply br. at 4, 24-25).

In a naked effort to secure an advisory opinion from this Court, Appellants have attempted to shift the focus to a single aspect of Pennsylvania law, *see* 18 Pa.C.S. § 6107, that could restrict the ability of 18-to-20-year-olds to carry openly during intermittent periods of statewide emergencies. *Ibid.* But that shift in focus is patently inconsistent with the sole issue Appellants raised on appeal, *see* 3d Cir. Dkt. No. 14 (opening br. at 3), and contradicts the way they litigated this case below.

Throughout these proceedings, Appellants were "careful to point out" that they were not challenging any aspect of Pennsylvania law "*individually*." J.A.11 (dist. ct. op.) (emphasis in original) (citing plaintiffs' br., ECF No. 36 at 10)). Instead, Appellants challenged the "*combined force* of Sections 6106, 6107, 6109 . . . in conjunction with the ongoing declared state of emergency." 3d Cir. Dkt. No. 14 (opening br. at 8). Because of recent amendments to the Pennsylvania Constitution, there is no future possibility of a public health related emergency declaration lasting for years, which is what precipitated the present suit. 3d Cir. Dkt. No. 43 (Commissioner's supp. br.).

Pennsylvanians between the ages of 18 and 21 years old currently have the ability to openly carry firearms on public streets throughout the Commonwealth. It is purely speculative they will again be restricted in the manner that prompted the present suit. This Court should dismiss Appellants' facial challenge to Pennsylvania's law as moot. *Am. Bird Conservancy v. Kempthorne*, 559 F.3d 184, 188 (3d Cir. 2009) ("The central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.") (cleaned up, citation omitted, emphasis added).

Respectfully,

*/s/ Daniel B. Mullen*
DANIEL B. MULLEN
Deputy Attorney General

15

## CERTIFICATE OF SERVICE

I, hereby certify that I have served the foregoing Letter Brief for Appellee, Commissioner Pennsylvania State Police, via CM/ECF, on the following:

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036

Joshua Prince
Civil Rights Defense Firm, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General

DATE: July 25, 2022