August 1, 2022

**Re:** ***Lara et al. v. Comm'r Pa. State Police*, No. 21-1832**

Janet Carter
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017

Dear Ms. Dodszuweit,

Pennsylvania's public-carry restrictions on 18- to 20-year-olds are constitutional under the approach to Second Amendment cases set out in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons in the Commissioner's July 25, 2022 letter (Dkt. 57). Everytown for Gun Safety submits this letter as amicus curiae to expand on two methodological points in the Commissioner's submission. First, on the initial, textual inquiry of the *Bruen* framework, the burden is on plaintiffs. Second, the historical analysis should center on 1868, not 1791.

**I.   Plaintiffs Have the Burden to Establish that the Second Amendment's Plain Text Covers Their Conduct**

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. First, the court must ask whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129-30. If so, the court then moves on to ask whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)).

As the Commissioner notes (Dkt. 57 at 7), and plaintiffs do not contest (Dkt. 56 at 3-5), the burden on the initial, textual inquiry is on the plaintiff. First, *Bruen* itself makes this clear, by indicating that a presumption that the Constitution protects a plaintiff's

conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. If the burden were on the government throughout—in what would be an extraordinary departure from ordinary principles of constitutional litigation—the Court would have said that the presumption exists from the outset. Second, placing the initial burden on the plaintiff accords with the Court's approach to other constitutional issues. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights under the Free Exercise and Free Speech Clauses. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

For the reasons in the Commissioner's letter, plaintiffs have failed to satisfy their burden under *Bruen*'s textual inquiry. *See* Dkt. 57 at 10. That should end the case.

## II. The Proper Focus for Analysis of Historical Regulation Is 1868, Not 1791

If the Court proceeds to the second, historical inquiry, the most relevant time period centers on 1868, when the Fourteenth Amendment was ratified and made the Second Amendment applicable to the states. Several circuits reached this conclusion in applying the first step of the pre-*Bruen* framework.[1] *Bruen* does not alter that conclusion for cases,

---

[1] *See Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is [to] a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."), *criticized on other grounds by Bruen*, 142 S. Ct. at 2124, 2126-27; *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that if the claim concerns a state or local law, the 'scope' question asks how the right was publicly understood when the Fourteenth Amendment was proposed and ratified."); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3d Cir. 2021) ("[T]he question is if the Second and *Fourteenth Amendments'* ratifiers approved [the challenged] regulations …." (emphasis

2

like this one, challenging a state or local law. It expressly left open the question "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868"—as opposed to 1791, when the Second Amendment was ratified—"when defining its scope." *Bruen*, 142 S. Ct. at 2138 (explaining that it did not need to resolve issue because the public understanding "for all relevant purposes" in the case before it was the same in both 1791 and 1868).[2] Moreover, it concluded that "[s]tep one of the predominant framework [applied in the lower courts] is broadly consistent with *Heller*." *Bruen*, 142 S. Ct. at 2127. Accordingly, the step-one analyses in the cases just cited remain, as a general matter, good law.

For the reasons set out in the Commissioner's letter, as well as in his original brief (at 28-33, 41-44) and in Everytown's amicus brief (at 10-24), this Court should uphold Pennsylvania's law whether it focuses on the period around 1791 or the period around 1868.[3] But if this Court prefers to settle the issue the Supreme Court left open now, it

---

added)); *Binderup v. Att'y Gen.*, 836 F.3d 336, 362 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and in the judgments) (quoting *Ezell*).

[2] Plaintiffs grossly misread *Bruen* to have resolved the issue in favor of 1791, claiming that Reconstruction-era laws "come far too late." Dkt. 56 at 9-10; *see also id.* at 5 n.1. Obviously, the Court did not resolve the issue it expressly left open. And to the extent that the majority put a thumb on the scale, it was in favor of 1868, not 1791. *See infra* at pp. 5-7 (explaining that majority cited scholarship arguing for 1868 and none arguing for 1791, and approvingly cited consideration of 19th-century laws in sensitive places analysis). For similar reasons, Plaintiffs err in continuing to insist that *Gamble v. United States*, 139 S. Ct. 1960 (2019), requires this Court to discount the wealth of historical laws from the second half of the 19th century. Dkt. 56 at 5 n.1, 10. *Bruen* confirms that *Gamble* has no such effect: it acknowledged *Gamble* and still expressly left open the question whether 1868 or 1791 is the proper focus. *See* 142 S. Ct. at 2137-38.

[3] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the Commissioner's evidence), it should rely on 19th-century history to clarify that meaning. It is simply not plausible for plaintiffs to contend that today's generation, 231 years removed from the Second Amendment's ratification, is better able to determine the 1791 meaning of its text than was

3

should conclude that 1868 is the correct focus.

To begin with, in a case involving a state or local law, that focus is the only correct answer to the originalist question: how did the people understand the right at the time of its adoption? There was no right to keep and bear arms constraining the states under the U.S. Constitution until 1868; as *Bruen* correctly observed, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." 142 S. Ct. at 2137. Thus, when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right should control the originalist analysis today. To insist otherwise is to demean the originalist project. In a case against a state, if a court were to privilege a founding-era understanding of the right over a different Reconstruction-era understanding, it would reject what the people understood the right to be at the time they gave it effect.

