## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

MADISON M. LARA, *et al.*,

*Plaintiffs/Appellants,*

vs.

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA, No. 2:20-cv-1582,
The Hon. William S. Stickman IV

## BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES ACTION FUND IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING

[Additional Counsel Listed
on Signature Page]

Jim Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA  19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for* Amici Curiae
*Giffords Law Center to Prevent
Gun Violence, Brady Center to
Prevent Gun Violence, and March
For Our Lives Action Fund*

February 22, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate procedure, *Amici Curiae* Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Action Fund state that they do not have parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

/s/ *Jim Davy*
Jim Davy

Dated:  February 22, 2024

# TABLE OF CONTENTS

**PAGE**

INTEREST OF *AMICI CURIAE* ................................................................ 1

INTRODUCTION ................................................................................... 1

REASONS FOR GRANTING REHEARING ........................................... 2

I.    The Majority's Decision Conflicts with Binding Precedent and Undermines Lawmakers' Ability to Enact Laws That Prevent Gun Violence and Are Constitutional. ............................................ 2

II.   The Challenged Laws Are Analogous to Historical Regulations of Groups Posing a Heightened Risk of Violence When Armed...... 8

CONCLUSION ..................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Binderup* v. *Att'y Gen.*,
    836 F.3d 336 (3d Cir. 2016) ................................................................ 4

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008)............................................................................ 5

*Folajtar* v. *Att'y Gen.*,
    980 F.3d 897 (3d Cir. 2020) ................................................................ 6

*Gall* v. *United States*,
    552 U.S. 38 (2007)............................................................................. 9

*Graham* v. *Florida*,
    560 U.S. 48 (2010)............................................................................. 9

*Kipke* v. *Moore*,
    2023 WL 6381503 (D. Md., Sept. 29, 2023) ...................................... 7

*Koons* v. *Platkin*,
    2023 WL 3478604 (D.N.J., May 13, 2023) ......................................... 7

*N.Y. State Rifle & Pistol Ass'n* v. *Bruen*,
    597 U.S. 1 (2022).......................................................................*passim*

*Range* v. *Att'y Gen.*,
    69 F.4th 96 (3d Cir. 2023)........................................................ 3, 6, 8

*United States* v. *Barton*,
    633 F.3d 168 (3d Cir. 2011) ................................................................ 6

*United States* v. *Daniels*,
    77 F.4th 337 (5th Cir. 2023) ............................................................... 6

*United States* v. *Gould*,
    2023 WL 3295597 (S.D. W. Va. May 5, 2023) .................................... 6

*United States* v. *Jackson*,
   69 F.4th 495 (8th Cir. 2023) ................................................................. 5

**Constitution, Statutes, and Rules**

U.S. CONST. amend. II ...................................................................*passim*

**Other Authorities**

*A Partial List of Mass Shootings in the United States in
   2022*, N.Y. TIMES (Jan. 24, 2023) ....................................................... 12

Centers for Disease Control and Prevention, Web-based
   Injury Statistics Query and Reporting System
   (WISQARS), *Leading Cause of Death Reports, 1981–2020*
   (last visited Feb. 21, 2024) .................................................................. 13

Daniel W. Webster et al., *The Case for Gun Policy Reforms in
   America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH.
   (2012) ................................................................................................... 10

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and
   Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013)............................... 13

Elise Hammond et al., *The Latest on Mass Shooting in
   Farmington, New Mexico*, CNN (May 16, 2023)................................. 13

Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in
   Mass Shootings: Young Assailants*, N.Y. TIMES (June 2,
   2022) .................................................................................................... 11

Isabel Rosales et al., *6 People Face Murder Charges for the
   Sweet 16 Party Massacre that Left 4 Dead and 32 Injured*,
   CNN (Apr. 21, 2023) ........................................................................... 12

J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor
   for Completed Suicide: Even More Lethal Than We Knew*,
   173 AM. J. PSYCHIATRY 1094 (2016) ................................................... 14

Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947 (2008) ..................................................... 13

Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022) ...................................................... 14

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ..................... 9

Matthew Miller & David Hemenway, *Guns and Suicide in the United States*, 359 NEW ENGL. J. MED. 989 (2008)....................... 14

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ....................................................... 9

*Murder Charges Upheld in South Street Shooting That Killed 3, Wounded 11*, NBC 10 PHILADELPHIA (Sept. 8, 2022) .................................................................. 12

