No. 21-1832

# In The United States Court of Appeals
# For the Third Circuit

Madison M. Lara, Sophia Knepley, Logan D. Miller, Second Amendment Foundation, Inc., and Firearms Policy Coalition, Inc.,

*Plaintiffs-Appellants*,

v.

Commissioner Pennsylvania State Police,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA (20-cv-1582)
(Hon. William S. Stickman, IV, Presiding)

**SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLANTS**

Joshua Prince, Esq.
Civil Rights Defense Firm, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@CivilRightsDefenseFirm.com
(888) 202-9297
(610) 400-8439 (fax)

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

                                                **Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 1

I. *Rahimi* Applied *Bruen*, It Did Not Change It. ............................................ 1

II. This Court Could Reissue Its Prior Opinion Unchanged Following *Rahimi*. ....... 7

CONCLUSION ............................................................................................... 11

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page**

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................................ 1, 3

*Lara v. Comm'r Pa. State Police*,
    91 F.4th 122 (3d Cir. 2024) ............................................................ 7, 8, 9, 10

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022) .................................................................................... 1, 5

*United States v. Rahimi*,
    144 S. Ct. 1889 (2024) ................................................ 1, 2, 3, 4, 5, 6, 9

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ................................................................... 5, 6

*Worth v. Jacobson*,
    108 F.4th 677 (8th Cir. 2024) ............................................................ 10, 11

# INTRODUCTION

The Supreme Court's decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), does not in the least undermine this Court's prior judgment in this case. While *Rahimi* is instructive as an example of how to apply the framework that was first applied in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and made more explicit in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), unlike those cases, *Rahimi* did not purport to be anything more than an application of existing precedent. This Court faithfully applied that same precedent when it decided this case, so *Rahimi* does not require changing anything in the prior decision. Indeed, a decision of the Eighth Circuit, raising the same basic issue as is presented by this case, issued after *Rahimi*, tracked this Court's pre-*Rahimi* reasoning almost exactly. This Court should therefore simply reinstate, largely unchanged, the Court's pre-*Rahimi* decision, and hold that Pennsylvania's law precluding 18-to-20-year-olds from carrying firearms in public during a declared state of emergency is unconstitutional.

# ARGUMENT

## I. *Rahimi* Applied *Bruen*, It Did Not Change It.

In *Rahimi*, the Supreme Court held that 18 U.S.C. § 922(g)(8), which prohibits a person subject to a domestic violence restraining order from possessing a firearm for the duration of that restraining order, was not facially unconstitutional. 144 S.

1

Ct. at 1903. *Rahimi* is an important case, but it would not do to overstate its importance. *Rahimi* is important because it offers the first post-*Bruen* example from the Supreme Court of how to apply *Bruen* to a novel question. In upholding a federal law against a Constitutional challenge, it demonstrates that the *Bruen* analysis does not spell the end of firearm regulation and, at the same time, it reaffirms that modern firearm laws are presumptively unconstitutional unless the government can demonstrate, by proffering historical analogues that are similar in "how" and "why" they restrict the right to keep and bear arms, that they are "consistent with the principles that underpin our regulatory tradition" as well as "the principles underlying the Second Amendment." *Id.* at 1898.

On the other hand, *Rahimi* did not meaningfully alter or limit the *Bruen* analysis, or change any element of its application. Indeed, in describing how to derive the "principles that underpin our regulatory tradition," the Court in *Rahimi* reiterated *Bruen*'s description of how to analyze proposed analogues, emphasizing that "[w]hy and how the regulation burdens the right are central to this inquiry." *Id.*

Acknowledging the limited scope (at least compared to decisions like *Bruen* and *Heller*) of what the Supreme Court set out to accomplish, *Rahimi*'s analysis of the relevant historical analogues to derive a constitutional principle applicable to the federal ban on firearm possession by those subject to domestic violence restraining orders is nevertheless instructive to lower courts attempting the *Bruen* analysis. To

2

begin with, *Rahimi* notably did not conduct a textual analysis, but rather implicitly found—since it had to go on to discuss history—that Rahimi was part of "the people" with Second Amendment rights. This should not be (and apparently was not) controversial, since *Heller* already said "the people" includes, at a minimum, "all Americans." 554 U.S. at 581. Nevertheless, *Rahimi*'s brevity is instructive and demonstrates that, in most cases, the textual analysis conducted in *Heller* will be more than enough to get past the threshold in *Bruen* and on to the meat of its analysis—the search for relevant historical analogues that can be meaningfully compared to modern laws.

