IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 21-1832**

_____

**MADISON M. LARA; SOPHIA KNEPLEY; LOGAN D. MILLER; SECOND
AMENDMENT FOUNDATION, INC.; FIREARMS POLICY COALITION,**

**Appellants**

**v.**

**COMMISSIONER PENNSYLVANIA STATE POLICE**

**Appellee**

_____

**APPELLEE'S POST-REMAND SUPPLEMENTAL BRIEF
ADDRESSING *UNITED STATES v. RAHIMI***

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ENTERED APRIL 16, 2021 D.C. No. 2-20-CV-01582 (HON. W. STICKMAN IV, PRESIDING)

|  |  |  |
|---|---|---|
|  |  | MICHELLE A. HENRY *Attorney General* |
|  | BY: | DANIEL B. MULLEN *Deputy Attorney General* |
| Office of Attorney General 1251 Waterfront Place Pittsburgh, PA 15222 Phone: (412) 235-9067 FAX:  (412) 565-3028 |  | BRETT GRAHAM *Deputy Attorney General* |
|  |  | SEAN A. KIRKPATRICK *Chief Deputy Attorney General Chief, Appellate Litigation Section* |
| DATE: November 25, 2024 |  |  |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................4

I.   *RAHIMI* MEANINGFULLY CLARIFIED *BRUEN*'S METHODOLOGY. ........................4

    A.   The appropriate analysis focuses on the principles that underpin our regulatory tradition..........................................................5

    B.   The Second Amendment allows more regulations than those in existence by 1791. ..................................................................8

    C.   *Rahimi* cautioned against facial challenges........................................10

II.   MINIMUM AGE RESTRICTIONS COMPORT WITH THE PRINCIPLES THAT UNDERPIN OUR REGULATORY TRADITION ...................................................11

III.   THIS COURT'S PRIOR DECISION IS INCOMPATIBLE WITH *RAHIMI* ...................20

    A.   This Court incorrectly demanded Founding-Era statutory twins........20

    B.   Incorrectly perceiving a conflict between the Founding and Reconstruction eras, this Court refused to consider highly-relevant post-ratification history. ......................................................20

    C.   This Court incorrectly relied on highly-irrelevant militia laws. .........23

    D.   This Court erred in concluding that Appellants cleared the high bar to succeed in their facial challenge. ...........................................26

CONCLUSION.................................................................................29

CERTIFICATE OF COUNSEL ........................................................30

CERTIFICATE OF SERVICE ..........................................................31

# TABLE OF AUTHORITIES

**Page**

## Cases

*Andrews v. State*, 50 Tenn. 165 (1871) ........................................................18

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ............................................13

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ....................... 1, 10, 13, 18, 24

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...........................................................26

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ..........................................................11

*Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024), *reh'g en banc denied*, 97 F.4th 156 (3d Cir. 2024), *vacated sub nom*, *Paris v. Lara*, 24-93 (U.S. 2024).............................................. 2, 3, 9, 11, 12, 15, 20, 21, 23, 24, 26, 27

*Lawrence v. Chater*, 516 U.S. 163 (1996) .................................................................2

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ....................................... 10, 14

*New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) .. 1, 4, 5, 9, 13, 14, 19, 22, 23, 26

*NRA v. Bondi*, 61 F.4th 1317, 1329 (11th Cir. 2023), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023) .................................................19

*Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 130 (3d Cir. 2023) vacated sub nom. Garland v. Range, 144 S.Ct. 2706 (2024), *vacated sub nom.*, *Garland v. Range*, 144 S.Ct. 2706 (2024).............................................................................5

*Second Amendment Foundation, et al. v. Paris*, 24-cv-01015 (M.D. Pa.) ..............28

*State v. Callicutt*, 69 Tenn. 714 (1878) ....................................................18

*United States v. Rahimi*, 144 S.Ct. 1889 (2024) .... 1, 5, 6, 7, 8, 9, 11, 12, 13, 14, 20, 21, 22, 25, 26, 27, 28

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ..............................................6

*United States v. Salerno*, 481 U.S. 739 (1987) ................................................ 11, 26

## Statutes

18 Pa.C.S. § 6107 ........................................................................ 20, 27

18 Pa.C.S. § 6107(a)(1)..................................................................28

18 Pa.C.S. § 6109(d) ....................................................................27

18 U.S.C. § 922(g)(8)....................................................................7, 26

1883 Kan. Sess. Laws 159 (1883) ..........................................................20

1883 Wis. Sess. Laws 290 (1883)..........................................................20

Act No. 311 of Feb. 14, 1730, 4 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 152 ......................................................................12

## Other Authorities

David Flynn, *Credit in the Colonial American Economy*, EH.Net Encyclopedia, edited by Robert Whaples (2008) ......................................................15

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 154–55 (2023) ................................................15

Kevin Sweeney, "Firearms Militias, and the Second Amendment," *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (2013)23

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049 (2024) .......................... 14, 15, 16, 17

Megan Walsh & Saul Cornell, *The Expansion of Historical Analogues for Age-Based Firearms Restrictions in the Era of the 14th Amendment (Part 2)*, Second Thoughts Blog, Duke Center for Firearms Law (Sept. 13, 2024) .......................17

Patrick Charles, *Armed in America: The History of Gun Rights from Colonial Militias to Concealed Carry* (2018) ......................................................... 17, 18, 19

Randolph Roth, "Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History," in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker et al. eds., 2019) ........................................... 16, 17

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004) .......................... 16, 25

