No. 21-1832

In The United States Court of Appeals
For the Third Circuit

MADISON M. LARA, SOPHIA KNEPLEY, LOGAN D. MILLER, SECOND AMENDMENT
FOUNDATION, INC., AND FIREARMS POLICY COALITION, INC.,

*Plaintiffs-Appellants*,

v.

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA (20-cv-1582)
(Hon. William S. Stickman, IV, Presiding)

## SUPPLEMENTAL RESPONSE BRIEF OF PLAINTIFFS-APPELLANTS

Joshua Prince, Esq.
CIVIL RIGHTS DEFENSE FIRM, P.C.
646 Lenape Road
Bechtelsville, PA 19505
Joshua@CivilRightsDefenseFirm.com
(888) 202-9297
(610) 400-8439 (fax)

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES........................................................................ ii

INTRODUCTION ....................................................................................1

ARGUMENT ...........................................................................................2

I.  The Panel Decision Was Entirely Consistent With *Rahimi*. ...............................2

     A.     *Rahimi* Does Not Disturb the Panel's Focus on 1791............................2

     B.     The Panel's Discussion of Founding-Era History Remains Accurate Following *Rahimi*....................................................................5

     C.     *Rahimi*'s Discussion of Facial and As-Applied Challenge Does Not Alter the Panel Decision.......................................................7

II.  The State Cannot Carry Its Historical Burden Under *Bruen* and *Rahimi*. ...........9

     A.     The State Has Not Found Any Historical Principle That Supports the Carry Ban. .............................................................................9

     B.     There Is No Reason To Relax the State's Burden To Come Forward With Founding-Era Evidence of a Relevantly Similar Historical Principle....................................................................14

CONCLUSION ......................................................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Jones v. Bonta,*
    34 F.4th 704 (9th Cir. 2022) ....................................................................10, 11

*Jones v. Bonta,*
    47 F.4th 1124 (9th Cir. 2022) .........................................................10

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ..........................................................12

*Lara v. Comm'r Pa. State Police,*
    91 F.4th 122 (3d Cir. 2024) .............................................1, 3, 6, 7, 12, 13, 17

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022)........................................... 1, 9, 10, 14, 15, 16, 17

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024)................................. 1, 3, 4, 7, 8, 9, 11, 12, 13, 14, 15

*Worth v. Jacobson,*
    108 F.4th 677 (8th Cir. 2024) .........................................................5, 9, 10, 14

**Other Authorities**

Emily Scolnick, *Penn's Jewish community members express opposition to
    encampment amid split student perspectives*, THE DAILY PENNSYLVANIAN
    (Apr. 27, 2024), https://bit.ly/3CRyaST .......................................................8, 9

Saul Cornell & Nicolas DeNino, *A Well Regulated Right: The Early American
    Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).............................7

Elizabeth Kneebone & Steven Raphael, *City and Suburban Crime Trends in
    Metropolitan America*, BROOKINGS (May 2011), https://bit.ly/4ig4vmf ......11

Keith Schweigert, *Study finds Eagles have the NFL's 'angriest' fanbase; Steelers
    fans rank 4th*, FOX43 (July 30, 2024), https://bit.ly/3OA8xIF ......................11

## INTRODUCTION

In this Court's previous decision in this case, it held "that 18-to-20-year-olds are, like other subsets of the American public, presumptively among 'the people' to whom Second Amendment rights extend," that "the Second Amendment should be understood according to its public meaning in 1791," and that, given the "conspicuously sparse record of state regulations on 18-to-20-year-olds at the time of the Second Amendment's ratification," the State failed to carry its burden of showing that its ban on firearm carriage by 18-to-20-year-olds during declared states of emergency was constitutional. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 132, 134, 136–37 (3d Cir. 2024).

The Supreme Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), did not alter any one of those holdings. Indeed, as Plaintiffs' have explained, it reinforced them. The State argues otherwise, but its Supplemental Brief does nothing to rehabilitate its defenses of the Carry Ban. It argues that the panel was wrong to focus on 1791 as the critical year for understanding the meaning of the Second Amendment, but even as it does so, it acknowledges that *Rahimi* did not develop this issue beyond what the Supreme Court did in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and based on *Bruen*, this Court determined 1791 was the critical date. It argues that this Court conducted too stringent a review of Founding era historical evidence and erred in relying on militia

1

laws from the period, but neither criticism accurately describes this Court's reasoning. Finally, it claims that this is a "facial" challenge which ought to be difficult for Plaintiffs to mount, but it fails to offer a single constitutional application of the Carry Ban that is within the scope of Plaintiffs' challenge.

