IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**No. 21-1832**

_____

**MADISON M. LARA; SOPHIA KNEPLEY; LOGAN D. MILLER; SECOND
AMENDMENT FOUNDATION, INC.; FIREARMS POLICY COALITION,**
**Appellants**

**v.**

**COMMISSIONER PENNSYLVANIA STATE POLICE,**
**Appellee**

_____

**PETITION FOR PANEL REHEARING, OR,
ALTERNATIVELY, REHEARING EN BANC**

_____

APPEAL FROM THE JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ENTERED APRIL 16, 2021(NO. 2-20-CV-01582)
(HON. WILLIAM S. STICKMAN, IV, PRESIDING)

DAVID W. SUNDAY, JR.
*Attorney General*

BY:  DANIEL B. MULLEN
*Senior Deputy Attorney General*

Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA 15222
Phone: (412) 235-9067
FAX:  (412) 565-3028

BRETT GRAHAM
*Deputy Attorney General*

SEAN A. KIRKPATRICK
*Chief Deputy Attorney General*
*Chief, Appellate Litigation Section*

DATE: February 10, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

RULE 35.1 STATEMENT ...................................................................v

INTRODUCTION ...............................................................................1

REASONS FOR GRANTING REHEARING .......................................2

I.    THE MAJORITY'S ANALYSIS CONFLICTS WITH *BRUEN* AND *RAHIMI*. .................2

    A.    The Majority overlooked relevant historical principles. .......................2

    B.    The Majority contrived a conflict between the Founding and Reconstruction. ..................................................................6

    C.    The Majority lapsed into a "use it or lose it" view of legislative authority. ................................................................10

    D.    The Panel ignored *Rahimi*'s guidance on facial challenges. ...............12

II.   THE PANEL SHOULD HAVE REMANDED FOR FURTHER PROCEEDINGS. ...........14

    A.    The Commissioner should have been allowed an opportunity to develop a historical record. ...........................................14

    B.    Appellants should not have been permitted to enlarge the appellate record with new evidence. ..................................15

    C.    The Majority's remedy subjects 18-to-20-year-olds to less oversight than other adults. ...............................................17

CONCLUSION ...................................................................................19

CERTIFICATE OF COUNSEL .............................................................20

CERTIFICATE OF SERVICE ...............................................................21

# TABLE OF AUTHORITIES

**Page**

## Cases

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ..................................14

*Capen v. Campbell*, 708 F.Supp.3d 65 (D. Mass. 2023) ..........................14

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ................................................................15

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... 4, 5, 9

*Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897 (3d Cir. 2020).................3

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019)..........................................................3

*Lara v. Comm'r Pa. State Police*,
125 F.4th 428 (3d Cir. 2025) .......................................... 1, 2, 3, 6, 7, 9, 10, 12, 16

*Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024),
*reh'g denied*, 97 F.4th 156 (3d Cir. 2024),
*vacated sub nom*, *Paris v. Lara*, 24-93 (U.S. 2024) ............................... 1, 2, 3, 11

*Lawrence v. Chater*, 516 U.S. 163 (1996) ...............................................................1

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................................4

*N.Y.S.R.P.A. v. Bruen*, 597 U.S. 1 (2022).............................................. v, 4, 6, 8, 11

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023),
*reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023) .........5, 8

*NRA v. Swearingen*, 545 F.Supp.3d 1247 (N.D. Fla. 2021) .....................................8

*Oregon Firearms Fed'n v. Kotek*, 682 F.Supp.3d 874 (D. Or. 2023).....................14

*Pitsilides v. Barr*, ___ A.3d ___, 21-3320, (3d Cir. Feb 10, 2025) .................. 14, 17

*Range v. Attorney General*, 124 F.4th 218 (3d Cir. 2024) ......................................13

*Reese v. ATF*, 2025 WL 340799 (5th Cir. 2025) ....................................................13

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001)................................................18

*State v. Callicutt*, 69 Tenn. 714 (1878)........................................................................5

*United States v. Rahimi*, 602 U.S. 680 (2024).................... v, 2, 3, 4, 6, 7, 11, 12, 13

