No. 21-1832

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

MADISON M. LARA, *et al.*,

*Plaintiffs/Appellants,*

vs.

COMMISSIONER PENNSYLVANIA STATE POLICE,

*Defendant/Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
No. 2:20-cv-1582
The Hon. William S. Stickman IV

**BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES ACTION FUND IN SUPPORT OF APPELLEE'S PETITION FOR REHEARING**

[Additional Counsel Listed on Signature Page]

Jim Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA  19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for* Amici Curiae
*Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Action Fund*

February 18, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate procedure, *Amici Curiae* Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March For Our Lives Action Fund state that they do not have parent corporations and that no publicly held corporation owns 10 percent or more of their stock.

/s/ *Jim Davy*

Jim Davy

Dated:  February 18, 2025

# TABLE OF CONTENTS

*Page*

I.   REASONS FOR GRANTING REHEARING ................................... 3

    A.   The Panel's Decision Conflicts with Binding Precedent and Undermines Lawmakers' Ability to Enact Laws That Prevent Gun Violence Consistently with the Constitution .... 3

    B.   Further Factual Development Is Needed to Assess Historical Analogues ............................................................. 8

II.  THE PENNSYLVANIA LAWS FIT WITHIN THE HISTORICAL TRADITION OF REGULATING GROUPS POSING A HEIGHTENED RISK OF VIOLENCE WHEN ARMED ...................................................................... 10

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

*Antonyuk* v. *James*,
120 F.4th 941 (2d Cir. 2024) ................................................................ 5

*District of Columbia* v. *Heller*,
554 U.S. 570 (2008) ...................................................................... 4, 6

*Graham* v. *Florida*,
560 U.S. 48 (2010) ........................................................................ 11

*Jones* v. *Becerra*,
No. 19-cv-01226 (S.D. Cal.), ECF Nos. 133, 134, 140 ......................... 9

*Jones* v. *Bonta*,
47 F.4th 1124 (9th Cir. 2022) ........................................................... 9

*Miller* v. *Alabama*,
567 US 460 (2012) ......................................................................... 11

*Nat'l Rifle Ass'n of Am., Inc.* v. *Swearingen*,
No. 18-cv-00137 (N.D. Fla.), ECF Nos. 106, 108 ............................... 10

*National Rifle Association of America* v. *Swearingen*
No. 21-12314 (11th Cir.) ................................................................. 9

*New York State Rifle & Pistol Ass'n* v. *Bruen*,
597 U.S. 1 (2023) ................................................................ *passim*

*Paris* v. *Lara*,
— U.S. —, 2024 WL 4486348 (Oct. 15, 2024) ...................................... 2

*Pinales* v. *Lopez*,
No. 24-cv-00496 (D. Haw.), ECF No. 45 ...................................... 7, 10

*Range* v. *Att'y Gen. United States*,
124 F.4th 218 (3d Cir. 2024) ............................................................. 6

*United States* v. *Gould,*
  672 F. Supp. 3d 167 (S.D. W. Va. 2023) ............................................. 7

*United States* v. *Rahimi,*
  602 U.S. 680 (2024) .................................................................... *passim*

*Woldford* v. *Lopez,*
  116 F. 4th 959 (9th Cir. 2024) ............................................................ 5

## Constitution and Rules

U.S. CONST. amend. II ................................................................. *passim*

Fed. R. App. P. 29(a) ....................................................................... 1

Fed. R. App. P. 40(b)(2) .................................................................. 2

## Other Authorities

Ctrs. for Disease Control and Prevention, Web-based Injury
  Statistics Query and Reporting System (WISQARS),
  *Leading Cause of Death Reports, 1981–2020* (last visited
  Feb. 21, 2024) .............................................................................. 14

Daniel W. Webster et al., *The Case for Gun Policy Reforms in
  America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH.
  (2012) ....................................................................................... 12

E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and
  Public Policy*, 103 AM. J. PUB. HEALTH 27 (2013) .............................. 15