If the understanding changed between 1791 and 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." K. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But if the scope of each enumerated right must be the same as against the

---

the Reconstruction generation, 77 years removed. Indeed, in relying heavily on *Heller*'s statement, quoted in *Bruen*, that Reconstruction-era evidence "do[es] not provide *as much* insight into [the Second Amendment's] original meaning as earlier sources," plaintiffs implicitly acknowledge that it provides at least *some* insight. *See* Dkt. 56 at 9 (quoting *Bruen*, 142 S. Ct. at 2137-38) (emphasis added) (cleaned up); *see also infra* n.6.

state and federal governments, *see Bruen*, 142 S. Ct. at 2137, then originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this issue: *Bruen* noted prior decisions that had "assumed" that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. But if the majority believed those decisions controlled the issue, it would have said so. Instead, the Court pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at 2138. And then it cited two scholars who support the 1868 view, and none who supports 1791. *See id.* (citing A. Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and K. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917) (now published at 97 Ind. L.J. 1439). On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[4] More recently,

---

[4] *See* Amar, *The Bill of Rights*, at xiv (account is "attentive to the possibility" that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[W]hen we 'apply' the Bill of Rights against the states today, we must first and foremost reflect on the meaning and spirit of the amendment of 1866, not the Bill of 1789. … [I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government").

Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." Lash, manuscript, at 2. On this view, too, 1868 meanings bind both the state and federal governments.

There is good reason for this to be the leading originalist view: insisting that the 1791 understanding should apply against the states does not make sense in light of the Supreme Court's lengthy analysis in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), of the understanding of the right to keep and bear arms around 1868. *See id.* at 770-78. It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in an opinion by Judge Sykes, reads *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified." *Ezell*, 651 F.3d at 702.

Plaintiffs' insistence (at 9) that the Court "did not view things that way"—*i.e.*, did not agree with the only two scholars it cited—is, therefore, baffling. Plaintiffs' argument is also inconsistent with the passage in *Bruen* instructing the lower courts on historical methodology through the example of "sensitive places" restrictions. There, the Court indicated that adequate restrictions on guns in legislative assemblies, polling places, and courthouses exist in "18th- *and 19th-century*" laws to satisfy its historical analysis (142 S.

6

Ct. at 2133 (emphasis added))—an incomprehensible statement if it believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, all the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[5]

Finally, further confirmation that 1868 is the correct focus occurred in the *Bruen* oral argument, where the following exchange took place between Justice Thomas and counsel for the NRA's New York affiliate, former Solicitor General Paul Clement:

> JUSTICE THOMAS: … [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?
> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction as -- you know, and -- and -- and giving preference to that over the founding.

Tr. of Oral Arg., No. 20-843, at 8:2-17.

In sum, the historical inquiry should focus on the period around 1868, not 1791. And 1868 is not a cutoff; *Heller* instructs that "examination of a variety of legal and other sources to determine the *public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." 554 U.S.

---

[5] *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36 (2018) (citing no 19th-century laws); *id.* at 244-47 (citing 1873 Texas law and 1874 decision upholding 1870 Georgia law; article also cites 1870 Louisiana and 1874 and 1886 Maryland laws in same section, at 243); Br. for Independent Institute as Amicus Curiae, *Bruen*, No. 20-843, at 11-17 (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).[6]

Thus, the most important indicators of the scope of the right to keep and bear arms are the wealth of restrictions from the second half of the 19th century, which demonstrate beyond doubt that individuals under 21 do not have a right to carry firearms in public.

---

[6] *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting James Madison). Here, state laws from the second half of the 19th century establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and speak in one voice. But even if this Court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it were to conclude (contrary to the Commissioner's evidence) that the status of the right vis-à-vis those under 21 was uncertain at the time of the founding, it should then consider the 19th-century evidence and recognize that it "settle[s] the meaning of" the right as one that did not extend to those under 21.

|                          | Respectfully submitted,          |
|--------------------------|----------------------------------|
| Dated:  August 1, 2022   | By: *s/* Janet Carter            |

                                              Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4184
New York, NY 10017
(646) 324-8174
*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

# CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Letter Brief of Everytown for Gun Safety as Amicus Curiae in Support of Defendant-Appellee on all parties via CM/ECF.

The foregoing letter brief is identical to Exhibit A attached to the Consented Motion for Leave to File Letter Brief of Everytown for Gun Safety as Amicus Curiae in Support of Defendant-Appellee, filed and served on August 1, 2022.

Dated: August 2, 2022    By: *s/ Janet Carter*

                                              Janet Carter
                                              Everytown Law
                                              450 Lexington Avenue, P.O. Box 4184
                                              New York, NY 10017
                                              (646) 324-8174
                                              jcarter@everytown.org
                                              *Counsel for Amicus Curiae*
                                              *Everytown for Gun Safety*