RAND Corp., *The Effects of Minimum Age Requirements* (last updated Jan. 10, 2023) ........................................................ 14

Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 TRAUMA, VIOLENCE, & ABUSE 62 (2017). ........................................................... 11

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010–2019 (last visited Feb. 21, 2024) .............................................. 10

U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38 (last visited Dec. 27, 2023).................................. 9, 10

William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 Notre Dame L. Rev. (forthcoming 2024) ................. 4, 7

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are three non-profit organizations dedicated to ending gun violence in the United States. Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence each have decades of experience supporting laws and strategies to end gun violence in the United States. March For Our Lives, formed in 2018 after the Parkland, Florida high school shooting, is a non-profit organization comprised of young Americans advocating for sensible laws that prevent gun violence. *Amici* have an interest in ensuring that the United States Constitution is interpreted correctly so as to allow the nation's democratically accountable officials to pass common-sense legislation that prevents gun violence.

## INTRODUCTION

The panel majority in this case invalidated several Pennsylvania laws that had the effect of prohibiting 18-to-20-year-olds from carrying guns in public during a government-declared state of

---

[1] Appellants and Appellee have consented to *amici*'s filing. *See* Fed. R. App. P. 29(a)(2). No counsel for a party authored this brief in whole or in part or funded the preparation or submission of this brief, and no person other than *amici* or their counsel made such a monetary contribution. *See* Fed. R. App. P. 29(a)(4)(E).

emergency (the "Challenged Laws"). In doing so, the majority took an overly narrow approach that demands a near-exact, pre-1791 historical match to the Challenged Laws' restrictions on this age group. This approach conflicts with the Supreme Court's and this Court's binding precedents, including *New York State Rifle & Pistol Association* v. *Bruen*, 597 U.S. 1 (2022). These errors pose a grave threat to public safety, not just with respect to the Challenged Laws, but because they could mistakenly upend a wide swath of life-saving, constitutional gun laws. The majority's erroneous interpretation of binding precedent and the exceptional importance of the questions at issue warrant rehearing. Fed. R. App. P. 35(b)(1), 40(a)(2). For the reasons presented by Defendant/Appellee Pennsylvania State Police Commissioner, and those discussed here by *amici*, the Court should grant panel or *en banc* rehearing.

## REASONS FOR GRANTING REHEARING

I.   **The Majority's Decision Conflicts with Binding Precedent and Undermines Lawmakers' Ability to Enact Laws That Prevent Gun Violence and Are Constitutional.**

"Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Bruen*, 597 U.S. at 80 (Kavanaugh, J.,

concurring) (citation omitted).  This Court, sitting *en banc*, has confirmed that the second step of *Bruen*'s test, which looks to "the Nation's historical tradition of firearm regulation," means modern laws "need only be 'relevantly similar'" to historical regulations.  *Range* v. *Att'y Gen.*, 69 F.4th 96, 103 (3d Cir. 2023), *petition for cert. pending*, No. 23-374 (filed Oct. 18, 2023) (citing *Bruen*, 597 U.S. at 24, 29).  But instead of faithfully applying precedent, the majority reduced *Bruen*'s second step to an empty matching exercise, assessing whether the Commissioner could identify nearly identical regulations of 18-to-20-year-olds at the Founding.  (Panel Op. at 22-29.)[2]  That is not the law.

The majority's analysis rests on at least two fundamental errors.  First, by demanding that the Commissioner identify a "record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification," the majority misconstrued *Bruen* as requiring a *precise* historical analogue to the Challenged Laws.  (Panel Op. at 23.)  While *Bruen* recognizes that reasoning by analogy is a

---

[2] *Amici*'s focus here is *Bruen*'s second step.  *Amici* agree with the Commissioner that the majority also erred at step one in determining that 18-to-20-year-olds are among "the people" within the Second Amendment's scope.  *See* Pet. for Reh'g at 4-10.

valuable tool in bringing the historical understanding of the Second Amendment to bear on present day gun laws, *Bruen* does not impose an analytical straightjacket.  "The strongest understanding of *Bruen* is that the Supreme Court [adopted] the standard of review generally accepted by courts applying the right to bear arms, not some novel and *sui generis* test that looks for a direct analogue of the specific law."  William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 Notre Dame L. Rev. (forthcoming 2024), https://perma.cc/PD2G-TKCA.  *Bruen* not only allows for but demands more than the "mindless parsing of historical analogies," *id.*, and does not require the government to identify a "historical *twin*."  *Bruen*, 597 U.S. at 29.