*Rahimi*'s historical analysis is similarly instructive, though, again, not groundbreaking. In "considering whether [Section 922(g)(8)] is consistent with the principles that underpin our regulatory tradition," *Rahimi* conspicuously focused on the Founding era. 144 S. Ct. at 1898. It stressed that in the analogical process, "[i]f laws *at the founding* regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* (emphasis added). It also cautioned that that "[e]ven when a law regulates arms-bearing for a permissible reason … it may not be compatible with the right if it does so to an extent *beyond what was done at the founding*." *Id.* (emphasis added). And in analyzing Section 922(g)(8), the Court's analysis remained true to these statements, as it focused on

what firearm regulation looked like at the Founding, when the Second Amendment was ratified. For instance, the Court noted that, although going back to "the earliest days of the common law" there were examples of laws disarming certain groups (including "political opponents [of the sovereign] and disfavored religious groups"), it treated those laws as having only limited value because they were largely defunct by the Founding. *Id.* at 1899. The only laws of that type that were *not* defunct at the Founding—those "regulations targeting individuals who physically threatened others"—comprised the "two distinct legal regimes" of surety laws and "going armed" laws that formed the basis of the Supreme Court's decision. *Id.* In discussing these laws, the Court stressed their Founding-era bona fides, heavily based its understanding of them on Founding-era sources, and cited little from outside the Founding era. *See id.* at 1899–1901 (chiefly citing Blackstone's *Commentaries on the Laws of England* and a 1795 Massachusetts statute to understand the way surety laws functioned and "targeted the misuse of firearms," and noting that four States had codified "going armed" prohibitions between 1741 and 1807). Indeed, other than a citation to a 2010 case citation (which merely confirmed that these Founding-era traditions *remained* a part of the legal landscape today), *Rahimi* cited *nothing* in its assessment of historical evidence that post-dated the ratification of the Fourteenth Amendment in 1868.

Based on this historical evidence, the Court concluded that the Second Amendment is consistent with "what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id*. at 1901. Given the facts of Rahimi's own case, the Court had "no trouble concluding" that, in disarming him, Section 922(g)(8) on its face was consistent with that historical principle. *Id.* at 1902.

Before ending its opinion, however, the Court had one more cautionary note to sound. Discussing the issue separately, Justice Barrett referred to the error committed by the Fifth Circuit below as a type of "level of generality problem." *Id.* at 1925 (Barrett, J., concurring). And the majority explained that error lies on either end of the "generality" spectrum for courts attempting to derive principles from historical sources. On the too-narrow end, the Court held that the Fifth Circuit had effectively required a " 'historical twin' rather than a 'historical analogue.' " *Id.* at 1903 (quoting *Bruen*, 597 U.S. at 30). The comparison between the Supreme Court's and the Fifth Circuit's analysis of the surety laws is illuminating to understand what the Supreme Court meant by this. The Fifth Circuit, in reviewing the surety laws, recognized that they "come closer" than other proffered analogues "to being 'relevantly similar' " to Section 922(g)(8), in that they were "more clearly a part of our tradition of firearm regulation" and were similarly motivated by a desire "to protect an identified person … from the risk of harm posed by another identified

5

individual," and it recognized also that "*how* the surety laws worked resembled certain of the mechanics of § 922(g)(8)." *United States v. Rahimi*, 61 F.4th 443, 459–60 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (2024). So far, so good. Nevertheless, the Fifth Circuit declined to rely on the surety laws because they did not prohibit public carry and possession of weapons if the individual who threatened violence managed to post sureties, unlike Section 922(g)(8) which offered no similar escape valve, so that, in the Fifth Circuit's judgment, "the historical surety laws did not impose 'a comparable burden on the right of armed self-defense.' " *Id.* at 460. In so holding, the Fifth Circuit permitted too small a difference in *how* the laws burdened the right to overcome the striking similarity in *why*, and it failed to account for the *more* stringent burden placed on the right by the also "relevantly similar" "going armed" laws.