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. INTER ALIA 1 (2021) ....................................................................................................... 24, 25

Thomas Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) .................18

iv

Tom Kelleher, The Debit Economy of 1830s New England (Sturbridge, Mass.: Old Sturbridge Village) ...............................................................................15

**Treatises**

James Kent, 2 *Commentaries on American Law*, "Of Infants," Lecture 31 (1827) 12

William Blackstone, *Commentaries on the Laws of England*, Vol. I at 463 (1st ed. 1765) ...............................................................................................12

William Blackstone, *Commentaries on the Laws of England*, Vol. II, Ch. 16. (St. George Tucker ed 1803) ......................................................................13

William Macphearson, *Treatise on the Law Relating to Infants*, 517 (1842) .........13

Zephaniah Swift, 1 *A System of the Laws of the State Of Connecticut* 213 (1795).12

**INTRODUCTION**

In *United States v. Rahimi*, 144 S.Ct. 1889 (2024), the Supreme Court corrected several widespread misconceptions about the historical test established in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). Most importantly, *Rahimi* clarified that courts must identify historical *principles* in Second Amendment cases, not historical *replicas*. *Rahimi*, 144 S.Ct. at 1897-98. *Rahimi* also cautioned against placing undue weight on the absence of specific Founding-era regulations on a particular topic because "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1898-99; *id.* at 1924-26 (Barrett, J., concurring). And several Justices reiterated that post-ratification history, including from the mid-to-late-19th-century, is a "critical tool of constitutional interpretation." *Id.* at 1915-18 (Kavanaugh, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008)); *id.* at 1917 (Barrett, J., concurring) (post-ratification history "can be an important tool"); *id.* at 1904-06 (Sotomayor, J., and Kagan, J., concurring) (courts may look to "the founding or Reconstruction").

Because this Court did not have the benefit of *Rahimi* when it decided this case, it was led astray by Appellants' fundamental misapprehension of *Bruen*'s methodology. Appellants insisted that Pennsylvania's law was valid only if it boasted Founding-era historical twins. Letter Br. at 7 (3d Cir. ECF 56) ("*Bruen*

1

requires a *specific* analysis of whether widely accepted historical restrictions are directly analogous to the law being challenged[.]") (emphasis in original);  Reply Letter Br. at 8   (3d Cir. ECF 63) (*Bruen* required a Founding-era law imposing "*specific consequences*" on 18-to-20-year-olds "when it came to the public carrying of firearms") (emphasis added). And they urged this Court to disregard *all* post-ratification evidence from the mid-to-late-1800s, arguing that *Bruen* somehow precluded *any* consideration of historical evidence from that time-period. Letter Br. at 9-10 (3d Cir. ECF 56).

This Court adopted Appellants' deeply-flawed arguments. *Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 137 (3d Cir. 2024) (emphasizing the lack of "a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns"); *id.* at 133-34 (holding that mid-to-late 19th-century history cannot be considered in Second Amendment cases). The Supreme Court instructed this Court to reconsider its prior ruling in light of *Rahimi*, thus believing that there is at least a "reasonable probability" that *Rahimi* changes the result. *See, e.g.*, *Lawrence v. Chater*, 516 U.S. 163, 167 (1996). Respectfully, *Rahimi* does change the result. This Court's prior ruling is incompatible with *Rahimi* in multiple respects.

Appellants will no doubt urge this Court to simply re-adopt its prior analysis, and will attempt to frame *Rahimi* as a mere speed bump that does not make "the slightest difference in the outcome of this case[.]" Cert. Opp. at 3, 24-93 (U.S. Aug.

2

29, 2024). But the High Court already rejected Appellants' effort to treat *Rahimi* as a toothless decision. This Court should as well. This Court should adopt the analysis offered by Judges Restrepo and Krause, both of whom accurately perceived *Bruen*'s focus on historical principles even before *Rahimi*. *Lara*, 91 F.4th at 140-184 (Restrepo, J., dissenting) (Founding-era common law principles and Founding-era statutes categorically banning firearms possession to dangerous groups validate Pennsylvania's law); *id.*, 97 F.4th 156, 163 (3d Cir. 2024) (Krause, J., dissenting from the denial of en banc) (Pennsylvania's law is analogous to Founding-era laws categorically disarming dangerous groups because, under *Bruen*, courts look for a "match in principle, not with precision") (cleaned up).[1]

Appellants led this Court down the garden path once with their erroneous understanding of *Bruen*. Do not allow them to do so a second time.

---

[1] These opinions will be referred to hereinafter as the "Restrepo Dissent" and the "Krause Dissent," respectively. All pin cites, however, will be to the Federal Reporter.

## ARGUMENT

### I. *RAHIMI* MEANINGFULLY CLARIFIED *BRUEN*'S METHODOLOGY.

To understand the impact of *Rahimi*, it is first necessary to understand *Bruen*'s framework. In *Bruen*, the Court held that the right to keep and bear arms "demands a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Ibid.* Only if a firearm regulation is consistent with this Nation's historical tradition "may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Ibid.* (cleaned up).

To carry this burden, governments can reason by analogy, and need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Ibid.*[2]

---

[2] Several Justices emphasized that *Bruen* had no impact on laws regulating who may lawfully possess firearms or laws that categorically excluded classes of individuals from owning guns. 597 U.S. at 72 (Alito, J., concurring); *id.* at 81

Despite *Bruen*'s admonitions about "historical twins" and "dead ringers," a number of courts "misunderstood the methodology" and required governments to produce precise historical replicas of the challenged law to prevail. *Rahimi*, 144 S.Ct. at 1897. Under that misreading of *Bruen*, "any difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy." *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 130 (3d Cir. 2023) (Krause, J. dissenting).[3] The High Court took up *Rahimi* to correct this misunderstanding.