Turning to the historical task set for it by *Rahimi*, the State fails to elucidate a historical "principle" justifying the Carry Ban. Its first—that legislatures can categorically disarm groups they judge to be dangerous—is wholly without historical support and would effectively nullify the Second Amendment as a bulwark against states bent on disarming portions of their populations. Its second—that historically the rights of minors could be limited in significant ways—does not extend to restrictions on firearms, which are lacking from the historical record, and in any event does not apply to 18-to-20-year-old Pennsylvanians today, because they are adults. The Court should reenter its previous decision in this matter.

## ARGUMENT

### I. The Panel Decision Was Entirely Consistent With *Rahimi*.

#### A.    *Rahimi* Does Not Disturb the Panel's Focus on 1791.

Nothing in *Rahimi* upsets the panel's decision to focus on 1791 as the critical year for understanding the scope of the Second Amendment. *Contra* State Suppl. Br., Doc. 107 at 8 (Nov. 25, 2024). Indeed, the State concedes that "[a]s in *Bruen*, it was unnecessary for the Court [in *Rahimi*] to resolve the question of whether"

courts should treat 1791 or 1868 as the critical date for understanding the scope of the Second Amendment. *Id.*; *see also id.* at 21 (noting that following *Rahimi* the question "remains unresolved" by the Supreme Court). That means that *Rahimi* necessarily did not change the legal landscape on which this Court has already concluded that "to maintain consistency in our interpretation of constitutional provisions, … the Second Amendment should be understood according to its public meaning in 1791." *Lara*, 91 F.4th at 134. There is, therefore, no reason to reconsider that previous conclusion in light of *Rahimi*. To the contrary, as Plaintiffs detailed in their own supplemental brief, *Rahimi* added to the "strong hint[s]," *id.* at 133, that *Bruen* had made that 1791 should be seen as the critical year, *see* Pls.' Suppl. Br., Doc. 106 at 3–4 (Nov. 25, 2024).

The State points to *Rahimi*'s statement that "[t]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791," as support for its contrary position. State Suppl. Br. at 8 (quoting *Rahimi*, 144 S. Ct. at 1897–98). But if anything, that statement supports Plaintiffs, because the Court still referenced 1791 as the critical year for understanding the scope of the Second Amendment, even as it acknowledged that the same historical principles with roots in 1791 may look different in application today than they appeared then. Justice Barrett's statement in concurrence chastising the Fifth Circuit for "imposing a test that demands overly specific analogues" because that approach "forces 21st-century

regulations to follow late-18th-century policy choices," is the same. *See Rahimi*, 144 S. Ct. at 1925; *see also* State Suppl. Br. at 9. The object of Justice Barrett's criticism was the level of generality at which Founding-era history was viewed by the Fifth Circuit, not the focus on Founding-era history itself. The framing of her statement demonstrates she shares that focus, as does the rest of her concurrence where she emphasizes that the normal course for understanding the meaning of the Second Amendment should be to simply review Founding-era history ("the generally dispositive kind" of history), while "history (or tradition) that long postdates ratification does not serve [an illuminating] function." *Rahimi*, 144 S. Ct. at 1924–25.

Finally, the State objects that the panel erred by deciding this issue at all, and argues that it "put the cart before the horse" when it "resolv[ed] the historical timeframe debate in the abstract." State Suppl. Br. at 21–22. The State claims this was inappropriate given that deciding which period controls is necessary only if there is a conflict between them (and the State claims there is no conflict here). *Id.* This objection makes no sense. Once this Court held, as it did, that the Founding era did not provide any historical support for the State's position and in fact undermined it, the only way it *could* have won this case under *Bruen* was by both establishing (1) that Reconstruction-era history actually trumps Founding-era history *and* (2) Reconstruction-era history conflicted with the Founding-era history and supported

the State. The State had to win on both of those points, which means it could lose on either (and indeed, would lose under either, *see Worth v. Jacobson*, 108 F.4th 677, 698 (8th Cir. 2024) (finding Reconstruction-era history similarly unavailing to support a modern ban on firearm carriage by 18-to-20-year-old adults)). There is no reasonable basis on which to criticize this Court for picking one path over the other.