*Vermont Fed'n of Sportsmen's Clubs v. Birmingham*,
    2024 WL 3466482 (D. Vt. 2024).........................................................................14

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) ...............................................13

**Statutes**

18 Pa.C.S. § 6106(b) ..............................................................................................16

18 Pa.C.S. § 6107...............................................................................................6, 12

18 Pa.C.S. § 6107(a)(1)...........................................................................................13

18 Pa.C.S. § 6107(a)(2)...................................................................................... 16, 17

18 Pa.C.S. § 6109(d) ........................................................................................ 13, 18

18 U.S.C. § 922(b)(1)...............................................................................................18

1883 Kan. Sess. Laws 159 (1883) .............................................................................5

1883 Wis. Sess. Laws 290 (1883)..............................................................................5

Act No. 311 of Feb. 14, 1730, 4 *Statutes at Large of Pennsylvania from 1682 to
    1801*, at 152 ..........................................................................................................3

**Other Authorities**

Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99, 154–55 (2023) ................................................11

Kevin Sweeney, "Firearms Militias, and the Second Amendment," *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (2013)..8

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049 (2024) .............................. 4, 9, 11, 12

Patrick Charles, *Armed in America: The History of Gun Rights from Colonial Militias to Concealed Carry* (2018) .....................................................................5

Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. INTER ALIA 1 (2021) ...........................................................................................................8, 10

**Treatises**

Thomas Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ...................5

William Blackstone, *Commentaries on the Laws of England* (1765) .......................3

## **RULE 35.1 STATEMENT**

I express a belief, based on reasoned and studied professional judgment, that the Panel's decision is contrary to the decisions of the United States Supreme Court and that consideration by the full Court is necessary to secure and maintain uniformity of decisions. The Panel's decision is contrary to *United States v. Rahimi*, 602 U.S. 680 (2024) and *N.Y.S.R.P.A. v. Bruen*, 597 U.S. 1 (2022). This appeal involves exceptionally important questions, as the Panel resolved reoccurring methodological questions that will bind this Court in future Second Amendment cases.

## INTRODUCTION

Last year, this Court narrowly denied rehearing after a divided panel held that Pennsylvania's law establishing 21 as the minimum age to publicly carry firearms during emergencies violates the Second Amendment. *Lara v. Comm'r Pa. State Police*, 91 F.4th 122 (3d Cir. 2024), *reh'g denied*, 97 F.4th 156 (3d Cir. 2024) ("*Lara I*"). Preempting *Rahimi*, the *Lara I* Majority misinterpreted *Bruen* to require Founding-era twins. 91 F.4th at 137 (seeking "a single founding-era statute imposing restrictions on the freedom of 18-to-20-year-olds to carry guns"). The Supreme Court granted certiorari, vacated, and remanded for reconsideration under *Rahimi*, *Paris v. Lara*, 24-93 (U.S. Oct. 15, 2024), reflecting the Justices' assessment of at least a "reasonable probability" that *Rahimi* changed the result. *Lawrence v. Chater*, 516 U.S. 163, 167 (1996).

On remand, however, the Majority barely accounted for *Rahimi*'s principles-focused methodology. *Lara v. Comm'r Pa. State Police*, 125 F.4th 428 (3d Cir. 2025) ("*Lara II*"). By the Majority's own admission, *Lara II* is largely a rehash of *Lara I*. *Id.* at 431 (the opinion is "repetitive of our earlier decision"). The Majority doubled down on its misinterpretation of *Bruen*, requiring the Commissioner to find a 1791 replica of Pennsylvania's law. *Id.* at 439 (seeking "an eighteenth-century regulation barring 18-to-20-year-olds from carrying firearms"). And, once again, the Majority invoked inapposite Founding-era militia laws to justify ignoring all post-

1

enactment historical regulations from the mid-to-late nineteenth century. *Id.* at 443-44.

For the second time, the Majority has bound this Circuit to an erroneous Second Amendment methodology that will inevitably confuse and complicate future cases, threatening firearm regulations in three states. Whatever the ultimate result, this Court should not permit the Majority's deeply-flawed analysis to be the final word on these important issues.