Garrett Behanna et al., *Shooting That Left 4 People Dead in
  North Sewickley Township Was a Triple Murder-Suicide,
  DA Says*, CBS NEWS (Jan. 14, 2025) .................................................. 14

Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in
  Mass Shootings: Young Assailants*, N.Y. TIMES (June 2,
  2022) ......................................................................................... 13

Tomáš Paus et al., *Why Do Many Psychiatric Disorders
  Emerge During Adolescence?*, 9 NATURE REVS.
  NEUROSCIENCE 947 (2008) ............................................................. 14

Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449 (2013) ................... 11

Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH (2012). ...................................................... 15

Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049, 3108 (2024) ................................................................................... 6

Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220 (2014) ..................................................................... 11

Michael Levenson, *What We Know About the Assassination Attempt Against Trump*, N.Y. TIMES (July 30, 2024) ......................... 14

RAND Corp., *The Effects of Minimum Age Requirements* (last updated July 16, 2024) ............................................................... 15

Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 TRAUMA, VIOLENCE, & ABUSE 62 (2017). .................................................................................. 13

U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2020 to July 1, 2023*, National Population by Characteristics: 2020–2024 (last visited Feb. 18, 2025) ............................................... 12

U.S. Dep't of Justice, *Crime in the United States*, Arrests by Age, 2019, tbl.38 (last visited Feb. 18, 2025) ..................................... 12

William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 NOTRE DAME L. REV. 1467, 1508 (2024) ....................... 8

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are three non-profit organizations dedicated to ending gun violence in the United States.  Giffords Law Center to Prevent Gun Violence and Brady Center to Prevent Gun Violence each have decades of experience supporting laws and strategies to end gun violence in the United States.  Formed in 2018 after a high school shooting in Parkland, Florida, March For Our Lives is a non-profit organization comprised of young Americans advocating for sensible laws that prevent gun violence. *Amici* have an interest in ensuring that the United States Constitution is interpreted correctly for the nation's democratically accountable officials to pass common-sense legislation that prevents gun violence.

## INTRODUCTION

Last year, a panel of this Court issued an opinion invalidating several Pennsylvania laws that together prohibit 18-to-20-year-olds from publicly carrying guns during a government-declared state of emergency (the "Pennsylvania Laws").  The Supreme Court vacated that opinion for

---

[1] The parties have consented to *amici*'s filing.  No counsel for a party authored this brief in whole or in part or funded the preparation or submission of this brief, and no person other than *amici* or their counsel made such a monetary contribution.  *See* Fed. R. App. P. 29(a)(2), (a)(4)(E).

reconsideration in light of *United States* v. *Rahimi*, 602 U.S. 680 (2024).
*Paris* v. *Lara*, — U.S. —, 2024 WL 4486348 (Oct. 15, 2024).  The panel
majority did not update its analysis, continuing to take an overly narrow
approach that demands a near-exact, 1791-era historical match to the
Pennsylvania Laws, and admitting that its opinion was "repetitive of [its]
earlier decision."  (Panel Op. 5.)

These errors pose a grave threat to public safety, not just with
respect to the Pennsylvania Laws, but because they could mistakenly
threaten the validity of a wide swath of life-saving, constitutional
legislation.  The panel's erroneous interpretation of binding precedent
and the exceptional importance of the questions at issue warrant
rehearing by this full Court.  Fed. R. App. P. 40(b)(2).  For the reasons
presented by the Commissioner, and those discussed here by *amici*, the
Court should grant rehearing *en banc* and remand to the district court
for further development of the necessary historical record.

## I.    REASONS FOR GRANTING REHEARING

### A.    The Panel's Decision Conflicts with Binding Precedent and Undermines Lawmakers' Ability to Enact Laws That Prevent Gun Violence Consistently with the Constitution.