In particular, the majority here failed to consider the "how and why" behind the Challenged Laws, *Bruen*, 597 U.S. at 30, which place time-limited restrictions on a cohort that presents heightened risks of violence when armed.  *See infra* Section II.  The majority thus failed to consider that the "the founding generation did not understand the right to keep and bear arms to extend to certain categories of people deemed too dangerous to possess firearms."  *Binderup* v. *Att'y Gen.*, 836 F.3d 336, 367 (3d Cir. 2016) (Hardiman, J., concurring).  Indeed, lawmakers'

historical "discretion to prohibit possession of firearms by a category of persons . . . who pose an unacceptable risk of dangerousness may allow greater regulation than would an approach that employs means-end scrutiny." *United States* v. *Jackson*, 69 F.4th 495, 505 (8th Cir. 2023).

Second, the majority was incorrect to hold that only statutes from 1791, when the Second Amendment was ratified, were relevant here. (Panel Op. at 21; *see* Pet. for Reh'g at 13-15.)  In "set[ting] aside the Commissioner's catalogue of statutes from the mid-to-late nineteenth century" regulating 18-to-20-year-olds' access to guns (Panel Op. at 22), the majority disregarded the Supreme Court's instruction that evidence of the "public understanding of [the Second Amendment's] text in the period after its enactment or ratification" is probative of its meaning. *District of Columbia* v. *Heller*, 554 U.S. 570, 605 (2008); *see also Bruen*, 597 U.S. at 35-36.    Indeed, *Bruen* gave detailed consideration to numerous 19th-century statutes, *id.* at 52-57, all outside of the majority's narrow "historical reference point," (Panel Op. at 21).

Left uncorrected, these two errors could improperly undermine wide swaths of constitutional gun laws, including *Heller's* "presumptively lawful" regulations, 554 U.S. at 626-26 & n.26, which

generally post-date the Second Amendment's ratification. But as this Court has repeatedly held, the "presumptive[] lawful[ness]" of those regulations "is not dicta." *Range*, 69 F.4th. at 110 (Ambro, J., concurring); *Folajtar* v. *Att'y Gen.*, 980 F.3d 897, 903 (3d Cir. 2020); *United States* v. *Barton*, 633 F.3d 168, 171 (3d Cir. 2011). As one court explained in the context of gun restrictions on the mentally ill—one of *Heller*'s presumptively lawful examples—even if "a formal regulation prohibiting the possession of firearms by the *mentally ill* did not exist at the time the Second Amendment was enacted," the principles underlying the Second Amendment permit such restrictions. *United States* v. *Gould*, --- F. Supp. 3d ---, 2023 WL 3295597, at *12 (S.D. W. Va. May 5, 2023); *see also United States* v. *Daniels*, 77 F.4th 337, 349 (5th Cir. 2023) (noting a lack of "positive-law statutes concerning mental illness and firearms" at the founding). Yet the majority's logic would find the lack of such prohibitions dispositive.

The majority's overly narrow search for precisely analogous pre-1791 regulations could also impose an unworkable test on modern "sensitive place" regulations. As *Bruen* acknowledged, strict analogical reasoning is not the right approach to these restrictions: "the historical

record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 597 U.S. at 30. Indeed, "[t]he constitutional validity of a prohibition on carrying arms aboard aircraft does not turn on whether the eighteenth and nineteenth centuries had analogous regulations of ships and railcars. The search should instead be for the legal principles that govern sensitive places." Baude & Leider, *supra*.[3]

Taken at face value, the majority's decision could force elected officials to select gun regulations from a set menu of precise analogues to laws that existed in 1791, thus rejecting the "nuanced approach" that accounts for laws addressing "unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. This punishing diminution of government authority could stymie legislative efforts to pass life-saving constitutional legislation. Rehearing is needed to reaffirm that the appropriate inquiry entails analyzing "how and why" a

---

[3] Lower courts (including in this Circuit) have mistakenly assessed the constitutionality of sensitive place restrictions with a quixotic search for historical laws prohibiting guns in zoos, casinos, and sports arenas. *See, e.g.*, *Koons* v. *Platkin*, 2023 WL 3478604, at *45-48 (D.N.J. May 13, 2023); *Kipke* v. *Moore*, 2023 WL 6381503, at *7-13 (D. Md. Sept. 29, 2023).

law affects an individual's ability to bear arms, not searching for pre-1791 historical twins. *Range*, 69 F.4th at 103 (citing *Bruen*, 597 U.S. at 29). Only this approach can appropriately assess "modern regulations that were unimaginable at the founding." *Id.* (citing *Bruen*, 597 U.S. at 28).