On the too-general end of the spectrum, the Supreme Court went out of its way to "reject the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.' " *Rahimi*, 144 S. Ct. at 1903. It clarified that its use of the term "responsible" to describe the plaintiffs in *Heller* and in *Bruen* had not signaled a limit on the scope of the Second Amendment, but merely indicated that they were among "the class of ordinary citizens who undoubtedly enjoy the Second Amendment right." *Id.* The Court criticized any such rule as "unclear" and "responsible" as a "vague term." *Id.* Such a principle would not be administrable and

would be subject to manipulation by courts, threatening to create an exception that swallows the rule.

**II. This Court Could Reissue Its Prior Opinion Unchanged Following *Rahimi*.**

The panel opinion in this case faithfully followed *Heller* and *Bruen* and, as a result, it is entirely consistent with *Rahimi*, which merely applied those precedents. The State has previously argued that the panel decision was inconsistent with all three of those cases because it "foreclosed reliance on historical sources at the textual prong" of the *Bruen* analysis, Pet. for Reh'g or Reh'g En Banc at 4, Doc. 81 (Feb. 15, 2024) ("En Banc Pet."); Pet. for Certiorari at 20–21, *Lara v. Paris*, No. 24-93 (U.S. July 25, 2024) ("Cert. Pet."), it declined to consider laws from the latter half of the 19th century as relevant to determining whether 18-to-20-year-olds have full firearm rights, En Banc Pet. 13; Cert. Pet. 21, and it required the State to point to a "historical twin" to justify its law, En Banc Pet. 15; Cert Pet. 11. Not only does *Rahimi* not support the State on any of these arguments, it is affirmatively harmful to the State's position, and bolsters the panel's decision on all three points.

1. In its opinion, this Court recognized that in both *Heller* and *Bruen*, the Supreme Court had accorded the plain text of the Second Amendment a "broad scope," especially as to "the people," a phrase which "cast a wide net" and presumptively included all Americans. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 130 (3d Cir. 2024). The Court rejected the State's argument that, at the

Founding, those under 21 would not have been considered part of "the people" because they were minors. *Id.* at 131. In so holding, this Court *never* suggested that it could not look at historical evidence—including evidence of the age of majority—in attempting to understand the textual scope of the Second Amendment. Rather, it rejected the State's argument on its own terms, explaining that *even if* 18-to-20-year-olds were not "the people" at the Founding, that would not mean they are so excluded today, given that such reasoning would limit the term in many cases to "white, landed men, and that is obviously not the state of the law." *Id.* It similarly noted that the State's argument was logically flawed—the simple fact that someone was a minor at the Founding and lacked certain rights would not mean that they were entirely outside "the people," but could equally be explained by the government nevertheless having "the power to disable the exercise of *a right they otherwise possess*." *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)). And finally, it recognized that the State's argument would have this Court interpreting the scope of "the people" uniquely narrowly, compared to how it has read the phrase in other parts of the constitution where it appears, an unacceptable outcome. *Lara*, 91 F.4th at 131–32.

*Rahimi* is fully consistent with this reasoning. As explained above, *Rahimi* did not even bother to engage in a separate analysis of the plain text of the Second Amendment because it was clear under *Heller* that Rahimi was part of "the people,"

8

an implicit recognition, in line with this Court's opinion, that the Amendment "casts a wide net" and that restrictions must come, if at all from history. *Id.* at 130.