By an overwhelming 8-1 majority, the Supreme Court rejected the Fifth Circuit's misinterpretation of *Bruen* and clarified its Second Amendment methodology in several important ways.

## A. The appropriate analysis focuses on the principles that underpin our regulatory tradition.

Most importantly, *Rahimi* clarified that *Bruen* never "meant to suggest a law trapped in amber" or that the Second Amendment permits only "those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S.Ct. at 1897-98. Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 1898

---

(Kavanaugh, J., concurring). Justice Alito highlighted that federal law "bars the sale of a handgun to anyone under the age of 21." *Id.* at 73.

[3] *Range* was vacated *sub nom. Garland v. Range*, 144 S.Ct. 2706 (2024).

(emphasis added); *id.* at 1925 (Barrett, J., concurring) ("Analogical reasoning under *Bruen* demands a wider lens: Historical regulations reveal a principle not a mold.") (cleaned up).

The fastest route to understanding the effect of *Rahimi*'s principles-based approach is to examine how the Supreme Court invoked surety laws and affray laws as historical support to uphold a federal statute prohibiting individuals from possessing weapons when they are subject to a domestic violence restraining order.

Surety laws required individuals suspected of future misbehavior to post a bond or else be incarcerated. *See Rahimi*, 144 S.Ct. at 1899-1900. They imposed *ad hoc* and limited restrictions on Second Amendment rights; an individual subject to a surety could still possess and carry firearms, so long as they had paid the required sum. *See id.* at 1939 (Thomas, J., dissenting). Indeed, surety laws did not inherently touch on firearm possession at all.

Meanwhile, affray laws prohibited "going armed, with dangerous or unusual weapons" to terrify the public and, in some instances, provided that an offender would forfeit their arms. *See id.* at 1901 (citation omitted). This deprivation occurred after a criminal proceeding, punished past behavior, and was aimed at individuals deemed to be "a threat to society generally, rather than to identified individuals." *United States v. Rahimi*, 61 F.4th 443, 459 (5th Cir. 2023), *rev'd* 144 S.Ct. at 1903.

The law at issue in *Rahimi*, 18 U.S.C. § 922(g)(8), was easily distinguishable from both surety laws and affray laws. Unlike an individual subject to a surety, Mr. Rahimi could *not* keep possession of his firearms, purchase additional firearms, or carry firearms in public. *Rahimi*, 144 S.Ct. at 1939-40 (Thomas, J., dissenting). Unlike an individual "going armed," Mr. Rahimi did not pose a threat to the public generally, nor did he seek to carry a "dangerous and unusual" weapon to "terrif[y] the good people of the land." *Id.* at 1942-43. He was not afforded all the due process of a criminal proceeding—the ban was "an automatic, uncontestable consequence of certain orders." *Id.* at 1930.

The majority acknowledged these distinctions, stating that Section 922(g)(8) was "by no means identical" to the surety and going armed laws. *Id.* at 1901. But it "d[id] not need to be." *Ibid.* That is because, when "*[t]aken together*," those laws "confirm what common sense suggests:" *legislatures* can regulate or ban firearm use by those who pose a danger. *Id.* at 1896, 1901-02 (emphasis added); *see also id.* at 1896 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."); *see also id.* at 1926 (Barrett, J., concurring) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns.") (citation omitted). Because both surety laws and affray laws supported that broad principle, and Section 922(g)(8) "fits

comfortably within that tradition," the law survived a facial challenge. *Rahimi*, 144 S.Ct. at 1896-97.[4]

## B. The Second Amendment allows more regulations than those in existence by 1791.

As in *Bruen*, it was unnecessary for the Court to resolve the question of whether "courts should *primarily* rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Rahimi*, 144 S.Ct. at 1898 n.1 (emphasis added). Still, *Rahimi* provided important guidance about how courts should evaluate regulations addressing societal concerns that did not exist at the Founding. Several Justices pointed to post-ratification history—including Reconstruction-era history—as an important tool in that inquiry.

The Court generally warned against treating the absence of Founding-era firearms regulations on a particular topic as dispositive because "[t]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S.Ct. at 1897-98. "Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Ibid.*

---

[4] Although the ban at issue in *Rahimi* involved a judicial determination that an individual posed a threat, the Court was careful not to suggest "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." 144 S.Ct. at 1901.

These admonitions built upon *Bruen*'s reminder that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 *or the Reconstruction generation in 1868*." 597 U.S. at 27-28 (emphasis added). Cases "implicating societal concerns or dramatic technological changes" thus require "a more nuanced approach." *Ibid.*; *see also* Restrepo Dissent, 91 F.4th at 147 ("Legislatures tend not to enact laws to address problems that do not exist, and the absence of such laws does not speak to an inconsistency with the Nation's historical tradition[.]").

Justice Barrett expounded on this point by highlighting the risks of "demanding overly specific analogues" from the Founding, as many courts had in the wake of *Bruen*. *Rahimi*, 144 S.Ct. at 1925-26 (Barrett, J., concurring). In particular, that approach wrongly "assumes that founding-era legislature maximally exercised their powers to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Id.* at 1925. That "flawed" assumption—which "forces 21st-century regulations to follow late-18th-century policy choices"—is not required by originalism. *Ibid.* "Analogical reasoning under *Bruen*" therefore "demands a "wider lens: Historical regulations reveal a *principle*, not a mold." *Ibid.* (emphasis added).