### B.    The Panel's Discussion of Founding-Era History Remains Accurate Following *Rahimi*

The State charges the panel with two errors in its analysis of Founding-era history, but neither criticism is warranted. First, it claims the panel erred in "demand[ing] Founding-Era statutory twins" to support the Carry Ban. State Suppl. Br. at 20. The State does not elaborate on this objection, which Plaintiffs have already explained is unfounded. As this Court well knows, the State has not merely failed to produce a historical twin, it has failed to produce any law restricting the firearm rights of 18-to-20-year-olds, or any group of adults based on age, from anywhere in the Founding era. *See* Pls.' Suppl. Br. at 10.

Second, the State argues that the panel decision "rested 'exclusively on 18th-century militia laws.' " State Suppl. Br. at 23 (quoting *Lara v. Comm'r Pa. State Police*, 97 F.4th 156, 157 (3d Cir. 2024) (Krause, J., dissental)). It criticizes the panel for failing to correctly apply the *Bruen* analysis, and gleaning the wrong historical "principle" from those laws by not adequately comparing the "why" (the State says the laws' inclusion of 18-to-20-year-olds were "dictated by strategic imperatives")

and the "how" (the State notes that, as in any organized fighting force, 18-year-olds in a militia would have been "under the supervision of … officers"). *Id.* at 23–24 (citations omitted).

This gets *Bruen* backwards. This Court's holding was based on a finding that the text of the Second Amendment extended to cover 18-to-20-year-old adults, and on the State's failure to provide *any* historical justification for treating them differently than the text would suggest is appropriate. Plaintiffs did not need to prove, by reference to historical laws, that there was a relevant historical "principle" conferring on them Second Amendment rights—that was done in the text. The State had to (and failed to) prove the reverse. Contrary to the State's apparent understanding of the opinion, at no point did this Court treat the militia laws as somehow *conferring* the right to keep and bear arms on 18-to-20-year-olds. Rather, those laws provided "good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed" that aligned with what was already evident from the State's failure to cite "a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns." *Lara*, 91 F.4th at 137. That is still true after *Rahimi*.

The panel was entirely right, therefore, to reject the State's argument that the militia laws actually supported modern restrictions on 18-to-20-year-olds because 18-year-old militiamen in the 1790s were supervised by officers when mustering, or

bore arms that their parents were sometimes required to purchase for them. *See* State Suppl. Br. at 24. As to the first point, *all* militiamen were supervised by officers, 18-year-olds were not unique in that respect. *See* Saul Cornell & Nicolas DeNino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510 (2004). And when not mustering, they still possessed their arms and were free to use them without militia supervision. As to the second point, as the panel noted, while some militia statutes did require parents to be sure their children were properly outfitted for militia service, "nothing in those statutes says that 18-to-20-year-olds could not purchase or otherwise acquire their own guns." *Lara*, 91 F.4th at 137.

## C. *Rahimi*'s Discussion of Facial and As-Applied Challenge Does Not Alter the Panel Decision

The State argues that, following *Rahimi*, Plaintiffs' challenge should be more difficult to succeed on because it is "facial" and *Rahimi* reiterated those challenges are the "most difficult … to mount successfully." State Suppl. Br. at 10 (quoting *Rahimi*, 144 S. Ct. at 1898); *see also id.* at 27. But as with so much else, *Rahimi* said nothing new in this regard, and this Court's prior analysis need not be changed at all.

That *Rahimi* presented a facial challenge was significant to that case because Section 922(g)(8) provided "two independent bases for liability"—either because an individual violated a restraining order that included "a finding that he poses 'a

credible threat to the physical safety' of a protected person," *or* because he violated a restraining order that merely included a prohibition on "the use, attempted use, or threatened use of physical force." 144 S. Ct. at 1898 (citations omitted). The Court did not have to ask whether the latter of these complied with the Second Amendment, because it concluded that the former did (and Rahimi's own restraining order included such a finding of a credible threat of violence).