## REASONS FOR GRANTING REHEARING

### I.    THE MAJORITY'S ANALYSIS CONFLICTS WITH *BRUEN* AND *RAHIMI*.

### A.    The Majority overlooked relevant historical principles.

In *Rahimi*, the Supreme Court clarified that *Bruen* never "meant to suggest a law trapped in amber" or that the Second Amendment permits only "those regulations identical to ones that could be found in 1791." *Id.* at 691-92. Instead, the analysis is "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 692 (emphasis added). As Judges Restrepo and Krause accurately perceived even before *Rahimi*, Pennsylvania's minimum age restriction is consistent with historical principles. *Lara I*, 91 F.4th at 146-147 (Restrepo, J., dissenting); *id.*, 97 F.4th at 161 (Krause, J., dissenting from rehearing denial).

*Rahimi* confirms that the Second Amendment broadly permits modern firearm restrictions on categories of persons who pose a danger if armed. 602 U.S. at 697-700; *see also Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting) ("founding-era legislatures categorically disarmed groups … judged to be a threat to the public safety"); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 924 (3d Cir. 2020) (Bibas, J., dissenting) ("the Second Amendment's touchstone is dangerousness"). And "which groups posed sufficient risk to justify categorical disarmament" was historically a question for *legislatures*. *Lara I*, 97 F.4th at 161 (Krause, J., dissenting from rehearing denial).

Critically, Founding-era legislatures routinely established minimum age requirements for fundamental rights, and typically drew the line at age 21. *See, e.g.*, Act No. 311 of Feb. 14, 1730, 4 *Statutes at Large of Pennsylvania from 1682 to 1801*, at 152 (establishing 21 as the minimum age for marriage). Under the common law, too, under-21-year-olds were considered minors. *Lara II*, 125 F.4th at 449-51 (Restrepo, J., dissenting) (citing, *inter alia*, William Blackstone, *Commentaries on the Laws of England* (1765)). The consequences of this categorization were "profound," as minors had "very little independent ability to exercise fundamental rights," including the right to contract, own property, speak, associate, marry, and petition. *Id.* at 451.

In sum, Founding-era legislatures could: (1) categorically disarm those who posed a danger; and (2) set minimum age requirements for the exercise of fundamental rights. "Taken together," *see Rahimi*, 602 U.S. at 698, this history establishes that restrictions on 18-to-20-year-olds comport with the principles that underpin our regulatory tradition.

This Court is also bound to consider whether post-ratification history reinforces this view.[1] It does.

Between 1856 and 1897, twenty jurisdictions curtailed the gun rights of under-21-year-olds, enacting more restrictive laws than the modest Pennsylvania scheme challenged here. Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3092 (2024) (collecting statutes); Response Br. at 29-31 (3dCir.ECF 23). As will be discussed *infra* at I(C), the timing of those laws coincided with a rise in firearm violence by minors—a societal problem the Founding generation did not confront.

Unsurprisingly, 19th-century courts and commentators—not to mention the public—widely approved of these regulations. Patrick Charles, *Armed in America: The History of Gun Rights from Colonial Militias to Concealed Carry*, 141, 404-05

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 641 (2008) (post-ratification history, including from the Reconstruction era, is "instructive"); *see also McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010); *Bruen*, 597 U.S. at 52-53; *Rahimi*, 602 U.S. at 722-28 (Kavanaugh, J., concurring); *id.* at 738 (Barrett, J., concurring).

n.212 (2018). In the only known legal challenge to one of these laws, Tennessee's Supreme Court upheld a law banning pistol sales to under-21-year-olds. *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). Thomas Cooley—"the most famous" 19th-century legal scholar to interpret the Second Amendment, *Heller*, 554 U.S. at 616—explained that "the State may prohibit the sale of arms" to under-21-year-olds. Thomas Cooley, *Treatise on Constitutional Limitations*, 740 n.4 (5th ed. 1883). A survey of 19th-century newspapers and other sources found consistent public support for these laws "in the hopes of stemming the tide of firearm-related injuries at the hands of minors." *NRA v. Bondi*, 61 F.4th 1317, 1329 (11th Cir. 2023).[2] "It would be odd indeed if the people who adopted the Fourteenth Amendment did so with the understanding that it would invalidate widely adopted and widely approved-of gun regulations at the time." *Id*. at 1330.