In *Rahimi*, the Supreme Court issued a critical clarification of how to apply the Second Amendment to modern gun regulations, rejecting the overly narrow historical tests that some lower courts applied in the wake of *New York State Rifle & Pistol Ass'n* v. *Bruen*, 597 U.S. 1 (2022).  As the Court explained, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."  602 U.S. at 691–92; *see id.* at 691 (*Heller* and *Bruen* "were not meant to suggest a law trapped in amber").  "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition."  *Id.* at 692 (emphasis added).  Instead of faithfully applying that direction, the panel continued down the overly narrow path that *Rahimi* rejected, mistakenly taking the view that "[n]othing in *Rahimi* undermines the reasoning" in the panel's earlier, vacated opinion.  (Panel Op. 26.)  The panel's analysis rests on three fundamental errors.

First, at the first step of the *Bruen* analysis, the panel ignored evidence that those under the age of 21 were historically considered minors with few independent legal rights. Second Amendment rights should be "enshrined with the scope they were understood to have when the people adopted them," which requires courts to consider "a variety of legal and other sources to determine the public understanding of a legal text." *District of Columbia* v. *Heller*, 554 U.S. 570, 605, 634–35 (2008). The panel disregarded this instruction, claiming that courts "are not limited to looking through that same retrospective lens at the first step," and refusing to consider historical evidence. (Panel Op. 17.)

Second, the panel incorrectly held that only statutes from 1791, when the Second Amendment was ratified, are relevant to the second step of the *Bruen* analysis. (Panel Op. 26.) That approach disregards the Supreme Court's instruction that "public understanding of [the Second Amendment's] text in the period after its enactment or ratification" is probative of its meaning. *Heller*, 554 U.S. at 605. Indeed, in *Bruen*, the Supreme Court gave detailed consideration to numerous 19th-century statutes, *see* 597 U.S. at 35–36, 52–57, and many courts have found 1868, the year of the Fourteenth Amendment's ratification,

to be relevant in seeking historical analogues, particularly for state laws, *see, e.g.*, *Wolford* v. *Lopez*, 116 F.4th 959, 980 (9th Cir. 2024); *Antonyuk* v. *James*, 120 F.4th 941, 972–73 (2d Cir. 2024).

Third, the panel's analysis contravened the Supreme Court's warning against searches for "a 'dead ringer' or a 'historical twin.'" *Rahimi*, 602 U.S. at 692; *see id.* at 739 (Barrett, J., concurring) ("imposing a test that demands overly specific analogues has serious problems"). For instance, the panel ignored the broader context of minors' general lack of rights during the relevant historical periods and wrongly rejected analogous historical laws identified by the Commissioner. (Panel Op. 27–36.) Instead, the panel narrowly looked to militia statutes to support "the principle that 18-to-20-year-olds are 'able-bodied men' entitled to exercise the right to bear arms," despite acknowledging that possession of firearms in the militia context is "distinguishable from a right to bear arms unconnected to such service." (Panel Op. 27, 35.)

The panel also ignored several historical principles consistent with the Pennsylvania Laws, which place a limited restriction (both in time and space) on a cohort of people who present disproportionately heightened risks of violence when armed, due in part to a scientifically

recognized lack of impulse control. *See infra* Section II. As this Court, sitting *en banc*, recently explained, "*Rahimi* did bless disarming (at least temporarily) physically dangerous people." *Range* v. *Att'y Gen. United States*, 124 F.4th 218, 230 (3d Cir. 2024). Had the panel considered the principles elucidated by history, it should have recognized that "historical and modern laws have the same 'why': concerns about public safety resulting from minors' impulsivity and their improper usage of firearms." Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 Minn. L. Rev. 3049, 3108 (2024).