## II. The Challenged Laws Are Analogous to Historical Regulations of Groups Posing a Heightened Risk of Violence When Armed.

The "why" underlying the Challenged Laws highlights the fact that the majority's decision not only flouts history but also threatens lives. The Pennsylvania Legislature's decision to enact time-limited restrictions on 18-to-20-year-olds' ability to carry firearms in public is consistent with the nation's history of regulating persons who present a heightened danger to the public when armed. Neuroscience and social science research confirm that 18-to-20-year-olds with easy access to firearms pose a substantial risk of danger to themselves and others, mirroring the justification for long-standing regulations of other highly dangerous cohorts. This evidence reinforces the Challenged Laws' constitutionality and demonstrates this case's remarkable stakes.

As the Supreme Court has recognized, the human brain does not finish developing until the mid-to-late twenties. *See Graham* v. *Florida*, 560 U.S. 48, 68 (2010); *Gall* v. *United States*, 552 U.S. 38, 58 (2007). The last part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[4] As a result of 18-to-20-year-olds' heightened impulsivity, they pose a heightened risk of dangerousness when armed.[5] National data shows dramatically higher rates of violent crime in this age cohort:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[6]

---

[4]    *See* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013).

[5]    *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents['] . . . proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

[6]    U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38 (last visited Feb. 21, 2024), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38.

- Though 18-to-20-year-olds make up less than 5% of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[7]

- 18-to-20-year-olds account for more than 12% of property crime arrests.[8]

The following chart, showing homicide offense rate by age in 2009, illustrates the disproportionate share of homicides committed by 18-to-20-year-olds:[9]

---

[7]    *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2010 to July 1, 2019*, National Population by Characteristics: 2010–2019 (last visited Feb. 21, 2024), https://www.census.gov/data/datasets/time-seriesdemo/popest/ 2010s-national-detail.html.

[8]    *Crime in the United States*, *supra* note 6.

[9]    Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. 1, 5 (2012).



18-to-20-year-olds are also uniquely likely to commit mass shootings, which traumatize whole communities and have an outsized impact on perceptions of public safety.[10]  Experts have noted a "very big cluster of young people" among mass shooting perpetrators.[11]  Indeed, many recent mass shootings involve perpetrators in the age range covered by the Challenged Laws.  On May 14, 2022, an 18-year-old white

---

[10]    Mass shootings cause "an array of mental health problems in survivors and members of affected communities.  Furthermore, they have been associated with increased fears and decreased perceptions of safety in indirectly exposed populations."  Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 TRAUMA, VIOLENCE, & ABUSE 62, 79 (2017).

[11]    Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings:  Young Assailants*, N.Y. TIMES (June 2, 2022), https://www.nytimes.com/2022/06/02/us/politics/mass-shootings-young-men-guns.html.

supremacist killed ten Black people and wounded three others at a supermarket in Buffalo, New York.[12] Just 10 days later, an 18-year-old killed 19 children and two teachers at an elementary school in Uvalde, Texas.[13] Below the headlines lurk dozens more mass shootings perpetrated by 18-to-20-year-olds. For example, in June 2022, two Philadelphia 18-year-olds were charged with murder after they "randomly fired" into a crowd of innocent bystanders, killing three people and injuring 14;[14] in April 2023, a 19-year-old and two 20-year-olds were charged in a mass shooting at a sweet 16 party in Dadeville, Alabama that killed four people and injured 32 others;[15] and on May 16, 2023, an 18-year-old gunman killed three people and wounded six others in

---

[12]    *A Partial List of Mass Shootings in the United States in 2022*, N.Y. TIMES (Jan. 24, 2023), https://www.nytimes.com/article/mass-shootings-2022.html.

[13]    *Id.*

[14]    *Murder Charges Upheld in South Street Shooting That Killed 3, Wounded 11*, NBC 10 PHILADELPHIA (Sept. 8, 2022), https://www.nbcphiladelphia.com/news/local/murder-charges-upheld-in-south-street-shooting-that-killed-3-wounded-11/3356960/.