2. This Court also declined to examine evidence "from the mid-to-late nineteenth century" to determine whether Pennsylvania's restrictions on 18-to-20-year-olds were consistent with the history of regulation of the right to keep and bear arms., "as each was enacted at least 50 years after the ratification of the Second Amendment." *Id.* at 134. Tellingly, in arguing that this was error in its petition for certiorari, the State did not even attempt to argue this decision as inconsistent with *Rahimi*. *See* Cert. Pet. 22 ("Disregarding post-enactment history altogether … is inconsistent with *Bruen*, *Heller*, and *McDonald*."). Indeed, given that *Rahimi* once again formally reserved judgment on the 1791 vs. 1868 question, it cannot possibly be read to abrogate this Court's holding that 1791 is the proper date. *See* 144 S. Ct. at 1898 n.1. And if anything, *Rahimi's* analysis supports this Court's decision. As noted above, *Rahimi's* historical work was almost exclusively focused on the Founding and cannot possibly be read to *require* consideration of evidence from the latter half of the 19th century especially where, as here, the Founding era provides a "conspicuously sparse record of state regulations on 18-to-20-year-olds" and strongly contradictory evidence in the form of militia statutes that refute the State's position. *Lara*, 91 F.4th at 136.

3. Contrary to the State's argument in seeking certiorari, in conducting its review of the historical evidence, this Court did not come close to requiring a "historical twin." Rather, as has just been seen, the panel's conclusion was based largely on the State's failure to come forward with a *single* Founding era law that singled out 18-to-20-year-olds (or any other age group, for that matter) for *any* form of infringement of the right to keep and bear arms on account of their age. Under *Rahimi*, it remains impossible for courts to pull a relevant historical "principle" out of thin air, which is what would have been required for the State to succeed on its claim.

And this remains true *even if* the State's later evidence were to be considered. Giving the historical record the most generous possible reading, the State's evidence shows that in the latter half of the 19th century, several states enacted laws that impacted the rights of those under 21 to acquire handguns (ignoring, for the moment, the critical fact that several states still provided methods for handgun acquisition by this group and put no restrictions on the right to carry a handgun once it had been acquired). As this Court has previously noted, individuals "[u]nder the age of 21 were considered minors" at the Founding and through the Reconstruction period in which the State attempts to build its case. *Id.* at 131. That is fatal to the State's attempt to rely on these laws, given that its burden is to derive a principle that could be applied to bar "the public carrying of handguns by ordinary, law-abiding, *adult*

10

citizens." *Worth v. Jacobson*, 108 F.4th 677, 693 (8th Cir. 2024) (emphasis added). It is hardly requiring a "historical twin" to recognize that historical laws that, for the most part, were *explicitly* based on the minority status of those affected by them, *id.* at 698 (identifying just *one* historical restriction, from 1875, that was "both not *entirely* based on one's status as a minor and not *entirely* removed from burdening carry"), cannot create a principle that extends to legal adults.

    4.    To the extent that there is any doubt about whether *Rahimi* should alter the Court's previous reasoning in this case, *Worth* should resolve it. Unlike the prior opinion in this case, *Worth*, which answered an essentially identical Second Amendment question, was issued after *Rahimi*, and it reached the same result on almost identical reasoning, rejecting the claim that things like historical status as a "minor" could be used to carve up the plain text understanding of the term "the people," *id.* at 690, giving controlling emphasis to Founding era history, *id.* at 692–93, and as we have just seen, even upon consideration of the broadest version of the historical record, finding no historical principle that would support disarming adult Americans today on account of their age, *id.* at 698. The appropriate response to the GVR in this case is simply to reissue the panel's prior opinion, acknowledging that *Rahimi*, while instructive, does not meaningfully alter the analysis this Court is required to perform.

11

## CONCLUSION

The Court should reinstate its pre-*Rahimi* decision.

Dated: November 25, 2024

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
joshua@civilrightsdefensefirm.com
(888) 202-9297
(610) 400-8439 (fax)

Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this court.

Dated: November 25, 2024    /s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(ii) because this brief contains 2,779 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: November 25, 2024    /s/David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on November 25, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 25, 2024　　　　　　　　　　　s/ David H. Thompson
　　　　　　　　　　　　　　　　　　　　　　　David H. Thompson

　　　　　　　　　　　　　　　　　　　　　　　*Counsel for Plaintiffs-Appellants*