In addition, four Justices reiterated the Court's prior pronouncements that post-ratification historical sources—including from the mid-to-late-19th-century—are a "critical tool of constitutional interpretation." *Rahimi*, 144 S.Ct. at 1915-18

9

(Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 605); *id*. at 1915-16 ("as this Court has stated time and again for more than two centuries, post-ratification history—sometimes referred to as tradition—can also be important for interpreting vague constitutional text and determining exceptions to individual constitutional rights"); *id.* at 1917 (Barrett, J., concurring) (post-ratification history "can be an important tool"); *id.* at 1904-06 (Sotomayor, J., and Kagan J., concurring) (indicating that courts may look to "the founding or Reconstruction"); *see also Heller*, 554 U.S. at 614 (the Reconstruction era's "understanding of the origins and continuing significance of the Amendment is instructive"); *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (plurality) ("it is clear that the Framers and *ratifiers of the Fourteenth Amendment* counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty") (emphasis added); *Bruen*, 697 U.S. at 52-53 (relying on 19th-century-regulations as evidence that "concealed-carry prohibitions were constitutional only if they did not similarly prohibit *open* carry") (emphasis in original).

### C. *Rahimi* cautioned against facial challenges.

Aside from these methodological clarifications, the Court also expressed a general disfavor for facial challenges in Second Amendment cases. It reminded both courts and litigants that facial challenges are the "most difficult . . . to mount successfully" because a plaintiff must demonstrate that "no set of circumstances

exists" under which the law would be valid. *Rahimi*, 144 S.Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

As Justice Gorsuch explained, the unique difficulties with facial challenges are rooted in the constraints of Article III of the Constitution, which vests the judiciary with the power to decide only actual cases and controversies, "not abstractions." *Id.* at 1910 (Gorsuch, J., concurring) (cleaned up). So when presented with a facial challenge only—like the challenges asserted here and in *Rahimi*—a court's role is not to ask "whether the challenged statute is always lawfully applied, or whether other statutes might be permissible." *Ibid.* The only question is whether the challenged law has "*any* lawful scope." *Ibid.* (emphasis in original).

## II. MINIMUM AGE RESTRICTIONS COMPORT WITH THE PRINCIPLES THAT UNDERPIN OUR REGULATORY TRADITION

Judges Restrepo and Krause correctly concluded that Pennsylvania's statutory scheme is consistent with the principles that underpin the Nation's historical tradition of firearm regulation. Restrepo Dissent, 91 F.4th at 146-147; Krause Dissent, 97 F.4th at 161. On remand, this Court should follow suit.

Initially, *Rahimi* confirms that the Second Amendment broadly permits modern regulations that ban firearm possession by categories of persons who pose a danger. 144 S.Ct. at 1901-02; *see also Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) ("founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety"). And, as Judge Krause

highlighted, "which groups posed sufficient risk to justify categorical disarmament" was historically a question for *legislatures*. Krause Dissent, 97 F.4th at 161 (citation omitted). Notably, Founding-era legislatures had significant latitude to establish minimum age requirements for most fundamental rights. *See, e.g.*, Act No. 311 of Feb. 14, 1730, 4 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 152 (establishing 21 as the minimum age for marriage).

When Founding-era legislatures exercised this power, it is no coincidence that they typically drew the line at age 21. At common law, anyone under 21 was considered a minor. Restrepo Dissent, 91 F.4th at 143-44; William Blackstone, *Commentaries on the Laws of England*, Vol. I at 463 (1st ed. 1765) ("So that full age in male or female, is twenty one years . . . who till that time is an infant, and so styled in law."); Zephaniah Swift, 1 *A System of the Laws of the State Of Connecticut* 213 (1795) ("Persons within the age of 21, are, in the language of the law denominated infants, but in common speech—minors."); James Kent, 2 *Commentaries on American Law*, "Of Infants," Lecture 31 (1827) (those who have not yet "attained the age of twenty-one years" are unable "to take care of themselves"); *Rahimi*, 144 S.Ct. at 1899 (consulting common law sources).

The consequences of this categorization was "profound" as minors had "very little independent ability to exercise fundamental rights, including those of contract and property." Restrepo Dissent, 91 F.4th at 145. Minors could not vote, could not

serve in the military or marry without parental consent, could not serve on juries, and even lacked First Amendment rights to access certain information and materials. *Id.* at 146; *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 834 (2011) (Thomas, J., dissenting) (Founding-era minors "could not serve on juries"). When minors worked, they did not have the inherent right to retain the wages they earned, as their parents and guardians "receive[d] the profits." William Blackstone, *Commentaries on the Laws of England*, Vol. II, Ch. 16. (St. George Tucker ed 1803); William Macphearson, *Treatise on the Law Relating to Infants*, 517 (1842) ("A father frequently sends his son to work as journeyman, and his earning are taken to be the father's.").