This case is not comparable, and the State fails to come up with a *single* example of an application of the statute to 18-to-20-year-olds who are ineligible for carry licenses solely because of their age that would be constitutional. It suggests for example, that the State would be particularly aggrieved if it declared an emergency "due to civil unrest on college campuses throughout the Commonwealth" and yet "law enforcement officials in Pennsylvania [were] powerless to stop 18-to-20-year-olds from going armed with deadly weapons." State Suppl. Br. at 27–28. This is a puzzling claim, because the State does not attempt to explain why this application is distinct from any other type of emergency in a constitutionally relevant sense, and it is wholly disconnected from any of the State's historical evidence. The State's concerns need not be so vague; it is not difficult to imagine a world in which campus protests make 18-to-20-year-olds feel unsafe and in need of a means to lawfully defend themselves. *See, e.g.,* Emily Scolnick, *Penn's Jewish community members express opposition to encampment amid split student perspectives*, THE DAILY

PENNSYLVANIAN (Apr. 27, 2024), https://bit.ly/3CRyaST. Indeed, it is central to the "principles underlying the Second Amendment," *Rahimi*, 144 S. Ct. at 1898, that the Plaintiffs, and other law-abiding 18-to-20-year-olds, have a means to do so. Such concerns are reasons to reaffirm the vitality of Plaintiffs' Second Amendment rights, not to undercut them.

## II. The State Cannot Carry Its  Historical Burden Under *Bruen* and *Rahimi*.

### A.    The State Has Not Found Any Historical Principle That Supports the Carry Ban.

The State offers two historical "principles" that it alleges underpin the American tradition of Second Amendment regulation, but neither can justify its restrictions on 18-to-20-year-old adults. First, it asserts that "the Second Amendment broadly permits modern regulations that ban firearm possession by categories of persons who pose a danger," and that legislatures have the authority to judge for themselves  " 'which groups pose[] sufficient risk to justify categorical disarmament.' " State Suppl. Br. at 11–12 (quoting *Lara*, 97 F.4th at 161 (Krause, J., dissental)). The Eighth Circuit rejected this precise argument in *Worth v. Jacobson*, the only post-*Rahimi* court of appeals decision addressing a similar challenge to this one, which the State tellingly does not even mention in its supplemental brief because it so definitively rejects the notion that *Rahimi* alters the analysis that this Court has already conducted. As *Worth* explained "[a] legislature's ability to deem a category of people dangerous based only on belief [that they posed

such a danger] would subjugate the right to bear arms 'in public for self-defense' to 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " 108 F.4th at 694 (quoting *Bruen*, 597 U.S. at 70). And to be clear, endorsing legislative authority to declare 18-to-20-year-olds "dangerous" would be giving legislatures the authority to make such determinations "based only on belief," resulting, in a bizarre twist, in an even more deferential review of legislative enactments than the was provided for by the old interest balancing test that *Bruen* rejected. "Only 0.25% of [18-to-20-year-olds] commit violent crimes," so if this Court accepts the State's argument, it would be permitting a restriction on "the rights of 99.75% of [18-to-20-year-olds] based on the bad acts of an incredibly small sliver of the [18-to-20-year-old] population." *Jones v. Bonta*, 34 F.4th 704, 748 (9th Cir. 2022) (Lee, J., concurring), *vacated on reh'g en banc in light of* Bruen, 47 F.4th 1124 (9th Cir. 2022) (Mem.).

Such a law would not even survive intermediate scrutiny. *Bonta*, 34 F.4th at 730 (maj. op.) (discussing *Craig v. Boren*, 429 U.S. 190 (1976)). And if the legislature has such broad authority to disarm those it views as "dangerous," there are a host of other disarmament laws that the legislature could presumably enact on an equally tenuous basis. Judge Lee, for example, points out that men comprise 99.9999% of mass shooters (even if only 0.000001% of men commit such a crime), so on the same basis Pennsylvania could presumably disarm all men as "dangerous."

10

*Id.* at 748 (Lee, J., concurring). And once a legislature is slicing "the people" up into more and less dangerous groups based more on stereotypes than on any particular finding of individual dangerousness, there is no reason to stop with men. Applying the "principle" promoted by the State here would presumably permit disarming anyone who lives in a city rather than a suburb, *see* Elizabeth Kneebone & Steven Raphael, *City and Suburban Crime Trends in Metropolitan America* at 5–6, BROOKINGS (May 2011), https://bit.ly/4ig4vmf, or Pennsylvanians who prefer the Eagles to the Steelers, *see* Keith Schweigert, *Study finds Eagles have the NFL's 'angriest' fanbase; Steelers fans rank 4th*, FOX43 (July 30, 2024), https://bit.ly/3OA8xIF. If the Second Amendment means anything at all, it surely must mean legislatures cannot, at will, deny the right to keep and bear arms to a broad swath of the adult population based on the legislature's perception of whether they are deserving of the right.