Many of these 19th-century laws went significantly further in curtailing arms-bearing by under-21-year-olds than Pennsylvania does today. Some banned *all possession* by minors, while others prohibited minors from acquiring or carrying arms. 1883 Kan. Sess. Laws 159 (1883); 1883 Wis. Sess. Laws 290 (1883). Pennsylvania merely prohibits 18-to-20-year-olds from publicly carrying during

---

[2] *reh'g granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023).

emergencies. 18 Pa.C.S. § 6107. This modest limitation adheres to historical principles and traditions.

Taken together, these historical sources reveal that legislatures may establish 21 as the minimum age for gun rights because of the danger posed by armed minors. The Majority's misapprehension of *Bruen* and *Rahimi* caused it to overlook this history.

## B.    The Majority contrived a conflict between the Founding and Reconstruction.

In both *Bruen* and *Rahimi*, it was unnecessary for the Court to resolve "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope." *Rahimi*, 602 U.S. at 692 n.1 (quoting *Bruen*, 597 U.S. at 37). But the Majority resolved that issue here, binding future panels and lower courts. The Majority claimed that by merely *referencing* post-enactment statutes, the Commissioner asserted "by implication" a conflict between 1791 and 1868 understandings and thus "forced" the issue. *Lara II*, 125 F.4th at 439 n.17. Not so.

The Commissioner's actual position is—and has always been—that it is unnecessary to resolve that question here because there *is no conflict* between the 1791 and 1868 understandings of the rights of 18-to-20-year-olds. Post-Rem.Supp.Br. at 21 (3dCir.ECF 107); Letter Br. at 5 n.1 (3dCir.ECF 57). The people who adopted the Second Amendment in 1791 believed that under-21-year-olds were

minors who could have certain fundamental rights restricted. The people who adopted the Fourteenth Amendment in 1868 shared that understanding.

It is unclear precisely why the Majority perceived a conflict between 1791 and 1868. Parts of the opinion seemingly reason from Founding-era silence, *i.e.*, that the *absence* of identical regulations means the Founding generation necessarily disapproved of minimum age laws. *Lara II*, 125 F.4th at 439 n.17. Other passages suggest a conflict between Founding-era militia statutes and 19th-century-minimum-age laws. *Id.* at 443-44. This ambiguity, standing alone, necessitates rehearing, as district courts will inevitably struggle to understand the proper analysis. Whatever the basis for the Majority's holding, neither analysis comports with the Supreme Court's Second Amendment precedents.

Insofar as the Majority reasoned from Founding-era silence, that analysis is the functional equivalent of demanding historical twins, and shrugs off the High Court's admonition that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 692. Simply put, *Rahimi* belies the Majority's conclusion that the absence of identical arms-bearing restrictions on 18-to-20-year-olds in 1791 means that the Founding generation disapproved of them. The Majority's reasoning has no limiting principle, and would require invalidating *all age restrictions* on firearm possession—even on five-year-olds—because such laws did not exist at the Founding.

7

To the extent the Majority perceived a conflict between 19th-century age laws and Founding-era militia laws, that conclusion is also unsound. *Bruen* instructs that when assessing the relevance of historical statutes, courts must consider the general societal problem the laws addressed. 597 U.S. at 26. Because the Majority failed to understand the underlying purpose of Founding-era militia statutes, it gleaned the wrong principle from them.

Founding-era militia statutes were "not about protecting handguns for self[-]defense, but securing muskets for national defense." Kevin Sweeney, "Firearms, Militias, and the Second Amendment," *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller*, 362-63 (2013). Accordingly, "the composition of the militia was always dictated by strategic imperatives, not by any constitutional mandate" that under-21-year-olds had the right to bear arms. Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, 40 YALE L. & POL'Y REV. INTER ALIA 1, 16 (2021).