Left uncorrected, these errors could improperly undermine the validity of numerous constitutionally valid gun violence prevention laws and threaten public safety. The panel's reasoning would generate substantial questions about even regulations found by the Supreme Court in *Heller* to be "presumptively lawful," 554 U.S. at 626–27 & n.26, which generally post-date the Second Amendment's ratification. As one court explained in the context of gun restrictions regarding people with mental illness—one of *Heller*'s presumptively lawful examples—even if "a formal regulation prohibiting the possession of firearms by the *mentally ill* did not exist at the time the Second Amendment was

enacted," the principles underlying the Second Amendment permit such restrictions. *United States* v. *Gould*, 672 F. Supp. 3d 167, 182–83 (S.D. W. Va. 2023); *cf. Pinales* v. *Lopez*, No. 24-cv-00496 (D. Haw.), ECF No. 45 at 37 ("[T]here is persuasive evidence that young folks' position in society explains the absence of firearms regulations at the Founding. In other words, there was no reason 'why' regulations were necessary."). Yet the panel's logic would seem to compel the conclusion that the lack of prohibitions at the time of the Second Amendment's ratification is dispositive.

The panel's short-sighted search for precisely analogous 1791-era regulations presages an unworkable test on modern "sensitive place" regulations. As the Supreme Court made clear in *Bruen*, strict analogical reasoning is the wrong approach to these restrictions: "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." 597 U.S. at 30. "The constitutional validity of a prohibition on carrying arms aboard aircraft does not turn on whether the eighteenth and nineteenth centuries had analogous regulations of ships and railcars. The search should instead be for the legal principles that govern sensitive places." William Baude

& Robert Leider, *The General-Law Right to Bear Arms*, 99 NOTRE DAME
L. REV. 1467, 1508 (2024).

Taken at face value, the panel's decision could force legislators
to select gun regulations from a static menu of precise analogues to laws
that existed in 1791, thus rejecting the core of *Rahimi*'s holding, rather
than taking the appropriate "nuanced approach" that accounts for laws
addressing "unprecedented societal concerns or dramatic technological
changes." *Bruen*, 597 U.S. at 27.  Remand is needed to acknowledge that
the appropriate inquiry entails analyzing "why and how" a law affects
the ability to bear arms for purposes of lawful self-defense and comparing
that "why and how" to historical "principles," not searching for circa-1791
twins.  *Rahimi*, 602 U.S. at 692.  Only this more flexible approach can
effectively apply "the balance struck by the founding generation to
modern circumstances." *Id.*

**B.    Further Factual Development Is Needed to Assess
Historical Analogues.**

Further development of the factual record is required to
properly consider whether the Pennsylvania Laws fit within historical
tradition, as *Rahimi* directs.  As the panel acknowledged, only a "sparse
record" was developed in the district court under an entirely different

legal regime before *Bruen* and *Rahimi* were decided. (Panel Op. 33.) By comparison, other federal courts considering similar laws have benefited from robust records, including expert reports.

For instance, after the Supreme Court issued its opinion in *Bruen*, the Ninth Circuit, sitting *en banc*, vacated a pre-*Bruen* panel opinion on a minimum-age law and remanded the case to the district court. *Jones* v. *Bonta*, 47 F.4th 1124, 1125 (9th Cir. 2022). In the district court, the parties engaged in extensive discovery, developing a record that included a catalogue of historical laws and regulations and numerous expert reports. *See* No. 19-cv-01226 (S.D. Cal.), ECF Nos. 133, 134, 140. The roster of experts included multiple American history scholars who provided opinions on historical access to firearms by those under the age of 21, a gun crime expert who provided opinions on the relationship between access to guns and violent crimes, and an expert who reported on the unique dangers that 18-to-20-year-olds pose in relation to gun violence. *Id.* Likewise, in *National Rifle Association of America* v. *Swearingen* (No. 21-12314), the Eleventh Circuit considered a minimum-age law after both parties had the opportunity to develop a record, including compilations of Founding-era laws, historical

Congressional reports, and expert reports on public safety, criminology, and adolescent brain development. *See* No. 18-cv-00137 (N.D. Fla.), ECF Nos. 106, 108. Further, in *Pinales* v. *Lopez*, the district court denied the plaintiff's request for a preliminary injunction, relying in part on the state's expert evidence related to "historical firearm regulations, evidence about mass shootings, and developmental neuroscience and psychology." No. 24-cv-00496 (D. Haw.), ECF No. 45 at 6.