[15]    Isabel Rosales et al., *6 People face murder charges for the Sweet 16 party massacre that left 4 dead and 32 injured*, CNN (Apr. 21, 2023), https://www.cnn.com/2023/04/19/us/dadeville-alabama-birthday-party-shooting-wednesday/index.html.

Farmington, New Mexico, with a firearm purchased shortly after his 18th birthday.[16]

Access to guns among this age cohort also exacerbates suicide risk. To begin, 18-to-20-year-olds are more likely to develop and act upon suicidal impulses. Many major psychiatric conditions first develop in adolescence,[17] and, in the past decade, suicide was the third most common cause of death among 18-to-20-year-olds.[18] Their impulsivity and propensity toward negative emotional states puts them at particular risk of suicide, which "is commonly an impulsive act by a vulnerable individual."[19]

---

[16]    Elise Hammond et al., *The latest on mass shooting in Farmington, New Mexico*, CNN (May 16, 2023), https://www.cnn.com/us/live-news/farmington-new-mexico-shooting-05-16-23.

[17]    Jay N. Giedd et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[18]    Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981–2020* (last visited Feb. 21, 2024), https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

[19]    E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

These impulsive acts are particularly deadly when mixed with easy access to firearms.  In 2020, more than half of the 3,305 suicide deaths among 16-to-21-year-olds involved firearms,[20] and firearm suicide among teens has trended sharply upwards.[21]  Laws restricting this cohort's access to guns can prevent those deaths.  Suicide by firearm has the highest fatality rate of any method—while 4% of non-firearm suicide attempts are fatal, 85% of suicide attempts with a gun are fatal.[22]  Fewer than 3% of people who survive one suicide attempt later die by suicide.[23]  A young adult's access to firearms when contemplating a suicide attempt, therefore, often determines whether they will live or die.

---

[20]    RAND Corp., *The Effects of Minimum Age Requirements* (last updated Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/minimum-age.html.

[21]    Jennifer Mascia & Olga Pierce, *Youth Gun Suicide Is Rising, Particularly Among Children of Color*, THE TRACE (Feb. 24, 2022), https://www.thetrace.org/2022/02/firearm-suicide-rate-cdc-data-teen-mental-health-research/.

[22]    Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

[23]    J. Michael Bostwick et al., *Suicide Attempt as a Risk Factor for Completed Suicide: Even More Lethal Than We Knew*, 173 Am. J. Psychiatry 1094, 1098 (2016).

## CONCLUSION

The majority's decision ignored the nation's long-standing history and tradition of laws regulating access to guns for categories of persons deemed particularly dangerous when armed. In doing so, it adopted an overly stringent analysis that runs afoul of *Bruen*. The decision threatens to upend numerous other constitutional gun regulations. *Amici* respectfully request that the Court grant panel or *en banc* rehearing.

Dated:  February 22, 2024

Respectfully submitted,

*Of Counsel for* Amicus Curiae
*Giffords Law Center to Prevent
Gun Violence:*

Esther Sanchez-Gomez
Kelly M. Percival
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA  94104
(415) 433-2062

Robert A. Sacks
Leonid Traps
Sophie A. Kivett
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498
(212) 558-4000

Elizabeth A. Rose
Madeline B. Jenks
Beatriz L. Albornoz
Cason J.B. Reily
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC  20006
(202) 956-7500

/s/ *Jim Davy*
Jim Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA  19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for* Amici Curiae *Giffords
Law Center to Prevent Gun
Violence, Brady Center to Prevent
Gun Violence, and March for Our
Lives Action Fund*

*Of Counsel for* Amicus Curiae
*Brady Center to Prevent Gun
Violence:*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street NE, Suite 400
Washington, DC  20002
(202) 370-8100

*Of Counsel for* Amicus Curiae
*March For Our Lives Action Fund:*

Ciara Malone
March For Our Lives Action Fund
90 Church Street # 3417
New York, NY  10008
(913) 991-4440

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 29(b)(4) because it contains 2599 words, excluding the parts of the brief exempted by Rule 32(f);

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font; and

(iii) was scanned for viruses prior to submission.

## CERTIFICATE OF BAR MEMBERSHIP

I certify pursuant to L.A.R. 28.3(d) that I am a member in good standing of the Bar of the Third Circuit.


/s/ Jim Davy
Jim Davy


Dated:  February 22, 2024

## CERTIFICATE OF SERVICE

I certify that on February 22, 2024, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


/s/ Jim Davy
Jim Davy

Dated:  February 22, 2024