The above history demonstrate that: (1) Founding-era legislatures could categorically disarm those who posed a danger if armed; and (2) Founding-era legislatures could establish minimum age requirements for most fundamental rights, typically drawing the line at age 21. "Taken together," *see Rahimi*, 144 S.Ct. at 1901, these principles are more than sufficient to establish that restrictions on 18-to-20-year-olds comport with the principles that underpin our regulatory tradition. But this Court should also consider whether post-ratification history reinforces this view. *Heller*, 554 U.S. at 614 (post-ratification history, including from the Reconstruction era, is "instructive"); *Bruen*, 697 U.S. at 30, 52-53 (relying on mid-to-late-19th-century-regulations as evidence that "concealed-carry prohibitions were

constitutional only if they did not similarly prohibit *open* carry" and that sensitive-places restrictions are constitutional); *McDonald*, 561 U.S. 770-78 (relying on mid-to-late-19th-century evidence was central to the Court's conclusion that the right to bear arms applied to the States); *see also Rahimi* 144 S.Ct. at 1915-18 (Kavanaugh, J., concurring); *id.* at 1917 (Barrett, J., concurring); *id.* at 1904-06 (Sotomayor, J., and Kagan J., concurring). It does.

Between 1856 and 1897, twenty jurisdictions enacted laws significantly curtailing the gun rights of under-21-year-olds, most of which were more restrictive than the modest Pennsylvania law challenged here. Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3092 (2024) (collecting statutes); *see also* Response Br. at 29-31 (3d Cir. ECF 23). Critically, however, this Court must not view these regulations in a vacuum. Instead, this Court should consider the monumental societal, economic, and technological shifts during the 19th century, which created the imperative for legislatures to enact laws restricting the ability of under-21-year-olds to acquire and use handguns. *See* Response Br. at 32-33 (3d Cir. ECF 23); Walsh & Cornell, 108 MINN. L. REV. at 3087-96; *see also Bruen*, 597 U.S. at 27-28 (courts must take a "nuanced approach" to cases "implicating societal concerns or dramatic technological changes" not present at the Founding).

When the Second Amendment was adopted in 1791, America was a largely agrarian, "cash poor" society in which people made purchases primarily through credit and barter. Walsh & Cornell, 108 MINN. L. REV. at 3088; David Flynn, *Credit in the Colonial American Economy*, EH.Net Encyclopedia, edited by Robert Whaples (2008); Tom Kelleher, *The Debit Economy of 1830s New England* (Sturbridge, Mass.: Old Sturbridge Village). Urban areas "simply did not exist in 1791 as we understand them today." Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 154–55 (2023). "In 1790, just before the Second Amendment was ratified, 33,000 people lived in New York City, the country's largest city and home of the First Congress." *Ibid.* "The population of the *entire country* was under four million." *Ibid.* (emphasis in original).

In 1791, handguns "were owned by a tiny fraction of the population." Walsh & Cornell, 108 MINN. L. REV. at 3088. The weapons commonly owned during this period—*i.e.*, muskets—fired only one shot and were time-consuming to load, often inaccurate, unreliable, and prone to misfire. *Ibid.* (citation omitted); Blocher & Ruben, 133 YALE L.J. at 153; Krause Dissent, 97 F.4th at 162, 165 (citations omitted). As a result, there were not many homicides by firearms in 1791, and thus "little need to enact modern-style gun regulations aimed at restricting access to weapons." Walsh & Cornell, 108 MINN. L. REV. at 3088; *see also* Randolph Roth,

"Why Guns Are and Are Not the Problem: The Relationship Between Guns and Homicide in American History," in *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* (Jennifer Tucker et al. eds., 2019) (during the Founding, "[g]un use in homicides was rare because muzzle-loading firearms had limitations as murder weapons"); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 500 (2004) ("firearms only accounted for a small percentage of homicides in the period before the Civil War"). And given the legal status of minors at the Founding, as well as the "socio-economic forces" of the time, it was exceedingly difficult for minors to acquire firearms in early America without parental consent. Walsh & Cornell, 108 MINN. L. REV. at 3062-63; *id.* at 3078 ("minors did not have the legal capacity or financial resources to purchase weapons themselves").

By the 1850s, however, significant societal, economic, and technological changes created the impetus for regulations that prevented minors from acquiring and using firearms. *See* Walsh & Cornell, 108 MINN. L. REV. at 3088. During the antebellum period, nearly every facet of American society transformed due to urbanization, industrialization, the transition to a market economy, the availability of cash, and—most importantly for present purposes—the mass production of deadlier and more accurate handguns. *Ibid.*; Patrick Charles, *Armed in America: The*

16

*History of Gun Rights from Colonial Militias to Concealed Carry*, 141 (2018) ("technological advances in firearms and other dangerous weapons" during the 19th century made "more readily available to the public at large, and therefore resulted in an increase of deadly encounters and violence"); *see also* Roth, *supra* ("Once breech-loading revolvers, shotguns, and rifles were introduced the mid-nineteenth century, [] the impact of guns on the homicide rate burgeoned."). Those transformations, in turn, created a new societal problem that was unknown to the generation that adopted the Second Amendment: interpersonal handgun violence, including by minors. Charles, *Armed in America:* at 141 (describing the legislative and public reaction to "the tide of firearm-related injuries at the hands of minors"); Megan Walsh & Saul Cornell, *The Expansion of Historical Analogues for Age-Based Firearms Restrictions in the Era of the 14th Amendment (Part 2)*, Second Thoughts Blog, Duke Center for Firearms Law (Sept. 13, 2024) (table of mid-to-late-19th-century news articles detailing accidental shootings by minors)

Governments—and in particular legislatures—were thus forced to "deal with gun violence as a significant societal problem for the first time in American history." Walsh & Cornell, 108 Minn. L. Rev. at 3088. Between 1856 and 1897, twenty legislatures responded to this new problem by curtailing minors' ability to acquire or possess firearms. *Id.* at 3092, Table 1 (collecting statutes); *see also* Response Br. at 40-31 n.16 (collecting statutes).