Rather than demonstrating a workable, narrowly drawn tradition, the foregoing shows that the "dangerous" principle that the State purports to extract from history is an exception that would swallow the rule. *Rahimi* speaks directly to this when it cautions against drawing lessons from the past in such a broad way that they would create vague and broad exceptions to the fundamental right to keep and bear arms. *See* 144 S. Ct. at 1903 (" 'Responsible' is a vague term. It is unclear what such a rule [disarming irresponsible people] would entail.").

Of course, all of the foregoing presupposes that there is *something* in the historical record from which the State can derive this broad tradition, but there is not. The only points of support for the State's argument are a pair of citations to *Rahimi*'s discussion of the historical tradition of disarming "an individual [who] poses a clear threat of physical violence to another," *Id.* at 1901, and to then-Judge Barrett's dissent in *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019), in which she noted that, as a factual matter, there were instances in which "founding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety," *see* State Suppl. Br. at 11. But *Rahimi* did not identify a tradition that would extend to "categories of persons," *id.* and was, instead, about *individual* danger. Similarly, while Justice Barrett acknowledged Founding-era legislatures sometimes legislated against groups, the State stops quoting her dissent just before she acknowledged that this long and largely shameful history (the foundation of which is built on laws targeting slaves, Native Americans, Catholics, etc., in a set of prohibitions that this Court acknowledged would be unconstitutional today, *see Lara*, 91 F.4th at 131), nevertheless *did not support* "a legislative power to categorically disarm felons because of their status as felons," *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting). Nor can they support categorically disarming 18-to-20-year-olds today.

Second, the State suggests that historically "Founding-era legislatures could establish minimum age requirements for most fundamental rights, typically drawing

the line at age 21." State Suppl. Br. at 13. But *Rahimi* is no different from *Bruen* in that it insists on deriving a principle relevant specifically to the right to keep and bear arms. *See Rahimi*, 144 S. Ct. at 1898. The State's examples of laws from the Founding treating those under 21 as minors and limiting their ability to serve on juries, vote, or get married does not mean that they can be deprived the right to carry firearms for lawful purposes including self-defense today. *See Lara*, 91 F.4th at 131 ("Notwithstanding the legal status of 18-to-20-year-olds during that period, however, the Commissioner's position is untenable."). Indeed, if anything, it sends the opposite message to the one the State intends: it is striking that even though they were considered "minors" for most purposes, the Founders never enacted a *single law* that would have limited in any way and 18-year-olds right to use firearms lawfully on an equal playing field with adults. *See id.* at 137.

The State wholly misapprehends the importance of the fact that 18-to-20-year-olds were minors at the Founding, and stresses that point to its detriment. It emphasizes that when Founding-era legislatures drew lines with respect to other rights at 21, they did so because "anyone under 21 was considered a minor" and "[t]he consequences of this categorization w[ere] 'profound.' " State Suppl. Br. at 12. Plaintiffs do not dispute any of that—but it affirmatively supports their case, not the State's. In cautioning against reading history to suggest a "law trapped in amber," the Supreme Court in *Rahimi* was warning courts not to attempt an application of

historical precedents to modern situations in which the "principle" that supported the historical regulation no longer applied. *See* 144 S. Ct. at 1897. That is precisely what the State is advocating for here: it wants to take restrictions (on things *other than* firearms rights) that it admits were valid against 18-to-20-year-olds at the Founding only because they were minors, a categorization that it asserts has "profound" significance, and apply them to legal adults today. For this reason the Eighth Circuit was right to note in *Worth* that, even if a court *were to* consider the late-19th century restrictions the Commissioner points to, *see* State Suppl. Br. at 14, they would make no difference as modern restrictions on 18-to-20-year-olds are disanalogous because they target legal adults, *Worth*, 108 F.4th at 698.

### B.    There Is No Reason To Relax the State's Burden To Come Forward With Founding-Era Evidence of a Relevantly Similar Historical Principle.