"In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one." *NRA v. Swearingen*, 545 F.Supp.3d 1247, 1256-59 (N.D. Fla. 2021), *aff'd sub nom*, *Bondi*. When the Second Amendment was ratified in 1791, nine states mandated militia service beginning at age 16. *Id.* at 1257. The Majority does not meaningfully grapple with this fact: the minimum age for militia service fluctuated based on strategic imperatives. *See also*

*Lara I* Reh'g Pet., at 17-18 (3d.Cir.ECF 81). Nor does the Majority account for how the logical extension of its analysis would impact firearms restrictions on 16 and 17 year olds.

Militia laws are an exceedingly-weak source for understanding the Founding generation's view of the Second Amendment. Precisely for this reason, the High Court made it clear—more than 15 years ago—that the scope of the Second Amendment is "*unconnected* with militia service." *Heller*, 554 U.S. at 582 (emphasis added). Because militia laws are irrelevant to an individual's right to self-defense, *Heller*, 554 U.S. at 603, and offer no insights into how the Founding generation viewed regulations protecting the public from gun violence by minors, they are not relevant to the present inquiry.

But even if 18th-century militia laws were relevant, Judge Restrepo ably explained why they actually underscore the Founding generation's view that under-21-year-olds did not have inherent Second Amendment rights. *Lara II*, 125 F.4th at 451-52. When militia laws called on under-21-year-olds to serve, parental consent was usually a prerequisite, and parents were often required to furnish participating minors with arms. Walsh & Cornell, 108 MINN. L. REV. at 3080-81. Such provisions appear superfluous if minors already had the inherent right to acquire and carry firearms, as the Majority suggests.

Adult supervision was also a critical component of under-21-year-olds' ability to bear muskets in the militia where they served "under the supervision of peace officers who … stood *in loco parentis*." *Lara II*, 125 F.4th at 452 (Restrepo, J., dissenting). Thus, at the Founding, "access to, and the ability to keep and bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them[.]" Cornell, *Infants*, 40 YALE L. & POL'Y REV. INTER ALIA at 14. That minors occasionally bore arms in the militia "at the pleasure of their superiors" did not mean they had "an independent *right* under the Second Amendment" that they could assert against the government. *Lara II*, 125 F.4th at 452-53 (Restrepo, J., dissenting).

In short, the Majority's reliance on Founding-era silence and inapposite militia laws reveals its fundamental misapprehension of *Bruen* and *Rahimi*.

### C.   The Majority lapsed into a "use it or lose it" view of legislative authority.

In its search for Founding-era replicas, the Majority overlooked an important reason why early legislatures may not have enacted specific laws curtailing the gun rights of minors: there was simply no societal need for such regulations in 1791. And "[l]egislatures tend not to enact laws to address problems that do not exist[.]" *Lara II*, 125 F.4th at 453 (Restrepo, J., dissenting).

In 1791, handguns "were owned by a tiny fraction of the population," and it was exceedingly difficult for minors to acquire firearms without parental consent.

Walsh & Cornell, 108 MINN. L. REV. at 3088, 3062-63, 3078. The commonly-owned weapon—a musket—was time-consuming to load, single-shot, inaccurate, and prone to misfire. Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L. J. 99, 153 (2023). Because of the "scarcity and limited lethality" of Founding-era weapons, there was no need to enact age-restrictions at that time. *Lara I*, 95 F.4th at 165 (Krause, J., dissenting from rehearing denial).

This changed during the 19th century. By the 1850s, the mass production of deadlier and more accurate handguns made such weapons "readily available" for the first time. *Id.* at 3088. Increased access led to a "tide of firearm-related injuries at the hands of minors." Charles, *Armed in America* at 141. These monumental economic and technological changes created the imperative for legislatures to enact laws restricting the ability of under-21-year-olds to acquire and use handguns. Walsh & Cornell, 108 MINN. L. REV. at 3087-89.