This Court should at least vacate the panel decision and remand to the district court so that the parties can develop the record necessary to conduct the thorough historical analysis mandated by the Supreme Court in *Bruen* and *Rahimi*.

## II.  The Pennsylvania Laws Fit Within the Historical Tradition of Regulating Groups Posing a Heightened Risk of Violence When Armed.

Development of a robust record of historical evidence before the district court would reinforce the constitutionality of the Pennsylvania Laws, which are consistent with the nation's history of regulating persons who present a heightened danger to the public when

armed.[2]  Neuroscience and social science research confirm that 18-to-20-year-olds with access to firearms pose a substantial risk of danger to themselves and others, mirroring the justification for long-standing regulations of other highly dangerous cohorts.

As the Supreme Court has recognized, the human brain does not finish developing until the mid-to-late twenties.  *See Miller* v. *Alabama*, 567 US 460, 471–72 n.5 (2012); *Graham* v. *Florida*, 560 U.S. 48, 68 (2010).  The last part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[3]  Because of 18-to-20-year-olds' well-documented impulsivity, they pose a heightened risk of dangerousness to themselves and others when armed.[4]

_____

[2] As the Commissioner explains, there is a long-standing tradition of age-based restrictions on 18-to-20-year-olds' use of firearms in public.  (Pet. Br. 2–6.)  *Amici* submit this brief to provide additional context regarding how that history fits within the broader tradition of regulating dangerous groups' access to firearms.

[3] Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE & TREATMENT 449, 453, 456 (2013).

[4] *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014).

National data also shows dramatically higher rates of violent crime in this age cohort:

- Arrests for homicide, rape, and robbery are higher among 18-to-20-year-olds than older adults.[5]

- Though 18-to-20-year-olds make up less than 5% of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[6]

- 18-to-20-year-olds account for more than 12% of property crime arrests.[7]

The following chart, showing the homicide offense rate by age in 2009, illustrates the disproportionate share of homicides committed by 18-to-20-year-olds:[8]

---

[5] U.S. Dep't of Just., *Crime in the United States*, Arrests by Age, 2019, tbl.38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38 (last visited Feb. 18, 2025).

[6] *Id.*; U.S. Census Bureau, *Annual Estimates of the Resident Population by Single Year of Age and Sex: April 1, 2020 to July 1, 2023*, National Population by Characteristics: 2020–2024 (last visited Feb. 18, 2025), https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-detail.html.

[7] *Crime in the United States*, *supra* note 5.

[8] Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POL'Y & RSCH. 1, 5 (2012).



The 18-to-20-year-old age group is also uniquely likely to commit mass shootings, which traumatize whole communities and have an outsized impact on perceptions of public safety.[9]  Experts have noted a "very big cluster of young people" among mass shooting perpetrators.[10]  Many recent mass shootings involve 18-to-20-year-old perpetrators.  On July 13, 2024, for example, a 20-year-old fired multiple shots at President Trump during a rally in Butler, Pennsylvania, wounding him,

---

[9] Sarah R. Lowe & Sandro Galea, *The Mental Health Consequences of Mass Shootings*, 18 TRAUMA, VIOLENCE, & ABUSE 62, 79 (2017).

[10] Glenn Thrush & Matt Richtel, *A Disturbing New Pattern in Mass Shootings: Young Assailants*, N.Y. TIMES (June 2, 2022), https://www.nytimes.com/2022/06/02/us/politics/mass-shootings-young-men-guns.html.

killing one spectator, and critically wounding two others.[11]  Earlier this year, on January 12, 2025, an 18-year-old in Beaver County, Pennsylvania shot and killed his parents, his 16-year-old brother, and himself.[12]

Access to guns among this age cohort also exacerbates suicide risk.  Eighteen-to-twenty-year-olds are more likely than older adults to develop and act upon suicidal impulses.  Many major psychiatric conditions first develop in adolescence,[13] and, in the past decade, suicide was the third most common cause of death among 18-to-20-year-olds.[14] Impulsivity and propensity toward negative emotional states puts young

---

[11] Michael Levenson, *What We Know About the Assassination Attempt Against Trump*, N.Y. TIMES (July 30, 2024), https://www.nytimes.com/article/shooting-trump-rally.html.