When 19th-century legislatures categorically disarmed a group that posed a danger to the public and established a minimum age of 21 for the exercise of a fundamental right, they were merely enacting regulations that cohered with well-established Founding-era principles. It is thus unsurprising that 19th-century courts and commentators—not to mention the public at large—universally approved of these regulations. Charles, *Armed in America* at 141 (noting that "lawmakers and public" supported laws "restricting the sale of dangerous weapons to minors"). In the only known legal challenge to one of these laws, Tennessee's Supreme Court upheld a law banning the sale of pistols to under-21-year-olds. *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). That court stated that the law was "not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Id.* at 717.[5] Thomas Cooley, "the most famous" 19th-century legal scholar to interpret the Second Amendment, *Heller*, 554 U.S. at 616, explained that "the State may prohibit the sale of arms to minors," meaning under-21-year-olds. Thomas Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883). And a recent survey of 19th-century newspapers and other sources found consistent public support for "laws restricting the sale of dangerous weapons to minors" "in the hopes of stemming the tide of

---

[5] Only seven years earlier, that same court held that "a statute that forbade openly carrying a pistol" by adults was unconstitutional under Tennessee's Second Amendment analogue. *Andrews v. State*, 50 Tenn. 165, 187 (1871).

firearm-related injuries at the hands of minors." *NRA v. Bondi*, 61 F.4th 1317, 1329 (11th Cir. 2023) (citation omitted);[6] *see also* Charles, *Armed in America* at 404-05 n.212 (discussing 19th-century newspaper articles about the problem of firearms violence by minors).

Taken together, the above historical sources reveal an unmistakable historical principle: legislatures may establish a minimum age for gun rights because of the danger posed by minors, and may draw the line at age 21.

Pennsylvania's law is relevantly similar to these historical laws. When deciding whether a modern law is "relevantly similar" to historical regulations, courts compare "*how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29-30 (emphasis added). As to the "why" of the historical laws, they were enacted "to prevent crime" by dangerous groups, and in particular minors—a growing problem in the mid-to-late-19th-century. Modern restrictions on under-21-year-olds serve the same purpose.

*Bruen*'s "how" metric is satisfied, too. Many relevant anologues went significantly further than Pennsylvania in curtailing arms bearing by under-21-year-olds. Some, like Kansas, banned *all possession* by minors, while others, like Wisconsin, prohibited minors from acquiring or carrying arms. 1883 Kan. Sess.

---

[6] The Eleventh Circuit granted rehearing en banc in *Bondi*, *see* 72 F.4th 1346 (11th Cir. 2023).

Laws 159 (1883); 1883 Wis. Sess. Laws 290 (1883). Pennsylvania, by contrast, merely prohibits 18-to-20-year-olds from publicly carrying during proclaimed emergencies. 18 Pa.C.S. § 6107. That modest limitation adheres to historical principles and traditions.

## III.    THIS COURT'S PRIOR DECISION IS INCOMPATIBLE WITH *RAHIMI*

### A. This Court incorrectly demanded Founding-Era statutory twins.

This Court faulted the Commissioner for not producing a historical twin from the Founding. *See, e.g.*, *Lara*, 91 F.4th at 137 (". . . the Commissioner cannot point us to a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns"). But *Rahimi* precludes courts from myopically searching for a singular precursor, thereby endorsing a "law trapped in amber." 144 S.Ct. at 1897. Rather, "the appropriate analysis involves considering whether the challenged regulation is consistent with *the principles that underpin* our regulatory tradition." *Id.* at 1897-98 (emphasis added). Simply put, *Rahimi* repudiates any notion that Pennsylvania was required to produce a Founding-era replica of its law in order to prevail.

### B. Incorrectly perceiving a conflict between the Founding and Reconstruction eras, this Court refused to consider highly-relevant post-ratification history.

This Court also erred when it refused to consider any post-ratification history from the mid-to-late 1800s. *Lara*, 91 F.4th at 134-35. That refusal resulted from the

Majority's view that it was necessary to resolve the question of whether courts should primarily rely on the understanding of the right to keep and bear arms that prevailed in 1791 or 1868. *Id.* at 133-34. Believing that a "strong hint" existed in *Bruen*, this Court held that no historical sources from the mid-to-late 19th-century could be considered—seemingly in any case. *Ibid.* That error, in turn, caused this Court to overlook the importance of the post-ratification technological developments detailed *supra*.[7]

In *Rahimi*, the Court clearly stated that the question of whether "courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" remains unresolved. 144 S.Ct. at 1898 n.1. *Rahimi* thus belies this Court's conclusion that a "strong hint" in *Bruen* resolved the historical timeframe question. The Commissioner's position on this issue is—and has always been—that this Court does not need to resolve that open question in this particular case. Letter Br. at 5 n.1 (3d Cir. ECF 57) (it is unnecessary to resolve the issue because "both in 1791 and 1868 those younger than 21 were considered [minors] not covered by the right.").