The State attempts to explain away the complete lack of Founding-era evidence for its position by arguing that this Court must "consider the monumental societal, economic, and technological shifts during the 19th century" which led, in its narrative, to a sudden need to regulate 18-to-20-year-olds' access to firearms in the latter half of the 19th century. State Suppl. Br. at 14. Even if this narrative were true, it would not help the State. When *Bruen* cautioned that courts must be sensitive to "cases implicating unprecedented societal concerns or dramatic technological changes" which may require "a more nuanced approach," it did not give the

government carte blanche to permit new forms of regulation without roots at the Founding, but merely cautioned that the Court should, in such cases, not look for a one-to-one historical and modern regulatory comparison, but only ensure that modern laws are "relevantly similar" to historical ones. 597 U.S. at 27, 29. As *Bruen* explained, the meaning of the Second Amendment "is fixed according to the understandings of those who ratified it," though the Constitution "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28. In other words, changes in circumstance might impact the way that "the principles that underpin our regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, are *expressed* today, but for a regulation to be valid, it still has to be a part of such a tradition with roots at the Founding. *See* Pls.' Suppl. Br. at 9. So because, as explained just above, the State has failed to demonstrate any such principle that could excuse its ban on 18-to-20-year-old adults carrying firearms during emergencies, regardless of any change in circumstances or technological developments, the State has failed to carry its burden.

In any event, the State's narrative of change is directly contrary to binding Supreme Court precedent. The State argues that its regulation is made necessary by the dangers of urban living, and claims that "[u]rban areas 'simply did not exist in 1791 as we understand them today," State Suppl. Br. at 15 (quoting Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133

YALE L.J. 99, 154–55 (2023)), that handguns were rare and less "deadl[y]" and "accurate" than the handguns that became available in the mid-19th century, State Suppl. Br. at 16, and that state legislatures in that period "were thus forced to 'deal with gun violence as a significant societal problem for the first time in American history,'" just after Reconstruction, *id.* at 17 (quoting Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3088 (2024)).

*Heller* and *Bruen* run directly contrary to this historical story. In discussing the possibility that some other cases might present truly new societal or technological issues that make analogizing more complex, *Bruen* cautioned that neither it nor *Heller* were such cases. Instead, in both *Bruen* and *Heller* the Supreme Court employed a "straightforward historical inquiry" because the "challenged regulation addresse[d] a general societal problem that has persisted since the 18th century" so that "the lack of a distinctly similar historical regulation addressing that problem [was] relevant evidence that the challenged regulation[s] [were] inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26–27. The problem for the State is that the problems confronting the Court in both *Heller* and *Bruen*, that it found to be nothing new, are precisely those that the State points to here as though they were unprecedented at the Founding: "'handgun violence,' primarily in 'urban area[s].'" *Id.* at 27 (quoting *District of Columbia v. Heller*, 554 U.S. 570,

631 (2008) (brackets in *Bruen*)); *see also id.* ("The District in *Heller* addressed a perceived societal problem—firearm violence in densely populated communities—and it employed a regulation—a flat ban on the possession of handguns in the home—*that the Founders themselves could have adopted to confront that problem*."). Because these very problems were so long-standing, *Bruen* explained that *Heller* determined D.C.'s regulation was unconstitutional "after considering 'founding-era historical precedent,' including 'various restrictive laws in the colonial period.' " *Id.* at 27. This Court is therefore on firm ground in continuing to insist that, if the State is to justify its law at all, it must do so with Founding-era sources and cannot rest on the assertion that the Founders never dealt with gun violence in enacting wholly new and draconian restrictions on the rights of law-abiding adults. *See Lara*, 91 F.4th at 135.

## CONCLUSION

The Court should reinstate its pre-*Rahimi* decision.

Dated: December 2, 2024         Respectfully submitted,

/s/David H. Thompson
Joshua Prince, Esq.         David H. Thompson
CIVIL RIGHTS DEFENSE FIRM, P.C.    Peter A. Patterson
646 Lenape Road          John D. Ohlendorf
Bechtelsville, PA 19505      COOPER & KIRK, PLLC
joshua@civilrightsdefensefirm.com    1523 New Hampshire Avenue, NW
(888) 202-9297           Washington, DC 20036
(610) 400-8439 (fax)       (202) 220-9600
                            (202) 220-9601 (fax)

17

dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this court.

Dated: December 2, 2024          /s/David H. Thompson
                                 David H. Thompson
                                 *Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B)(ii) because this brief contains 4,194 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: December 2, 2024          /s/David H. Thompson
                                 David H. Thompson
                                 *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on December 2, 2024. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 2, 2024

s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiffs-Appellants*