The Supreme Court instructed courts to take a "nuanced approach" to cases "implicating societal concerns or dramatic technological changes" not present at the Founding. *Bruen*, 597 U.S. at 27-28. Because regulatory challenges evolve, "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Ibid.*; *Rahimi*, 602 U.S. at 692 ("the Second Amendment

permits more than just those regulations identical to ones that could be found in 1791").

Here, however, the Majority failed to recognize that there was "little need to enact modern-style gun regulations aimed at restricting access to weapons" at the Founding. Walsh & Cornell, 108 MINN. L. REV. at 3088. Only in the 19th century did States began to "deal with gun violence as a significant societal problem *for the first time in American history*." *Id.* (emphasis added). Instead of analyzing this history with nuance, the Majority wrongly assumed that "founding-era legislatures maximally exercised their powers to regulate, thereby adopting a 'use it or lose it' view of legislative authority." *Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring). The Majority flattened the relevant history, and its reasoning is incompatible with *Bruen* and *Rahimi*.

### D.    The Panel ignored *Rahimi*'s guidance on facial challenges.

The lone issue in this case is whether 18 Pa.C.S. § 6107—which prohibits unlicensed carry during emergencies and does not mention age—survives a *facial* challenge. *Lara II*, 125 F.4th 432 n.5 ("Appellants … have not articulated any as-applied challenge"); Comm'r Reply Supporting Remand at 9-11 (3d.Cir.ECF 96) (detailing Appellants' "ever-changing request for relief"). Appellants' choice to bring the "most difficult challenge to mount successfully" goes a long way towards resolving this case. *Rahimi*, 602 U.S. at 693. The Majority erred in concluding that

Appellants demonstrated "no set of circumstances" under which Pennsylvania's law would be valid. *Ibid.*

It bears emphasizing that Pennsylvania is *not* in the practice of disarming 18-to-20-year olds, who may generally carry firearms openly without a license.[3] Pennsylvania regulates public carry of *any kind* (open or concealed) during proclaimed emergencies by limiting it to individuals who have undergone *investigations and background checks*. 18 Pa.C.S. §§ 6107, 6109(d).[4] The question, therefore, is whether this limitation is constitutional in *any* application. *Rahimi*, 602 U.S. at 693. It is.

The Majority's contrary conclusion means that during an emergency—*e.g.*, due to civil unrest or natural disaster—Pennsylvania is powerless to stop unlicensed 18-to-20-year-olds from going armed with deadly weapons. That holding defies common sense and is inconsistent with historical practice. The Court should confirm the facial validity of Pennsylvania's law.

---

[3] *Contra Range v. Attorney General*, 124 F.4th 218, 230–31 (3d Cir. 2024) (contrasting "de facto lifetime disarmament" with "temporary disarmament"); *Worth v. Jacobson*, 108 F.4th 677, 683 (8th Cir. 2024) (striking down ban on *all* carry by 18-to-20-year-olds); *Reese v. ATF*, 2025 WL 340799, at *3 (5th Cir. 2025) (striking down ban on handgun *purchases* by 18-to-20-year-olds).

[4] Even during emergencies, 18-to-20-year-olds may still possess firearms, carry firearms on private property, and publicly-carry firearms when actively engaged in self-defense. 18 Pa.C.S. § 6107(a)(1).

## II.    THE PANEL SHOULD HAVE REMANDED FOR FURTHER PROCEEDINGS.

### A.    The Commissioner should have been allowed an opportunity to develop a historical record.

This appeal arises from the District Court's 2021 pre-*Bruen* decision granting the Commissioner's motion to dismiss and denying a preliminary injunction. Given the seismic legal and factual developments since then, the Commissioner requested a full remand back to the District Court. 3dCir.ECF 92, 96. Without explanation, the Panel denied that request. 3d.Cir.ECF 102.