[12] Garrett Behanna et al., *Shooting That Left 4 People Dead in North Sewickley Township Was a Triple Murder-Suicide, DA Says*, CBS NEWS (Jan. 14, 2025), https://www.cbsnews.com/pittsburgh/news/2-people-dead-2-others-injured-shaffer-road-north-sewickley-township-beaver-county/.

[13] Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVS. NEUROSCIENCE 947, 952 (2008).

[14] Ctrs. for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), *Leading Cause of Death Reports, 1981–2020*, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html (last visited Feb. 18, 2025).

people at particular risk of suicide, which "is commonly an impulsive act by a vulnerable individual."[15]  These impulsive acts are particularly deadly when mixed with easy access to firearms.  In 2021, more than half of the 2,735 suicide deaths among U.S. 16-to-20-year-olds involved firearms.[16]  Suicide by firearm has the highest fatality rate of any method—while 4% of non-firearm suicide attempts are fatal, 85% of suicide attempts with a gun are fatal.[17]  Laws regulating this age cohort's access to guns can prevent many of those tragic deaths.

## CONCLUSION

The panel's decision ignored the principles underlying the nation's history and tradition of regulating access to guns for 18-to-20-year-olds and persons deemed particularly dangerous when armed.  In doing so, it adopted an overly stringent analysis that cannot be squared

---

[15] E. Michael Lewiecki & Sara A. Miller, *Suicide, Guns, and Public Policy*, 103 AM. J. PUB. HEALTH 27, 27 (2013).

[16] RAND Corp., *The Effects of Minimum Age Requirements*, https://www.rand.org/research/gun-policy/analysis/minimum-age.html (last updated July 16, 2024).

[17] Matthew Miller et al., *Suicide Mortality in the United States*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

with *Rahimi*.  The decision threatens to upend numerous other constitutional gun regulations.  Rehearing is thus warranted.

Dated:  February 18, 2025

*Of Counsel for* Amicus Curiae
*Giffords Law Center to Prevent
Gun Violence:*

Esther Sanchez-Gomez
Kelly M. Percival
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA  94104
(415) 433-2062

Robert A. Sacks
Leonid Traps
Madeline B. Jenks
Sophie A. Kivett
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
(212) 558-4000

Elizabeth A. Rose
SULLIVAN & CROMWELL LLP
1700 New York Avenue NW
Suite 700
Washington, DC  20006
(202) 956-7500

Respectfully submitted,

/s/ *Jim Davy*
Jim Davy (PA # 321631)
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA  19125
(215) 792-3579
jimdavy@allriselaw.org

*Counsel for* Amici Curiae *Giffords
Law Center to Prevent Gun
Violence, Brady Center to Prevent
Gun Violence, and March for Our
Lives Action Fund*

*Of Counsel for* Amicus Curiae
*Brady Center to Prevent Gun
Violence:*

Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN
VIOLENCE
840 First Street NE, Suite 400
Washington, DC  20002
(202) 370-8100

*Of Counsel for* Amicus Curiae
*March For Our Lives Action Fund:*

Ciara Malone
March For Our Lives Action Fund
90 Church Street # 3417
New York, NY  10008
(913) 991-4440

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I certify that this brief:

(i) complies with the type-volume limitation of Rule 29(b)(4) because it contains 2,593 words, excluding the parts of the brief exempted by Rule 32(f);

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font; and

(iii) was scanned for viruses prior to submission.

## CERTIFICATE OF BAR MEMBERSHIP

I certify pursuant to L.A.R. 28.3(d) that I am a member in good standing of the Bar of the Third Circuit.


/s/ *Jim Davy*
Jim Davy

Dated:  February 18, 2025

# CERTIFICATE OF SERVICE

I certify that on February 18, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Jim Davy*
Jim Davy

Dated:  February 18, 2025