In any event, this Court's analysis of that debate put the cart before the horse. Before engaging in any historical overview whatsoever, this Court began by

---

[7] As explained above, these developments explain why there were not specific laws at the Founding regulating handgun possession by 18-to-21-year-olds.

resolving the historical timeframe debate in the abstract. *Lara*, 91 F.4th at 134-35. Only after it decided the debate did this Court turn to selectively analyzing the regulatory landscape. But that approach flipped *Heller*, *McDonald*, and *Bruen* on their heads. In all of those cases, the High Court *began* with an exhaustive historical surveys of the pre-ratification and Founding periods, *and then* continued to survey the antebellum and Reconstruction periods. *See, e.g.*, *Rahimi*, 144 S.Ct. at 1924 (Barrett, J., concurring) ("In *Bruen*, the Court took history beyond the founding era, considering gun regulations that spanned the 19th century."); *id.* at 1915-19 (Kavanaugh, J., concurring) (discussing the role of post-ratification history). *If*—and only *if*—this survey revealed a direct and irreconcilable conflict between the 1791 understanding of the right and the 1868 understanding, *then* it would be necessary to decide which era prevails. *Bruen*, 597 U.S. at 38 ("We need not address this issue today because . . . the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry.").

Here, there is no conflict. The generation that ratified the Second Amendment in 1791 understood that legislatures could establish minimum age requirements for fundamental rights and that legislatures could place categorical bans on those who posed a danger if armed. The generation that ratified the Fourteenth Amendment in 1868, thereby incorporating the right to keep and bear arms, had the exact same

understanding. Because the "public understanding of the right to keep and bear arms in both 1791 and 1868" was the same, this Court does not need to resolve this issue. *Bruen*, 597 U.S. at 38.

### C. This Court incorrectly relied on highly-irrelevant militia laws.

After erroneously demanding historical twins and refusing to consider relevant post-ratification history, this Court's decision ultimately rested "exclusively on 18th-century militia laws." Krause Dissent, 97 F.4th at 157. Specifically, this Court reasoned that because some state legislatures chose to include minors in the militia during times of war or conflict, "founding-era lawmakers" must have "believed those youth could, and indeed should, keep and bear arms." *Lara*, 91 F.4th at 136-37. But by failing to consider those militia laws in context, this Court gleaned the wrong principle.

For one, *Bruen* instructs that when assessing the relevance of a historical statute, courts must consider the general societal problem that the law addressed. 597 U.S. at 26. Founding-era militia statutes were "not about protecting handguns for self[-]defense, but securing muskets for national defense." Kevin Sweeney, "Firearms, Militias, and the Second Amendment," *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller*, 362-63 (2013). Accordingly, "the composition of the militia was always dictated by strategic imperatives, not by any constitutional mandate" that under-21-year-olds had a right to bear arms. Saul

Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. INTER ALIA 1, 16 (2021). Precisely for this reason, the High Court made it clear—more than 15 years ago—that the scope of the Second Amendment is "unconnected with militia service." *Heller*, 554 U.S. at 582. Because militia laws had nothing to do with an individual citizen's right to self-defense, *Heller*, 554 U.S. at 603, and offer no insights into how the Founding generation viewed regulations that protect the public from interpersonal handgun gun violence by minors, they are not relevant to the present inquiry.

Even assuming that militia laws are relevant, Judge Restrepo correctly explained why 18th-century militia laws actually demonstrate the Founding generation's view that under-21-year-olds should have access to deadly weapons only under appropriate adult supervision. Restrepo Dissent, 91 F.4th at 145-46. Minors "only rendered militia service under the supervision of peace officers who, like teachers, stood *in loco parentis*." *Ibid.* When state militia laws called on under-21-year-olds to serve, parental consent was usually a prerequisite, and parents were often required to furnish participating minors with arms. Cornell, *"Infants"* 40 YALE L. & POL'Y REV. INTER ALIA at Table 1 (collecting statutes from 1776 to 1825).

Adult supervision was also a critical component of under-21-year-olds' ability to bear muskets once in the militia. Restrepo Dissent, 91 F.4th at 145-46. Once

properly mustered, militiamen were subject to fines, strict discipline, and punishment, and their arms were subject to periodic inspection. Cornell & DeDino, 73 FORDHAM L. REV. at 508-10. Thus, at the Founding, "access to, and the ability to keep and bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers." Cornell, *"Infants,"* at 14, *supra*. That minors occasionally bore arms in the militia "at the pleasure of their superiors" did not mean they had "an independent *right* under the Second Amendment" that they could assert against the government. Restrepo Dissent, 91 F.4th at 145-46 (emphasis in original).

In any event, even if the Majority had discerned the correct principle from Founding-era militia laws—and, to be clear, it did not—it mistakenly tethered Pennsylvania's law to policy choices embodied in late-18th-century-militia statutes, leaving the "law trapped in amber." *Rahimi*, 144 S.Ct. at 1897; *id.* at 1925-26 (Barrett, J., concurring) (courts should not "force 21st-century regulations to follow late-18th-century *policy choices*") (emphasis added). Requiring Pennsylvania's law to comport with late-18th-century militia policies would be as mistaken as requiring 18th-century attitudes and policy choices surrounding domestic violence to

invalidate 18 U.S.C. § 922(g)(8). *Rahimi* confirms that this Court should not reiterate erroneous reliance on Founding-era militia laws.[8]

### D.    This Court erred in concluding that Appellants cleared the high bar to succeed in their facial challenge.

*Rahimi*'s guidance about facial challenges makes clear that this Court erred in concluding that Appellants carried their heavy burden of demonstrating that "no set of circumstances exists" under which Pennsylvania's law would be valid. *Rahimi*, 144 S.Ct. at 1898 (quoting *Salerno*, 481 U.S. at 745). In light of Appellants'

---

[8] Besides militia laws, the only other historical regulation the Majority analyzed in any detail was a 1721 Pennsylvania statute that limited the ability of one to hunt on another's land without permission. *Lara*, 91 F.4th at 135-136. The Commissioner cited that statute in his response brief *nearly a year before Bruen*. Response Br. at 28 (3d Cir. ECF 23). Respectfully, this Court failed to consider the Commissioner's citation in context.