Regrettably, the Commissioner has been denied the opportunity to tailor his arguments in the District Court to the *Bruen* standard—let alone *Rahimi*—trapping him in a jurisprudential moment before courts had honed and sketched out the historical inquiry it mandates. This Court recently recognized that cases litigated pre-*Bruen* should be remanded "[g]iven the intervening developments in our Second Amendment law[.]" *Pitsilides v. Barr*, ___ A.3d ___, 21-3320, Op. at 15 (3d Cir. Feb 10, 2025); *see also Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023). A remand here would similarly enable the Commissioner to develop a historical and factual record, potentially with the aid of a historical expert, as States have done in other similar cases. *Oregon Firearms Fed'n v. Kotek*, 682 F.Supp.3d 874, 885, 899-901 (D. Or. 2023); *Capen v. Campbell*, 708 F.Supp.3d 65, 70, 82-83, 89-90 (D. Mass. 2023); *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 2024 WL 3466482, *2, 8-13, 15-16 (D. Vt. 2024).

The Panel's refusal to remand defies this Court's call for "extreme caution" before enjoining democratically-enacted gun laws at preliminary phases of litigation. *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 199 (3d Cir. 2024). Discretion is particularly warranted where, as here, "federal courts are asked to block states from enforcing their laws" because it "threatens federalism and the separation of powers[.]" *Id.* at 205-06.

The Panel should have granted the Commissioner's request to remand to the District Court so that he could, for the first time, develop a record under the *Bruen* and *Rahimi* framework. Absent that opportunity, this case will stand for the proposition that happenstance and litigation strategy can frustrate thoughtful review in Second Amendment cases.

### B. Appellants should not have been permitted to enlarge the appellate record with new evidence.

Although the Panel refused to allow the Commissioner to develop a record, it permitted Appellants to enlarge the record on appeal with a vague, self-serving affidavit aimed at staving off mootness. 3d.Cir.ECF 114, 115, 116.

Because all three individual plaintiffs are now at least 21 years of age, their claims are moot. That leaves the two organizational plaintiffs—the Firearms Policy Coalition and the Second Amendment Foundation (collectively, "Organizational Plaintiffs")—alone to litigate these claims. But, as Organizational Plaintiffs

acknowledge, they must have at least one member who would have standing in order to proceed. *Lara II*, 125 F.4th at 445 n.28.

Below, the Organizational Plaintiffs did not establish that they have any Pennsylvania members other than the three individual plaintiffs. They therefore moved to enlarge the record on appeal with a recently-compiled declaration by Keegan Gaston, an 18-year-old member of the Organizational Plaintiffs' groups who avers that he owns a handgun, desires to carry on public streets during declared emergencies, and interprets Pennsylvania's law to forbid that act. Gaston Decl. at ¶¶ 2-9 (3dCir.ECF 114-1). The Majority found no standing issue because "nothing has been provided calling those simple facts into question." *Lara II*, 125 F.4th at 445 n.28. Which is true, but *only because the Majority denied the Commissioner's request for a remand to discover those facts*.

Moreover, the Majority's conclusion that Gaston's affidavit saves this case from mootness erroneously presumes that *any* 18-to-20-year-old Pennsylvanian necessarily has standing to challenge the law. That reasoning ignores the possibility that Gaston falls within one of the 15 enumerated exceptions in Pennsylvania's statute which would exempt him from the licensing requirement all together, thus permitting him to carry *even during a proclaimed emergency*. 18 Pa.C.S. § 6106(b) (exceptions to licensing requirement); 18 Pa.C.S. § 6107(a)(2) (permitting public carry during emergencies for persons "exempt from licensing under section

16

6106(b)"). None of these facts are before the Court, not because they are irrelevant, but because the Majority allowed Appellants to supplement the record with a vague declaration, while denying the Commissioner any opportunity to challenge that evidence.

Fortunately, there is both a process and a forum to adjudicate these facts: discovery in the District Court. *See Pitsilides* at 15-20. It was profoundly unfair to allow a one-sided expansion of the record so that Appellants could avoid any discovery and maintain organizational standing with a vague post-appeal declaration, while simultaneously denying the Commissioner the opportunity to meet his *Bruen* evidentiary burden in the District Court.