The Commissioner was specifically responding to Appellants' argument in their opening brief that the right to keep and bear arms extends beyond the home. Opening Br. at 12-21 (3d Cir. ECF 24). At the time, no binding precedent had squarely resolved that broad issue. *Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013) (declining to "definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home" but recognizing that the Second Amendment "*may* have some application beyond the home") (emphasis in original). This discussion was obviously subsumed by *Bruen*'s later clarification that the Second Amendment does indeed extend beyond the home. 597 U.S. at 10. The Commissioner's post-*Bruen* letter briefs took the Supreme Court's pronouncement on that issue as a given, and did not reference the 1721 statute at all. Instead, the Commissioner focused on the Founding-era view that under-21-year-olds could be denied fundamental rights and statutes enacted in the mid-to-late-1800s to support the specific age-based component of its law. Letter Br. at 7-13 (3d Cir. ECF 57). Thus, the Commissioner *never* argued that a 1721 Pennsylvania hunting statute was specifically analogous to Pennsylvania's age restriction.

arguments on appeal, as well as the choices they made in bringing this action, the only issue currently in this case is whether 18 Pa.C.S. § 6107—which prohibits unlicensed open carry during emergencies and does not specifically mention age—survives a *facial* challenge under the Second Amendment. *Lara*, 91 F.4th at 127 n.4 ("Appellants . . . have not articulated any as-applied challenge in their briefs"); *see also* Reply Br. at 4, 24-25 (3d Cir. ECF 38). Appellants' choice to bring the "most difficult challenge to mount successfully" thus goes a long way towards resolving this case. *Rahimi*, 144 S.Ct. at 1898.

It bears repeating that Pennsylvania is emphatically *not* in the practice of disarming 18-to-20-year olds, who are generally free to openly-carry firearms without a license. Section 6107 regulates public carry of any kind (open or concealed) during proclaimed emergencies by limiting it to those who have undergone *investigations and background checks* as required by Section 6109. *See* 18 Pa.C.S. § 6109(d).[9] The question, therefore, is whether this limitation in Section 6107 is constitutional in *any* application. *Rahimi*, 144 S. Ct. at 1898. It is. To conclude otherwise would mean that during a proclaimed emergency—*e.g.*, due to civil unrest on college campuses throughout the Commonwealth, law enforcement

---

[9] Because Appellants already conceded that the Commissioner does not enforce the licensing provisions of Section 6109, the constitutionality of Section 6109 is not before this Court. Reply Br. at 3-5 (3d Cir. ECF 38).

officials in Pennsylvania would be powerless to stop 18-to-20-year-olds from going armed with deadly weapons. That holding would defy both common sense and more than two-hundred years of historical practice.

Given *Rahimi*'s clarifications about facial and as-applied challenges, it would be improper for this Court to issue broad pronouncements and tackle abstract questions in deciding this case. This Court should reject Appellants' efforts to make 6107 the tail that wags the dog. *See, e.g.*, *Second Amendment Foundation, et al. v. Paris*, 24-cv-01015 (M.D. Pa.) (arguing that *Lara* prohibits Pennsylvania from denying concealed-carry licenses to 18-to-20-year-olds). And it should await an appropriate as-applied challenges in "particular circumstances." *Rahimi*, 144 S.Ct. at 1909-10 (Gorsuch, J., concurring) (the Court's rejection of the facial challenge left ample room for future as-applied challenges *e.g.*, a prosecution against a person who uses a firearm in self-defense).[10]

---

[10] Even during declared emergencies, 18-to-20-year-olds may still possess firearms, carry firearms on private property, and may still carry firearms on public property if they are actively engaged in defense of themselves or their property. *See* 18 Pa.C.S. § 6107(a)(1).

## CONCLUSION

For these reasons, *Rahimi* dramatically impacts the result, and necessitates affirming the District Court's judgment.

Respectfully submitted,

MICHELLE A. HENRY
Attorney General

By:     /s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General
Bar No. 321525 (Pa.)

BRETT GRAHAM
Deputy Attorney General

SEAN A. KIRKPATRICK
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA 15222
Phone: (412) 235-9067
FAX:   (412) 565-3028

DATE: November 25, 2024

## CERTIFICATE OF COUNSEL

I, Daniel B. Mullen, Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 6,483 words within the meaning of Fed.R.App.P. 32(a)(7)(B). In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Daniel B. Mullen
_____

DANIEL B. MULLEN
Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Daniel B. Mullen, Deputy Attorney General, certify that I have served the

foregoing document, via electronic service, on the following:

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper Kirk, PLLC
(*Counsel for Appellants*)

Joshua Prince
Civil Rights Defense Firm, P.C.
(*Counsel for Appellants*)

Lisa Ebersole
Everytown for Gun Safety
(*Counsel for Amicus Curiae*)

Alex Hemmer
State of Illinois
Office of Attorney General
(*Counsel for Amicus Curiae*)

James P. Davy
Giffords Center to Prevent Gun Violence
Ceasefire Pennsylvania Education Fund
(*Counsel for Amicus Curiae*)

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Deputy Attorney General

DATE: November 25, 2024

31