### C. The Majority's remedy subjects 18-to-20-year-olds to less oversight than other adults.

This case also should have remanded so that the District Court could craft an appropriate remedy. Instead, the Majority re-wrote Pennsylvania's intricate statutory scheme, giving 18-to-20-year-olds *more rights* and subjecting them to *less oversight* than other adults.

Under Pennsylvania's law, public carry of *any kind* (open or concealed) during emergencies is limited to those with licenses. 18 Pa.C.S. § 6107(a)(2). The rationale for this policy choice is obvious: Pennsylvania's legislature wanted to limit arms-bearing during emergencies to those who have undergone the *investigations*

*and background checks* required before obtaining licenses. 18 Pa.C.S. § 6109(d). The distinction is between *licensees* and *non-licensees*.

An 18-to-20-year-old publicly carrying during an emergency will not have undergone *any* investigation or background check. In fact, 18-to-20-year-olds do not even undergo background checks before *acquiring* handguns, as federal law prohibits them from purchasing handguns from federally-licensed dealers. 18 U.S.C. § 922(b)(1). Thus, the Majority's ham-handed remedy affords 18-to-20-year-olds— and only them—the unique privilege of *unlicensed* public carry during proclaimed emergencies without *any background check*. That remedy does considerable violence to the delicate statutory scheme that Pennsylvania's legislature enacted.

Instead of rewriting Pennsylvania's statute on a limited, one-sided factual record, the Panel should have remanded for further proceedings so the District Court could determine whether the Appellants' proposed injunction satisfies the applicable criteria. *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001).

## CONCLUSION

The Court should grant rehearing.

Respectfully submitted,

DAVID W. SUNDAY, JR.
Attorney General

By:    /s/ Daniel B. Mullen

DANIEL B. MULLEN
Senior Deputy Attorney General
Bar No. 321525 (Pa.)

BRETT GRAHAM
Deputy Attorney General

SEAN A. KIRKPATRICK
Chief Deputy Attorney General
Chief, Appellate Litigation Section

Office of Attorney General
1251 Waterfront Place
Pittsburgh, PA 15222
Phone: (412) 235-9067
FAX:   (412) 565-3028

DATE: February 10, 2025

## CERTIFICATE OF COUNSEL

I, Daniel B. Mullen, Senior Deputy Attorney General, hereby certify as follows:

1. That I am a member of the bar of this Court.

2. That the text of the electronic version of this brief is identical to the text of the paper copies.

3. That a virus detection program was run on the file and no virus was detected.

4. That this brief contains 3,897 words within the meaning of Fed.R.App.P. 32(a)(7)(B) and that it complies with the word count limit set forth in Fed.R.App.P. 40. In making this certificate, I have relied on the word count of the word-processing system used to prepare the brief.

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Senior Deputy Attorney General

## CERTIFICATE OF SERVICE

I, Daniel B. Mullen, Senior Deputy Attorney General, do hereby certify that I

have this day served the foregoing Petition via electronic service on the following:

David H. Thompson
Peter A. Patterson
John D. Ohlendorf
Cooper & Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
*Counsel for Appellants*

Joshua Prince
Civil Rights Defense Firm, P.C.
646 Lenape Rd.
Bechtelsville, PA 19505
*Counsel for Appellants*

Janet Carter
Everytown Law
450 Lexinton Ave.
P.O. Box 4148
New York, NY 10017
*Counsel for Amicus Everytown for Gun Safety Support Fund*

Lisa Ebersole
Cohen Milstein Sellers & Toll
1100 West Tower, Suite 500
Washington, DC 20005
*Counsel for Amicus Everytown for Gun Safety Support Fund*

Alex Hemmer
Office Of Attorney General of Illinois
100 W. Randolph Street – 12th Floor
Chicago, IL 60601
*Counsel for Amicus State of Illinois*

21

James P. Davy
P.O.Box 15216
Philadelphia, PA 19125
*Counsel for Amicus Giffords Law Center to Prevent Gun Violence and Ceasefire
Pennsylvania Education Fund*

/s/ Daniel B. Mullen

DANIEL B. MULLEN
Senior Deputy Attorney General

DATE: February 10, 2025